UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

```
UNITED STATES OF AMERICA,    )
                 Plaintiff,  }
     vs.                     }
                             }   SACR-10-70-CJC
HARSHAD SHAH,                )
                 Defendant.  }   VOLUME 2
---------------------------}
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

July 16, 2015


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
1    APPEARANCES OF COUNSEL:

2    EILEEN M. DECKER
     United States Attorney
3    DENNISE D. WILLETT
     Assistant United States Attorney
4    Chief, Santa Ana Branch Office
     JENNIFER L. WAIER
5    Assistant United States Attorney
     8000 United States Courthouse
6    411 West Fourth Street
     Santa Ana, CA  92701
7    (714) 338-3500

8    For the Defendant:

9    MICHAEL M. SEVERO
     THE SEVERO LAW FIRM
10   70 South Lake Avenue, Suite 945
     Pasadena, CA  91101
11   (626) 844-6400

12   DANIEL W. LAYTON
     WILSON TAX LAW GROUP, APLC
13   10832 Lemon Drive, Suite C609
     Yorba Linda, CA  92886
14   (714) 463-4430

15   JOSEPH P. WILSON
     WILSON TAX LAW GROUP, APLC
16   18032 Lemon Drive, Suite C609
     Yorba Linda, CA  92886
17   (714) 463-4430

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1

 2                            I-N-D-E-X

 3    PLAINTIFF'S
      WITNESSES:            DIRECT    CROSS    REDIRECT   RECROSS
 4
      (None)
 5
      PLAINTIFF'S
 6    EXHIBITS:                                MARKED     RECEIVED

 7    (None)

 8    DEFENSE
      WITNESSES:            DIRECT    CROSS    REDIRECT   RECROSS
 9
      MICHAEL HAM
10      (Continued)           4        42        66         73
      TED MEYER               74       105       112
11    RICHARD SPEIER         115       124       128

12    DEFENSE
      EXHIBITS:                                 MARKED     RECEIVED
13
14    Exhibit 28                                             70
      Exhibit 73, pages 1 and 2                             142
15

16

17

18

19

20

21

22

23

24

09:01  25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

4

```
 1    SANTA ANA, CALIFORNIA; THURSDAY, JULY 16, 2015; 12:34 P.M.

 2              {Jury present.}

 3              THE COURT:  Please be seated, ladies and

 4    gentlemen.

 5              Are you ready?

 6              MR. SEVERO:  Thank you, Your Honor.

 7         MICHAEL HAM, DEFENSE WITNESS, PREVIOUSLY SWORN

 8                    DIRECT EXAMINATION (Continued)

 9    BY MR. SEVERO:

10    Q    Good afternoon, sir.  At the break we were discussing

11    your lack of memory regarding a request for a break.  Do you

12    recall that?

13    A    Yes, I do.

14    Q    May I ask you to refer to Defense Exhibit 53.  I think

15    it's the -- yes.  Do you have it in front of you?

16    A    Yes, I do.

17    Q    The first -- if you could turn to the third page of

18    that exhibit, and I'm going to ask you to read the middle --

19    it's set out in sections; correct?

20    A    Correct.

21    Q    The middle section.

22    A    Where it starts "I tried?"

23    Q    Yes.  Just read it to yourself.  Actually it starts a

24    little higher up where it says "Message by."

25    A    Okay.
```

Time stamps (left margin):
- 12:29 — line 8
- 01:00 — line 9
- 01:00 — line 10
- 01:01 — line 11
- 01:01 — line 12
- 01:01 — line 13
- 01:01 — line 14
- 01:01 — line 15
- 01:02 — line 16
- 01:02 — line 17
- 01:02 — line 18
- 01:02 — line 19
- 01:02 — line 20
- 01:02 — line 21
- 01:02 — line 22
- 01:02 — line 23
- 01:02 — line 24
- 01:03 — line 25

01:03   1   Q    Have you had an opportunity to review that document?

01:03   2   A    Yes, I have.

01:03   3   Q    Does it refresh your recollection regarding your

01:03   4   request for a mental holiday?

01:03   5   A    I don't remember meeting with Dr. Silver, but this is

01:03   6   accurate, I'm sure.  I mean, I can't remember it.  It isn't

01:03   7   that I didn't do it.  This sounds like what I was going

01:03   8   through at the time, yeah.

01:03   9   Q    And that was on July 5th of 2008 --

01:03  10   A    That's correct.

01:03  11   Q    -- is that correct?

01:03  12   A    That's correct.

01:03  13   Q    So you had been back to work for a period of time?

01:03  14   A    Yeah.

01:03  15   Q    You were going through training again?

01:03  16   A    Right.

01:03  17   Q    And this is already causing you some mental

01:04  18   difficulties?

01:04  19   A    Yeah.  One of the main reasons I had trouble during

01:04  20   training was we traveled.  We had training in Oakland.  Then

01:04  21   we came home for a little bit.  We traveled to Seattle, came

01:04  22   home for a little bit.  And then we traveled again to

01:04  23   Oakland and then came home.  I don't travel well.  My wife

01:04  24   loves to travel.  I hate to travel.  I stay home.  I am a

01:04  25   home body.

01:04   1    Q     Just a moment, sir, because we need to do a question

01:04   2    and answer.

01:04   3    A     I'm sorry.

01:04   4    Q     This was causing you stress?  You needed a break --

01:04   5    A     Yes.  The pressure of the training was causing me

01:04   6    stress, and then being away from home.

01:04   7    Q     Right.  Let me just tell you this.  We need to do this

01:04   8    one at a time.  Sometimes -- I think you need to be closer

01:04   9    to the microphone.  I'm not hearing you and I think

01:04   10   you're --

01:04   11   A     How's that?  Is that better?

01:04   12   Q     That's perfect.  Thank you, sir.

01:04   13         Do you recall if you got your mental break --

01:04   14   mental holiday?  I'm sorry.

01:05   15   A     No, because I was in a training phase, and you can't

01:05   16   take any time off.  That's the part of the thing.

01:05   17   Q     The training phase you were in was the 1040, 1120,

01:05   18   flow-through stuff?

01:05   19   A     This would have been, I think it was, phase two of

01:05   20   training in July, and this would have been still basic 1040,

01:05   21   I think, as I remember.

01:05   22   Q     All right.  During the time -- well, let me do this.

01:05   23   You were assigned to do the corporate audit for Dr. Shah; is

01:05   24   that correct?

01:05   25   A     The S corporation, yes.

01:05  1  Q    And you were still in training at the time; correct?

01:05  2  A    At that time I had -- we were just going into phase

01:06  3  four S corp partnership training.

01:06  4  Q    So you are assigned the corporate audit when your

01:06  5  training on corporate returns is just starting?

01:06  6  A    In other words, we are assigned the cases.  We review

01:06  7  them.  We send out initial contact things, and then we go to

01:06  8  training.

01:06  9  Q    Okay.  So was this audit assigned to you as part of

01:06  10  your training?

01:06  11  A    That's correct.  It was a training case.

01:06  12  Q    It was a training case.  So you had a coach --

01:06  13  A    Yes.

01:06  14  Q    -- that was helping you with that?

01:06  15  A    Yeah.  She oversaw me.

01:06  16  Q    That would be Ms. Henry?

01:06  17  A    Correct -- Rena, yes.

01:06  18  Q    You had been away from audits for quite a while?

01:06  19  A    About seven years.

01:06  20  Q    And this is a training case that's assigned to you;

01:06  21  correct?

01:06  22  A    Correct.

01:06  23  Q    All right.  So out of the gate, you draw a complaint

01:06  24  from the taxpayer; correct?

01:06  25  A    Yes, sir, a phone call.  Yes, sir, that's correct.

01:06  1   Q    The first call that Dr. Shah made to you --

01:07  2   A    That's correct.

01:07  3   Q    -- later developed into a complaint to the Dallas Call

01:07  4   Center; correct?

01:07  5   A    That's correct.

01:07  6   Q    And, of course, that was also pretty stressful for you?

01:07  7   A    By then I had adjusted in.  Plus we weren't traveling

01:07  8   anymore, so I felt a lot more comfortable.

01:07  9   Q    How many complaints had you drawn in your career with

01:07  10  the IRS?

01:07  11  A    You mean formal complaints?

01:07  12  Q    Yes, sir.

01:07  13  A    None that I know of.

01:07  14  Q    Would this have been the first?

01:07  15  A    Yes, but I don't know if it was formalized or not.

01:07  16  Q    All right.  So let's not put labels on it.  Complaints

01:07  17  of any type.  Before Dr. Shah complained about you, was

01:07  18  there a -- do you recall any other complaints?

01:07  19  A    Occasionally.  Taxpayers don't want to be audited.  I

01:07  20  know that sounds change, but, you know -- we're not very

01:08  21  popular.

01:08  22  Q    But a complaint such as this where you actually got

01:08  23  pulled into the supervisor's office; correct?

01:08  24  A    Yes.  I believe that's the second or third time that

01:08  25  happened in the whole time I have been with the IRS.

01:08   1   Q    But after your return from disability, this was the
01:08   2   first time you had drawn a complaint?
01:08   3   A    That's correct.
01:08   4   Q    And it was a pretty adversarial kind of setting between
01:08   5   you and Dr. Shah for a while there; correct?
01:08   6   A    On his part, yes.
01:08   7   Q    You had no problems with it?
01:08   8   A    I have been yelled at plenty, so it's not -- I can
01:08   9   understand where he is coming from, to be honest with you.
01:08  10   Q    You can understand where he is coming from because?
01:08  11   A    I hate it when I get audited.
01:09  12   Q    Let me ask you this.  Didn't you in fact in at least
01:09  13   one or more conversations actually hang up on Dr. Shah?
01:09  14   A    I ended the call twice.
01:09  15   Q    I'm sorry?
01:09  16   A    I ended the call and hung the phone up twice.
01:09  17   Q    In one session?
01:09  18   A    Yes -- over probably an hour period.  He called several
01:09  19   times.
01:09  20   Q    Did you think that was proper?
01:09  21   A    Under the circumstances I did, yes.
01:09  22   Q    All right.  But for a revenue agent was that proper?
01:09  23   Is that something that you're trained on?
01:09  24   A    We're not really trained on that, but I had spoken to
01:09  25   Dr. Shah and he was looking for an extension.  In the first

01:09  1    conversation he was two months out, which is longer than

01:09  2    normal.  It's like -- that's almost seven weeks longer than

01:09  3    normal.  I gave him an additional two weeks.

01:09  4            Then when he was saying that wasn't enough, I

01:09  5    explained to him this is the most I can give you.  If you

01:10  6    have something else to talk about, we can talk about it, but

01:10  7    this has been decided and you have got to go above me to do

01:10  8    it anymore.  And if your next question is not about

01:10  9    something other than --

01:10  10   Q    Okay.  I understand that there were circumstances, but

01:10  11   you ended up hanging up on him in that same conversation

01:10  12   twice?

01:10  13   A    Twice.  That's correct, yeah.

01:10  14   Q    At some point you actually made an appointment to see

01:10  15   Dr. Shah at his office?

01:10  16   A    Correct.

01:10  17   Q    At that appointment you brought your coach with you?

01:10  18   A    That's correct.

01:10  19   Q    Because of the bitterness, if you will, between you?

01:10  20   A    Dr. Shah's bitterness, yes.

01:10  21   Q    And that was when you met for the first time.

01:11  22   Ms. Henry, the coach, was only there for 30 minutes or so

01:11  23   because it seemed like you two were working together well?

01:11  24   A    Correct.  She was there for the initial interview only.

01:11  25   When that ended, I don't know if she toured the business

01:11   1   with me or not, but then she left for the day.  I told her
01:11   2   that I thought everything was under control.
01:11   3   Q    Do you recall the date of that first interview?
01:11   4   A    No, I don't.  I can barely remember what I had for
01:11   5   breakfast.
01:11   6   Q    Do you recall if in that first interview Dr. Shah said
01:11   7   anything that you would have considered an overture?
01:11   8   A    No, not at that time.  No.
01:11   9   Q    Do you recall if in that first interview you discussed
01:11   10  any of your mental health issues with Dr. Shah?
01:11   11  A    You know, I can't remember.  I could have.  It could
01:11   12  have been at that one that we discussed or I explained to
01:11   13  him, whatever, that I suffered from major depression.
01:11   14  Q    And was that something you did as a technique to try to
01:12   15  curry favor with the taxpayer?
01:12   16  A    Not his favor.  You always kind of look for common
01:12   17  ground because it's such an adversarial situation.  When I
01:12   18  had done a neuropathy guy a couple of years into when I was
01:12   19  with the IRS, I shared with him that when I weighed
01:12   20  400 pounds, I was a diabetic and was -- in other words, you
01:12   21  are looking for common ground.
01:12   22  Q    Did it occur to you that by discussing your medical
01:12   23  issues with Dr. Shah, you were actually providing
01:12   24  information that was confidential of a doctor/patient
01:12   25  nature?

01:12   1   A   My family is genetically --

01:12   2   Q   I understand, but I need you to answer.

01:12   3   A   I don't consider the information confidential.

01:12   4   Q   You don't?

01:12   5   A   No.

01:12   6   Q   So what you're saying to this jury is that you shared

01:13   7   your mental health disabilities and issues with a

01:13   8   psychiatrist, and it's okay for him to divulge it to the

01:13   9   whole world?

01:13   10  A   I wasn't there as a patient.  We didn't have a

01:13   11  patient/doctor relationship.  I was there as an auditor, and

01:13   12  this was a personal aside that I willingly provided.

01:13   13  Q   Did you discuss at that first meeting your first

01:13   14  attempted suicide that you told us about earlier?

01:13   15  A   No.

01:13   16  Q   At some point you did, though?

01:13   17  A   I can't remember, but it could have come up at some

01:13   18  point, yes.

01:13   19  Q   As it turned out, your relationship with him became

01:13   20  pretty friendly; is that true?

01:13   21  A   I would say cordial, yes.

01:13   22  Q   Well, I mean, cordial and friendly enough that you

01:13   23  refer to him as Doc.  Hey, Doc; right?

01:13   24  A   That's correct.  I did.

01:13   25  Q   And he would refer to you as Mike; right?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:13    1    A    That's correct.  Yes.

01:13    2    Q    And this was all due to the ongoing disclosure in large

01:14    3    part of your medical issues?

01:14    4    A    I don't remember it being ongoing.  I remember that I

01:14    5    disclosed it to him, but I think the only conversations

01:14    6    after that about it were when he asked me what medication I

01:14    7    was taking and the dosage.  And he also offered me free

01:14    8    prescriptions and that type of thing.

01:14    9    Q    Okay.  Let me go back for a moment to your training.

01:14   10    Your training required you or taught you that you had to

01:15   11    keep your -- an examiner's record; correct?

01:15   12    A    That's correct.  Yes.

01:15   13    Q    In fact, you were trained twice.  The first time, the

01:15   14    first phase --

01:15   15    A    That's correct.  I went through training twice.

01:15   16    Q    Right.  And you were told that the examiner's record

01:15   17    needed to be complete?

01:15   18    A    Correct.

01:15   19    Q    And it needed to be accurate?

01:15   20    A    Correct.

01:15   21    Q    And you would have to put into that examiner's record

01:15   22    everything that was significant about your job and your

01:15   23    relationship -- strike that.  The training taught you that

01:15   24    your notes and the examiner's record needed to include

01:15   25    everything that was significant about your relationship with

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:15   1   the taxpayer?

01:15   2   A    I don't remember being trained to that, no, but I tried

01:15   3   to do that.  But I didn't put everything into the

01:15   4   record that was -- I mean, in my opinion my discussion with

01:16   5   him on that was not audit related in a sense other than it

01:16   6   was to form this bond, if you will, or understanding.

01:16   7   Q    It was not important for your supervisors who reviewed

01:16   8   the record or for your successors to know how you developed

01:16   9   a common ground?

01:16   10  A    I don't believe in any audit I have ever done that I

01:16   11  have put in the record efforts done to reach a common

01:16   12  ground.

01:16   13  Q    How about bribery overtures?  Is that significant?

01:16   14  A    A bribery overture would be, yes.

01:16   15  Q    And that would be in your record; right?

01:16   16  A    If I thought it was a bribe offer, I would put it in

01:16   17  the record.  That's correct.

01:16   18  Q    All right.  So let me direct your attention to what's

01:17   19  in evidence as Government's Exhibit 15.  That would be the

01:17   20  other binder.  Let me see.  I think it would be the other

01:17   21  black binder.

01:17   22  A    I'm sorry.  Fifteen?

01:17   23  Q    Yes, sir.

01:17   24  A    Okay.  Yes.

01:17   25  Q    Let me direct your attention to November 19th of 2009.

01:17  1   A    Okay.  Yes.

01:18  2   Q    Your statement in the record --

01:18  3             MR. SEVERO:  This is in evidence, so may I

01:18  4   publish?

01:18  5             THE COURT:  You may.

01:18  6             MR. SEVERO:  Thank you.

01:18  7   BY MR. SEVERO:

01:18  8   Q    It would be the November 19th entry that says

01:18  9   that TMP -- being the taxpayer; correct?

01:18  10  A    That's correct -- tax matters person.

01:18  11  Q    Right -- related examination regarding the revenue

01:18  12  agent's discussion with TIGTA and his overtures of, quote,

01:18  13  unquote, "settling this matter"?

01:18  14  A    Correct.

01:18  15  Q    Is that what he said to you?  I mean, you put it in

01:18  16  quotes.

01:18  17  A    I believe those were his exact words if I put them in

01:18  18  quotes.  But this had sort of been going on with job offers

01:18  19  and prescription offers and things like that before that.

01:18  20  Q    Did you not -- did you believe that the job offers were

01:19  21  bribery overtures?

01:19  22  A    No, I didn't.  I have had that happen before on other

01:19  23  audits, and you explain to them that legally and morally you

01:19  24  can't do that because it's a conflict of interest and it's

01:19  25  illegal, and you just push them aside like that.  No, I

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:19  1   can't work for you.  When he offered the prescriptions, I
01:19  2   told him:  I get free prescriptions from Kaiser.  Why would
01:19  3   I need them from you even?
01:19  4   Q    You didn't consider those bribery overtures?
01:19  5   A    Not at that time, no.
01:19  6   Q    You didn't call TIGTA at that time?
01:19  7   A    I did not call TIGTA at that time.
01:19  8   Q    By the way, you have been trained that when you receive
01:19  9   a bribery overture, you should call whom?
01:19  10  A    TIGTA.
01:19  11  Q    Should you go to your manager?
01:19  12  A    No.  TIGTA first.
01:20  13  Q    So your -- you go to a bribery awareness seminar at
01:20  14  some point; correct?
01:20  15  A    Correct.  Yes.
01:20  16  Q    When did that happen?
01:20  17  A    I don't know the date of it, but it was right before
01:20  18  these occurrences.
01:20  19  Q    Right before?
01:20  20  A    Yes.
01:20  21  Q    Which occurrences?
01:20  22  A    It was before the 16th.
01:20  23  Q    Of what?
01:20  24  A    I'm sorry.  That same page, November 16, 2009.  It was
01:20  25  probably within the week before that period.  I'm not

01:20  1  positive, though.

01:20  2  Q    Now, you received these -- another job offer again on

01:20  3  November 19th? because it says settling the matter.  The

01:20  4  page doesn't say what the overture was.  All you said was

01:20  5  that there were overtures of settling the matter.  Did you

01:20  6  mean in your note to imply that these overtures of settling

01:21  7  the matter were improper overtures or bribery overtures?

01:21  8  A    On the 11/16 in quote marks I put --

01:21  9  Q    I think you're talking about 11/19.

01:21  10  A    No.  I'm reading 11/16, tax matters partner stated he's

01:21  11  making progress and gathering both income, and taxpayer made

01:21  12  an overture to RA, in quotes, after the audit is over,

01:21  13  perhaps you could come work with me part time or I could

01:21  14  give your wife a job.

01:21  15  Q    Right.  Now, before your bribery overture seminar, you

01:21  16  had brushed these things aside?

01:21  17  A    That's correct.

01:21  18  Q    Then you go to the seminar.  Do you recall who gave the

01:21  19  seminar?

01:21  20  A    It was one of the TIGTA -- I don't know his name, but

01:21  21  it was one of the --

01:21  22  Q    It wasn't Mr. Gomez?

01:21  23  A    No, it wasn't Mr. Gomez, and it wasn't the gentleman

01:21  24  that's the head of it in the back there either.  It was

01:21  25  another TIGTA officer or special agent.

01:21  1   Q    All right.  So when you called TIGTA, they asked you to

01:22  2   send an e-mail; right?

01:22  3   A    Yes.

01:22  4   Q    Was that after you made contact with Agent Gomez?

01:22  5   A    Yes, it was.

01:22  6   Q    He asked you to sum up what had been said?

01:22  7   A    Correct.

01:22  8        MR. SEVERO:  Your Honor, Defense Exhibit 13 I

01:22  9   believe is in.

01:22  10       THE COURT:  I believe it is.  That sounds

01:22  11  familiar.  What is that?

01:22  12       MR. SEVERO:  It's a copy of an e-mail from Mr. Ham

01:22  13  to Mr. Gomez.

01:22  14       THE COURT:  Yes, that is in.

01:22  15  BY MR. SEVERO:

01:22  16  Q    Do you have that in front of you?

01:22  17  A    Yes, sir.

01:22  18  Q    Directing your attention to Defense Exhibit 13, and

01:23  19  actually what I want to do is direct your attention to the

01:23  20  second line starting with "TPH."  Do you see that?

01:23  21  A    Yes.

01:23  22  Q    Right here (indicating)?

01:23  23  A    Yes.

01:23  24  Q    The taxpayer has been alluding to getting this matter

01:23  25  settled and:  "What can you do for me?" in quotes?

01:23   1   A     Right.

01:23   2   Q     That's what he was saying; right?

01:23   3   A     Yeah.

01:23   4   Q     Mike, what can you do for me?

01:23   5   A     Correct.

01:23   6   Q     Rather not what he could do for you but what you could

01:23   7   do for him?

01:23   8   A     To reach an agreement, yes.

01:23   9   Q     Okay.  So then your -- is this e-mail the first time

01:23   10  you had had a conversation with Agent Gomez?

01:24   11  A     That's my recollection.  I called TIGTA the day before

01:24   12  and left a message that I had been -- that I had what I

01:24   13  thought was a bribe attempt, whatever.  And Mr. Gomez, Agent

01:24   14  Gomez, called me back the next day and left a voicemail, and

01:24   15  then he called back after the voicemail.

01:24   16  Q     All right.  You explained to the taxpayer that it would

01:24   17  be a conflict to have you work for him; correct?

01:24   18  A     That's correct.  I told him it was illegal and a

01:24   19  conflict of interest.

01:24   20  Q     All right.  So at some point you get together with

01:24   21  Agent Gomez?

01:24   22  A     I believe it was a telephone conversation, yes, to

01:24   23  start with.

01:24   24  Q     Did he tell you what he wanted to do?

01:25   25  A     Yes.  He told me to summarize the case in an e-mail and

01:25  1   send it to him.

01:25  2   Q    Is that the e-mail, that Exhibit 13 that I showed you?

01:25  3   A    Yes, I believe it is.

01:25  4   Q    And then after that, did he tell you how he wanted to

01:25  5   proceed?

01:25  6   A    No.

01:25  7   Q    Did he tell you to go forward with your report?

01:25  8   A    Correct, with the audit.

01:25  9   Q    And did he ask you to send him a copy of the report?

01:25  10  A    At some point he did.  He asked me when it was

01:25  11  finalized to let him know, and at that time he asked for a

01:25  12  copy or a summary of the report.

01:25  13  Q    Did he ever tell you that he was concerned about your

01:25  14  integrity as a revenue agent?

01:25  15  A    Never brought it up, no.

01:25  16  Q    Did he tell you what the objective of the investigation

01:25  17  would be?

01:25  18  A    It was never vocalized, but I think we both knew -- or

01:25  19  I knew anyway.

01:26  20  Q    The objective was to get Dr. Shah to actually commit

01:26  21  bribery?

01:26  22  A    I don't believe that was my objective, but it was the

01:26  23  objective of the whole thing.

01:26  24  Q    TIGTA?  It was TIGTA's objective?

01:26  25  A    Well, it's the IRS's objective.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:26 1   Q    So as a revenue -- you were representing the IRS in

01:26 2   this?

01:26 3   A    That's correct.

01:26 4   Q    So essentially -- your integrity is not in question, so

01:26 5   the only thing you had to focus on was trying to get

01:26 6   Dr. Shah to make the bribery payment?

01:26 7   A    No.  I wasn't trying to make him do anything.  I was

01:26 8   trying to settle the case.

01:26 9   Q    You weren't trying to get him to make a bribery offer?

01:26 10  A    No.  In a sense he had already made the offers.

01:26 11  Q    Right.  Exactly.  So he made the offer, so why not stop

01:26 12  there?

01:26 13  A    Because we have to finish the report.  Up to that point

01:27 14  he had done nothing that I thought was criminal, so I had no

01:27 15  problem continuing with the RAR, the revenue agent report.

01:27 16  Q    You didn't asked to be released from the case because

01:27 17  of these conversations; correct?

01:27 18  A    No.

01:27 19  Q    But once you get Agent Gomez in, the direction of this

01:27 20  thing changed; correct?

01:27 21  A    No.

01:27 22  Q    Well, let's see.  At this point you were being asked to

01:27 23  monitor the phone calls?

01:27 24  A    That's correct, but the --

01:27 25  Q    Hold on.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

22

01:27  1    A    I'm sorry.

01:27  2    Q    You weren't monitoring the phone calls before Agent

01:27  3    Gomez got in?

01:27  4    A    That's correct.  Yes, that's correct.

01:27  5    Q    And did he tell you what the objective of monitoring

01:27  6    the phone calls would be?

01:27  7    A    Yeah, to see -- to capture if Dr. Shah offered a bribe.

01:27  8    Q    Right.

01:27  9    A    In other words, not a suggestion of a bribe but a

01:27  10   bribe.

01:27  11   Q    And in order to do that, you needed the audit report to

01:28  12   go out to Dr. Shah; correct?

01:28  13   A    Yes.  I believe it was a revised audit report because I

01:28  14   had already given him one or two before that.

01:28  15   Q    Well, do you recall telling him on the phone on a

01:28  16   monitored call what the figures were?

01:28  17   A    On the revised report, yes, I do.

01:28  18   Q    And do you recall him saying, Mike, you're killing me

01:28  19   on this?

01:28  20   A    Yes, I do.

01:28  21   Q    But in that first call on January 5th, there was no

01:28  22   bribery overture that you can recall; correct?

01:28  23   A    I don't remember the conversation.  I'd have to read

01:28  24   the transcript of the conversation.  I don't recall.

01:28  25   Q    Well, maybe we can do that.  That would be Exhibit 3 --

01:28  1    let me see.  Yes, Exhibit 3-A, Government's Exhibit 3-A.
01:28  2    And I think the --
01:28  3              MR. SEVERO:  Your Honor, I think the ladies and
01:28  4    gentlemen of the jury have a copy of the transcript.
01:29  5              THE COURT:  I believe they do.
01:29  6              THE WITNESS:  3-A?
01:29  7    BY MR. SEVERO:
01:29  8    Q    3-A.  That's 3.  You're looking at 3.
01:29  9    A    I am looking at 3, yes.
01:29  10   Q    There is another tab right after that.
01:29  11   A    Okay.
01:29  12   Q    Do you have 3-A?
01:29  13   A    Yes, I have 3-A.
01:29  14   Q    I am going to direct your attention starting at page 3
01:29  15   at the bottom, line 26:  All right.  And it comes out to
01:30  16   total with tax, license, and interest -- I think you were
01:30  17   joking about that; right?  There is no license?
01:30  18   A    You're correct.  There's no license.  I probably meant
01:30  19   to say penalty.
01:30  20   Q    Okay.  So -- tax, license, and interest, it's $410,000
01:30  21   for 2006, 2007, 2008?
01:30  22   A    Correct.
01:30  23   Q    Then when you turn the page, it's when he makes a
01:30  24   statement; correct?
01:30  25   A    Yes.

01:30   1   Q     Now, is it your testimony -- he makes a statement
01:30   2   about:  Mike, you're going to kill me; correct?
01:30   3   A     Yeah.  Okay.
01:30   4   Q     Is it your testimony that before this date, you had
01:30   5   floated a figure to him?
01:30   6   A     Yes.  He had been issued a revenue agent report before
01:30   7   this.  I don't know the date.  It's in the case history.
01:30   8   But this was a revised -- I don't remember for exact, but I
01:30   9   know it was at least the second revision if not the third.
01:30   10  But I can't remember.
01:30   11  Q     Good.  So the first one was what?
01:31   12  A     I don't know.  I don't have it.
01:31   13  Q     Was it higher than this revised?
01:31   14  A     Sir, this was five years ago.  I can barely remember
01:31   15  what I had for breakfast today.
01:31   16  Q     All right.  So in your earlier reports that you had
01:31   17  disclosed to him, was he also distraught to the point where
01:31   18  he said this is going to kill me?
01:31   19  A     No -- I don't remember that, no.
01:31   20  Q     So only on this one was it that --
01:31   21  A     Yeah.  And one of the reasons this was revised was I
01:31   22  was waiting for additional bank documents.
01:31   23  Q     Right.  I understand that.
01:31   24  A     After I worked those bank documents and got -- I don't
01:31   25  remember exactly what I got out of it, but I think I

01:31   1   probably got additional income.  So that additional taxable

01:31   2   income was added to his gross receipts, which would have

01:31   3   upped the --

01:31   4   Q    Before you had this monitored phone call, did you fax

01:31   5   the report to Agent Gomez?

01:32   6   A    I can't remember.  I know that I faxed him a summary of

01:32   7   it, I think, but I don't know if I actually faxed the report

01:32   8   or not.

01:32   9   Q    Did you run the report by your supervisor before you

01:32   10  sent it out?

01:32   11  A    No.  I never did on any case.

01:32   12  Q    Is this the first time that you had TIGTA involved in

01:32   13  an audit?

01:32   14  A    Yes.

01:32   15  Q    So were you directed when to disclose the report by

01:32   16  TIGTA -- by Agent Gomez?

01:32   17  A    By disclose you mean?

01:32   18  Q    By faxing the report to Dr. Shah.

01:32   19  A    Yes.  TIGTA advised me -- first I had to do additional

01:32   20  audit work.  He said:  When you're done, get the RAR and

01:32   21  call me.  Do not contact the doctor again until you have

01:33   22  talked to me.

01:33   23  Q    Was there a need to rush this report?

01:33   24  A    No.  We were done.  This thing had been going since

01:33   25  March, and now we're into January of the next year.

01:33  1   Q    So if I understand your testimony correctly, you had

01:33  2   been getting these occasional statements about "working for

01:33  3   me" or other such things for six months?

01:33  4   A    Yes.  Yeah.

01:33  5   Q    Approximately?

01:33  6   A    Yeah.  Well, yeah.

01:33  7   Q    Before you brought them to the attention of the TIGTA?

01:33  8   A    That's correct.

01:33  9   Q    And by now you already have a report ready?

01:33  10  A    Revised report, yes.

01:33  11  Q    Now, at the first meeting with Dr. Shah, did he provide

01:33  12  you with a binder full of documents?

01:33  13  A    The only thing -- to my memory the only thing Dr. Shah

01:34  14  provided to me at that first meeting were his -- I believe

01:34  15  they were his corporate credit card statements with

01:34  16  yellow-highlighted or whatever amounts on it.

01:34  17  Q    I am holding up a binder that --

01:34  18  A    I don't remember seeing that, no.

01:34  19  Q    No question pending.

01:34  20  A    I'm sorry.

01:34  21  Q    It's about -- it's a four-inch binder.  It's full of

01:34  22  paper.  Do you remember whether it was a binder like this

01:34  23  that you received on that first meeting?

01:34  24  A    To my memory it was loose credit card statements, but

01:34  25  that was five years ago.

01:34   1    Q    It wasn't anything like this, like what I'm showing

01:34   2    you?

01:34   3    A    I don't remember anything like that, no.

01:34   4         MS. WAIER:  Your Honor, what is that?  Is that

01:34   5    documents from the audit file?

01:34   6         THE COURT:  I think he was just trying to say as

01:34   7    an example of what materials that were supplied to him.

01:34   8    BY MR. SEVERO:

01:35   9    Q    Actually I have a binder full of accounting documents,

01:35   10   patient account ledgers, that I received this morning,

01:35   11   balance sheets and the like.  You never got anything like

01:35   12   this on the first --

01:35   13   A    No.  Dr. Shah's statement was he had no accounting

01:35   14   records, that he had no books.

01:35   15   Q    Dr. Shah was doing his own taxes?

01:35   16   A    Yes, he was.

01:35   17   Q    And he was using Turbo Tax?

01:35   18   A    He was using a tax program.  I'm not sure -- yeah,

01:35   19   probably Turbo Tax.  That's the most popular.

01:35   20   Q    So isn't it a fact that he started requesting his bank

01:35   21   records that you had in your possession from early on in the

01:35   22   audit process?

01:35   23   A    We requested from him bank documents.  He said he

01:36   24   couldn't provide them.  I then summonsed the banks, and then

01:36   25   Dr. Shah after that didn't want the bank to be summonsed and

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:36  1    provided us with some of his bank documents.  Yes.

01:36  2    Q    But you also received the summonsed documents from the

01:36  3    bank?

01:36  4    A    On that time, no, because we called the bank and said

01:36  5    we would willingly quash the summons because he has provided

01:36  6    at least a partial response to what we wanted.  So we will

01:36  7    look at this first and then decide what we're going to do.

01:36  8    Q    All right.  Did he ask you to share with you whatever

01:36  9    documents you had?

01:36  10   A    At that time I don't remember him doing that, no.

01:37  11   Q    Your duty as a revenue agent is to share or to provide

01:37  12   documents to the taxpayer when he requests them; is that

01:37  13   true?

01:37  14   A    That's not totally correct.

01:37  15   Q    All right.  You don't have such a duty?

01:37  16   A    The duty that we have is to provide -- the IRS code

01:37  17   states that taxpayers are responsible for providing records

01:37  18   to substantiate their expenses.  The IRS is responsible for

01:37  19   substantiation of the income.  The IRS as a practice does

01:38  20   not provide anything to the taxpayer from our file that he

01:38  21   already either has or can get from the bank.  We are not a

01:38  22   copy service.

01:38  23   Q    You don't have to do that?

01:38  24   A    That's correct.  That's my understanding.

01:38  25   Q    But you did provide him with documents after the

01:38  1  $30,000 payment?

01:38  2  A    Yeah.

01:38  3  Q    Why did you do that?

01:38  4  A    Because we had discussed –– my trying to take this

01:38  5  report, this revenue agent report, from a $410,000 agreed

01:38  6  amount down to zero is unusual at best.  And my manager,

01:38  7  when she saw that, would have said to me no, no, no.  How

01:38  8  did it go like this?  They're kind of on guard for that kind

01:38  9  of thing.

01:38  10       So what I had asked Dr. Shah to do as part of the

01:38  11  sting was to provide me with documentation.  He said he

01:38  12  had –– a whole bunch of those deposits nontaxable deposits.

01:38  13  They were other things.  So what the taxpayer is asked to do

01:39  14  is provide documentation that they're other things.  He was

01:39  15  going to write me a letter or provide me statements or

01:39  16  whatever explaining away the unreported income, which would

01:39  17  then be more believable that I could get it down to zero.

01:39  18  Q    Let me see if I can get the answer to this question.

01:39  19  What documents did you provide to him after the $30,000

01:39  20  payment?

01:39  21  A    After the $30,000 payment, Dr. Shah went to my trunk

01:39  22  and I allowed him to take a stack of bank documents about

01:39  23  that thick (indicating).

01:39  24       MR. SEVERO:  Indicating, Your Honor, approximately

01:39  25  a foot tall.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:39   1          THE WITNESS:  A foot tall, and he was going
01:39   2   to take them into the Staples store and have them copied
01:39   3   so that he -- it's my thinking he did that so that he
01:39   4   would be able to provide me with the documentation I asked
01:39   5   for.
01:39   6   BY MR. SEVERO:
01:39   7   Q    Mr. Ham, sir, I'm trying to find out what documents
01:39   8   were --
01:39   9   A    Bank statements.  I'm sorry.  They were bank
01:39  10   statements.
01:39  11   Q    Those are bank statements that you had summonsed?
01:39  12   A    A combination of bank statements I summonsed plus bank
01:40  13   statements that he had provided, yes.
01:40  14   Q    Are these documents that you felt you had a duty to
01:40  15   disclose?
01:40  16   A    Well, as part of the sting, yes.
01:40  17   Q    As part of the audit?
01:40  18   A    As part of the audit no.  As I said before, we are not
01:40  19   a copy service.  He could get those -- he is supposed to
01:40  20   have those records as a businessman to start with.  If he
01:40  21   doesn't have them, then he can get them from his bank.
01:40  22   That's the IRS policy, is the taxpayer gets them from the
01:40  23   bank.
01:40  24   Q    So you set up a sting with Mr. Gomez; correct?
01:40  25   A    Yes.

| | | |
|---|---|---|
| 01:40 | 1 | Q   Mr. Gomez set up a sting with you; correct? |
| 01:40 | 2 | A   Yes. |
| 01:40 | 3 | Q   And it was to trap Dr. Shah into making a payment; |
| 01:40 | 4 | correct? |
| 01:40 | 5 | A   Okay.  Yeah, sure. |
| 01:40 | 6 | Q   This sting was directed by Agent Gomez; correct? |
| 01:40 | 7 | A   That's correct. |
| 01:40 | 8 | Q   He told you what to do and what to say; correct? |
| 01:41 | 9 | A   More he told me what to do and what not to say. |
| 01:41 | 10 | Q   Okay.  Were you -- did you have any safety concerns? |
| 01:41 | 11 | A   No, because I think they had six officers on me. |
| 01:41 | 12 | Q   Not only that but you had a very friendly relationship |
| 01:41 | 13 | with Dr. Shah; correct? |
| 01:41 | 14 | A   That's correct, yeah. |
| 01:41 | 15 | Q   And the relationship was developed over time with your |
| 01:41 | 16 | talking about your mental health issues and him talking to |
| 01:41 | 17 | you rather loosely about how things should work? |
| 01:41 | 18 | A   As I said, after that initial conversation where I |
| 01:41 | 19 | disclosed that I had a mental illness, it was brought up by |
| 01:41 | 20 | him after that time with suggestions of either free |
| 01:41 | 21 | prescriptions or free therapy for life, that type of thing. |
| 01:41 | 22 | I don't remember ever bringing it up again after that first |
| 01:41 | 23 | meeting. |
| 01:41 | 24 | Q   When you issued the report, the revised report -- |
| 01:42 | 25 | A   Yes. |

01:42  1   Q    Let's put it this way.  When you issued the report on

01:42  2   around January 5th of 2010, did you have all the

01:42  3   documentation you needed to do the report?

01:42  4   A    Yes, I did.

01:42  5   Q    Did you have all the expenses?

01:42  6   A    Dr. Shah provided no documentation for expenses

01:42  7   whatsoever.

01:42  8   Q    So you didn't?

01:42  9   A    No.  We used a different methodology to arrive at the

01:42  10  expenses.

01:42  11  Q    Your method here was just to simply show up with a 4549

01:42  12  Form and demand a tax payment?

01:42  13  A    That wasn't my methodology, no.

01:42  14  Q    Isn't that what happened, though?  You told him he owed

01:42  15  $410,000 and here's the report.  Pay up -- in installments

01:42  16  perhaps.

01:43  17  A    Yeah, but that isn't how -- in other words, he provided

01:43  18  no documentation for expenses.  We used a different

01:43  19  methodology and determined a national average for what

01:43  20  his expenses should be and gave him that.  In the old days

01:43  21  the IRS would give you zero, but that's not fair.  So they

01:43  22  went to this business standards thing where a taxpayer

01:43  23  would get credit form some expenses even if he had zero

01:43  24  records.

01:43  25  Q    Was part of the sting that you would hold onto the

01:43   1   $410,000 figure at least until he made an offer for money?

01:43   2   A    I don't know.  We went in there.  I took a report to

01:43   3   him, and that's when he offered -- reoffered the 15 and then

01:43   4   a little bit more.

01:43   5   Q    And then it was part of the sting that once he made the

01:43   6   offer, you would reduce that to zero?

01:44   7   A    That's correct.  I redid the report to show zero.

01:44   8   Q    And that was all in line with trying to get Dr. Shah to

01:44   9   come up with money for the bribe?

01:44   10  A    Yes.  That's correct.

01:44   11  Q    I'm going to direct your attention to defense

01:45   12  Exhibit 15.  I think that's in evidence.

01:45   13          MR. SEVERO:  Your Honor, I have defense

01:45   14  Exhibit 15.  I don't recall now --

01:45   15          THE COURT:  It's in.

01:45   16          MR. SEVERO:  Thank you.  May I publish?

01:45   17          THE COURT:  You may.

01:45   18  BY MR. SEVERO:

01:45   19  Q    This is an e-mail from you on January 11th.

01:45   20  A    Yes.

01:45   21  Q    Do you see that?

01:45   22  A    Yes, I do.

01:45   23  Q    You were directed by Agent Gomez to summarize a phone

01:45   24  call that you had received from Dr. Shah; correct?

01:45   25  A    Correct.

01:46   1    Q    Now, do you recall -- let me go back here.  Do you

01:46   2    recall when the first $15,000 offer was made? what date?

01:46   3    A    It's my recollection it was in the initial recorded

01:46   4    phone call I made to Dr. Shah.

01:46   5    Q    Okay.  That's the Exhibit 3-A that you have, the

01:46   6    government's Exhibit 3-A.  And then I am going to represent

01:46   7    to you that it's not on that one.

01:46   8    A    Then my recollection is incorrect.

01:46   9    Q    Okay.  So I'm going to ask you to turn to 4-A.

01:46   10   A    Okay.

01:46   11   Q    And after quite a few pages of discussion here

01:47   12   regarding taxes, which we will get to in a moment, at page 8

01:47   13   do you see that at line 17?

01:47   14   A    Yes.  Okay.

01:47   15   Q    I will give you cash, $15,000.  Do you see that?

01:47   16   A    Yes.

01:47   17   Q    That's the first time that the issue of money came up

01:47   18   with him; right?

01:47   19   A    That's correct.

01:47   20   Q    So on this e-mail, Exhibit 15, that's published before

01:47   21   the jury, you had received a call from Dr. Shah on the 7th;

01:47   22   is that correct?

01:47   23   A    Yeah.

01:47   24   Q    Let me tell you what happened here.  You sent an

01:47   25   e-mail -- it's at the bottom, the bottom portion of the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:47   1    e-mail -- and it had a typo if you will or a word that

01:47   2    wasn't correct.  Then Agent Gomez asked you to revise it and

01:48   3    send it again, which is what you have on top.

01:48   4    A    Okay.

01:48   5    Q    Okay?

01:48   6    A    Yeah.

01:48   7    Q    The bottom one, the mistake is actually on this line

01:48   8    where it says:  Whole thing up tomorrow and then we will

01:48   9    talk about how I will take take of you.  The actual word

01:48   10   should have been take care of you.  You had to make that

01:48   11   correction.  The call came in on the 7th; correct?

01:48   12   A    Correct.

01:48   13   Q    Now, at that point he had not made any kind of payment

01:48   14   offer; is that true?

01:48   15   A    No.  He just referred to in the previous conversations

01:48   16   that he would take care of me.

01:48   17   Q    Right.  And isn't it a fact that he was actually

01:48   18   talking about taking care of you medically?

01:48   19   A    That wasn't the impression I got, because we hadn't

01:48   20   talked about that in a while and I had already told him that

01:48   21   I couldn't take his psychiatric help and that I couldn't

01:48   22   take his prescriptions.

01:49   23   Q    In this e-mail on the 7th, he says:  Michael, you are

01:49   24   killing me.  I need to see the bank records.  Do you see

01:49   25   that?

01:49   1    A    Yes.

01:49   2    Q    Right here.

01:49   3    A    Okay.

01:49   4    Q    Right?

01:49   5    A    Right.

01:49   6    Q    So he requested the bank records from you?  Is that a

01:49   7    request?

01:49   8    A    Yes, it is.

01:49   9    Q    Did you provide them?

01:49   10   A    I didn't at that time, no.

01:49   11   Q    At some point he told you that he wanted you to take

01:49   12   out Schedule C; is that correct?

01:49   13   A    On his personal return, I believe that's correct.

01:49   14   Q    You got the personal return from Ms. Raghaven; right?

01:50   15   That was assigned to you?

01:50   16   A    It was transferred to me, yes.

01:50   17   Q    Was that part of your training as well?

01:50   18   A    No.  Ms. Raghaven received that return as part of a --

01:50   19   I don't know if it was a project, but that was picked up in

01:50   20   what they call a differential score audit that the IRS

01:50   21   looked at it, put it in the computer, and the computer said

01:50   22   this doesn't make sense, that it should be looked at.  She

01:50   23   was assigned it and then she called Dr. Shah to tell him

01:50   24   that she was auditing.

01:50   25   Q    But it was transferred to you then?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:50  1    A    When she found out that he was being audited by me on

01:50  2    the corp, she went to her manager or my manager or whatever,

01:50  3    and it was transferred over to me.

01:50  4    Q    When it was transferred to you, was it a training case

01:50  5    as well, the personal one?

01:50  6    A    No.  It was just a 1040.

01:50  7    Q    All right.  The 1040 wasn't but the corporate was?

01:50  8    A    Yes.  That was the flow-through entity.  It was the one

01:50  9    that originally was being audited.

01:50  10   Q    Right.  You were aware that Dr. Shah had signed a form

01:51  11   872, a consent to extend the statute of limitations?

01:51  12   A    I believe I'm the one that acquired it.

01:51  13   Q    You requested it from him?

01:51  14   A    Yes.

01:51  15   Q    Did he cooperate with that?

01:51  16   A    I can't remember if he cooperated or not.  He signed

01:51  17   it.  So, yes, he cooperated.

01:51  18   Q    Okay.  So by extending to April 2011, you actually had

01:51  19   more time to prepare that report and come to a final

01:51  20   resolution of this thing; is that correct?

01:51  21   A    If I needed the time, yes, that's correct.  Are you

01:51  22   asking why we did the extension?

01:51  23   Q    No.  You did the extension because the statute was

01:51  24   about to run on the 2006 return; right?

01:52  25   A    That's correct, yes.  We only got an 872, I think, on

01:52   1   the 2006.

01:52   2   Q    Right.  But that extension -- and we've seen it earlier

01:52   3   today and I don't need to belabor that -- went to

01:52   4   April 2011?

01:52   5   A    That's common practice, yes.

01:52   6   Q    All right.  So you had plenty of time to allow him to

01:52   7   provide you with information to come to a final resolution;

01:52   8   correct?

01:52   9   A    The information I had been requesting since March of

01:52   10  the prior year, yes.

01:52   11  Q    Right.  Okay.  So what you're saying is he was slow in

01:52   12  bringing the stuff in?

01:52   13  A    What I'm saying is he didn't provide anything.

01:52   14  Q    Well, that's not true.  You said earlier that at the

01:52   15  first meeting he provided some credit card statements.

01:52   16  A    Credit card statements, yeah, and I told him that a

01:52   17  credit card statement alone was not enough because, as he

01:52   18  put it, this is a corporate credit card, therefore all

01:52   19  expenses on it are corporate expenses.

01:52   20       I explained to him that that's not true and that

01:52   21  he has to substantiate that the expenses were actually

01:53   22  business related and not personal.

01:53   23  Q    Did Agent Gomez ask you once you got into the case how

01:53   24  close you were to completing the report?

01:53   25  A    Yes, he did.

01:53  1   Q    Did he tell you to make the completion of the report a

01:53  2   priority?

01:53  3   A    I don't remember him saying that, but I think it was

01:53  4   obvious that it needed to be -- that that case needed to be

01:53  5   pushed up, yes.

01:53  6   Q    Well, do you remember meeting with Mr. Layton and

01:53  7   Mr. Wilson as well as Mr. Speier on June 23rd of 2015?

01:53  8   A    Yes.

01:53  9   Q    Do you remember having said --

01:53  10           MS. WAIER:  Objection, Your Honor.  Improper

01:53  11   impeachment hearsay.

01:53  12           THE COURT:  Overruled.

01:53  13           You may proceed.

01:53  14   BY MR. SEVERO:

01:53  15   Q    Do you remember stating to them that Gomez told you to

01:54  16   make the RAR a priority?

01:54  17   A    Okay.  Yeah.

01:54  18   Q    You said that?

01:54  19   A    If they said I said it, I said it.

01:54  20   Q    Okay.  Did you actually say that?  I mean, did

01:54  21   Mr. Gomez actually say make this a priority?

01:54  22   A    As I said, we were moving the case to the top of the

01:54  23   heap because of the situation.  So, yeah.

01:54  24   Q    You needed to get the sting going, right, and you

01:54  25   needed the report for the sting?

01:54    1    A    That's correct, the revised report for the sting.

01:54    2    Q    All right.  Except for Mr. Gomez's urging you to finish

01:54    3    the report, would you not have taken more time to complete

01:54    4    the report?

01:54    5    A    I got the last dump of bank documents, and I can't

01:54    6    remember the date.  The day that I got that, from my reading

01:54    7    of my case history earlier, I took five hours to process

01:54    8    that last dump of documents and to come up with a revised

01:55    9    gross receipts amount.  So it was done.  That was it.

01:55   10    That's all I needed.

01:55   11    Q    At the same meeting on June 23rd, 2015, with the

01:55   12    gentlemen that I have spoken of, did you not say to them

01:55   13    that but for the urging of Mr. Gomez, you would have taken a

01:55   14    bit longer to complete the report?

01:55   15    A    No.  I don't remember saying that.  We --

01:55   16    Q    No question pending, sir.

01:55   17    A    All right.

01:55   18    Q    Did you tell Dr. Shah that if he didn't agree with the

01:55   19    amount, that he could address the report with appeals, your

01:56   20    manager, or the tax Court?

01:56   21    A    Not in that order, but, yes.

01:56   22    Q    Yes, of course.  It would be the manager, appeals, and

01:56   23    then the tax Court; correct?

01:56   24    A    Correct.  Yeah.

01:56   25    Q    Right.  But you didn't do that because you were in the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:56  1  midst of a sting operation?

01:56  2  A    Well, I only do that if the taxpayer requests that it

01:56  3  be done.  And Dr. Shah did not request to meet with my

01:56  4  manager or to appeal it.

01:56  5  Q    It's fair to say that your normal audit procedures were

01:56  6  discarded once Mr. Gomez became involved in this sting?

01:56  7  A    My normal audit procedures were abandoned after I

01:56  8  completed my audit work and prepared the RAR as I thought it

01:56  9  should be.  After that, my audit work was not standard.

01:56  10 Q    But the fact is you completed the RAR, the report, in

01:57  11 the midst of the sting.  Do you understand me?

01:57  12 A    Yes.  That's correct.

01:57  13 Q    And it is correct?

01:57  14 A    The report?

01:57  15 Q    Yes.

01:57  16 A    I believe it is, yes.

01:57  17 Q    In fact, you were told to go ahead and complete the

01:57  18 report and present it?

01:57  19 A    That's correct.

01:57  20 Q    Because it was necessary for the sting?

01:57  21 A    Okay.  Yes, sir.

01:57  22        MR. SEVERO:  I need a moment, Your Honor.

01:57  23        THE COURT:  All right.

01:57  24        (Pause in proceedings)

01:57  25 BY MR. SEVERO:

01:57  1  Q    A couple more things and then I will turn you over.

01:57  2       Dr. Shah estimated his tax liability to be around

01:58  3  $150,000; is that true?

01:58  4  A    No.  It was 410 total.  I don't know what his tax

01:58  5  liability was, but the total with penalties and interest was

01:58  6  the 410.

01:58  7  Q    That's your report?

01:58  8  A    That's my report.  That's correct.

01:58  9  Q    What I am saying to you is that Dr. Shah's estimate of

01:58  10  what he owed the IRS was around 150; correct?

01:58  11  A    That's correct, 50 a year.

01:58  12  Q    Right.  And he told you:  I'll write you a check for

01:58  13  150, on then we'll take care of you later?  Is that what

01:58  14  happened?

01:58  15  A    That's what he said, yes.

01:58  16  Q    Do you know that he turned out to be reasonably

01:58  17  correct?

01:58  18  A    No, I don't.

01:58  19  Q    That he did owe only 150?

01:58  20  A    I never saw another report after that because I was

01:58  21  taken off the case.

01:58  22  Q    As part of the sting, it was necessary for you to bring

01:59  23  the report to zero in order to get the $30,000 payment?

01:59  24  A    That's correct.

01:59  25  Q    And you did that?

01:59   1    A     I did that per TIGTA's request.

01:59   2              MR. SEVERO:  I have nothing further.

01:59   3                        CROSS-EXAMINATION

01:59   4    BY MS. WAIER:

01:59   5    Q     Good afternoon.

01:59   6    A     Good afternoon.

01:59   7    Q     Did Special Agent Glenn Gomez tell you that you were

01:59   8    working on a sting?

01:59   9    A     That was my paraphrase.  He never said it.

01:59   10   Q     Okay.  And when you contacted him, did he just want to

01:59   11   know what happened?

01:59   12   A     Yeah.

01:59   13   Q     Did he ask you to be truthful and tell him everything

01:59   14   that had happened?

01:59   15   A     Yes, he did.

01:59   16   Q     Did you do that?

01:59   17   A     Yes, I did.

01:59   18   Q     Did you then write an e-mail that we have looked at?

01:59   19   Was that all true and correct?

01:59   20   A     Yes, it is.

02:00   21   Q     In fact, you don't have any personal vendetta against

02:00   22   Dr. Shah; do you?

02:00   23   A     I like Dr. Shah.

02:00   24   Q     You didn't want him to bribe you; did you?

02:00   25   A     No.  I believe I asked him about 12 times during the

| | | |
|---|---|---|
| 02:00 | 1 | sting or whatever you want to call it, I advised him again |
| 02:00 | 2 | and again and again that it's illegal, that we could both go |
| 02:00 | 3 | to jail.  In the back of my heart I guess I was hoping he |
| 02:00 | 4 | would go idle, you know, let's knock this off. |
| 02:00 | 5 | Q    You gave him multiple, multiple times to back away; |
| 02:00 | 6 | right? |
| 02:00 | 7 | A    I said I -- |
| 02:00 | 8 |         MR. SEVERO:  Objection.  Leading. |
| 02:00 | 9 |         THE COURT:  Sustained. |
| 02:00 | 10 |         MS. WAIER:  Your Honor, it's cross-examination. |
| 02:00 | 11 |         THE COURT:  I know. |
| 02:00 | 12 |         MS. WAIER:  Okay. |
| 02:00 | 13 | BY MS. WAIER: |
| 02:00 | 14 | Q    When you called TIGTA, had you asked Dr. Shah for any |
| 02:00 | 15 | kind of benefit or anything? |
| 02:00 | 16 | A    No. |
| 02:00 | 17 | Q    Do you believe that you had a doctor/patient |
| 02:01 | 18 | relationship? |
| 02:01 | 19 | A    No.  Like I said, the only time I mentioned mental |
| 02:01 | 20 | health issue was during the opening day, not at the meeting |
| 02:01 | 21 | but at the opening day. |
| 02:01 | 22 | Q    And after that it was Dr. Shah that was asking you |
| 02:01 | 23 | questions? |
| 02:01 | 24 | A    That's correct. |
| 02:01 | 25 | Q    When you contacted Special Agent Gomez, did he ask you |

02:01   1   where you were in the audit?

02:01   2   A     Yes.

02:01   3   Q     What did you tell him?

02:01   4   A     I told him that -- I'm not sure whether I talked to

02:01   5   Agent Gomez before or after I worked that last bank document

02:01   6   dump, but I explained that I had -- that I was almost done,

02:01   7   that we were just waiting for this one thing and that when I

02:01   8   got that done, we would be done.  Like I said, I don't know

02:01   9   if I had worked that bank stuff before I talked to him or

02:01   10  after.

02:01   11  Q     I just want to do a quick overview.  You started this

02:01   12  case on March 16th, 2009?

02:02   13  A     Correct.

02:02   14  Q     Okay.  And you opened it like you opened any other case

02:02   15  that you have ever done?

02:02   16  A     Standard procedure, yes.

02:02   17  Q     Okay.  And we have heard testimony that you hung up on

02:02   18  Dr. Shah.  Is that true that you hung up on him?

02:02   19  A     I ended the conversation and hung up the phone twice,

02:02   20  yes.

02:02   21  Q     But you did it in a professional manner?

02:02   22         MR. SEVERO:  Objection.  Leading.

02:02   23         THE COURT:  Overruled.

02:02   24         THE WITNESS:  I thought so, yes.  I thought I was

02:02   25  being professional when I explained that I was going to hang

02:02  1   up before I hung up.

02:02  2   BY MS. WAIER:

02:02  3   Q    Then when you had the initial -- and you gave him

02:02  4   plenty of time to put together his books and records for

02:02  5   your May 15th, 2009, meeting; is that right?

02:02  6   A    More than two months.

02:02  7   Q    And that's more than most taxpayers get?

02:02  8   A    Most taxpayers get three weeks.

02:02  9   Q    When you met Dr. Shah on May 15, 2009, was he the same

02:02  10  way with you that he was on the phone?

02:02  11  A    Oh, no.  No.

02:02  12  Q    What was the difference?  How was the difference in

02:03  13  demeanor between the phone call and the meeting?

02:03  14  A    Well, the first thing he did at the meeting was

02:03  15  apologize profusely for the misunderstanding, so to speak,

02:03  16  on the phone, and that he -- you know, let's start fresh and

02:03  17  go from there.  And after that, it was fine.  There was

02:03  18  never another cross word the whole time that we were doing

02:03  19  the audit.

02:03  20  Q    So you had a cordial relationship with Dr. Shah?

02:03  21  A    Correct.

02:03  22  Q    Was it mostly typical, a typical relationship that you

02:03  23  had with other taxpayers you were auditing?

02:03  24  A    For me, yes.

02:03  25  Q    And none of those other taxpayers that you had that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:03   1    kind of relationship has ever bribed you; is that right?

02:03   2    A    As I said, I have had taxpayers offer the job thing and

02:03   3    that kind of thing, but usually it's the one time and you

02:03   4    tell them it's illegal and I can't do and all that, and it

02:03   5    goes away.  In this case it didn't.

02:04   6    Q    Now, we heard on the May 15, 2009, meeting, did

02:04   7    Dr. Shah have all the documents?

02:04   8    A    No.  The only thing Dr. Shah presented to my memory is

02:04   9    those credit card statements I've been talking about, and

02:04   10   that was it for documentation.

02:04   11   Q    Okay.  So even though he had two months, he did not

02:04   12   have the documentation ready?

02:04   13   A    That's correct.

02:04   14   Q    Okay.  And there came a time where you actually had to

02:04   15   issue a summons?

02:04   16   A    Yes.  I think I issued the summons immediately after

02:04   17   that meeting, to my recollection.

02:04   18   Q    Well, before we do that, after that initial meeting you

02:04   19   had a conversation with your coach to expand the audit; is

02:04   20   that right?

02:04   21   A    Yes -- Rena Henry.  Yes.

02:04   22   Q    So it started with the audit of 2007 only; right?  You

02:04   23   had the 2007 return?

02:04   24   A    Correct.  Yeah.

02:04   25   Q    And then it was expanded to 2006, 2007, and 2008?

02:04  1    A    That's correct.  That's standard operating procedure

02:04  2    for us, that you look at the return that's in question.  You

02:04  3    review the prior and subsequent years.  If you see the same

02:05  4    pattern on those prior and subsequent years, instead of

02:05  5    wading all the way through and then having two more audits,

02:05  6    you just combine it all into one.  So you do it right at the

02:05  7    beginning of the audit so it doesn't delay it any more than

02:05  8    it has to.

02:05  9    Q    You talked that with Ms. Henry, and she agreed with

02:05  10   that strategy?

02:05  11   A    Yes, she did.

02:05  12   Q    Shortly thereafter you also received the 1040s?

02:05  13   A    Yes.  That's correct.

02:05  14   Q    And can you tell the jury why that makes sense, that if

02:05  15   you have the corporate return in a case like this, the 1040

02:05  16   is you should also do?

02:05  17   A    The 1120-S is just an S corporation, which stands for

02:05  18   small corporation.  All it is is a glorified self-employed

02:05  19   person.  They incorporate and become a corporation, but the

02:05  20   corporation doesn't pay taxes.  They flow through -- any

02:05  21   profit from that corporation flows from the corporation to

02:05  22   their personal return, and that's where the corporation's

02:05  23   profit or loss is reported -- on their personal return.

02:06  24   Q    So you had -- so now you have three tax years for the

02:06  25   corporation and the 1040s?

02:06   1   A    Correct.  Our procedure was we opened an additional

02:06   2   file for the personal returns because that's a different

02:06   3   return.  It's connected but it's different.

02:06   4   Q    All right.  And then on July 7th you had gotten no

02:06   5   response from document requests, so you prepared and

02:06   6   submitted a summons?

02:06   7   A    Correct.

02:06   8   Q    So, now, we started in March and now we're into July.

02:06   9   A    Right.

02:06   10  Q    Four months and still no documents?

02:06   11  A    Correct.

02:06   12  Q    Do you remember what happened with the summons?

02:06   13  A    When I reread my case history, Dr. Shah called and was

02:06   14  upset about the summons.  He didn't want it to go through.

02:06   15  Evidently he had talked to the bank already.  I told him --

02:06   16  I said we have to have the documents, and that's when he

02:07   17  through a series of conversations said, well, I'll bring the

02:07   18  documents to you.

02:07   19  Q    Then on July 20th, 2009 -- and I would like to direct

02:07   20  your attention to Exhibit 15 of the government's exhibits on

02:07   21  page 3.

02:07   22  A    Date?

02:07   23  Q    Exhibit 15, page 3; date, July 20th, 2009.

02:07   24  A    Okay.

02:07   25  Q    Is that your entry?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:07  1   A    Yes, it is.

02:07  2   Q    Okay.  And it says:  "Bank called.  Taxpayer has

02:07  3   contacted the bank and told them that since he had already

02:07  4   provided the summonsed documents, the bank should not send

02:07  5   out the documents"?

02:07  6   A    Correct.

02:07  7   Q    Had the taxpayer provided you those documents?

02:07  8   A    Not at that time.

02:07  9   Q    So Dr. Shah was not telling the truth to the bank?

02:07 10        MR. SEVERO:  Objection.  Calls for a conclusion.

02:07 11        THE COURT:  Sustained.

02:07 12   BY MS. WAIER:

02:08 13   Q    You advised the bank that that wasn't true; right?

02:08 14        MR. SEVERO:  Objection.

02:08 15        THE COURT:  Overruled.

02:08 16        THE WITNESS:  You know, I don't remember if I -- I

02:08 17   can't remember my conversation with the bank.

02:08 18   BY MS. WAIER:

02:08 19   Q    Well, it says here:  "RA advised the bank that unless

02:08 20   they considered that a crush action, they should mail out

02:08 21   the summonsed documents."

02:08 22   A    That would be the standard reply, yes.

02:08 23   Q    And then ultimately after management got involved, he

02:08 24   then provided the records?

02:08 25   A    Yes, he did -- well, some of the records.

02:08   1   Q    Okay.  And, in fact, if you look at the entry on

02:08   2   July 21st, 2009, he had told the manager he was going to

02:08   3   bring them that day but he didn't show up?

02:08   4   A    Correct.

02:08   5   Q    But then he showed up later the next day?

02:08   6   A    Correct.

02:08   7   Q    And did he provide you all the documents?

02:08   8   A    No.  Like I said, it was a partial response.

02:08   9   Q    But you used those documents to put together a revenue

02:08   10  agent report; is that right?

02:09   11  A    I don't remember -- in other words, I don't think I

02:09   12  would have had enough documents at that point to prepare an

02:09   13  RAR because to determine his gross receipts, I would need

02:09   14  all of the documents.  If I didn't have them, I couldn't

02:09   15  prepare an RAR.

02:09   16  Q    Okay.  Well, then if you look at the next page,

02:09   17  October 13th, 2009, it says:  "Prepared an RAR for all three

02:09   18  tax years."  Is that when you prepared an RAR?

02:09   19  A    I believe that was the first one, yes.

02:09   20  Q    And you discuss -- it says:  "Called taxpayer to

02:09   21  discuss the RAR on October 16th, 2009."  Do you see that?

02:09   22  A    Okay.  Yeah -- called or met with.

02:09   23  Q    Well, it says called to schedule.  I think the next day

02:09   24  you met with him, on October 16, 2009, and you reviewed the

02:09   25  RAR line by line, correct?

02:09  1   A     Correct.

02:09  2   Q     Okay.  And if you look there, he declined to sign the

02:09  3   extension of time for the 2006?

02:09  4   A     Yes, he sis.

02:09  5   Q     And he told you that he was going to provide documents

02:09  6   to you, so he didn't have to sign it?

02:10  7   A     Yes.  Yeah.

02:10  8   Q     And you advised him that if he did not provide the

02:10  9   documents, that an ISND would issue?

02:10  10  A     If he didn't provide the signed extension, yes, that's

02:10  11  our standard practice.

02:10  12  Q     What is that?

02:10  13  A     The IRS has a statute of limitations.  It's three years

02:10  14  from the date you filed your return or April 15th three

02:10  15  years later, whichever is later.  What happens is if the

02:10  16  IRS -- the biggest sin in the IRS is blowing a statute.  In

02:10  17  other words, letting a taxpayer statute expire to where the

02:10  18  IRS can't collect any tax.  So you're given a three-day

02:10  19  suspension the first time; the second time they won't even

02:10  20  talk to you.  So it's a real no-no in the IRS.

02:10  21        So what you do is you take this extension out and

02:10  22  you advise the taxpayer that we are doing this so that you

02:10  23  have the time to provide records or whatever, and you sign

02:10  24  it.  If a taxpayer refuses to sign it, what you do is the

02:11  25  IRS policy is they issue a statutory Notice of Deficiency.

02:11   1   What that means is --

02:11   2           MR. SEVERO:  Your Honor, this is getting into a

02:11   3   narrative.

02:11   4   BY MS. WAIER:

02:11   5   Q    So he did sign this statutory -- he signed the

02:11   6   extension?

02:11   7   A    Yes.  At some point he did, yes.

02:11   8   Q    But only after talking to management.  We had to have

02:11   9   another management involvement.

02:11   10  A    Yes.

02:11   11  Q    So Dr. Shah knows how to call management; right?

02:11   12  A    Yes.

02:11   13  Q    He had multiple interactions with management in this

02:11   14  case?

02:11   15  A    Yes, he did.

02:11   16  Q    Is that typical in your cases?

02:11   17  A    Not typical but not unheard of.

02:11   18  Q    Okay.

02:11   19  A    It's money.

02:11   20  Q    And you noted in your activity report that on

02:11   21  November 16, 2009, that the taxpayer made an overture to you

02:11   22  that "After the audit is over, perhaps you could work with

02:11   23  me part time, or I could give your wife a job"?

02:11   24  A    Correct.

02:11   25  Q    Did that happen?

02:11   1   A    Yes, it did.

02:12   2   Q    Then on the 19th you called TIGTA?

02:12   3   A    Correct.

02:12   4   Q    So Special Agent Gomez told you -- asked where you were

02:12   5   in the audit at that time?

02:12   6   A    Yes.

02:12   7   Q    And you told him you were at the tail end?

02:12   8   A    Yeah.  I was almost done, yes.

02:12   9   Q    So he said:  "Finish what you have to do, and when

02:12   10  you're done, you give me a call"?

02:12   11  A    Correct.

02:12   12  Q    Did he tell you he wanted nothing to do with the audit?

02:12   13  A    I don't know if he told me that, but he didn't have

02:12   14  anything to do with the audit.

02:12   15  Q    Right.  And he made clear that he wanted you to do what

02:12   16  you needed to do and to call him when you were done?

02:12   17  A    Correct.

02:12   18  Q    In fact, you didn't contact him and tell him you were

02:12   19  done until December?

02:12   20  A    I was waiting for documents, I think.

02:12   21  Q    And that report, that revenue agent's report, based on

02:12   22  the documents you had at the time, was it accurate?

02:12   23  A    In my professional --

02:12   24       MR. SEVERO:  Objection.  Calls for a conclusion.

02:13   25       THE COURT:  Overruled.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:13   1           THE WITNESS:  In my professional judgment, yes.

02:13   2  BY MS. WAIER:

02:13   3  Q    I mean, as part of the sting operation, you didn't

02:13   4  fabricate your revenue agent's report; did you?

02:13   5  A    The facts were there.  Everything on that report was

02:13   6  documented in my work papers.

02:13   7  Q    And the revenue agent report was not part of the sting

02:13   8  for TIGTA.  It was part of the audit?

02:13   9  A    That's correct.  The report was prepared as the final

02:13  10  report for the audit.  Irregardless of what was going to

02:13  11  happen after that, that was to my best work what Dr. Shah

02:13  12  fairly owed.

02:13  13  Q    And, in fact, a 30-day notice was issued on that

02:13  14  report?

02:13  15  A    I don't remember that.  Yeah, probably, because now

02:13  16  we're into the next year.  We're eight months into this

02:13  17  thing, and we're supposed to only be on it, like, five at

02:13  18  the most.  After that they started putting pressure on you

02:13  19  to get it done.

02:13  20  Q    So when -- so what were the instructions that Special

02:14  21  Agent Gomez gave you regarding talking with the taxpayer?

02:14  22  A    I know at some point he told me not to contact the

02:14  23  taxpayer until I contacted Gomez, but I am not sure at what

02:14  24  point that was.  In other words, he wanted to talk to me

02:14  25  before I talked to the taxpayer.

02:14   1    Q    Okay.  And did he tell you he wanted your conversations

02:14   2    to be monitored?

02:14   3    A    Yes, he did.

02:14   4    Q    Okay.  And did he also -- were you also instructed that

02:14   5    you were not to make any kind of bribe overtures or do

02:14   6    anything to the taxpayer?

02:14   7    A    That's correct.

02:14   8    Q    You were told to just see where it goes?

02:14   9    A    Exactly.

02:14   10   Q    And you were also told --

02:14   11        MR. SEVERO:  Objection.  Leading.

02:14   12   BY MS. WAIER:

02:14   13   Q    Were you also told to make sure that the taxpayer knows

02:14   14   it's illegal?

02:14   15   A    Yeah.  He wanted to make -- I was told to not bargain

02:15   16   in the sense -- in other words, whatever you're offered,

02:15   17   you're offered.  Don't try to drive it up or anything.  I

02:15   18   was told to make sure that I said at least once that, you

02:15   19   know, this is illegal and that we could both go to jail, or

02:15   20   something like that, to make sure that the doctor knew that

02:15   21   it was illegal.  And I think I overdid it when I --

02:15   22   Q    But the bottom line is you weren't trying to make

02:15   23   Dr. Shah pay you a bribe; were you?

02:15   24   A    No.

02:15   25        MR. SEVERO:  Objection.  Leading.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:15  1              THE COURT:  Overruled.

02:15  2              THE WITNESS:  No.

02:15  3    BY MS. WAIER:

02:15  4    Q    In fact, you did almost everything to make him back

02:15  5    out?

02:15  6    A    In my heart I did, yes.

02:15  7    Q    On the first phone call -- let's look at Exhibit 3-A.

02:15  8    That was on January 5th.  I want to focus your attention to

02:15  9    the very end of the conversation.  I want to take you to

02:16  10   page 7 of 3-A.

02:16  11   A    Okay.  I'm there.

02:16  12   Q    At the very top Dr. Shah says:  "You're going to work

02:16  13   for me.  You're going to work for me for the rest of my

02:16  14   life"?

02:16  15   A    Correct.

02:16  16   Q    Did you think that was an appropriate response from a

02:16  17   taxpayer?

02:16  18              MR. SEVERO:  Objection.  Vague as to proper and

02:16  19   calls for a conclusion.

02:16  20              THE COURT:  Overruled.

02:16  21              THE WITNESS:  At that point that was beyond, you

02:16  22   know, intimation.  It was pretty much I'm offering you --

02:16  23              MR. SEVERO:  Objection.  No question pending.

02:16  24   Nonresponsive.

02:16  25   BY MS. WAIER:

02:16   1   Q    And then on the 8th when you went to go meet with him

02:16   2   at the office -- I am going to direct your attention to

02:16   3   Exhibit 4-A.  I want to talk about on page 6 of Exhibit 4-A.

02:16   4   A    Okay.

02:16   5   Q    If you look at lines 10 through 11, you tell him:  "I

02:17   6   just can't capriciously change a report"?

02:17   7   A    Correct.

02:17   8   Q    Is that true?

02:17   9   A    Yeah.  Well, for something that big, yes, that's true.

02:17   10   Q    I mean, as a revenue agent, you need to have

02:17   11   substantiation for the report?

02:17   12   A    That's correct.

02:17   13   Q    So at that meeting had Dr. Shah given you

02:17   14   profit-and-loss statements and records, would you have been

02:17   15   receptive to those?

02:17   16   A    Yeah.  That's why -- I don't remember how many document

02:17   17   requests I issued, but, you know, we are eight months into

02:17   18   this and I probably issued at least three or four of them --

02:17   19   all saying the same thing because nothing came in.

02:17   20   Q    Okay.  There has been talk that Dr. Shah says that -- I

02:17   21   want to take your attention to page 7 of Exhibit 4-A.

02:18   22   A    Okay.

02:18   23   Q    So Shah says:  "That will be 150, 120, 140,

02:18   24   whatever" --

02:18   25   A    I'm sorry.  What line are you on?

02:18   1   Q     Line 24.

02:18   2   A     Okay.  Yeah.

02:18   3   Q     I am on page 7, line 24.  It says:  "That will be 150,

02:18   4   120, 140, whatever it comes to, yeah, to pay you off.  Okay?

02:18   5   So in other words, you give me a check for the IRS for that

02:18   6   amount, okay, and then a week later we figure a dollar

02:18   7   amount, and I will give it to you"?

02:18   8   A     Yes.  That's what he told me.

02:18   9   Q     Did you take that as a bribe overture?

02:18   10  A     Very much so.

02:18   11  Q     Then he says:  "I will be very blunt with you.  If I

02:18   12  hire someone, I have to pay them, but I would rather pay

02:18   13  you."  Is that something you introduced, or was that Dr.

02:18   14  Shah?

02:18   15  A     No, I have never uttered that in my life.

02:18   16  Q     In fact, Dr. Shah on line 17 says:  "I will give you

02:18   17  cash, $15,000."  Is that the first time cash was ever talked

02:18   18  about between you and Dr. Shah?

02:18   19  A     Yes, it is.

02:19   20  Q     For you was that a bribe?

02:19   21  A     Yes, overt.

02:19   22  Q     Then on page 10, line 19, you say:  "I'm not talking"

02:19   23  -- well, let's try line 16:  "All right, this makes me

02:19   24  nervous.  I've got 18 years with the government."  He says:

02:19   25  "Well, the government is not going to pay you any money,

| | | |
|---|---|---|
| 02:19 | 1 | Mike."  You say:  "I'm just talking about my pension and |
| 02:19 | 2 | stuff because this is illegal." |
| 02:19 | 3 | Is that what you were telling the jury about that |
| 02:19 | 4 | you were trying to tell him this is illegal? |
| 02:19 | 5 | A    Yeah.  I wanted to make sure it was really clear. |
| 02:19 | 6 | Q    So that he could back out if he wanted to; right? |
| 02:19 | 7 | MR. SEVERO:  Objection.  Leading. |
| 02:19 | 8 | THE COURT:  Sustained. |
| 02:19 | 9 | BY MS. WAIER: |
| 02:19 | 10 | Q    He could back out if he wanted to; right? |
| 02:19 | 11 | MR. SEVERO:  Same question. |
| 02:19 | 12 | THE COURT:  Sustained. |
| 02:19 | 13 | BY MS. WAIER: |
| 02:19 | 14 | Q    Could he back out if he wanted to? |
| 02:19 | 15 | MR. SEVERO:  Objection.  Calls for speculation. |
| 02:19 | 16 | THE COURT:  Sustained. |
| 02:19 | 17 | BY MS. WAIER: |
| 02:19 | 18 | Q    Did he back out? |
| 02:20 | 19 | A    No, he didn't. |
| 02:20 | 20 | Q    Instead he said:  "Don't talk about illegality"? |
| 02:20 | 21 | A    Correct. |
| 02:20 | 22 | Q    Then he changes it to $30,000 for zero out; correct? |
| 02:20 | 23 | A    Is that on the next page? |
| 02:20 | 24 | Q    Before we get there, I want to talk to you about this, |
| 02:20 | 25 | on page 19, line 13.  You're telling Dr. Shah that if he |

02:20   1   really owes the $150,000, he shouldn't pay it?

02:20   2   A    Correct.

02:20   3   Q    And he says:  "Let me give you another offer.  If you

02:20   4   make this go away, I will increase your payment"?

02:20   5   A    Correct.

02:20   6   Q    And you say:  "No, no.  It's fine at $15,000."  And

02:21   7   that's when he offers the $30,000, $10,000 each year to make

02:21   8   it zero?

02:21   9   A    Correct.

02:21   10  Q    That's something he introduced?

02:21   11  A    Correct.

02:21   12  Q    Then you say again on line 18 on page 20:  "If you

02:21   13  think you only owe $150,000 legally."  And he says:  "I'm

02:21   14  just taking a guess."

02:21   15  A    Right.

02:21   16  Q    So you told Dr. Shah, look, if you really believe this,

02:21   17  do something else.

02:21   18         MR. SEVERO:  Objection.  Testimony by counsel.

02:21   19         THE COURT:  Sustained.

02:21   20  BY MR. SEVERO:

02:21   21  Q    During the January 12th meeting, you were supposed to

02:21   22  meet Dr. Shah at his office; is that right?  This is on

02:21   23  January 12th when you were to meet with him after the

02:22   24  revenue agent report was zero, zero.

02:22   25  A    This was when I was to receive the money?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:22   1   Q    Yes, that morning.

02:22   2   A    Yes.  I drove to his office, yes.

02:22   3   Q    And then it was his idea to move to a different

02:22   4   location; is that right?

02:22   5   A    That's correct.

02:22   6   Q    And you had the zeroed-out revenue agent report?

02:22   7   A    That's correct, signed by me already.

02:22   8   Q    Was that because you wanted to see if Dr. Shah would

02:22   9   really go through with it?

02:22  10   A    What happens in some cases is that you will hand the --

02:22  11          MR. SEVERO:  Objection.  Nonresponsive.

02:22  12          THE WITNESS:  I'm sorry.  What was the question?

02:22  13          MR. SEVERO:  Move to strike.

02:22  14          THE COURT:  It will be stricken.

02:22  15          Could we have the question reread, please.

02:22  16          (Pending question read back)

02:22  17          THE WITNESS:  No.  It was standard procedure.

02:22  18   BY MS. WAIER:

02:22  19   Q    What was standard procedure?

02:22  20   A    In other words, you can't hand a taxpayer a signed --

02:23  21   in other words, I sign an agreement and I hand it to him.

02:23  22   And once the taxpayer has it in his possession, it's a

02:23  23   presented report.

02:23  24          If, for example, they have negotiated not to pay

02:23  25   penalties if you'll settle for this amount.  We are given

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:23  1    some discretion for that.  But if you hand them the report

02:23  2    without them signing it and then they say, no, and now the

02:23  3    bargaining starts at whatever the new figure is.  So you

02:23  4    never do that.  You always wait until, you know, they have

02:23  5    agreed to sign it.  And you hold onto it, they sign it, and

02:23  6    then divide it up.

02:23  7    Q    Right.  I guess my question is a different one, which

02:23  8    is -- so you went on the January 12th with a zero, zero,

02:23  9    zero revenue agent report; right?

02:23  10   A    That's correct.

02:23  11   Q    That wasn't a true report.  Dr. Shah really owed money?

02:23  12   A    That's correct.

02:23  13   Q    That was part of to see whether or not Dr. Shah would

02:23  14   go through with the $30,000 bribe?

02:24  15   A    That's correct.

02:24  16   Q    And he handed you $30,000 in cash?

02:24  17   A    Yes, he did.

02:24  18   Q    And that was in return for this zeroed-out revenue

02:24  19   agent report?

02:24  20   A    I got the cash first.

02:24  21   Q    Was that a bribe?

02:24  22   A    That's a bribe.

02:24  23           MR. SEVERO:  Objection.  Calls for a conclusion.

02:24  24           THE COURT:  Overruled.

02:24  25   BY MS. WAIER:

02:24   1   Q     One thing that you had told Dr. Shah is that you needed
02:24   2   something for your records?
02:24   3   A     Correct -- to explain going from 410 down to zero.
02:24   4   Q     Just something to put in there?
02:24   5   A     Something to put in there.
02:24   6   Q     And he was going to fax that to you?
02:24   7   A     Yeah.
02:24   8   Q     Is that the reason you went to Staples, to get the
02:24   9   records?
02:24  10   A     Yes, it is, so he could copy them.
02:24  11   Q     To put together this document that's part of this bribe
02:24  12   operation?
02:24  13   A     Correct.
02:24  14   Q     Not to figure out how much tax he really had due and
02:24  15   owing?
02:25  16   A     No.  That had already been determined in my opinion.
02:25  17   Q     Then at the very end of the call, if you look at page
02:25  18   44 of 46 --
02:25  19   A     I'm sorry?
02:25  20   Q     Of 6-A, page 44 of 46.
02:25  21   A     Which line?
02:25  22   Q     On line 22, Dr. Shah says:  "Well, let's just not do
02:25  23   this thing.  You take care of getting the technical letter
02:25  24   out.  If I fax you the letter, that's a communication."
02:25  25         So at the very end he decides he's not going to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:25   1   fax it to you, is that right, and you would just get the

02:25   2   technical letter?

02:25   3   A   Yes.

02:26   4   Q   In your conversations with Dr. Shah at the Staples

02:26   5   parking lot, did he tell you how to hide the money?

02:26   6   A   Yes, he did, in detail.

02:26   7   Q   What did he tell you to do?

02:26   8   A   Don't be dumb.  Don't put it all in the bank at once.

02:26   9   Don't tell your wife.  Put it in in small amounts -- that

02:26   10  type of thing.

02:26   11  Q   Buy gold?

02:26   12  A   Standard laundering.  Yeah, buy gold.

02:26   13  Q   Play lotto?

02:26   14  A   Yeah.

02:26   15  Q   Structure it under the $10,000 mark?

02:27   16          MR. SEVERO:  Objection.  Leading.

02:27   17          THE COURT:  Sustained.

02:27   18  BY MS. WAIER:

02:27   19  Q   Did he tell you to make sure to put it in the bank

02:27   20  slowly?

02:27   21  A   Yes, he did -- several times, I think.

02:27   22  Q   At no time during any of your conversation with

02:27   23  Dr. Shah that were recorded did he ever back out of the

02:27   24  bribe?

02:27   25  A   No, never.

02:27  1    Q    And at no time during these conversations did you ever

02:27  2    suggest a bribe?

02:27  3    A    Did I suggest a bribe?

02:27  4    Q    Yes.

02:27  5    A    No.  I never asked for one nor alluded to it, I don't

02:27  6    believe.

02:27  7              MS. WAIER:  Thank you.  No further questions.

02:27  8              THE COURT:  How much longer?

02:27  9              MR. SEVERO:  I don't think more than ten minutes.

02:27  10             THE COURT:  All right.  Let's give the court

02:27  11   reporter a break.  She needs it.  She's working very hard.

02:27  12                  (Recess taken at 2:27 p.m.;

02:27  13                  proceedings resumed at 2:47 p.m.)

02:41  14                  (Jury present.)

02:47  15             THE COURT:  Please be seated.

02:47  16             All right, Mr. Severo.  Please proceed.

02:47  17             MR. SEVERO:  Thank you.

02:47  18                     REDIRECT EXAMINATION

02:47  19   BY MR. SEVERO:

02:47  20   Q    Mr. Ham, is it your testimony that you shared your

02:47  21   mental-health issues only once with the doctor?

02:47  22   A    That I brought it up, yes.

02:47  23   Q    Just once?

02:47  24   A    To my recollection, yes.

02:47  25   Q    Let me direct your attention and the Court's attention

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:47  1    to defendant's Exhibit 13 in evidence.

02:48  2          MR. SEVERO:  I've published it, Your Honor.  I

02:48  3    think it's okay.

02:48  4    BY MR. SEVERO:

02:48  5    Q    Directing your attention, sir, to the third paragraph,

02:48  6    second sentence, starting with:  "RA" -- would that be you?

02:48  7    A    Yes.

02:48  8    Q    Sir?

02:48  9    A    Yes.

02:48  10   Q    -- "and TPH" -- would be Dr. Shah?

02:48  11   A    That's correct.

02:48  12   Q    -- "have discussed Mr. Ham's mental condition of major

02:48  13   depression on an ongoing basis since 5/15/2009."

02:48  14   A    Okay.

02:48  15   Q    That wasn't a one-time mention; was it?

02:48  16   A    To my recollection on this, the discussions were him

02:48  17   offering me psychiatric help, asking me the dosages on my

02:49  18   medicine.  In other words, we talked about it but only after

02:49  19   he brought it up -- other than the first time.

02:49  20   Q    I understand that, but the question is -- and this is

02:49  21   an e-mail.  Exhibit 13 is an e-mail from you to Mr. Gomez

02:49  22   where you tell Mr. Gomez that the discussion was not a

02:49  23   one-time thing but something that happened on an ongoing

02:49  24   basis for six months?

02:49  25   A    Yes.  Okay.

02:49   1   Q    All right.  So do you want to change your testimony

02:49   2   about a one-time mention?

02:49   3   A    My testimony is that I brought it up once and that the

02:49   4   rest of the times it was Dr. Shah bringing it up, you know.

02:49   5   Q    You never said anything again?

02:49   6   A    We talked about it but not -- just, you know, I would

02:49   7   wave him off and say I am with Kaiser Permanente.  I have

02:49   8   prescriptions.  I have a doctor.

02:49   9   Q    Did you not discuss with him how you were feeling and

02:49   10  your feelings of depression?

02:50   11  A    I don't recall that, no.

02:50   12  Q    All right.  Your notes -- I think we talked earlier

02:50   13  about your notes and your examiner's record being accurate

02:50   14  and complete; correct?

02:50   15  A    To the best of my ability they are accurate and

02:50   16  complete, yes.

02:50   17  Q    Would the issuance of an RAR, a revenue agent's report,

02:50   18  be something you would include in there?

02:50   19  A    Yes.  I'm supposed to, yes.

02:50   20  Q    I direct your attention to Government's Exhibit 15.

02:50   21  A    Page?

02:51   22  Q    Look at page 1 quickly.  Actually page 1 is just the

02:51   23  initiation of the case; correct?

02:51   24  A    Correct.

02:51   25  Q    Right.  When did you issue the first RAR?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

69

02:51    1    A    I don't know.  It's in here, but I don't know where it

02:51    2    is.

02:51    3    Q    Are you sure?

02:51    4    A    That I issued it?

02:51    5    Q    That you issued an RAR before the RAR on January 7,

02:51    6    2010.

02:51    7    A    I believe I did because at some point in this history I

02:51    8    remember reading something about the revised RAR.

02:51    9    Q    I know you've said that, but there is no indication on

02:51    10   this chronological report that you issued an RAR at all

02:51    11   prior to 2010 January 10; is there?

02:52    12                MS. WAIER:  That misstates the record, Your Honor.

02:52    13                THE COURT:  Overruled.  The jury can examine the

02:52    14   exhibit and make that determination themselves.  It's a

02:52    15   question, sir.  You don't have to adopt any assertion in the

02:52    16   question.

02:52    17                And your question was again, Mr. Severo?

02:52    18   BY MR. SEVERO:

02:52    19   Q    My question was:  There is nothing in this

02:52    20   chronological report that demonstrates that you issued an

02:52    21   RAR before the 410 report on January 7th?

02:52    22   A    If that's true, then it's my error.  The proof of my

02:52    23   issuing it should be that that revised -- all RAR, you

02:52    24   know --

02:52    25   Q    What you actually issued before, and perhaps it's

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:52   1   confusing you, is an examination change, a form 4605 for his

02:52   2   corporate return.

02:52   3   A    That's possible.

02:53   4           MR. SEVERO:  Your Honor, I have Defense

02:53   5   Exhibit 28.

02:53   6   BY MR. SEVERO:

02:53   7   Q    If you would turn to Exhibit 28.

02:53   8   A    I'm sorry.  In whose book?

02:53   9   Q    I'm sorry.  The defense exhibit would be the

02:53   10  not-so-nice tabs, the other large one on your right.

02:53   11  A    Twenty-eight?

02:53   12  Q    Yes.

02:53   13          MR. SEVERO:  For the record, it's a six-page

02:53   14  report entitled "Form 4605, Examination Charges."

02:53   15  BY MR. SEVERO:

02:53   16  Q    Do you see that, sir?

02:53   17  A    Yes, I do.

02:53   18          MR. SEVERO:  I would ask that it be introduced

02:53   19  into evidence.

02:53   20          THE COURT:  Any objection?

02:53   21          MS. WAIER:  No objection.

02:53   22          THE COURT:  Exhibit 28 will be received into

02:53   23  evidence.

02:53   24          (Exhibit 28 received in evidence.)

02:53   25          MR. SEVERO:  May I publish?

02:53  1          THE COURT:  You may, sir.

02:53  2          MR. SEVERO:  Thank you.

02:53  3  BY MR. SEVERO:

02:54  4  Q    This 4605 says revised down here.  Do you see that?

02:54  5  A    Uh-huh.

02:54  6  Q    That's for the corporation; isn't it?

02:54  7  A    Yes, it is.

02:54  8  Q    In fact, when you go to the last page, it says tax

02:54  9  changes, zero.  That's because the corporation doesn't pay

02:54 10  taxes; correct?

02:54 11  A    That's correct, yeah.

02:54 12  Q    So you had not issued a revenue agent's report -- let

02:54 13  me back up.  The corporation never pays taxes in a

02:54 14  Subchapter S setting; correct?

02:54 15  A    Yes.  That's correct.

02:54 16  Q    That's what you call a flow-through?

02:54 17  A    Correct.

02:54 18  Q    And it flows through to the shareholders?

02:54 19  A    Correct.

02:54 20  Q    The shareholder in this case was Dr. Shah; correct?

02:54 21  A    Yes.

02:54 22  Q    So the only place where he gets to pay a tax is in the

02:54 23  1040?

02:54 24  A    To pay the tax, that's correct.  Yeah.

02:54 25  Q    So the only revenue agent report that required a tax

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:54    1    payment would have been on the 1040?

02:54    2    A    For a tax payment, that's correct.

02:55    3    Q    And the only revenue agent report that you ever issued

02:55    4    on the 1040 would have been on January 7th?

02:55    5    A    I might have got confused.  I don't know.  You know, I

02:55    6    don't know.

02:55    7    Q    So the fact is that if -- so in the corporate return

02:55    8    which is this 4605, Exhibit 28, there is no change in tax at

02:55    9    all?

02:55   10    A    That's correct.  It's not a taxable entity.

02:55   11    Q    All right.  Now, sir, isn't it a fact that you told us

02:55   12    that you told our investigators and Mr. Layton and

02:55   13    Mr. Wilson in your meeting that you reported the situation

02:56   14    with Dr. Shah to TIGTA because you were concerned that it

02:56   15    might come back at you and reflect badly on you because you

02:56   16    didn't report it before?

02:56   17    A    That was the result of the briefing, yes.

02:56   18    Q    I see.  Okay.  Now, we have heard a lot of testimony on

02:56   19    your cross-examination about how many times you said to

02:56   20    Dr. Shah that it was illegal to do what you were doing;

02:56   21    right?

02:56   22    A    Okay.

02:56   23    Q    Did you try to actually stop any bribery payment?

02:56   24    A    Stop the payment?

02:56   25    Q    Yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:56   1   A    Not other than vocalizing that this is illegal, even

02:56   2   after I received the money.

02:56   3   Q    Did you ever say, no, I won't zero out this

02:56   4   report and --

02:56   5   A    No, I did not.

02:56   6   Q    Did you ever say I will report this to the authorities

02:57   7   if you continue to do this?

02:57   8   A    No, I did not.

02:57   9   Q    And that's because you were being -- you were in a

02:57   10   sting operation to try and get him to pay; correct?

02:57   11   A    Would you repeat the question.

02:57   12   Q    Let's try it again.  The reason you wouldn't want to

02:57   13   stop that is because the whole nature of your involvement

02:57   14   with Agent Gomez and being wired for sound was to get

02:57   15   Dr. Shah to commit a bribery offense?

02:57   16   A    True.

02:57   17            MR. SEVERO:  That's all I have.

02:57   18            THE COURT:  Ms. Waier.

02:57   19            MS. WAIER:  Very briefly.

02:57   20                      RECROSS-EXAMINATION

02:57   21   BY MS. WAIER:

02:57   22   Q    In meeting with Dr. Shah on January 8th and

02:57   23   January 12th, you were not trying to get him to pay a bribe;

02:57   24   were you?

02:57   25   A    No.

74

| | | |
|---|---|---|
| 02:57 | 1 | Q    In fact, you were doing your best that he wouldn't? |
| 02:57 | 2 | A    I tried, yes. |
| 02:58 | 3 |         MS. WAIER:  Thank you.  No further questions. |
| 02:58 | 4 |         THE COURT:  Mr. Ham, you can step down.  You are |
| 02:58 | 5 | excused, sir. |
| 02:58 | 6 |         Mr. Severo, are you going to call the next |
| 02:58 | 7 | witness? |
| 02:58 | 8 |         MR. SEVERO:  Yes, sir.  Mr. Wilson will call |
| 02:58 | 9 | Mr. Ted Meyer. |
| 02:58 | 10 |         THE COURT:  Very well. |
| 02:58 | 11 |           TED B. MEYER, DEFENSE WITNESS, SWORN |
| 02:58 | 12 |         THE CLERK:  Please state your full name and spell |
| 02:58 | 13 | your last name for the record. |
| 02:58 | 14 |         THE WITNESS:  Ted Berkeley Meyer, M-e-y-e-r. |
| 02:59 | 15 |         THE COURT:  Please proceed. |
| 02:59 | 16 |                   DIRECT EXAMINATION |
| 02:59 | 17 | BY MR. WILSON: |
| 02:59 | 18 | Q    Mr. Meyer, what is your occupation? |
| 02:59 | 19 | A    Currently I am a CPA. |
| 02:59 | 20 | Q    And what degrees do you hold? |
| 02:59 | 21 | A    I have a bachelor's degree from Brigham Young |
| 02:59 | 22 | University in accounting with a minor in economics. |
| 02:59 | 23 | Q    And what is the nature of your employment? |
| 02:59 | 24 | A    In the past I spent 34 years, eight months, and 14 days |
| 02:59 | 25 | working for the Internal Revenue Service. |

02:59  1   Q    And what was your position with the Internal Revenue

02:59  2   Service?

02:59  3   A    I started out as a tax auditor, someone who audits tax

02:59  4   returns in the IRS office.  I became a field revenue agent

02:59  5   doing examinations of more complex returns in the field.  I

02:59  6   became an on-the-job instructor, a classroom instructor, a

02:59  7   revenue agent group manager, priority program coordinator,

03:00  8   training coordinator, branch chief, and territory manager.

03:00  9   Q    What does it mean to be a territory manager?  What are

03:00  10  your duties?

03:00  11  A    As a territory manager I manage between seven and 11

03:00  12  groups of revenue agents, each having their own group

03:00  13  manager and secretary.

03:00  14  Q    And have you ever testified before in court?

03:00  15  A    I have.

03:00  16       MR. WILSON:  Your Honor, pursuant to 702, I would

03:00  17  like to qualify this witness as an expert.

03:00  18       THE COURT:  We can deal with that at the end of

03:00  19  the examination.  You can proceed.

03:00  20       MR. WILSON:  Thank you.

03:00  21  BY MR. WILSON:

03:00  22  Q    Mr. Meyer, did you have an opportunity to review the

03:00  23  IRS administrative files in this case?

03:00  24  A    Yes, I did.

03:00  25  Q    Did you review both the corporate administrative file

| | | |
|---|---|---|
| 03:00 | 1 | as well as the individual administrative files? |
| 03:00 | 2 | A    Yes, I did. |
| 03:00 | 3 | Q    And those administrative files include the audits as |
| 03:00 | 4 | well as the appeals? |
| 03:00 | 5 | A    Yes, they did. |
| 03:01 | 6 | Q    And you were hired by defense counsel to review these |
| 03:01 | 7 | documents? |
| 03:01 | 8 | A    Yes, I was. |
| 03:01 | 9 | Q    And to provide opinions as to whether or not |
| 03:01 | 10 | anything -- opinions regarding the matters in this case? |
| 03:01 | 11 | A    Yes, I was. |
| 03:01 | 12 | Q    And you received a retainer? |
| 03:01 | 13 | A    I did. |
| 03:01 | 14 | Q    How much was that? |
| 03:01 | 15 | A    The original retainer was for ten hours of work at $240 |
| 03:01 | 16 | an hour, so it was $2,400. |
| 03:01 | 17 | Q    And you bill on an hourly rate? |
| 03:01 | 18 | A    Yes, I do. |
| 03:01 | 19 | Q    What specific documents have you reviewed in this |
| 03:01 | 20 | matter? |
| 03:01 | 21 | A    In the administrative files themselves, they had copies |
| 03:01 | 22 | of the tax return, all the electronic documentation |
| 03:01 | 23 | concerning the selection of the return, the transmission of |
| 03:01 | 24 | the return, the transcripts that related to what was on the |
| 03:01 | 25 | returns, all the revenue agent work papers, all the appeals, |

03:01  1    office work papers, and the correspondence between the

03:02  2    taxpayer and the IRS, whether it would be at the examination

03:02  3    level or the appeals level.

03:02  4    Q     And after review of all these documents, were you able

03:02  5    to determine whether or not things were done inappropriately

03:02  6    or appropriately?

03:02  7    A     Yes, I was.

03:02  8    Q     And when you were at the IRS, were you in charge of

03:02  9    managers?

03:02  10   A     I was.

03:02  11   Q     And you were a manager yourself?

03:02  12   A     I was.

03:02  13   Q     And you were a revenue agent?

03:02  14   A     I was.

03:02  15   Q     And you were also in charge of multiple offices as

03:02  16   well?

03:02  17   A     Yes, I was.

03:02  18   Q     When you reviewed the administrative files in this

03:02  19   case, did you review the IRS report that was created on

03:02  20   12/14/09, i.e, the 410 report?

03:02  21   A     Yes, I was.  I did.

03:02  22   Q     And that's the report that Revenue Agent Ham issued to

03:03  23   Dr. Shah in January 2010?

03:03  24   A     Yes.

03:03  25   Q     And in reviewing that report, did you find that Revenue

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:03   1    Agent Ham correctly computed that report?

03:03   2    A    I discovered that he did not correctly compute that

03:03   3    report.

03:03   4    Q    And what exactly was incorrect about that report?

03:03   5    A    There were two main items that had nothing to do with

03:03   6    documentation provided by the taxpayer or not provided by

03:03   7    the taxpayer. They were brought up earlier today in

03:03   8    testimony, I believe.

03:03   9           The first was $138,000 adjustment related to a

03:03  10    flow-through loss on the individual return, and the second

03:03  11    item was I believe an $82,000 adjustment for Schedule C

03:03  12    expenses that were not deducted on the return.

03:03  13    Q    Okay. So there were those two items. And what did the

03:04  14    auditor, Revenue Agent Ham, do with respect to each of those

03:04  15    two items on his report?

03:04  16    A    Related to the $138,000 flow-through loss, the revenue

03:04  17    agent charged the taxpayer as if he had received benefit for

03:04  18    that loss. But, in fact, he never received benefit for that

03:04  19    loss. When tax returns are filed with the IRS, they go

03:04  20    through a process to check the math and to check the other

03:04  21    items on the return to make sure the return is processable.

03:04  22    In the olden days this used to be done by people in the

03:04  23    service centers, and they used to have purple pencils and

03:04  24    they'd make the corrections on the tax returns. So they're

03:04  25    referred to as purple-pencil adjustments.

03:04  1          In this case the taxpayer had claimed the loss
03:04  2  from the S corporation as if it was a passive activity, I
03:04  3  believe.  And because it was a passive activity, the service
03:05  4  center when they processed return, they said, well, a
03:05  5  passive activity loss of that amount is not allowable.  So
03:05  6  they removed that loss from the tax return when they
03:05  7  processed it.
03:05  8          So the taxpayer never got any benefit for that
03:05  9  amount.  Yet when Revenue Agent Ham prepared his audit
03:05  10  report, he added back an adjustment taking that amount out a
03:05  11  second time, so it had a significant effect on the
03:05  12  correctness of the report.
03:05  13  Q    Now -- so let me see if I can understand this a little
03:05  14  better.  So when he filed his return, he claimed a loss
03:05  15  incorrectly on his return.  And when the IRS received it in
03:05  16  the processing center, they automatically corrected his
03:05  17  return?
03:05  18  A    That is correct.
03:05  19  Q    Because he claimed a loss that actually it's not
03:05  20  appropriate to claim on the front of the return.  Is that
03:06  21  called like a computational adjustment?
03:06  22  A    A computational adjustment or a math error, yes.  And
03:06  23  again, it wasn't that the taxpayer wasn't allowed it.  Based
03:06  24  upon the return information, the taxpayer claimed the loss,
03:06  25  but he claimed it in a manner that was corrected by the

03:06    1    service centers.  So that's what removed the benefit of that
03:06    2    loss from the taxpayer.
03:06    3    Q    Is that something that when in preparing a return, if
03:06    4    you self prepare your return, is that a mistake you can make
03:06    5    in preparation of your return?
03:06    6    A    Yes.  It's a common mistake to do something that is
03:06    7    considered a math error, and the IRS corrects hundreds of
03:06    8    thousands of those each year when they process the returns.
03:06    9    Q    Are those the type of matters they don't have to issue
03:06   10    an audit in order to correct because they're so common?
03:06   11    A    It's basically because the taxpayer is filling out the
03:06   12    tax return and the IRS feels that the computation was done
03:06   13    incorrectly.  Therefore, there was no need to conduct an
03:07   14    examination, no need to go through statutory notice of
03:07   15    deficiency procedures.  They could make the correction
03:07   16    because all they were doing in effect was correcting the
03:07   17    mathematical calculations that were on the return.
03:07   18    Q    So when Agent Ham received the audit of this case, did
03:07   19    he become aware that the service center had already made
03:07   20    this correction?
03:07   21    A    Yes, he did.
03:07   22    Q    Did he become aware of that before he issued his report
03:07   23    later on?
03:07   24    A    Yes, he did.
03:07   25    Q    So he knew about this correction, yet he prepared a

03:07   1   report later on and it did not account for that correction

03:07   2   that was already made?

03:07   3   A    In effect, he charged the taxpayer with that amount

03:07   4   twice -- once when it was corrected by the service center

03:07   5   and once again when he included it in his reports.

03:07   6   Q    I would like to direct your attention to Exhibit 15 in

03:07   7   the government's binder, page 29.

03:08   8        Is this the -- I'll wait until you get there.

03:08   9   A    This Exhibit 15 is different, so maybe I don't have the

03:08   10  right binder.  It's page 20 of 39?

03:08   11  Q    Page 29 of 39.

03:08   12  A    Oh, I'm sorry.  I'm on page 20.  Okay.  Yes, I have it.

03:08   13  Q    Okay.  Is this where you discover that Revenue Agent

03:09   14  Ham was actually aware that the IRS had already corrected

03:09   15  this issue?

03:09   16  A    Yes.

03:09   17  Q    Which particular entry are you referring to?

03:09   18  A    On July 22nd, 2009, in that first portion of his

03:09   19  remarks, he states that he identified the $138,000 loss that

03:09   20  was disallowed as a loss when the return was processed.

03:09   21  Q    Okay.  And this was back in July 2009?

03:09   22  A    Yes, it was.

03:09   23  Q    Yet he issued his report in January 2010 with the

03:09   24  same -- and did not take account -- and he was aware of that

03:09   25  issue?

03:09  1   A    According to this record, he was aware of the issue and

03:09  2   he still included it a second time in his audit report.

03:09  3   Q    And what is the second issue that Revenue Agent Ham --

03:09  4   that you discovered that Revenue Agent Ham made on his own?

03:10  5   A    Again it was mentioned in earlier testimony.  The way

03:10  6   that Dr. Shah filled out his tax returns, he had a Schedule

03:10  7   C on his individual return that had income and expenses.

03:10  8   The correct methodology would have been to take the income,

03:10  9   deduct the expenses, and carry the difference onto the front

03:10  10  of the form 1040.  He did not do that.

03:10  11         Instead, for some reason he took just the income

03:10  12  item and copied it to the front of the 1040.  Therefore, he

03:10  13  never received benefit for all the expenses that were

03:10  14  claimed.

03:10  15  Q    Is this something that revenue agents are trained on in

03:10  16  order to not make that mistake?

03:10  17  A    Absolutely.

03:10  18  Q    Is it the type of error that is easy to catch?

03:10  19  A    It is.  The IRS has a policy that whenever they are

03:11  20  working on an examination based upon the copy of a return

03:11  21  prepared and presented by the taxpayer, the IRS knows that

03:11  22  they aren't sure that they're getting the original return.

03:11  23         So it is mandatory that when you're working off of

03:11  24  a copy of a return like Revenue Agent Ham was in this

03:11  25  situation, he had to pull the computer reports to ensure

03:11   1    that the amounts on the return that Dr. Shah provided him

03:11   2    were the same amounts on the return that was processed.

03:11   3            In this case the subsequent agent determined that

03:11   4    the amount was not -- that the computer printout was not

03:11   5    used by Revenue Agent Ham in order to show that that amount

03:11   6    had not been deducted previously.

03:11   7    Q    So Revenue Agent Ham, who had this case for almost a

03:12   8    year, made this mistake, but the subsequent revenue agent

03:12   9    that had this caught this immediately?

03:12   10   A    It appears that she found it very quickly because she

03:12   11   didn't have the case for that long.  Yes.

03:12   12   Q    Is that Revenue Agent Yu?

03:12   13   A    Yes, it is.

03:12   14   Q    Okay.  Did anyone else at the IRS repeat this same

03:12   15   issue in any subsequent reports after Ham?

03:12   16   A    No.  Once it was corrected by Agent Yu, it was correct

03:12   17   in all subsequent reports.

03:12   18   Q    And how many subsequent reports were there roughly?

03:12   19   A    I think there was an interim report by Yu.  Then she

03:12   20   did her final report, and then the appeals officer did

03:12   21   another report.

03:12   22   Q    And in reviewing all these different reports, did you

03:12   23   create a chart?

03:12   24   A    I did.

03:12   25   Q    And does the chart compare all the different items

84

03:12  1   between the adjustments on each of the various reports?

03:12  2   A    Yes.  I took the audit reports that were prepared by

03:12  3   the different people at the IRS, and I compared the

03:13  4   adjustments from one report to another report to see what

03:13  5   the differences were.

03:13  6   Q    And when you created this report, did you provide it to

03:13  7   defense counsel?

03:13  8   A    Yes, I did.

03:13  9   Q    Can I direct you to defense Exhibit No. 73.

03:13  10  A    Okay.  I have it.

03:13  11  Q    Okay.  Now, is this the report -- is this the chart

03:13  12  that you were just talking about?

03:13  13  A    Yes, it is.

03:13  14  Q    And you created this?

03:13  15  A    I did.

03:13  16  Q    And you created it based on the IRS reports --

03:13  17  A    Yes, I did.

03:14  18  Q    -- that were contained in the administrative file?

03:14  19  A    That is correct.

03:14  20  Q    And based on your review of this chart right here, is

03:14  21  it accurate?

03:14  22  A    Yes, it is.

03:14  23         MR. WILSON:  Your Honor, defense moves to have

03:14  24  this exhibit into evidence.

03:14  25         THE COURT:  Any objection?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:14  1          MS. WAIER:  Yes.  Objection under 1006.

03:14  2          THE COURT:  Is this a summary exhibit of

03:14  3  admissible underlying records?

03:14  4          MR. WILSON:  Yes, it is, Your Honor.  It's all the

03:14  5  exhibits that are in evidence.  They are all the revenue

03:14  6  agent reports.  They are already admitted.

03:14  7          MS. WAIER:  Your Honor, I'd like to direct your

03:14  8  attention to pages 3, 4, and 5.  That does not appear to be

03:14  9  such a thing.  And on 1 and 2, these are voluminous records

03:14 10  that qualify.

03:14 11          THE COURT:  We can deal with this at a break.  I

03:14 12  have no problem with you showing it to the jury because it's

03:15 13  a demonstrative, if anything.

03:15 14          MR. WILSON:  Thank you, Your Honor.  May I

03:15 15  publish?

03:15 16          THE COURT:  You may.

03:15 17  BY MR. WILSON:

03:15 18  Q    So can you please explain to the jury a little bit

03:15 19  about how this report works.

03:15 20  A    Sure.  What I did was I took each of the audit reports

03:15 21  in the administrative file, and I tried to compare one to

03:15 22  the other by looking at the adjusted items, the significant

03:15 23  adjusted items, from one report to the other.  So the first

03:15 24  four columns -- I'm sorry.  The first column obviously is

03:15 25  the line item off of the examination report.  Then the next

03:15  1    four columns are four different reports that were prepared

03:15  2    by the IRS where I show the amounts that were on those

03:15  3    reports to highlight the differences from one report to the

03:16  4    other.

03:16  5            The final two columns, the next to the last column

03:16  6    is comparing the 410 report to the statutory notice of

03:16  7    deficiency that was issued by Agent Yu.  And the final

03:16  8    column is a comparison of the 410 report, the report

03:16  9    prepared by Ham and shared with Dr. Shah, and the final

03:16  10   decision by appeals that was accepted by the Court.

03:16  11   Q    And what does the very bottom of this chart reflect?

03:16  12   A    At the bottom I have a summary of all three years since

03:16  13   the -- I believe Agent Ham had written that 410 number to

03:16  14   summarize all the amounts on the one audit report.  I put it

03:16  15   all down at the bottom looking at the total amount of

03:16  16   adjustments, the total increase in tax liability, the total

03:16  17   increase in penalties, and the total of the tax liabilities

03:16  18   and penalties together.

03:17  19           I didn't include the interest because the interest

03:17  20   would change depending on the dates that the reports were

03:17  21   written, not based solely upon the underlying adjustments.

03:17  22   Q    And in comparing the different reports, you were able

03:17  23   to determine the difference between the tax liability

03:17  24   between all the different reports?

03:17  25   A    I was able to compare the difference between the

03:17   1    asserted tax liability and all the reports, and the final
03:17   2    tax liability is decided by the Court.  Yes.
03:17   3    Q    And did you create -- in the back of this exhibit you
03:17   4    created a little chart which shows the difference between
03:17   5    the total tax and penalties asserted by Revenue Agent Ham in
03:17   6    the report dated 12/14, and the ultimate amount of tax that
03:17   7    was owed; correct?
03:17   8    A    Yes, I did.
03:17   9              MR. WILSON:  May I publish that, Your Honor?
03:17   10             THE COURT:  You may.
03:17   11             MR. WILSON:  Thank you.
03:17   12   BY MR. WILSON:
03:18   13   Q    So could you please explain to the jury how this chart
03:18   14   works.
03:18   15   A    Yes.  Again I just summarized all of the audit
03:18   16   adjustments and the increase in tax and penalty that were
03:18   17   asserted on that initial report by Agent Ham and compared it
03:18   18   to what is determined to be the correct tax liability, which
03:18   19   is what was accepted by the Court after the additional
03:18   20   examination work by Agent Yu after the appeals work on the
03:18   21   case and was finally entered into court as the final
03:18   22   corrected tax liability.
03:18   23             So in the 410 report the taxes and penalties were
03:18   24   $369,888.  The final determined corrected tax and penalty
03:18   25   was $154,956.  So I was comparing the difference between the

03:18   1   two, and the amount of tax and penalty asserted by Ham was

03:18   2   239 percent higher than what the correct tax liability was.

03:19   3   Q    Thank you.  So just for clarification, this report,

03:19   4   does it include interest?

03:19   5   A    It does not include interest because that would --

03:19   6   again, I didn't include interest because it varies upon

03:19   7   date, not on the underlying facts of the case.

03:19   8   Q    That's why when we refer to the 410 report which is the

03:19   9   number of 369, the 410 report includes interest?

03:19   10  A    That's correct.

03:19   11  Q    So this is the report that Revenue Agent Ham gave on --

03:19   12  created on 12/14/09?

03:19   13  A    I believe he created it on 12/14/09, but then he faxed

03:19   14  it to the taxpayer sometime in January and then discussed it

03:19   15  during one of those conversations.

03:19   16  Q    And that was the first report he ever received that

03:19   17  showed how much he individually might owe?

03:19   18  A    Yes, it is.

03:19   19  Q    Okay.  Thank you.

03:20   20       Now, we have heard testimony and you have been

03:20   21  able to review all the administrative files.  Based on your

03:20   22  professional opinion, was Dr. Shah uncooperative during the

03:20   23  period of the audit?

03:20   24  A    No.

03:20   25  Q    Why not?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:20  1   A    He continued to interact with the agent.  He had

03:20  2   meetings with the agent.  He had telephone conversations

03:20  3   with the agent.  He tried to provide him what documents he

03:20  4   had available, and he signed the statute extension.  He

03:20  5   discussed the case with the manager when there was an issue

03:20  6   with the statute extension.

03:20  7            So there was cooperation throughout the

03:20  8   examination.  It's just that he did not have all the

03:20  9   documents that the IRS requested.

03:20  10  Q    Now, he didn't have all the documents that the IRS

03:20  11  requested.  Is that pretty common for taxpayers to not have

03:20  12  all the documents that the IRS is requesting?

03:20  13  A    It's not uncommon.

03:21  14  Q    Now, is it common for a small business owner to not

03:21  15  have perfect books and records?

03:21  16  A    Small business owners in general have the poorest

03:21  17  accounting records of any type of business taxpayer.  They

03:21  18  are not required to keep books and records for different

03:21  19  statutory reasons under state law or professional law, so

03:21  20  they are oftentimes less than perfect records of accounting.

03:21  21  Q    Now, is that because a small business owner typically

03:21  22  doesn't have an accounting department or lots of different

03:21  23  resources and they're trying to do everything themselves?

03:21  24  A    Certainly that is one of the aspects.  Some taxpayers

03:21  25  want to take care of everything for themselves just because

03:21  1    they don't want to pay somebody else to do it.  Other people
03:21  2    will hire an outside firm to do it but they may not be
03:22  3    trusting of that firm.  And other people do pay sizeable
03:22  4    amounts to have people keep their books and records for
03:22  5    them.
03:22  6    Q    So just because a small business owner doesn't have
03:22  7    perfect books and records, that doesn't necessarily mean
03:22  8    they're a tax cheat; does it?
03:22  9    A    No, it does not.
03:22  10   Q    In fact, a lot of small businesses are -- is it true
03:22  11   that a lot of small businesses want to pay taxes?
03:22  12   A    I don't know if anybody is thrilled about paying taxes,
03:22  13   but they certainly are willing to pay their fair share, yes.
03:22  14   Q    Are they willing to try to do -- they're trying to meet
03:22  15   the demands of the regulatory agencies and --
03:22  16   A    My observation has been that they have a juggling act.
03:22  17   They're trying to get their business going.  They're trying
03:22  18   to be profitable at their business.  They're trying to pay
03:22  19   their employees.  They're trying to make a profit, and
03:22  20   they're also trying to keep within the law generally.
03:23  21   Q    So in your experience, when a small business owner gets
03:23  22   audited and they don't have good books and records, what's
03:23  23   the normal protocol to deal with that?
03:23  24   A    There's a number of different things that you can do.
03:23  25   You certainly talk to the taxpayer and see what records they

03:23  1   have, try to acquire the records that they have, but also
03:23  2   look at other alternatives about there those records could
03:23  3   be located or where they could be accessed in order to
03:23  4   assist the taxpayer in determining the correct tax
03:23  5   liability.
03:23  6   Q    In this case based on your review of the examination,
03:23  7   activity record, and audit files, did Dr. Shah give the IRS
03:23  8   what he had?
03:23  9   A    It appears that Dr. Shah did give the IRS what records
03:23  10  he had available, at least as far as I can tell.
03:23  11  Q    And did it look like Dr. Shah and the IRS were trying
03:23  12  to essentially reconstruct his records based on, you know,
03:23  13  bank statements and other documents that would be useful
03:24  14  when someone doesn't have perfect books and records?
03:24  15  A    Yeah.  It appeared to me based upon reading the
03:24  16  activity record that during that initial interview, Dr. Shah
03:24  17  did provide Agent Ham with some documents.  I'm not sure
03:24  18  what they were.  It sounds like they were something to do
03:24  19  with credit card statements, et cetera.  Subsequent to that,
03:24  20  Dr. Shah had an income statement of some sort that he
03:24  21  provided to Agent Ham.  I think it was in May of 2009.
03:24  22         And then subsequent to that, he also dropped off
03:24  23  three years' worth of bank statements to Agent Ham I think
03:24  24  sometime in July.  So he was preparing or gathering records
03:24  25  together and presenting them to the IRS.  Clearly he didn't

03:24  1    have all the records, though, at that point.

03:24  2    Q    And that's not uncommon for a taxpayer to not have all

03:24  3    the records?

03:24  4    A    It's such a common occurrence that it's called a

03:24  5    shoebox audit in the IRS where the taxpayers have to gather

03:25  6    stuff together and they just bring in what they have.  It's,

03:25  7    like, here's a shoebox.  Here's everything I got.  I'm not

03:25  8    sure where everything is.  So it's not an uncommon thing.

03:25  9    Q    Now, the audit for the individual 2007 or corporate

03:25  10   opened in March, correct, of 2009?

03:25  11   A    That is correct.

03:25  12   Q    And what's the normal time period for an audit to go on

03:25  13   for for something like this?

03:25  14   A    In the Los Angeles area at that time, I was a territory

03:25  15   manager, so we had regular reports and work plans about how

03:25  16   long it should take to examine a tax return.  The goal of

03:25  17   the IRS was to close a return on average in approximately

03:25  18   270 days.  So from the day of the first contact with the

03:25  19   taxpayer to the time that the case closes out from exam

03:25  20   should be about nine months.

03:25  21          However, that's certainly adjusted when you pick

03:26  22   up multiple years later on during the examination.  The

03:26  23   total span of the examination, it would not be unusual to go

03:26  24   a year or year and a half but in average try to get to that

03:26  25   270 days.

03:26   1          Generally at this time in the Los Angeles area the

03:26   2   averages were much closer to 290 to 300 days or maybe even a

03:26   3   little bit longer than that before the average case closed

03:26   4   out.

03:26   5   Q    So based on your review of this particular audit, when

03:26   6   Agent Ham issued his revenue agent report, were they still

03:26   7   well within that average time period?

03:26   8   A    Yes, they were.  When you consider the fact that there

03:26   9   were six returns under examination where only one of them

03:26   10  started in March and the others were started later, yes,

03:26   11  they were well within the average and the goal that was set

03:26   12  by the IRS.

03:26   13  Q    Now, Dr. Shah signed a statute extension allowing them

03:26   14  more time.  How does that affect the time period, you know,

03:26   15  as far as IRS normal protocols go and how long it takes for

03:27   16  an audit when they extend it?

03:27   17  A    It certainly grants the IRS and the taxpayer additional

03:27   18  time to resolve the case.  It doesn't necessarily change

03:27   19  what the goal is for when that case is going to close.  It's

03:27   20  important to note that each case is supposed to be

03:27   21  determined based upon the facts and circumstances of that

03:27   22  case.  So if the objective was to try and get it within 270

03:27   23  days, the IRS certainly realizes that some cases will close

03:27   24  out after 90 days and other cases will go for two, three,

03:27   25  four years.

03:27  1  Q    Based on your review of this particular audit, was

03:27  2  there an agreement to allow more time so that bank documents

03:27  3  could come in and they could review them?

03:27  4  A    Yes, there was.

03:27  5  Q    Who was that agreement between?

03:27  6  A    It was between Revenue Agent Ham and Dr. Shah.

03:27  7  Q    And is that the reason -- is that one of the reasons

03:28  8  Dr. Shah signed the 872, because they needed time to get

03:28  9  those bank documents in for him to review?

03:28  10  A    It would be reasonable to assume that.  I can't tell

03:28  11  from the records exactly that, but certainly that would make

03:28  12  sense to me, yes.

03:28  13  Q    And did Revenue Agent Ham allow Dr. Shah to have his

03:28  14  bank statements before he issued that report?

03:28  15  A    No, he did not.

03:28  16  Q    Is that in accordance with normal IRS protocol?

03:28  17  A    No, it is not.

03:28  18  Q    What is the protocol on that?

03:28  19  A    There is a number of different issues related to

03:28  20  taxpayers requesting copies of their own case files with the

03:28  21  IRS.  First of all, there is government-wide Freedom of

03:28  22  Information Act that requires the government to supply

03:28  23  taxpayers or other citizens copies of the records related to

03:28  24  them that the government holds unless disclosing those

03:28  25  documents would somehow hinder the operations of government.

03:29  1          So in this case there was a requirement if

03:29  2   Dr. Shah had requested under the Freedom of Information Act

03:29  3   to get a copy of his case file, it doesn't make any

03:29  4   difference if it's documents that Dr. Shah provided to the

03:29  5   IRS or whether or not they got it from a bank under a

03:29  6   summons, or whether it was developed by the IRS employee.

03:29  7   They would have to respond within -- the IRS would have to

03:29  8   respond within 20 days to that request.

03:29  9          In addition to that, there is a government-wide

03:29  10  process called the open government initiative where the

03:29  11  administration has stated that they want to make the

03:29  12  government more open and give more access to citizens to the

03:29  13  records that the government may have.

03:29  14          Inside of the IRS at this time, the IRS was being

03:29  15  criticized by areas like TIGTA for the delays that they had

03:29  16  in processing Freedom of Information Act reports.  So the

03:29  17  IRS took on a policy that they would not require the

03:30  18  taxpayer to make a formal Freedom of Information Act

03:30  19  request.  Rather, all they had to do was request the

03:30  20  documents from the taxpayer.  And as long as the documents

03:30  21  would not hinder the examination or any prosecution in a

03:30  22  criminal case, that the IRS should go ahead and disclose

03:30  23  those documents and give them to the taxpayer.

03:30  24  Q    So you heard the testimony of Agent Ham.  He didn't

03:30  25  follow that procedure; did he?

03:30    1    A      He did not.

03:30    2    Q      So he violated IRS policy?

03:30    3    A      Yes, he did.

03:30    4    Q      And he was wrong when he said he didn't have to give

03:30    5    those documents?

03:30    6    A      That is correct.  He was wrong.

03:30    7    Q      But in your review of the case activity records, he

03:30    8    also agreed that that's the reason he was going to get them,

03:30    9    to share them?

03:30   10    A      He prepared a summons that included bank statements,

03:30   11    deposit items, deposit slips, and canceled checks.  He

03:31   12    already had the bank statements, but I can understand if he

03:31   13    wanted to verify that those statements were correct, that he

03:31   14    would ask for them.

03:31   15          But the deposit slips, the deposit information,

03:31   16    and the canceled checks, the reason he would ask for those

03:31   17    things, especially the canceled checks, is because he would

03:31   18    want to gather information to verify the amount and the

03:31   19    deductibility of expenses that were claimed on the return.

03:31   20    The deposit slips and specific deposit items would be looked

03:31   21    at to determine whether or not they were taxable or

03:31   22    nontaxable items.

03:31   23          The problem for Revenue Agent Ham or any revenue

03:31   24    agent is it's very difficult to just look at those records

03:31   25    yourself without any input from anybody else and make the

03:31  1   determination of whether or not they are nontaxable deposits

03:31  2   or whether they're deductible expenses.

03:31  3          In this case he received the summonsed

03:31  4   information, and after the weekend, the next day, I believe,

03:31  5   or within a couple of days, he wrote the report without ever

03:32  6   contacting Dr. Shah, without contacting any third party,

03:32  7   making the determinations on which items were nontaxable and

03:32  8   which items were taxable and which times were deductible or

03:32  9   not deductible.

03:32  10  Q    Was it proper for him to -- well, let me step back.

03:32  11  You stated he received the bank summonsed documents.  What

03:32  12  is the normal time period to do a bank deposit analysis for

03:32  13  average?

03:32  14  A    It would depend on the number of bank accounts being

03:32  15  looked at, the number of tax years under question, and the

03:32  16  number of deposits that were made during the time period in

03:32  17  question.  So it could be anywhere from a couple hours to a

03:32  18  couple days, depending on how big the case is and how many

03:32  19  questionable items there are.

03:32  20  Q    In your review of Agent Ham's receipt of the summoned

03:33  21  documents, did it seem reasonable how quickly he prepared

03:33  22  his report?

03:33  23  A    The time he spent on the bank deposit analysis was

03:33  24  reasonable for what he did.  The question is whether or not

03:33  25  what he did was an accurate bank deposit analysis.

03:33  1   Q     So how many pages of documents did he receive roughly?

03:33  2   A     The bank charged the IRS for 1,015 pages of documents,

03:33  3   about four inches, maybe four and a half inches' worth of

03:33  4   documents.

03:33  5   Q     And what day of the week did he receive these

03:33  6   documents?

03:33  7   A     I would have to look at the record.  I don't recall.  I

03:33  8   believe that they came into the office late in the week, and

03:33  9   I think he reviewed the documents and did his bank deposit

03:33  10  analysis late in the week, maybe a Friday.

03:33  11  Q     And when was his report prepared?

03:33  12  A     Early the following week.

03:33  13  Q     And normally when they receive a bank deposit analysis,

03:33  14  would they first provide a copy of that to the taxpayer so

03:34  15  they could determine if anything in that report is

03:34  16  inaccurate?

03:34  17  A     Right.  As I said earlier, in order to do a complete

03:34  18  bank deposit analysis, you should have input from the

03:34  19  taxpayer based upon the deposited items as to explanations

03:34  20  of why they should or should not be taxable.  I think in the

03:34  21  earlier testimony you heard the same thing from Revenue

03:34  22  Agent Yu.

03:34  23  Q     So you would agree that he violated IRS protocol on

03:34  24  that as well?

03:34  25  A     That's correct.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:34    1    Q    What is the protocol when a taxpayer calls the IRS and

03:34    2    it doesn't go well?  Is the IRS -- does the IRS normally

03:34    3    hang up on taxpayers?

03:34    4    A    I guess I'm going to have to get some clarification,

03:34    5    because apparently the IRS -- everybody hangs up at the end

03:34    6    of a conversation.  There is a difference between hanging up

03:35    7    at an end of a conversation and hanging up on someone.  It

03:35    8    is inappropriate for an IRS employee to hang up on a

03:35    9    taxpayer while the conversation is still going on unless

03:35   10    there is some type of abuse or other thing that is taking

03:35   11    place during that phone conversation.

03:35   12    Q    Based on your review of the IRS files in this case, was

03:35   13    there evidence of abuse going on?

03:35   14    A    No, there was not.

03:35   15    Q    And when Dr. Shah called back, he got hung up on at

03:35   16    least twice according to Agent Ham.  Is there any excuse for

03:35   17    that?

03:35   18    A    No, there is not.

03:35   19    Q    Now, what was the manager supposed to do in a situation

03:35   20    when she was notified that her agent just hung on a

03:35   21    taxpayer?  What's the protocol?

03:35   22    A    Well, what should have happened and I believe partially

03:35   23    did happen was the group manager did have a discussion with

03:35   24    the taxpayer and had a discussion with the revenue agent to

03:36   25    try and find out what the problem was and to try and resolve

03:36   1   that problem and act as an intermediary in order to resolve
03:36   2   the problem.
03:36   3           I can't recall tell from the record what Revenue
03:36   4   Agent Ham said occurred during that conversation, and it
03:36   5   wasn't documented in detail by Gloria Witherspoon either.
03:36   6   So I can't comment on that.
03:36   7   Q    If the manager had known that the auditor had a series
03:36   8   of depression and other mental disabilities and he was hung
03:36   9   up by a taxpayer who was a psychiatrist, would that raise
03:36   10  any red flags for the manager to do things differently?
03:36   11  A    If I was involved in the situation, I would be
03:36   12  concerned about that situation where you had someone with
03:36   13  significant depression and mental health problems, somebody
03:36   14  that had been on workmen's compensation for seven years and
03:37   15  has an examination with a health care professional and
03:37   16  there's a conflict in the initial phone call, I would want
03:37   17  to make further inquiries to find out why that took place.
03:37   18  Q    Do you believe that they satisfied the further
03:37   19  inquiries in this case and did what you would have done?
03:37   20  A    I can't tell based upon the records.  It doesn't look
03:37   21  like there was an in-depth discussion.  It was just trying
03:37   22  to resolve and move the case forward.
03:37   23  Q    In reviewing the IRS reports, did you notice anything
03:37   24  else that the revenue agent had done wrong and not in
03:37   25  accordance with IRS protocol during the history of this

03:37  1  case?

03:37  2  A    Well, clearly one of the most important jobs for a

03:37  3  revenue agent is to come up with a correct audit report.

03:37  4  You know, the IRS has a lot of power.  We have the power to

03:37  5  summons people.  We have the power to summons testimony.  We

03:37  6  have the power to -- I still say we even though I have been

03:38  7  gone from the government a couple of years now.

03:38  8        The IRS has a lot of power, and so it is very

03:38  9  important that the relationship between the IRS and the

03:38  10 taxpayer be professional and businesslike throughout the

03:38  11 conducting of the examination.  It's also critically

03:38  12 important that the agent or anybody else working on the case

03:38  13 fully document the case file with both the lead sheets, the

03:38  14 work papers, and the activity record to show exactly what

03:38  15 happened during that examination in case anything should

03:38  16 happen at a later date where those actions would come under

03:38  17 question.

03:38  18        Clearly in this case the documentation that was

03:38  19 maintained by the IRS was deficient, deficient so much that

03:38  20 there is all this conflict about what was said and who said

03:38  21 it and when it was said.  There are -- I saw indications and

03:38  22 based on the testimony that I observed here, there were

03:38  23 things that occurred that should have been recorded in the

03:39  24 activity record that were not recorded.

03:39  25        There were reports issued or work done that was

not documented.  There were things in the case file that
really shouldn't have been in the case file.  One of the
activity records, Agent Ham talks about having 35 tax years
assigned to him in an inventory, which has nothing to do
with this examination.  It has something to do with whether
or not his manager is concerned about him adequately working
his inventory.  Those types of things should not be in the
record.

        The work papers themselves I felt were deficient.
As a territory manager, one of the things that I do is I
review the work of the group manager.  And on an annual
basis I would go out to the groups and I would sample open
cases from a number of different revenue agents and review
the open-case files.

        During that process I would identify where I
thought the agent was either making technically or
procedurally incorrect determinations on the case, whether
they were documenting the case file correctly, et cetera.
Clearly this is a great example of where the agent who was
working the case used the lead sheets to summarize what
happened, but the documentation to support what happened,
including the techniques used, the tests that were done, and
the determinations were inadequate.  They don't explain what
happened and why the decisions were made the way they were
made.

03:40   1   Q    Now, did you notice a distinct difference between

03:40   2   Revenue Agent Ham's case history notes and the subsequent

03:40   3   agent when it was transferred, her notes and how things were

03:40   4   handled?

03:40   5   A    Absolutely.

03:40   6   Q    And what were the differences that you noticed?

03:40   7   A    Everything that Agent Yu did was completely documented

03:40   8   both in the work papers and in the lead sheets as well as

03:40   9   the activity record as far as I could tell.  In fact, she

03:40   10  went to great pains to explain what the prior agent did

03:41   11  because it wasn't clear based upon the work papers.  She had

03:41   12  to reconstruct it, and she put that into the work papers as

03:41   13  well.

03:41   14         It appeared to me that she made substantial effort

03:41   15  to ensure that the work papers were clear and distinct about

03:41   16  the facts, the procedures, and the decisions that were made

03:41   17  during that examination.

03:41   18  Q    In review of the final numbers in this case, was a

03:41   19  penalty asserted against Dr. Shah for having a discrepancy

03:41   20  from what he filed and what the IRS found?

03:41   21  A    Yes, he was.

03:41   22  Q    What type of penalty is that?

03:41   23  A    It was accuracy-related penalty.

03:41   24  Q    What are the different types of penalties you can get

03:41   25  on the civil side?

03:41  1   A    Well, clearly the most drastic civil penalty would be a

03:42  2   civil fraud penalty.  It's the highest percentage and the

03:42  3   most detrimental to the taxpayer.

03:42  4   Q    What is that percent?

03:42  5   A    Well, I believe it's 50 percent of the corrected tax

03:42  6   liability.  An accuracy-related penalty is significantly

03:42  7   lower.  I think it ranges between 10 and 20 percent,

03:42  8   depending on the type of penalty that is asserted.

03:42  9        The purpose of penalties is not to punish

03:42  10  taxpayers but to encourage compliance with the tax laws

03:42  11  themselves.  In this case the determination by all of the

03:42  12  people that worked the case from Revenue Agent Ham through

03:42  13  Revenue Agent Yu and the appeals officer that heard the

03:42  14  case, they all determined that there was no criminal fraud,

03:42  15  that there was no civil fraud, that the only action that

03:42  16  should be penalized in the civil case is for an

03:43  17  accuracy-related penalty.

03:43  18  Q    And that would be a penalty based -- is that penalty

03:43  19  for someone who is just negligent and they don't keep good

03:43  20  books and records?

03:43  21  A    Yes.  In prior years there were things called

03:43  22  negligence penalties, and they have kind of rolled up into

03:43  23  this accuracy-related penalty to apply to a broader

03:43  24  situation by Congress.

03:43  25  Q    Is that the most common type of penalty that is

03:43  1   asserted by the IRS?

03:43  2   A    In a civil case that is the most common penalty

03:43  3   asserted, yes.

03:43  4   Q    Did the IRS reduce the accuracy-related penalty in this

03:43  5   case from the standard amount, from 20 percent all the way

03:43  6   down to 10 percent?

03:43  7   A    Yes, they did.

03:43  8   Q    Is that an indicator that they felt that the mistakes

03:43  9   were something less than the normal 20 percent mistake?

03:43  10  A    Right.  I think -- the work papers -- in the work

03:43  11  papers it states that the reason for the adjustments was due

03:44  12  to poor recordkeeping and lack of documentation.  It was not

03:44  13  an intentional underpayment of tax, and for that reason they

03:44  14  went with the accuracy-related penalty.

03:44  15          And during the appeals process, the government

03:44  16  felt that it was more appropriate to assert a 10 percent

03:44  17  penalty, which appeals can do.

03:44  18          MR. WILSON:  Thank you.  That's it.  Pass the

03:44  19  witness.

03:44  20          THE COURT:  Ms. Waier.

03:44  21          MS. WAIER:  Briefly.

03:44  22                      CROSS-EXAMINATION

03:44  23  BY MS. WAIER:

03:44  24  Q    Good afternoon.

03:44  25  A    Good afternoon.

03:44   1   Q    How many times have you testified in court?

03:44   2   A    I would probably say in -- probably seven, eight times.

03:45   3   Q    And you do speeches, give speeches?

03:45   4   A    I do.

03:45   5   Q    Talk to people?

03:45   6   A    I'm sorry?

03:45   7   Q    Talk to people?

03:45   8   A    Yes, I do.

03:45   9   Q    Okay.  In this case you said you only have billed

03:45   10  $2,400?

03:45   11  A    No.  I said that was my retainer.

03:45   12  Q    Okay.  So how much are you charging today for your

03:45   13  testimony and everything you have done on this case?

03:45   14  A    I will charge $240 an hour.

03:45   15  Q    Okay.  So how much all together are you probably

03:45   16  charging for this case?

03:45   17  A    It depends on how long the day is.  I don't know.

03:45   18  Q    How about an estimation.

03:45   19  A    If a day goes 10 hours, it would be $2,400.

03:45   20  Q    So $2,400 plus $2,400, that's how much you --

03:45   21  A    No.  My --

03:45   22  Q    I'm trying to find out how much you're going to be paid

03:45   23  for your work on this case.

03:45   24  A    So far I have charged about 90 hours to this case.

03:45   25  Q    How many hours?

03:45   1   A      90 hours to this case at $240 an hour.

03:45   2   Q      Okay.  I'm sorry.  I'm not a mathematician.  Can you

03:45   3   tell me how much that is.

03:45   4   A      No, I can't.  I don't have it written down anywhere.

03:46   5   Q      You don't have a ballpark on how much you think you're

03:46   6   going to be paid on this case?

03:46   7   A      At this particular time?

03:46   8          MR. WILSON:  Objection, Your Honor.  Asked and

03:46   9   answered.

03:46   10         THE COURT:  Overruled.

03:46   11         THE WITNESS:  I think it's going to be close to

03:46   12  $20,000 total.

03:46   13  BY MS. WAIER:

03:46   14  Q      $20,000?

03:46   15  A      Yes.

03:46   16  Q      You talked about tax records and different things like

03:46   17  that.  The tax preparer can get their own bank records;

03:46   18  right?

03:46   19  A      Not without approval of the taxpayer.

03:46   20  Q      I'm sorry.  A taxpayer can get their own records;

03:46   21  right?

03:46   22  A      It depends on which records you're talking about.

03:46   23  Q      Okay.  Can a taxpayer get their own bank records?

03:46   24  A      From who?

03:46   25  Q      Well, I think you would get them from the bank; right?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:46  1   A    I thought you might be talking about the IRS.

03:46  2   Q    I am talking about can a taxpayer get their own bank

03:46  3   records.

03:46  4   A    Yes, they can.

03:46  5   Q    They can go to the bank and get them; right?

03:46  6   A    Absolutely.

03:47  7   Q    Nowadays you can go right online; can't you?

03:47  8   A    Again depending on the account that you have, yes.

03:47  9   Q    Okay.  So it's pretty easy nowadays to go get your own

03:47  10  bank records?

03:47  11  A    I believe it is, yes.

03:47  12  Q    Okay.  And another thing taxpayers can do when they're

03:47  13  audited is get a tax preparer; right?

03:47  14  A    Yes, they can.

03:47  15  Q    And tax preparers have intimate amounts of knowledge

03:47  16  about the IRS process; right?

03:47  17  A    Yes, they do.

03:47  18  Q    And revenue agents deal well with tax preparers?

03:47  19  A    Most tax preparers, yes.

03:47  20  Q    Okay.  And tax preparers like to have, when they meet

03:47  21  with a taxpayer, like to get documents from that taxpayer;

03:47  22  right?

03:47  23  A    Absolutely.

03:47  24  Q    In fact, you know in this case that Dr. Shah ultimately

03:47  25  hired a tax preparer?

03:47   1   A     Yes, he did.

03:47   2   Q     And do you know that ultimately he did not want to hire

03:47   3   a tax preparer because he did not want to provide them a

03:47   4   tremendous amount of paperwork?  Were you aware of that?

03:47   5   A     No, I was not.

03:47   6   Q     Did you review the tapes, the recordings that were done

03:47   7   on this case?

03:47   8   A     I skimmed the transcripts.  I never listened to the

03:48   9   recordings other than the part that I heard here when I was

03:48   10  in the courtroom.

03:48   11          MR. WILSON:  Objection, Your Honor.  Scope.  Move

03:48   12  to strike.

03:48   13          THE COURT:  Overruled.

03:48   14  BY MS. WAIER:

03:48   15  Q     In coming to your opinions, did you review the tape

03:48   16  recordings, the statements of Dr. Shah that were recorded in

03:48   17  this case?

03:48   18  A     I skimmed over them.  My focus is what would happen

03:48   19  during the examination, not during the TIGTA investigation.

03:48   20  Q     Okay.  But the fact that Dr. Shah didn't want to hire a

03:48   21  tax preparer because he didn't want to provide paperwork,

03:48   22  that wouldn't go into your opinion on whether or not he had

03:48   23  documentation and was providing that to the IRS?

03:48   24          MR. WILSON:  Objection.  Testimony assumes facts

03:48   25  not in evidence.

03:48    1          THE COURT:  Sustained.

03:48    2   BY MS. WAIER:

03:48    3   Q    I'm going to show you -- I think this is your chart?

03:48    4   A    Yes.

03:48    5   Q    Between this number and this number, Dr. Shah hired a

03:49    6   tax preparer.  Are you aware of that?

03:49    7   A    Yes, I am.

03:49    8   Q    Are you aware that that tax preparer actually

03:49    9   re-created books and records?

03:49   10   A    Yes, I am.

03:49   11   Q    With profit-and-loss statements?

03:49   12   A    Yes, I am.

03:49   13   Q    Okay.  And you understand that those were given to

03:49   14   Ms. Yu?

03:49   15   A    Yes.

03:49   16   Q    And she used those in her examination?

03:49   17   A    Yes, she did.

03:49   18   Q    You said that the IRS -- that the revenue agent has a

03:49   19   lot of power in an audit; right?

03:49   20   A    That's correct.

03:49   21   Q    But so does the taxpayer; right?

03:49   22   A    Yes.

03:49   23   Q    The taxpayer can call management if they don't like

03:49   24   what the auditor is doing; right?

03:49   25   A    That is correct.

03:49   1    Q    And in this case that happened multiple times?

03:49   2    A    I know it happened.  I don't recall how many times.

03:49   3    Q    Okay.  More than once?

03:50   4    A    I believe so.

03:50   5    Q    Okay.  So Dr. Shah knew how to pick up the phone when

03:50   6    he had a problem with something?

03:50   7    A    I believe he did.

03:50   8    Q    And also the taxpayer, if they don't like the revenue

03:50   9    agent report, they have rights; don't they?

03:50   10   A    Yes, they do.

03:50   11   Q    Tell the jury what they can do if they don't like the

03:50   12   revenue agent report.

03:50   13   A    If they don't like the report, first the IRS would

03:50   14   request that the taxpayer ask for an informal conference

03:50   15   with a manager so that you get not an independent party but

03:50   16   someone else to take a look at the examination and determine

03:50   17   whether or not the revenue agent's reports are reasonable

03:50   18   and accurate.

03:50   19        Even if that doesn't proceed according to the

03:50   20   taxpayer's wishes, after the case is closed, the taxpayer

03:50   21   can request a hearing with the appeals officer -- something

03:50   22   that was done in this case.  And then if the appeals results

03:50   23   aren't satisfactory, the taxpayer can also take the case to

03:50   24   court.

03:50   25   Q    Right.  So the taxpayer has a lot of rights, and the

03:51   1   revenue agent report isn't the final word of the Internal

03:51   2   Revenue Service; right?

03:51   3   A    It doesn't have to be.  Correct.

03:51   4   Q    Right.  And also it's not appropriate for a taxpayer to

03:51   5   bribe a revenue agent; is it?

03:51   6   A    No, it is not.

03:51   7   Q    Even if there are problems with a report, is it

03:51   8   appropriate for a taxpayer to bribe a revenue agent?

03:51   9   A    It is not appropriate --

03:51   10              MR. WILSON:  Objection, Your Honor.  Calls for a

03:51   11  legal conclusion.

03:51   12              THE COURT:  Overruled.

03:51   13              THE WITNESS:  No, it's not appropriate to bribe an

03:51   14  IRS official.

03:51   15              MS. WAIER:  Okay.  Thank you.  No further

03:51   16  questions.

03:51   17              THE COURT:  Anything further?

03:51   18              MR. WILSON:  Real quick.

03:51   19                       REDIRECT EXAMINATION

03:51   20  BY MR. WILSON:

03:51   21  Q    Do taxpayers have the right to represent themselves in

03:51   22  an audit, or do they have to hire a representative?

03:51   23  A    They are perfectly within their rights to represent

03:51   24  themselves.

03:51   25  Q    So if they don't hire a tax representative, that speaks

03:52   1   nothing of them?

03:52   2   A    No, it does not.

03:52   3   Q    In the revenue agent report that Agent Ham issued in

03:52   4   January, the 410 report, did it include any notices of his

03:52   5   appeal rights?

03:52   6   A    I don't believe so.  I think it was just faxed to him

03:52   7   the report itself.

03:52   8   Q    Would a normal notice of proposed assessment or

03:52   9   adjustments include any additional language about taxpayer

03:52  10   rights?  Would that be something that would be useful for

03:52  11   the taxpayer?

03:52  12   A    It would be helpful to have the taxpayer be completely

03:52  13   aware of their appeal rights at the time a report is

03:52  14   provided to them.

03:52  15   Q    Do people who represent themselves, meaning non tax

03:52  16   professionals, necessarily know all these appeal rights, or

03:52  17   is it very common for non tax professionals to not be aware

03:52  18   of the administrative appeal process in tax court and how it

03:52  19   works and the 90-day letter?

03:52  20   A    It is not uncommon for taxpayers not to be aware of IRS

03:53  21   procedures and policies, including the appeal rights.

03:53  22   Q    And is that why the IRS has policies that require its

03:53  23   agents to communicate these rights to the taxpayer when they

03:53  24   issue reports?

03:53  25   A    Yes, it is.

03:53 1   Q    Did Agent Ham ever communicate those rights to Dr. Shah

03:53 2   in this case to your knowledge?

03:53 3   A    I believe when he made the initial contact with

03:53 4   Dr. Shah, there were a number of documents in the original

03:53 5   mailing to the taxpayer that would have included information

03:53 6   on appeal rights.

03:53 7   Q    But when he received his report nine months later, did

03:53 8   he ever talk to him to your knowledge about what his appeal

03:53 9   rights would be?

03:53 10  A    No.

03:53 11  Q    And the fact that you were paid for your time to

03:53 12  testify, did that influence your testimony in any way today?

03:53 13  A    No, it did not.

03:54 14        MR. WILSON:  Thank you.

03:54 15        THE COURT:  Ms. Waier, anything further?

03:54 16        MS. WAIER:  No, Your Honor.  Thank you.

03:54 17        THE COURT:  Sir, you can step down.  You are

03:54 18  excused.

03:54 19        Ladies and gentlemen, now that that witness

03:54 20  finished his testimony, I do need to give you a quick

03:54 21  instruction.

03:54 22        You heard testimony from a person who because of

03:54 23  his education and experience was permitted to state opinions

03:54 24  and the reasons for his opinions.  Such opinion testimony

03:54 25  should be judged like any other testimony.  You may accept

03:54   1   it or reject it and give it as much weight as you think it

03:54   2   deserves considering the witness's education and experience,

03:54   3   the reasons given for the opinion, and all other evidence in

03:54   4   the case.

03:54   5           I believe we are going to have another one or

03:54   6   maybe two experts -- two more.  So that instruction would

03:54   7   apply to those witnesses as well.

03:54   8           Mr. Severo.

03:54   9           MR. SEVERO:  Yes, Your Honor.  The defense calls

03:54   10  Rick Speier.

03:54   11          THE COURT:  Very well.

03:55   12      RICHARD SPEIER, JR., DEFENSE WITNESS, SWORN

03:55   13          THE CLERK:  Please state your full name and spell

03:55   14  your last name for the Court.

03:55   15          THE WITNESS:  Richard Speier, Jr., S-p-e-i-e-r.

03:55   16          THE COURT:  Please proceed.

03:55   17          MR. SEVERO:  Sorry I mispronounced your name.  I

03:55   18  should know better.

03:55   19          THE WITNESS:  No problem.  It happens all the

03:55   20  time.

03:55   21                      DIRECT EXAMINATION

03:55   22  BY MR. SEVERO:

03:55   23  Q    Good afternoon, sir.  Can you tell us what is your

03:55   24  current employment.

03:55   25  A    I am currently a self-employed consultant.

03:55   1    Q    In what area?

03:55   2    A    Primarily dealing with tax controversy matters, but I

03:55   3    also assist corporate clients and defense counsel in matters

03:55   4    dealing with other financial crimes including money

03:55   5    laundering or anti-money laundering.  I'm currently

03:55   6    representing a Macon municipality and its police department

03:56   7    in a civil suit.

03:56   8    Q    What is your professional background and experience?

03:56   9    A    For 29 years I was employed by the Internal Revenue

03:56   10   Service in their criminal investigation function.  I began

03:56   11   my career in 1977 as a special agent, which is the criminal

03:56   12   investigator position.

03:56   13         Subsequently I have held positions as a first- and

03:56   14   second-line manager.  I have been a special agent in charge

03:56   15   of both the Los Angeles office and the San Jose office.  I

03:56   16   was the West Coast executive for IRS criminal investigation

03:56   17   for a number of years.  I headed up its design team after

03:56   18   the 1998 Roth hearings, and I served as an acting deputy

03:56   19   number two for IRS nationwide.

03:56   20         And then in 2003 I became the deputy chief of IRS

03:57   21   criminal investigation, a position I held for approximately

03:57   22   three years until -- and going into December of 2005.  From

03:57   23   December 2005 to April of 2006, I was the acting chief of

03:57   24   IRS criminal investigation, which meant I was in charge of

03:57   25   all IRS criminal investigation programs and all of its

03:57  1  employees.

03:57  2  Q    Can you tell us whether you have provided lectures or

03:57  3  speaking engagements, that sort.

03:57  4  A    I will do anything for a free lunch, so I have done a

03:57  5  substantial amount of speaking for bar associations,

03:57  6  practitioner groups.  Since my retirement I have taught a

03:57  7  couple different seminars for the IRS criminal investigation

03:57  8  function.  And again, I lecture at bar associations and the

03:58  9  like.

03:58  10  Q    While you were the deputy chief of the IRS criminal

03:58  11  division, what was your responsibility for undercover

03:58  12  operations?

03:58  13  A    The deputy chief for IRS criminal investigation is the

03:58  14  ultimate sign-off authority for all what they call group-one

03:58  15  undercover operations, which are the larger, most

03:58  16  sophisticated operations, and those with a budget exceeding

03:58  17  $10,000.

03:58  18          So analysts working for me would work with a field

03:58  19  office.  They would develop a plan for an undercover

03:58  20  operation.  There would be a great deal of paperwork and

03:58  21  analysis involved.  Then ultimately that plan would be

03:58  22  presented to me for me to make a decision as to whether to

03:58  23  approve it or not approve it.

03:58  24  Q    Are you familiar with TIGTA?

03:58  25  A    I am indeed.

03:58   1   Q     How are you familiar with TIGTA?

03:59   2   A     Again in my 29 years working with the Internal Revenue

03:59   3   Service, I have worked with both the internal audit function

03:59   4   back when it was the intersection service and now TIGTA.

03:59   5   Then I have also worked very closely with the organization

03:59   6   Mr. Gomez is associated with.

03:59   7         I have worked joint investigations with TIGTA

03:59   8   agents, and then I have certainly been involved in referring

03:59   9   allegations of misconduct by any CI employees to TIGTA and

03:59   10   dealing with them on a number of matters.

03:59   11   Q     There was a time earlier in your tenure that the

03:59   12   predecessor to TIGTA, the Inspector General, was part of the

03:59   13   IRS; correct?

03:59   14   A     It was called the inspection service.  Yes, it was.

03:59   15   Q     Inspection service.  Okay.  And that worked separately

03:59   16   from the criminal investigation division?

03:59   17   A     Correct.  The criminal investigation division has a

03:59   18   different set of investigative responsibilities than TIGTA

03:59   19   does.

03:59   20   Q     In terms of law enforcement, is an undercover operation

04:00   21   any different whether it's conducted by TIGTA, LAPD, or the

04:00   22   criminal investigation division?

04:00   23   A     In general the object of undercover is to develop

04:00   24   allegations and evidence of illegal activity by inserting an

04:00   25   individual into any live scenario and determining whether or

04:00   1   not the target of the undercover operation commits criminal

04:00   2   activity.

04:00   3   Q    Did you have -- as deputy chief, you had sign-off

04:00   4   authority on all undercover operations?

04:00   5   A    I did.

04:00   6   Q    What did you have to review in order to sign off on an

04:00   7   undercover operation?

04:00   8   A    In the criminal division of IRS, there is a substantial

04:00   9   amount of oversight that goes into undercover.  It and

04:01   10  search warrants are the two most intrusive investigative

04:01   11  techniques utilized by IRS special agents, and criminal

04:01   12  investigation is the law-enforcement arm of the Internal

04:01   13  Revenue Service.

04:01   14       So because they're very sensitive techniques, they

04:01   15  are incredibly documented.  The object of an undercover is

04:01   16  written out.  The budget for an undercover operation is

04:01   17  written out.  So there is an investigative work plan.  There

04:01   18  is an analysis of the individuals who are going to be used

04:01   19  in the undercover.  There is a complete description of the

04:01   20  proposed targets or defendants.

04:01   21       There is a budget.  There is a discussion of how

04:01   22  monitoring, both electronic audio and video, will be done.

04:01   23  And if there is tax issues involved, the operation is not

04:01   24  only reviewed before sign-off by someone in my position, by

04:02   25  IRS criminal investigation personnel; it's also reviewed by

04:02  1   IRS in-house counsel and Department of Justice tax division

04:02  2   attorneys.  There is a substantial amount of oversight.

04:02  3   Q    You reviewed the facts of this case against Dr. Shah?

04:02  4   A    I have.

04:02  5   Q    And clearly this is not a tax evasion case; correct?

04:02  6   A    That's correct.

04:02  7   Q    And it wouldn't have fallen within the purview of the

04:02  8   criminal investigation division; right?

04:02  9   A    That is correct.

04:02  10  Q    However, the undercover operation would not vary

04:02  11  significantly whether it's a bribery case or a tax case?

04:02  12  A    There are similarities.

04:02  13  Q    What are those?

04:02  14  A    Well, in an undercover IRS criminal investigation

04:02  15  operation, it can be either in a tax allegation or an

04:02  16  allegation of money laundering.  In a money-laundering case,

04:03  17  which is very closely associated with this, IRS frequently

04:03  18  has an individual who they believe is laundering funds, and

04:03  19  they will approach that individual and see if they will

04:03  20  launder additional funds.

04:03  21       When one launders money illegally, one gets paid

04:03  22  for it.  So in the undercover it's very important to ensure

04:03  23  that the payment that's going to be offered to the target is

04:03  24  reasonable and does not induce an individual to conduct

04:03  25  activity they would not otherwise conduct.

04:03  1          What we used to say is we didn't want to create a

04:03  2  criminal.  So we wanted to make sure that the allegations

04:03  3  were real life and that we weren't offering -- we, the

04:03  4  government.  I'm doing the same thing Mr. Meyer did.  I'm

04:03  5  referring to something I did several years ago, and I can't

04:03  6  get the pronoun right.

04:03  7          CI would work very diligently with the Department

04:03  8  of Justice to ensure that the incentive to launder money was

04:03  9  not such that somebody might do something they wouldn't

04:04  10  ordinarily do.

04:04  11  Q    Sir, did you review the TIGTA procedures in this case?

04:04  12  A    I reviewed some TIGTA procedures, sir.  I reviewed the

04:04  13  online procedures I could find for TIGTA undercover

04:04  14  operations circa 2009.

04:04  15  Q    Did you find them to be different than the procedures

04:04  16  used by the IRS?

04:04  17  A    There are differences and primarily because most IRS

04:04  18  undercover operations deal with tax.  So, yes.  There was no

04:04  19  discussion specifically of the two main areas that I was

04:04  20  familiar with, which is tax fraud and money laundering.

04:04  21  Q    In connection with a sting based on a civil tax

04:04  22  liability, what is the standard procedure by government in

04:04  23  those cases?

04:04  24          MS. WAIER:  Objection.  Relevance.

04:05  25          THE COURT:  Overruled.

04:05  1          THE WITNESS:  Any crime dealing with tax liability

04:05  2   is treated again with an incredible amount of oversight, and

04:05  3   the degree of oversight is exercised not only in a tax

04:05  4   matter by IRS criminal investigators and their reviewers but

04:05  5   also by in-house IRS counsel and the Department of Justice

04:05  6   tax division attorneys.

04:05  7          The IRS is very sensitive to tax crimes because

04:05  8   the overall policy of the IRS is they want to ensure that an

04:05  9   individual pays the absolute correct amount of tax, no more

04:05  10  and no less.

04:05  11         So any undercover dealing with a tax liability is

04:05  12  scrutinized to ensure that an undercover is set up to

04:05  13  develop evidence of a crime but again not incentivize

04:05  14  somebody to do something that they wouldn't do otherwise.

04:06  15         Again, as an undercover scenario would be set up,

04:06  16  it would be set up to ensure that the taxpayer was trying to

04:06  17  evade or avoid their liability to pay the absolute correct

04:06  18  amount of tax.

04:06  19  BY MR. SEVERO:

04:06  20  Q    Did you come to understand that the sting operation in

04:06  21  this case was based on a revenue agent report?

04:06  22  A    Yes, sir.

04:06  23  Q    And what was the scrutiny provided by either the IRS or

04:06  24  TIGTA in terms of that revenue agent report that was used to

04:06  25  do the sting?

04:06  1   A    Based on testimony that we all heard, Mr. Ham completed

04:06  2   the revenue agent report at issue.  He did not share it with

04:06  3   coworkers or with his supervisor.  He did share it with

04:06  4   Mr. Gomez.  But again, scrutinizing Mr. Gomez's testimony, I

04:07  5   didn't find TIGTA to be doing anything -- not doing anything

04:07  6   they were supposed to.

04:07  7        Mr. Gomez was supposed to assume that the RAR he

04:07  8   received was true and accurate.  He had no way of knowing it

04:07  9   was inaccurate because Mr. Ham did not share it for

04:07 10   evaluation, review, or scrutiny with any supervisor in his

04:07 11   chain of command or a coworker.

04:07 12   Q    In your experience is that a defective procedure?

04:07 13   A    From my perspective it is.

04:07 14   Q    Is it -- you're saying that Agent Gomez relied on

04:07 15   Mr. Ham, on a revenue agent report that was wrong?

04:08 16   A    Oh, absolutely.  Yes, sir.  I believe Ms. Yu earlier

04:08 17   this morning told us it was inaccurate in two different

04:08 18   ways.

04:08 19   Q    With respect to the undercover operation, I think in

04:08 20   your testimony you stated that the IRS never wants to,

04:08 21   quote, unquote, create a criminal?

04:08 22   A    Correct, sir.

04:08 23   Q    Is it your opinion that in this case a criminal was

04:08 24   created?

04:08 25   A    My opinion is that we didn't have a chance to figure

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

04:08  1    that out because there was not an accurate revenue agent's
04:09  2    report presented to the taxpayer in this case, to Dr. Shah.
04:09  3    Q    So there was an incentive -- strike that.  In your law
04:09  4    enforcement experience, was the sting based on a civil tax
04:09  5    liability the way it was done here properly done?
04:09  6    A    No, sir.
04:09  7              MR. SEVERO:  That's all I have.
04:09  8              THE COURT:  Ms. Waier.
04:09  9                        CROSS-EXAMINATION
04:09  10   BY MS. WAIER:
04:09  11   Q    Good afternoon.
04:09  12   A    Good afternoon.
04:09  13   Q    All right.  So you're paid to be here; right?
04:09  14   A    Oh, yes, ma'am.
04:09  15   Q    Got your free lunch?
04:09  16   A    The lunch wasn't free.
04:09  17   Q    Well, there you go.  How much have you been paid so
04:09  18   far?
04:09  19   A    You know, as soon as you asked Mr. Meyer the question,
04:09  20   I knew I was in trouble.  The easy part is I get paid $250
04:10  21   an hour.  I will tell you I've got enough engagements right
04:10  22   now that I honestly do not know how many hours I've billed
04:10  23   on this.  I would say it's probably less than Mr. Meyer.
04:10  24   Q    That's not helpful.  How much do you think, ballpark
04:10  25   figure?

04:10  1  A    Oh, golly.  I am under oath and I honestly don't know.

04:10  2  Ballpark -- again, I have got -- and I am not trying -- I

04:10  3  have got a lot of other things that I'm doing.  Oh, golly.

04:10  4  Sorry folks.  I guess $17,000 to $20,000, but I couldn't

04:10  5  tell you for sure.  I just don't know.

04:10  6  Q    All right.  Okay.  So you work for IRS CI?

04:10  7  A    I did.

04:10  8  Q    You did.  I didn't know if you were using the same we.

04:10  9  A    I sometimes fall into that.

04:10  10  Q    And that is very different than TIGTA?

04:10  11  A    It is.

04:10  12  Q    TIGTA cases don't have to be reviewed by the tax

04:11  13  division?

04:11  14  A    They do not.

04:11  15  Q    They don't go through the same scrutiny of the IRS, of

04:11  16  what IRS CI cases have to go through?

04:11  17  A    That's correct.

04:11  18  Q    And there is a reason for that; right?

04:11  19  A    Oh, absolutely.

04:11  20  Q    Why?

04:11  21  A    I thought I explained it.  The IRS deals with tax

04:11  22  crime, and tax crime is based on IRS policies, one, that

04:11  23  everyone should pay only the right amount of tax; two, in a

04:11  24  criminal tax case IRS tax enforcement is based on giving the

04:11  25  criminal subject of investigation every conceivable benefit

04:11  1    of the doubt.  So a civil finding and a criminal finding in

04:11  2    the same case, the criminal dollars will be much lower than

04:11  3    the civil.

04:11  4    Q    And FBI cases, they don't go through the kind of

04:11  5    scrutiny either.  If the Federal Bureau of Investigation

04:12  6    is --

04:12  7    A    They don't go through the tax division.

04:12  8    Q    No.  In fact, all the law enforcement agencies that

04:12  9    bring cases to my office -- FBI, DEA, TIGTA -- they don't go

04:12  10   through that process or that scrutiny?

04:12  11   A    To the best of my knowledge, CI is the only one.

04:12  12   Q    CI is the only one.  And CI also can only investigate

04:12  13   certain crimes.  There is only -- IRS can only -- CI can

04:12  14   only investigate certain crimes?

04:12  15   A    Partially correct.

04:12  16   Q    Okay.  I mean, tax, money laundering, but they don't

04:12  17   investigate bribery cases; correct?

04:12  18   A    I am not trying to play word games with you, but many

04:12  19   bribery cases -- for example, the recent cases in Detroit,

04:12  20   cases that I supervise in East Palo Alto, there's tax

04:12  21   ramifications to bribery.

04:12  22   Q    I am talking about bribery of revenue agents.

04:13  23   A    Oh, CI does not.

04:13  24   Q    CI does not.  So you as someone who worked for CI never

04:13  25   worked on a bribery case dealing with a revenue agent;

04:13  1    right?

04:13  2    A    Not as a sole investigating agency.

04:13  3    Q    Right.  In fact, that is in the sole purview of TIGTA?

04:13  4    A    Absolutely.

04:13  5    Q    And they have their own regulations; correct?

04:13  6    A    Absolutely.

04:13  7    Q    Now, you talked about this investigation.  Did you look

04:13  8    at any ops plans in this case?

04:13  9    A    I did not.

04:13  10   Q    No.  You didn't have access to those files; right?

04:13  11   A    That's correct.

04:13  12   Q    So you're just basing that on your opinions on what in

04:13  13   terms of ops plans and what was followed?  What are you

04:13  14   looking at?

04:13  15   A    I believe I opined that Special Agent Gomez appeared to

04:13  16   follow the TIGTA guidance that I was able to locate and that

04:13  17   my opinions were based on the way as an administrator for

04:13  18   criminal investigation would approach, approve, and conduct

04:13  19   a similar operation if it was tax or money-laundering

04:14  20   related.

04:14  21   Q    Special Agent Gomez did everything right?

04:14  22   A    Special Agent Gomez to the best of my knowledge

04:14  23   followed his guidance.

04:14  24   Q    You called this investigation here an undercover.

04:14  25   Isn't it really just consensual monitoring going on in this

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

04:14   1   case?

04:14   2   A    Correct.

04:14   3   Q    So this is not a huge undercover operation.  This is

04:14   4   not a group one; right?  This is not a group one?

04:14   5   A    I don't know.  As you mentioned, I have not seen any of

04:14   6   the ops plans.

04:14   7   Q    Right.  Well, you were just saying that when you do

04:14   8   uncover operations, you follow this or that.  That isn't

04:14   9   this case?

04:14   10   A    It does not appear to be.

04:14   11   Q    And you talked a little bit about the revenue agent

04:15   12   report.  Whether or not the revenue agent report was right

04:15   13   or wrong, it does not excuse a taxpayer from bribing a

04:15   14   revenue agent; isn't that right?

04:15   15   A    That's correct.

04:15   16          MS. WAIER:  Thank you.

04:15   17          No further questions.

04:15   18          THE COURT:  Redirect

04:15   19                     REDIRECT EXAMINATION

04:15   20   BY MR. SEVERO:

04:15   21   Q    Neither TIGTA nor the FBI nor CI is allowed to entrap

04:15   22   an individual; is that true?

04:15   23   A    Absolutely.

04:15   24   Q    And that's not TIGTA procedures.  It's not CI

04:15   25   procedures.  It's the law of the land; is that correct?

04:15    1    A    Correct.

04:15    2    Q    So when we talk about procedures and whether they are

04:15    3    followed by TIGTA or not or followed by CI, the fact is that

04:15    4    the law enforcement agency has o conduct a fair

04:15    5    investigation; true?

04:15    6    A    Correct.

04:15    7    Q    The money that you have been paid has been for the time

04:16    8    you spent on the case; correct?

04:16    9    A    Correct.

04:16   10    Q    It has not influenced any of your opinions; has it?

04:16   11    A    Absolutely not.

04:16   12              MR. SEVERO:  That's all I have.

04:16   13              THE COURT:  Ms. Waier.

04:16   14              MS. WAIER:  Nothing further.  Thank you.

04:16   15              THE COURT:  All right.  Sir, you can step down.

04:16   16    You're excused.

04:16   17              Mr. Severo, anymore witnesses today?

04:16   18              MR. SEVERO:  No, sir.

04:16   19              THE COURT:  All right.

04:16   20              Ladies and gentlemen, then we are going to go

04:16   21    ahead and break a little bit early.  I still believe it's

04:16   22    our hope to finish the presentation of the evidence, to give

04:16   23    instructions on the law, and closing arguments tomorrow.

04:16   24    That's my hope.

04:16   25              Given that's my hope, I'm going to order that we

04:16  1  provide lunch for you.  I think your only option is

04:16  2  downstairs, right, but we will take you to lunch.  I don't

04:16  3  know if any of you have been bringing your lunch while you

04:16  4  have been sitting on this case, but you don't have to

04:16  5  tomorrow.  We will bring the lunch.

04:16  6       The final thing is I have to give you the recess

04:17  7  instruction again.  I know you probably could recite it to

04:17  8  me.  Remember until the trial is over, do not discuss this

04:17  9  case with anyone including your fellow jurors, members of

04:17  10  your family, people involved in the trial, or anyone else,

04:17  11  and do not allow others to discuss the case with you.  This

04:17  12  includes discussing the case in internet chat rooms or

04:17  13  through internet blogs, bulletin boards, e-mails or text

04:17  14  messaging.

04:17  15       If anyone tries to communicate with you about the

04:17  16  case, please let me know about it immediately.  Do not read,

04:17  17  watch, or listen to any news reports or other accounts about

04:17  18  the trial or anyone associated with it, including any online

04:17  19  information.  Do not do any research such as consulting

04:17  20  dictionaries, searching the internet, or using other

04:17  21  reference materials; and do not make any investigation about

04:17  22  the case on your own.

04:17  23       Finally, keep an open mind until all the evidence

04:17  24  has been presented and you have heard the arguments of

04:17  25  counsel, my instructions on the law, and the views of your

04:18   1   fellow jurors.

04:18   2           Have a very safe and good evening, and we will

04:18   3   look forward to seeing everybody tomorrow around 8:15.

04:18   4           (Jury not present)

04:18   5           THE COURT:  All right, as we discussed, I want to

04:18   6   go over the jury instructions and the verdict and make any

04:18   7   final changes.

04:18   8           MR. SEVERO:  I expect that we should be done with

04:18   9   testimony, unless there is a rebuttal case, at least from

04:19   10  our perspective by certainly 9:30 tomorrow.

04:19   11          THE COURT:  Terrific.

04:19   12          And how long do you think you're going to need in

04:19   13  your closing argument, just so we can plan them?

04:19   14          MR. WILSON:  Probably half an hour, 45 minutes, an

04:19   15  hour reserve.

04:19   16          THE COURT:  Ms. Waier?

04:19   17          MS. WAIER:  Probably about the same.

04:19   18          THE COURT:  Okay.  So we can probably then can

04:19   19  complete this before they go to lunch?

04:19   20          MS. WAIER:  Let's hope.

04:19   21          MR. SEVERO:  I hope so.

04:19   22          THE COURT:  The instructions are not that long.

04:19   23          Do you need a break, or can we get right into the

04:19   24  jury instructions?

04:19   25          MS. WAIER:  Let's go.

04:21  1          MR. SEVERO:  Let's do it.

04:21  2          THE COURT:  Okay, so as long as we speak into the

04:21  3  microphone for our court reporter, I strongly suggest and

04:21  4  recommend that we do it from the seat of the chairs.  No

04:21  5  need to stand up.

04:21  6          I suppose we start with the jury verdict because I

04:21  7  have no comments or any changes on it.  I think it's pretty

04:21  8  straightforward.

04:21  9          Is the verdict form approved by both sides?  Is it

04:21  10  approved by the government?

04:21  11          MS. WAIER:  Yes.

04:21  12          MR. LAYTON:  It's approved by defense counsel,

04:21  13  Your Honor.

04:21  14          THE COURT:  All right, so that takes care of the

04:21  15  verdict.

04:21  16          Now, the jury instructions, the one issue that I

04:21  17  think we need to add -- and I can go ahead and add it -- I

04:21  18  think we need an instruction on expert testimony, and 4.14 I

04:22  19  believe is the instruction.  I will go ahead and add that.

04:22  20  I put this on our system.

04:22  21          Where do you want me to add it?

04:22  22          MS. WAIER:  I was thinking about evidence maybe.

04:22  23          MR. LAYTON:  I was thinking about the evidence,

04:22  24  too.

04:22  25          MS. WAIER:  Maybe after the credibility of

04:22   1   witnesses on No. 9.  I would put it there.

04:22   2           MR. SEVERO:  I didn't bring my instructions with

04:22   3   me.  Are we talking about the Ninth Circuit Model

04:22   4   Instruction 4.14?

04:22   5           THE COURT:  Right.  So we will add that, and I

04:22   6   will put -- it will be the new No. 10.

04:22   7           MS. WAIER:  Okay.

04:22   8           THE COURT:  Then what I wanted to do is go over

04:22   9   all the other instructions one by one, but I wanted to --

04:23   10  because there was only two others that I had issues with.

04:23   11          Current Court Instruction No. 12, is that

04:23   12  accurate, given the lesser included offense; and should this

04:23   13  be reworded to reflect that?  It's on my page 12,

04:23   14  Instruction No. 12.

04:23   15          MR. SEVERO:  I think this was in because of the

04:23   16  lesser included.

04:23   17          THE COURT:  In other words, it's not accurate

04:23   18  because -- here is what I would propose if you agree with me

04:24   19  that this needs to be reworded because that's not accurate.

04:24   20  The way the jury instructions -- the other jury instructions

04:24   21  read and the verdict is they have to determine the lesser

04:24   22  included if they come back not guilty on the greater.

04:24   23          So what I was suggesting we would say is:  "You

04:24   24  are here only to determine whether the defendant is guilty

04:24   25  or not guilty of the crime of bribing a public official.

04:24  1   And if all of you are not convinced beyond a reasonable

04:24  2   doubt that the defendant is guilty of that crime, whether

04:24  3   the defendant is guilty or not guilty of the lesser crime of

04:24  4   illegal gratuity to a public official, the defendant is not

04:24  5   on trial for any other conduct or offense."

04:25  6            MS. WAIER:  That's fine.

04:25  7            MR. LAYTON:  Defense counsel approves.

04:25  8            THE COURT:  Okay.  The other instruction is -- has

04:25  9   Dr. Shah made a decision about whether he is going to

04:25 10   testify or not, or do you want to leave that open until

04:25 11   tomorrow?

04:25 12            MR. SEVERO:  Well, actually we can address an

04:25 13   issue that may help us decide here.  As the Court probably

04:25 14   hasn't forgotten, we had a situation on the 10th of this

04:26 15   month where the Court found that Dr. Shah had not been

04:26 16   truthful with the Court.  And as a result, you modified his

04:26 17   pretrial release conditions.

04:26 18            We are of the mind that the Court should not allow

04:26 19   that incident to be used to impeach Dr. Shah should he

04:26 20   choose to testify.

04:26 21            THE COURT:  I agree.  I already thought that

04:26 22   through.  No, I wasn't going to allow that.

04:26 23            MR. SEVERO:  Okay.  All right.  So with that in

04:26 24   mind, we will make the decision overnight, and then I will

04:26 25   inform you in the morning.  We'll see what happens.

04:26  1          THE COURT:  All right.

04:26  2          MS. WAIER:  Your Honor, on that ruling, if the

04:26  3   defendant opens the door in terms of if he has always been

04:27  4   truthful and accurate throughout the proceedings in this

04:27  5   case, I think the government should be able to inquire into

04:27  6   that.

04:27  7          THE COURT:  We're not going there.

04:27  8          MS. WAIER:  Okay.

04:27  9          THE COURT:  You're duly noted.  It's not going to

04:27  10  come in.  I just want the record clear.  I didn't increase

04:27  11  his pretrial release as punishment, and I'm not saying you

04:27  12  were suggesting it, but I thought that might have been the

04:27  13  impression.

04:27  14         I did that because I was worried about the flight

04:27  15  risk.  If he was misleading and false with me and with you,

04:27  16  I had serious concerns about whether he was going to show up

04:27  17  for trial or not.  But I didn't think at the point it made

04:27  18  sense putting him in custody to ensure that he would be here

04:27  19  because I thought I could achieve that with electronic

04:27  20  monitoring.  So I just want the record explicitly clear that

04:27  21  that was not done for punishment for misleading me.

04:28  22         MR. SEVERO:  Having shown up, would the Court

04:28  23  consider removing the monitoring?

04:28  24         THE COURT:  No, I would not.

04:28  25         MR. SEVERO:  I had to ask.

04:28  1           THE COURT:  But I won't increase it.

04:28  2           What I will do then, is I think the way the

04:28  3  current instructions are is they have them as separate

04:28  4  instructions that he's testified or he has not testified.

04:28  5  So I will just make them Instruction No. 3 instead of No. 3

04:28  6  and No. 4 if you follow me.

04:28  7           MR. SEVERO:  Okay.  Sure.

04:28  8           THE COURT:  And then once you let us know what

04:28  9  he's going to do, we'll pull out the one that doesn't apply

04:28  10  and then make copies.

04:28  11           MR. SEVERO:  Very well.  We have an inclination,

04:28  12  but we'll let you know in the morning.

04:28  13           THE COURT:  Okay.  That's fine.

04:29  14           MR. SEVERO:  Thank you.

04:29  15           The Court allowed him to get a haircut the other

04:29  16  day.  He didn't quite make it there because he needed to

04:29  17  sleep.  Is it okay if he goes today?

04:29  18           THE COURT:  Sure.

04:29  19           MR. SEVERO:  All right.  Thank you.

04:29  20           THE COURT:  Okay, if you have the instructions

04:29  21  before you, I am just going to say Instruction No. 1 and say

04:29  22  what it is.  And then, Ms. Waier, if you could indicate

04:29  23  approve or object.  And then, Mr. Layton, if you could do

04:29  24  the same thing, tell me if you approve or object.

04:29  25           Okay, first up is Instruction No. 1, the members

04:29    1    of the jury.

04:29    2                MS. WAIER:  Approve.

04:30    3                MR. LAYTON:  Approve, Your Honor.

04:30    4                THE COURT:  All right.  Instruction No. 2 is the

04:30    5    First Superseding Indictment is not evidence.

04:30    6                MS. WAIER:  Approve.

04:30    7                MR. LAYTON:  Approve, Your Honor.

04:30    8                THE COURT:  Instruction No. 3, that will be used

04:30    9    in the event Dr. Shah does not testify.

04:30   10                MS. WAIER:  Agree.

04:30   11                MR. LAYTON:  Agree, Your Honor.

04:30   12                THE COURT:  The next instruction will be the

04:30   13    alternate if Dr. Shah decides to testify.

04:30   14                MS. WAIER:  Agreed.

04:30   15                MR. LAYTON:  Approve.

04:30   16                THE COURT:  The next instruction is the definition

04:30   17    of "proof beyond a reasonable doubt."

04:30   18                MS. WAIER:  Agree.

04:30   19                MR. LAYTON:  Approve, Your Honor.

04:30   20                THE COURT:  The next instruction is what is

04:30   21    evidence.

04:30   22                MS. WAIER:  Agree.

04:30   23                MR. LAYTON:  Approve.

04:30   24                THE COURT:  The next instruction is what is not

04:30   25    evidence.

04:31   1           MS. WAIER:  Agree.

04:31   2           MR. LAYTON:  Approve.

04:31   3           THE COURT:  The next instruction is direct or

04:31   4  circumstantial evidence.

04:31   5           MS. WAIER:  Agree.

04:31   6           MR. LAYTON:  Approve.

04:31   7           THE COURT:  The next instruction is credibility of

04:31   8  witnesses.

04:31   9           MS. WAIER:  Agree.

04:31  10           MR. LAYTON:  Approve.

04:31  11           THE COURT:  The next instruction is the recorded

04:31  12  conversations.

04:31  13           MS. WAIER:  Agree.

04:31  14           MR. LAYTON:  I'm sorry, Your Honor.  I thought the

04:31  15  next one was the one that you had inserted.

04:31  16           THE COURT:  Oh, you're right, but I am just going

04:31  17  to give the model instruction on that.  It's the one I read

04:31  18  to the jury.

04:31  19           MR. LAYTON:  Which we approved already.

04:31  20           THE COURT:  You're right.  That would be the next

04:31  21  one.  So then --

04:31  22           MR. LAYTON:  And then the one you just said, No.

04:31  23  10 on recorded testimony, approve.

04:32  24           THE COURT:  All right.  Then the transcripts.

04:32  25           MS. WAIER:  Agree.

04:32   1                MR. LAYTON:  Approve.

04:32   2                THE COURT:  The next instruction is the one that I

04:32   3    am going to modify.  Do you need me to read it again?

04:32   4                MS. WAIER:  No.  Agree.

04:32   5                MR. LAYTON:  No.  That's approved, Your Honor.

04:32   6                THE COURT:  Okay.  Usually I see -- okay.  The

04:32   7    next instruction I have is the first substantive one on the

04:32   8    charge of bribing a public official.

04:32   9                MS. WAIER:  Agree.

04:32   10               MR. LAYTON:  Approve.

04:32   11               THE COURT:  The next is definition of a "public

04:32   12   official."

04:32   13               MS. WAIER:  Agree.

04:32   14               MR. LAYTON:  Approve.

04:32   15               THE COURT:  The next is definition of an "official

04:32   16   act."

04:32   17               MS. WAIER:  Agree.

04:33   18               MR. LAYTON:  Approve.

04:33   19               THE COURT:  The next is the lesser crime of

04:33   20   illegal gratuity to a public official.

04:33   21               MS. WAIER:  Agree.

04:33   22               MR. LAYTON:  Approve.

04:33   23               THE COURT:  The next is entrapment.

04:33   24               MS. WAIER:  Agree.

04:33   25               MR. LAYTON:  I seem to be missing the entrapment

```
04:33    1    one.  The entrapment is the Ninth Circuit model?
04:33    2              THE COURT:  Yes, it's the Ninth Circuit model.
04:33    3              MR. LAYTON:  Approve.
04:33    4              THE COURT:  I believe then now we go into the
04:33    5    concluding ones.
04:33    6              MS. WAIER:  Correct.
04:33    7              THE COURT:  The first up is -- I think it's the
04:33    8    jury deliberations.
04:33    9              MS. WAIER:  Agree.
04:33   10              MR. LAYTON:  Approve.
04:33   11              THE COURT:  The next is their conduct during
04:34   12    deliberations.
04:34   13              MS. WAIER:  Agree.
04:34   14              MR. LAYTON:  Approve.
04:34   15              THE COURT:  The next is notetaking.
04:34   16              MS. WAIER:  Agree.
04:34   17              MR. LAYTON:  Approve.
04:34   18              THE COURT:  Next is cannot consider punishment.
04:34   19              MS. WAIER:  Agree.
04:34   20              MR. LAYTON:  Approve.
04:34   21              THE COURT:  The next is a verdict form has been
04:34   22    prepared.
04:34   23              MS. WAIER:  Agree.
04:34   24              MR. LAYTON:  Approve.
04:34   25              THE COURT:  Then my final one is if you have
```

| | | |
|---|---|---|
| 04:34 | 1 | questions. |
| 04:34 | 2 | MS. WAIER:  Agree. |
| 04:34 | 3 | MR. LAYTON:  Approve. |
| 04:34 | 4 | THE COURT:  Okay.  Is there any other instructions |
| 04:34 | 5 | you believe need to be given to this jury? |
| 04:34 | 6 | MS. WAIER:  No, Your Honor. |
| 04:34 | 7 | MR. LAYTON:  No, Your Honor. |
| 04:34 | 8 | THE COURT:  Okay, then I will see everybody |
| 04:34 | 9 | tomorrow at 8:15. |
| 04:34 | 10 | MS. WAIER:  Thank you, Your Honor. |
| 04:34 | 11 | MR. SEVERO:  Thank you, Your Honor. |
| 04:34 | 12 | MR. LAYTON:  Thank you very much, Your Honor. |
| 04:34 | 13 | MR. SEVERO:  Your Honor, one thing.  I know that |
| 04:35 | 14 | during Mr. Wilson's examination of Mr. Meyer there was a |
| 04:35 | 15 | question about the use of the demonstratives or the summary, |
| 04:35 | 16 | and I think you deferred ruling on that.  I don't know -- |
| 04:35 | 17 | what did we do with it? |
| 04:35 | 18 | THE COURT:  Why don't we deal with it right now. |
| 04:35 | 19 | I don't think it will take long.  There was part of it that |
| 04:35 | 20 | I thought looked like a summary exhibit, but I agree with |
| 04:35 | 21 | Ms. Waier that there was other parts of it that clearly were |
| 04:35 | 22 | argumentative.  It was a demonstrative exhibit, which was |
| 04:35 | 23 | totally appropriate to show the expert and show the jury as |
| 04:35 | 24 | an aid. |
| 04:35 | 25 | MR. SEVERO:  Right.  So I think what we want to do |

04:35  1   it move the summaries in, the one with all the little

04:35  2   numbers, and then the graphs we can use as demonstrative

04:35  3   aids in closing.

04:35  4          THE COURT:  Correct.  Could you give me that

04:35  5   exhibit number so we are all clear?

04:36  6          MS. WAIER:  Seventy-three.

04:36  7          MR. SEVERO:  Yes.  Thank you.

04:36  8          THE COURT:  Seventy-three.  So the first page

04:36  9   would be a proper summary exhibit as well as the second

04:36  10  page, and that's it.

04:36  11         MR. SEVERO:  Very good.  That's great.

04:36  12         THE COURT:  So Exhibit 73, the first two pages of

04:36  13  it will be received into evidence.

04:36  14         (Exhibit 73, pages 1 and 2,

04:36  15          received in evidence.)

04:36  16         MR. SEVERO:  I guess they're in the book, so we

04:36  17  have to remove the --

04:36  18         THE COURT:  Yes.  You will have to get with

04:36  19  Melissa and fix that.

04:36  20         MR. SEVERO:  Very well.

04:36  21         THE COURT:  Okay?

04:36  22         MR. SEVERO:  Thank you.  Have a great evening.

04:36  23         THE COURT:  Thank you.

04:36  24         (Proceeding adjourned at 4:36 p.m.)

04:36  25                  *     *     *

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

04:36    1
04:36    2
04:36    3
04:36    4
04:36    5                        CERTIFICATE
04:36    6
04:36    7        I hereby certify that pursuant to Section 753,
04:36    8   Title 28, United States Code, the foregoing is a true and
04:36    9   correct transcript of the stenographically reported
04:36   10   proceedings held in the above-entitled matter and that the
04:36   11   transcript page format is in conformance with the
04:36   12   regulations of the Judicial Conference of the United States.
04:36   13
04:36   14   Date:  August 16, 2015
04:36   15
04:36   16
04:36   17                  /s/   Sharon A. Seffens  8/16/15
04:36                       _____
04:36   18                  SHARON A. SEFFENS, U.S. COURT REPORTER
        19
        20
        21
        22
        23
        24
        25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER