1                   UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

4    UNITED STATES OF AMERICA,          )
                                        )
5                                       )
                                        )
6                       Plaintiff,      )
                                        )
7                                       )
                                        )
8         Vs.                           )   No. SACR10-00070-CJC
                                        )
9                                       )
                                        )
10   HARSHAD SHAH,                      )
                                        )
11                                      )
                                        )
12                      Defendant.      )
                                        )
13   _____  )

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                   *JURY TRIAL, DAY 1*

18                       VOLUME II

19                  SANTA ANA, CALIFORNIA

20                TUESDAY, JULY 14, 2015

21

22

23              MIRIAM V. BAIRD, CSR 11893
           OFFICIAL U.S. DISTRICT COURT REPORTER
24           255 East Temple Street, # 181-K
            LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2853
                 MVB11893@AOL.COM

1                    **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFF,**     JENNIFER L. WAIER
     **UNITED STATES OF AMERICA:**       AUSA - OFFICE OF US
4                                        ATTORNEY
                                         411 WEST FOURTH STREET
5                                        SUITE 8000
                                         SANTA ANA, CA 92701
6                                        714-338-3550

7


8


9    **IN BEHALF OF THE DEFENDANT,**     MICHAEL V. SEVERO
     **HARSHAD SHAH:**                   THE SEVERO LAW FIRM
10                                       70 SOUTH LAKE AVENUE SUITE
                                         945
11                                       PASADENA, CA 91101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
01:03PM

01:04PM

01:04PM

01:04PM

01:04PM
```

 1          SANTA ANA, CALIFORNIA; TUESDAY, JULY 14, 2015; 1:00 P.M.

 2                  (Open court - jury present.)

 3                  THE COURT:  Please be seated.

 4                  Good afternoon, ladies and gentlemen.

 5                  Ms. Pham, after discussion with the lawyers, I've

 6      decided I'm going to excuse you from this case.  So, would

 7      you please report back down to the jury assembly room, and

 8      let -- let them know that I excused you?

 9                  THE PROSPECTIVE JUROR:  Okay.

10                  THE COURT:  All right.  Thank you.

11                  THE PROSPECTIVE JUROR:  Thank you.  Thank you very

12      much.

13                  THE COURT:  Melissa, would you call another fine

14      citizen to the lectern, please?

15                  THE CLERK:  Carly Pearson, P-E-A-R-S-O-N.

16                  THE COURT:  Hello, Ms. Pearson, can you serve on

17      this case, ma'am?

18                  THE PROSPECTIVE JUROR:  Yep.

19                  THE COURT:  Terrific.

20                  Can I have you take a seat there next to Ms. Clark?

21      Get comfortable or as comfortable as you can be, Ms. Pearson.

22      And then you'll know the drill.

23                  All right.  Do you recognize anybody at the

24      Government's table?

25                  THE PROSPECTIVE JUROR:  Nope.

```
 1              THE COURT:  Do you recognize anybody at Defense
 2    table?
 3              THE PROSPECTIVE JUROR:  No.
 4              THE COURT:  All right.  Could we get that
 5    microphone, Melissa, for her, please?
 6              I had indicated some names of people who could be
 7    testifying in this case, Ms. Pearson, as well as could be
 8    referenced in the evidence that's going to be presented.
 9              Did any of those names sound familiar to you,
10    ma'am?
11              THE PROSPECTIVE JUROR:  No.
12              THE COURT:  We talked about -- before the lunch
13    break, about the fundamental principles of our criminal
14    justice system, the presumption of innocence, the burden of
15    proof on the Government to prove a defendant guilty beyond a
16    reasonable doubt, and a defendant's constitutional right to
17    remain silent and not present any evidence.
18              Do you have any problems accepting those
19    principles?
20              THE PROSPECTIVE JUROR:  None at all.
21              THE COURT:  Any disputes or problems with the IRS
22    we should know about?
23              THE PROSPECTIVE JUROR:  Nope.
24              THE COURT:  Any training, education, or experience
25    in the mental health field?
```

1          THE PROSPECTIVE JUROR:  I have an IAP for a

2     learning disability.  It's an audio deficiency.  And then

3     once I -- and that was in -- I've had one all through my

4     schooling.  And once I started to excel out of that and out

01:06PM  5     of those programs, I started to tutor kids with IEPs and

6     similar disabilities.  So no formal training, but I did work

7     with kids and myself.

8          THE COURT:  Great.  Great.  Appreciate you telling

9     us about that.

01:06PM 10          You ever been a victim of any crime?

11          THE PROSPECTIVE JUROR:  Nope.

12          THE COURT:  You going to have any problem

13     evaluating the credibility of a witness from law enforcement

14     like any other witness?

01:06PM 15          THE PROSPECTIVE JUROR:  None at all.

16          THE COURT:  I had told your fellow citizens, there,

17     that I'm going to be giving instructions not to read, watch,

18     or listen to anything touching on the case.

19          You going to have any problems following that

01:06PM 20     instruction?

21          THE PROSPECTIVE JUROR:  Nope.

22          THE COURT:  You going to have any problem judging

23     whether the Government has met its burden of proof, the

24     defendant guilty beyond a reasonable doubt in this case,

01:07PM 25     judging whether he's guilty or not guilty?

```
 1              THE PROSPECTIVE JUROR:  No issue.

 2              THE COURT:  All right.  Could you tell us a little

 3     bit more about yourself by going over those categories on the

 4     juror information sheet?

 5              THE PROSPECTIVE JUROR:  So my name is Carly

 6     Pearson.  I live in Huntington Beach.  I'm not married.  I

 7     have no children.  I'm a student.  And I work at my

 8     parent's -- our family fish market that we've owned for

 9     44 years.  I've never been to jury duty at all, and my

10     favorite book is Slaughterhouse-Five, and my favorite movie

11     is 12 Angry Men.

12              THE COURT:  Well, welcome.

13              Ms. Waier.

14              MS. WAIER:  All right.  Slaughterhouse-Five and 12

15     Angry Men?

16              THE PROSPECTIVE JUROR:  Yep.

17              THE COURT:  All right.  On the IEP, was it only

18     audio?  If you can --

19              THE PROSPECTIVE JUROR:  So there's two types of

20     audio deficiencies, and mine is my mind to hand.  So I

21     remember most things that are said to me automatically, and I

22     have a really strong memory that way.  But when it comes to

23     like mind to hand, to like writing an essay or something like

24     that, things get a little bit jumbled.  I work through it

25     now.  Sometimes it comes up.  Like with my driving test, it
```

```
 1    comes up, and I have to take an audio test.  But, other than
 2    that, none of it --
 3              MS. WAIER:  Okay.
 4              THE PROSPECTIVE JUROR:  -- affects me.
 5              MS. WAIER:  So no problems -- nothing with hearing
 6    evidence or being able to --
 7              THE PROSPECTIVE JUROR:  No.
 8              MS. WAIER:  It doesn't seem that way at all, but I
 9    just thought I'd ask.
10              In terms of -- you said you've also counseled
11    people?
12              THE PROSPECTIVE JUROR:  Uh-huh.
13              MS. WAIER:  With the same kind of --
14              THE PROSPECTIVE JUROR:  Various things.  And I did
15    more tutoring than counseling.  And when you kind of tutor a
16    student, you kind of counsel.  But, you know, I wouldn't
17    formally call it that.
18              Yeah, I worked with kids ADD, ADHD, audio
19    deficiencies, dyslexia, just all kind of blanket learning
20    disabilities.  Nothing super severe like autism or Asperger's
21    or anything like that.  Just the general student who has a
22    little -- needs a little extra help.  I was able to
23    learn what I needed, and give them that extra help.
24              MS. WAIER:  What about depression?
25              THE PROSPECTIVE JUROR:  No.
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | MS. WAIER:  No.                                             |
|       | 2  | THE PROSPECTIVE JUROR:  No.                                 |
|       | 3  | MS. WAIER:  No one depressed?                               |
|       | 4  | THE PROSPECTIVE JUROR:  No.                                 |
| 01:09PM | 5  | MS. WAIER:  Okay.  Internal Revenue Service, no          |
|       | 6  | problems with people having to pay taxes?                  |
|       | 7  | THE PROSPECTIVE JUROR:  Nope.  None at all.                 |
|       | 8  | MS. WAIER:  Okay.  How about the investigative             |
|       | 9  | techniques?                                                 |
| 01:09PM | 10 | THE PROSPECTIVE JUROR:  No.                               |
|       | 11 | MS. WAIER:  All right.  You were pretty clear on           |
|       | 12 | law enforcement.  No problems with law enforcement?        |
|       | 13 | THE PROSPECTIVE JUROR:  No.                                 |
|       | 14 | MS. WAIER:  You can be fair and impartial?                 |
| 01:09PM | 15 | THE PROSPECTIVE JUROR:  Yep.                              |
|       | 16 | MS. WAIER:  All right.  Thank you.                         |
|       | 17 | THE PROSPECTIVE JUROR:  Thank you.                         |
|       | 18 | THE COURT:  Mr. Severo.                                     |
|       | 19 | MR. SEVERO:  Thank you, Your Honor.                        |
| 01:09PM | 20 | Good afternoon, Ms. Pearson.                             |
|       | 21 | THE PROSPECTIVE JUROR:  Good afternoon.                    |
|       | 22 | MR. SEVERO:  You're a full-time student?                   |
|       | 23 | THE PROSPECTIVE JUROR:  Yeah, and I work part-time         |
|       | 24 | at my family's business.                                   |
| 01:09PM | 25 | MR. SEVERO:  Okay.  Well, where do you go to            |

```
  1   school?

  2             THE PROSPECTIVE JUROR:  I go to Golden West

  3   College.

  4             MR. SEVERO:  Okay.  And what is your course of

  5   study?  What are you --

  6             THE PROSPECTIVE JUROR:  I'm there for another year,

  7   and my major, technically, is liberal arts, but I'm an

  8   advertising major.  And hopefully next year, I'll be at

  9   Boston University.

 10             MR. SEVERO:  And you're applying or how --

 11             THE PROSPECTIVE JUROR:  I have to wait for the

 12   period to open.  But the application is filled out.

 13             MR. SEVERO:  But you haven't applied yet?

 14             THE PROSPECTIVE JUROR:  No.

 15             MR. SEVERO:  That's where you'd like to go.

 16             THE PROSPECTIVE JUROR:  Yeah.  Absolutely.

 17             MR. SEVERO:  Do you know how cold it gets there?

 18             THE PROSPECTIVE JUROR:  I do.  I've been there when

 19   it's negative 17.  It's miserable.

 20             MR. SEVERO:  So, who is your favorite character in

 21   12 Angry Men?

 22             THE PROSPECTIVE JUROR:  Got to go with Henry Fonda.

 23   I mean, it's Henry Fonda, first of all.  And I like how

 24   impartial he was.  I think it represented what all of us

 25   should be.
```

01:09PM (line 5)
01:09PM (line 10)
01:09PM (line 15)
01:10PM (line 20)
01:10PM (line 25)

1           MR. SEVERO:  Your family's fish market --

2           THE PROSPECTIVE JUROR:  Uh-huh.

3           MR. SEVERO:  -- you guys hire an accountant?  Do

4   you deal with any of that?

01:10PM   5           THE PROSPECTIVE JUROR:  Personally, no.  My -- we

6   do have an accountant, but my mom also does our books, and

7   stuff like that.

8           MR. SEVERO:  And have you -- do you know if your

9   family's business has ever been audited?

01:10PM  10           THE PROSPECTIVE JUROR:  Well, under my parents'

11   ownership, no.  But under my grandparents, I do not know.

12           MR. SEVERO:  All right.  Do you know if your -- if

13   the family business is a corporation or is it a partnership?

14           THE PROSPECTIVE JUROR:  It's a corporation.

01:10PM  15           MR. SEVERO:  Corporation.

16           So you don't deal with any of the accounting

17   issues?

18           THE PROSPECTIVE JUROR:  Nope.

19           MR. SEVERO:  What do you do at the fish market?

01:11PM  20           THE PROSPECTIVE JUROR:  Everything that has to do

21   with customers.  I'm the fix-it person, as well.  So I can

22   build you a lobster trap, if you'd like one.

23           MR. SEVERO:  Really.

24           THE PROSPECTIVE JUROR:  I can fix your plumbing,

01:11PM  25   anything you'd like, like that.  I can filet fish.  I sell to

```
 1    customers.  I do all of that stuff, except for the books,
 2    basically.
 3              MR. SEVERO:  What time is lunch?
 4              THE PROSPECTIVE JUROR:  Whenever you'd like.
 5              MR. SEVERO:  Pass for cause.
 6              THE COURT:  Very well.
 7              We're now in the fourth phase of peremptory
 8    challenges.  The Government's up first.
 9              MS. WAIER:  The Government would like to thank and
10    excuse Juror No. 1, Mr. Keogh.
11              THE COURT:  Mr. Keogh, thank you for your time,
12    sir.
13              THE PROSPECTIVE JUROR:  Okay.  Thank you.
14              THE COURT:  If you could report back down to jury
15    assembly room, let them know that I excused you, sir.
16              THE PROSPECTIVE JUROR:  Okay.
17              THE CLERK:  Gary Perotin, P-E-R-O-T-I-N.
18              THE COURT:  Mr. Perotin, can you serve on this
19    case, sir?
20              THE PROSPECTIVE JUROR:  Your Honor, serving on this
21    jury will be a challenge.
22              THE COURT:  Why is that, sir?
23              THE PROSPECTIVE JUROR:  I'm a full-time family law
24    attorney for 39 years.  Nobody is covering my court
25    appearances, which I have almost every day.  I've already
```

01:11PM  5
01:11PM  10
01:11PM  15
01:12PM  20
01:12PM  25

[UNITED STATES DISTRICT COURT]

1    caught shrapnel for not appearing this morning at a court

2    appearance.

3              THE COURT:  Well, tell me what courts are, because

4    I can put a stop to that.  You can't be two places at once,

01:12PM    5    and you're going to be here.

6              THE PROSPECTIVE JUROR:  Well, this morning was

7    Lamoreaux, then I have a matter in Ontario tomorrow.  I have

8    to run an ex parte Thursday in Fullerton.  Friday is in

9    Lamoreaux, I can't remember what department, so --

01:12PM   10              THE COURT:  Okay.  Well, you just give the names of

11    all the courts, and I will personally put in a call to them.

12    But you of all people, we need you to serve.  You're a

13    servant of the law, and you know how important the law is.

14    And I know you know how important this jury system is.

01:13PM   15              We have some of the finest men and women serving

16    overseas, putting their life on the limb for this country and

17    the principles that it stands for, and we need all our

18    citizens to serve on these juries to stand behind these

19    principles.  And so I especially need lawyers being willing

01:13PM   20    and able to serve.  And I will not tolerate any judge,

21    particularly a state judge, saying -- or giving you a hard

22    time for sitting on this case.

23              THE PROSPECTIVE JUROR:  Very good, Your Honor.

24              The clients, of course, are less than thrilled when

01:13PM   25    their attorney doesn't show up, but we'll -- we'll do our

1    best.

2              THE COURT:  We will.

3              THE PROSPECTIVE JUROR:  Thank you.

4              THE COURT:  We will.

01:13PM   5    Okay.  Could I have you take that seat, please?

6              THE PROSPECTIVE JUROR:  This one here, Your Honor?

7              THE COURT:  Yep.

8              THE PROSPECTIVE JUROR:  Sure.

9              THE COURT:  All right.  Mr. Perotin, take your

01:14PM  10    time, sir.  Tell me when you're ready.

11             THE PROSPECTIVE JUROR:  Ready, Your Honor.

12             THE COURT:  Okay.  Do you recognize anybody at the

13    Government's table?

14             THE PROSPECTIVE JUROR:  I do not.

01:14PM  15             THE COURT:  Do you recognize anybody at the defense

16    table?

17             THE PROSPECTIVE JUROR:  Do not.

18             THE COURT:  Any of those people that I indicated

19    may be witnesses in this case or referred to in the evidence

01:14PM  20    sound familiar to you?

21             THE PROSPECTIVE JUROR:  They don't, Your Honor.

22             THE COURT:  Any problems following those and

23    accepting those three fundamental principles of our criminal

24    justice system?

01:14PM  25             THE PROSPECTIVE JUROR:  No, Your Honor.

```
 1              THE COURT:  Any prior disputes or problems with the
 2    IRS, the parties should know about?
 3              THE PROSPECTIVE JUROR:  None, Your Honor.
 4              THE COURT:  Any training, education, or experience
 5    in the mental health field?
 6              THE PROSPECTIVE JUROR:  No, Your Honor.
 7              THE COURT:  Ever been a victim of crime?
 8              THE PROSPECTIVE JUROR:  No.
 9              THE COURT:  Any problems evaluating the credibility
10    of a witness from law enforcement like any other witness?
11              THE PROSPECTIVE JUROR:  No.
12              THE COURT:  Any problem judging the guilt or
13    non-guilt of a defendant in a criminal case?
14              THE PROSPECTIVE JUROR:  I don't think so, Your
15    Honor.
16              THE COURT:  Any problems following the instruction
17    not to read, listen, or watch anything touching on the case
18    in the media?
19              THE PROSPECTIVE JUROR:  No problem.
20              THE COURT:  Could you tell us a little bit more
21    about yourself, and answer and address those categories on
22    the juror information sheet, please.
23              THE PROSPECTIVE JUROR:  Yes, Your Honor.  My name
24    is Gary Perotin.  I lived in Fullerton California for a
25    number of years.  Married.  Three children; 37, 35 and 20.
```

01:15PM (lines 5, 10, 15, 20, 25)

1    I'm an attorney.  Self-employed.  No prior jury service.

2    Favorite movie he is *Dr. Strangelove*.  Favorite book is the

3    *Bible*.

4              THE COURT:  All right.  Ms. Waier, any questions

01:16PM   5    for Mr. Perotin?

6              MS. WAIER:  Mr. Perotin, have you ever practiced

7    criminal law?

8              THE PROSPECTIVE JUROR:  I have.

9              MS. WAIER:  Okay.  Tell me about that.

01:16PM  10              THE PROSPECTIVE JUROR:  I practiced criminal law

11    for the first several years of duty, and I did pretty well at

12    it; but I didn't enjoy it.  I thought it was not a level

13    playing field at all.

14              MS. WAIER:  Okay.  And did you represent the

01:16PM  15    defendants mostly -- was it criminal defense?

16              THE PROSPECTIVE JUROR:  Always.

17              MS. WAIER:  Always criminal defense.

18              And was it mostly state or Federal practice?

19              THE PROSPECTIVE JUROR:  All state.

01:16PM  20              MS. WAIER:  All state.  And then you moved over to

21    family law?

22              THE PROSPECTIVE JUROR:  I did.

23              MS. WAIER:  Because you must not like conflict?

24              THE PROSPECTIVE JUROR:  At least I thought it was a

01:16PM  25    level play playing field in family law.

[UNITED STATES DISTRICT COURT]

1        MS. WAIER:  Okay.  And so you've been doing that

2   for a long time?

3        THE PROSPECTIVE JUROR:  39 years.

4        MS. WAIER:  You like it?

01:16PM  5        THE PROSPECTIVE JUROR:  I can do it pretty -- I can

6   do it in my sleep.  I like it.

7        MS. WAIER:  Okay.  I'll take it that you like it.

8        THE PROSPECTIVE JUROR:  No, I do like it.

9        MS. WAIER:  Okay.  Like practicing law?

01:17PM 10        THE PROSPECTIVE JUROR:  It's never boring.

11        MS. WAIER:  Never boring.

12        Do you do any jury trials?

13        THE PROSPECTIVE JUROR:  Never.

14        MS. WAIER:  All right.  Obviously, since you know

01:17PM 15   the law, you can follow it.

16        THE PROSPECTIVE JUROR:  I can.

17        MS. WAIER:  And you can be fair and impartial in

18   this case.

19        THE PROSPECTIVE JUROR:  Yes.

01:17PM 20        MS. WAIER:  Despite the fact that you might not

21   think there's a level playing field.

22        THE PROSPECTIVE JUROR:  Yes.

23        MS. WAIER:  Okay.  Thank you.  No further

24   questions.

01:17PM 25        THE COURT:  Mr. Severo.

```
 1              MR. SEVERO:  You ever tried -- good afternoon, sir.
 2      Sorry.
 3              THE PROSPECTIVE JUROR:  Good afternoon.
 4              MR. SEVERO:  Have you ever tried a jury case?
 5              THE PROSPECTIVE JUROR:  Never did.
 6              MR. SEVERO:  So how many years have you practiced?
 7              THE PROSPECTIVE JUROR:  I'm going to say six,
 8      seven, eight years.
 9              MR. SEVERO:  Right here in Orange County.
10              THE PROSPECTIVE JUROR:  Orange County, some L.A.,
11      Whittier, Norwalk, Pomona.  Some of the outlying branches.
12              MR. SEVERO:  And you thought your family law -- you
13      think your family law clients are more honorable than your
14      criminal law clients.
15              THE PROSPECTIVE JUROR:  Not at all.
16              MR. SEVERO:  It's arguing over the cat that
17      sometimes gets --
18              THE PROSPECTIVE JUROR:  In the vacuum cleaner.
19              MR. SEVERO:  In the vacuum -- you are not inclined
20      towards one side or the other in a criminal case, are you?
21              THE PROSPECTIVE JUROR:  I don't think so.
22              MR. SEVERO:  Your defense background, is not going
23      to make you an advocate for the defense.
24              THE PROSPECTIVE JUROR:  That's true.
25              MR. SEVERO:  Okay.  You go to church regularly.
```

Timestamps in left margin: 01:17PM (line 5), 01:17PM (line 10), 01:18PM (line 15), 01:18PM (line 20), 01:18PM (line 25)

```
 1              THE PROSPECTIVE JUROR:  I do.

 2              MR. SEVERO:  Okay.  Is -- you're saying you have

 3       court appearances and stuff.  Of course, His Honor is going

 4       work with you on this.

 5              THE PROSPECTIVE JUROR:  Yeah.

 6              MR. SEVERO:  Is this something that is going to

 7       happen for the next week or so?  Is it packed?

 8              THE PROSPECTIVE JUROR:  It's packed until

 9       the -- close till the end of the year.  And I guess that's a

10       good thing.

11              MR. SEVERO:  Yeah, of course.  Thank you.

12              THE PROSPECTIVE JUROR:  You bet.

13              THE COURT:  All right.  Okay.  We're in the fourth

14       phase of the peremptory challenges.  Now the defense is up

15       with two challenges.

16              MR. SEVERO:  May I have a moment?

17              THE COURT:  You may.

18              MR. SEVERO:  The defense would ask the Court to

19       thank and excuse Juror No. 5, Mr. Bocanegra.

20              THE COURT:  Sir, if you'd be kind enough to report

21       back down to jury assembly room.  And I greatly appreciate

22       you showing up today.

23              And another peremptory?

24              MR. SEVERO:  I think I can pass on the second one.

25              THE COURT:  All right.
```

01:18PM — line 5
01:19PM — line 10
01:19PM — line 15
01:19PM — line 20
01:20PM — line 25

```
 1                    MR. SEVERO:  Thank you.

 2                    THE COURT:  All right.  Melissa, would you --

 3                    THE CLERK:  Nancy Antunez, A-N-T-U-N-E-Z.

 4                    THE COURT:  Good afternoon, ma'am.  Can you serve

 5          on this case?

 6                    THE PROSPECTIVE JUROR:  I was actually wanting a

 7          request if I could be excused.

 8                    THE COURT:  Okay.  What's the problem?

 9                    THE PROSPECTIVE JUROR:  I have work at 2:00 --

10          well, actually, I have it at 8:00.  But I had someone switch

11          with me at 2:00.

12                    THE COURT:  All right.

13                    THE PROSPECTIVE JUROR:  And then I have a part time

14          job.

15                    THE COURT:  And what do you do?

16                    THE PROSPECTIVE JUROR:  Security.

17                    THE COURT:  Security.

18                    And do you live alone or do you live with family?

19                    THE PROSPECTIVE JUROR:  I live with my single

20          mother.

21                    THE COURT:  With your single mom, and --

22                    THE PROSPECTIVE JUROR:  And with my two younger

23          brothers.

24                    THE COURT:  And younger brothers.

25                    Are you the one responsible for paying the rent?
```

```
 1              THE PROSPECTIVE JUROR:  I pay half of it.
 2              THE COURT:  You pay half the rent.
 3              And does the security company pay for any jury
 4    service?
01:21PM   5    THE PROSPECTIVE JUROR:  They don't provide with
 6    that.
 7              THE COURT:  All right.  And if you miss this week
 8    of work, are you not going to be able to pay the rent at the
 9    end of the month?
01:21PM  10    THE PROSPECTIVE JUROR:  Well, actually I give half
11    of what my mom gets.  And she works a part-time job, as well.
12              THE COURT:  Okay.  All right.  Well, why don't we
13    see where this goes, and thank you for disclosing that.  And
14    we'll make a decision --
01:21PM  15    THE PROSPECTIVE JUROR:  Okay.
16              THE COURT:  -- a little later.  Okay.  Thank you.
17              All right.  Ma'am, tell me when you're ready.
18              THE PROSPECTIVE JUROR:  Okay.
19              THE COURT:  If you could look at the Government's
01:22PM  20    table, and tell me if you recognize any of those people?
21              THE PROSPECTIVE JUROR:  No.
22              THE COURT:  How about defense table?  Any of them
23    look familiar to you?
24              THE PROSPECTIVE JUROR:  No.
01:22PM  25    THE COURT:  Any of those witnesses that I indicated
```

```
 1    may be testifying or referred to in the evidence sound

 2    familiar to you?

 3              THE PROSPECTIVE JUROR:  No.

 4              THE COURT:  Any problems following those -- and

 5    accepting those three fundamental principles of our criminal

 6    justice system, the presumption of innocence, the burden of

 7    proof on the Government to prove the defendant guilty beyond

 8    a reasonable doubt, and a defendant's constitutional right to

 9    remain silent and not produce any evidence?

10              THE PROSPECTIVE JUROR:  No.

11              THE COURT:  Any prior disputes or problems with the

12    IRS?

13              THE PROSPECTIVE JUROR:  No.

14              THE COURT:  Ever been a victim of a crime, ma'am?

15              THE PROSPECTIVE JUROR:  No.

16              THE COURT:  Any training, education, or experience

17    in the mental health area?

18              THE PROSPECTIVE JUROR:  No.

19              THE COURT:  Any problems viewing the credibility of

20    a witness from law enforcement like any other witness?

21              THE PROSPECTIVE JUROR:  No.

22              THE COURT:  Do you have any immediate family

23    member, very close personal friend involved in law

24    enforcement?

25              THE PROSPECTIVE JUROR:  No.
```

[UNITED STATES DISTRICT COURT]

1         THE COURT:  Okay.  Are you going to have any

2   problems following the instruction not to watch, read, or

3   listen to anything touching on this case that might appear in

4   the media?

01:23PM 5         THE PROSPECTIVE JUROR:  No.

6         THE COURT:  Okay.  Would you tell us a little bit

7   more about yourself, and answer those questions or categories

8   on the juror information sheet?

9         THE PROSPECTIVE JUROR:  Hi, my name is Nancy

01:23PM 10  Antunez.  I live in Santa Ana, California.  I have -- I'm

11  single.  I have no kids.  And I am employed.  I work as a PSC

12  security.  And this is my first time coming for jury.  And my

13  favorite movie is *Pursuit of Happiness*.

14        MR. SEVERO:  I didn't hear that.

01:24PM 15        THE COURT:  All right.  Well, welcome, ma'am.

16        Ms. Waier, any questions?

17        MS. WAIER:  Yes.

18        It sounds like you believe serving on this jury

19  would be a hardship on you; is that right.

01:24PM 20        THE PROSPECTIVE JUROR:  Correct.

21        MS. WAIER:  And that you really -- although, want

22  to serve on the jury, it's not your preference to do so based

23  on your bills and things that you have to pay.

24        THE PROSPECTIVE JUROR:  Right.

01:24PM 25        MS. WAIER:  Would it be hard for you to focus on

1    the evidence knowing that you have to be -- or you feel like

2    you have to be somewhere else?

3                THE PROSPECTIVE JUROR:  Well, at this moment, from

4    work, yes.

5                MS. WAIER:  Okay.

6                THE PROSPECTIVE JUROR:  I mean, I had -- I actually

7    took the time to change with someone.  And I didn't think it

8    was going take this long, so --

9                MS. WAIER:  Okay.

10               THE PROSPECTIVE JUROR:  Yeah.

11               MS. WAIER:  But let's say that you have to serve on

12   this jury, would you have a hard time concentrating on the

13   evidence because you'd be worried about something else?

14               THE PROSPECTIVE JUROR:  Financial.  Yes.

15               MS. WAIER:  Yes.

16               I want -- I just want -- if you were to serve on

17   this jury, for you to be present every day and listen to the

18   evidence and be able to be here.  Because it's a very

19   important proceeding.

20               THE PROSPECTIVE JUROR:  No.

21               MS. WAIER:  Do you understand that?  So can you do

22   that?

23               THE PROSPECTIVE JUROR:  I can do that.

24               MS. WAIER:  So you can do that.  So the job would

25   not -- the fact that you can't make it to your job, you can

1    still be someone who will sit here every day and listen to

2    the evidence?

3              THE PROSPECTIVE JUROR:  I don't know.  I don't

4    think -- well, I don't think so.

01:25PM   5         MS. WAIER:  Okay.  I just -- I want to have a fair

6    trial.

7              THE PROSPECTIVE JUROR:  Right.

8              MS. WAIER:  And I really want you to be able to be

9    here and listen to the evidence and really pay attention.

01:25PM  10         Can you do that?

11             THE PROSPECTIVE JUROR:  I could try, but I can't

12   guarantee it because I have the work.

13             MS. WAIER:  Okay.  Okay.  Other than working, do

14   you -- are you a student?  Do you do anything else or are you

01:25PM  15   basically working part time right now?

16             THE PROSPECTIVE JUROR:  Working part time.

17             MS. WAIER:  Do you have any issues with the

18   Internal Revenue Service?

19             THE PROSPECTIVE JUROR:  No.

01:25PM  20         MS. WAIER:  No.

21             How about paying taxes?  Any problem that you had

22   to pay taxes with?

23             THE PROSPECTIVE JUROR:  No.

24             MS. WAIER:  Okay.  Investigative techniques?  No

01:26PM  25   problems with recordings?

```
 1                    THE PROSPECTIVE JUROR:  No.

 2                    MS. WAIER:  Okay.  Thank you so much.

 3                    THE COURT:  Mr. Severo?

 4                    MR. SEVERO:  Thank you, Your Honor.

 5                    Good afternoon, Ms. Antunez.

 6                    THE PROSPECTIVE JUROR:  Good afternoon.

 7                    MR. SEVERO:  How long have you been working

 8   security?

 9                    THE PROSPECTIVE JUROR:  For six months, I believe,

10   now.

11                    MR. SEVERO:  Six months.

12                    You had a security guard card?  Is that --

13                    THE PROSPECTIVE JUROR:  If I have a security guard

14   card, yes.

15                    MR. SEVERO:  That's how you get into the business,

16   right?

17                    THE PROSPECTIVE JUROR:  Yes.

18                    MR. SEVERO:  All right.  You've undergone some

19   training?

20                    THE PROSPECTIVE JUROR:  Yes.

21                    MR. SEVERO:  Do you work for a security company or

22   do you work directly for --

23                    THE PROSPECTIVE JUROR:  It's a security company.

24                    MR. SEVERO:  It's a security company.  Okay.

25                    So do you work in different venues, or are you
```

1    always in the same place?

2              THE PROSPECTIVE JUROR:  I work at events, as well.

3              MR. SEVERO:  You work events?

4              THE PROSPECTIVE JUROR:  Yes.

01:26PM  5              MR. SEVERO:  Okay.  Having done that kind of work,

6    you've come into contact with police officers all the time,

7    don't you?

8              THE PROSPECTIVE JUROR:  Correct.

9              MR. SEVERO:  Okay.  You have to call them, and, in

01:27PM  10   fact, you have to help the police do the police -- the

11   policeman's work.

12             THE PROSPECTIVE JUROR:  Right.

13             MR. SEVERO:  So you identify with police officers,

14   don't you?

01:27PM  15             THE PROSPECTIVE JUROR:  Yes.

16             MR. SEVERO:  And, in fact, you may want to be a

17   police officer?

18             THE PROSPECTIVE JUROR:  Right.

19             MR. SEVERO:  Is that why you want to be in

01:27PM  20   security?

21             THE PROSPECTIVE JUROR:  Yes.

22             MR. SEVERO:  Your -- your heart is on the side of

23   the law enforcement, isn't that true?

24             THE PROSPECTIVE JUROR:  Yes.

01:27PM  25             MR. SEVERO:  So it's fair to say that when you see

```
 1    a law enforcement agent, such as Agent Gomez or some of the
 2    other people that are going to -- could testify, you would
 3    tend to look at that testimony with a bit more credibility?
 4              THE PROSPECTIVE JUROR:  Right.
 5              MR. SEVERO:  Is that right?
 6              THE PROSPECTIVE JUROR:  Yes.
 7              MR. SEVERO:  So you couldn't possibly give the
 8    defendant the benefit of equal treatment or witnesses because
 9    you favor law enforcement, true?
10              THE PROSPECTIVE JUROR:  True.
11              MR. SEVERO:  Is your -- do you work every day?
12              THE PROSPECTIVE JUROR:  No.  I request some days
13    when people have it off, so -- and they work with what they
14    can.
15              MR. SEVERO:  Are you scheduled to work for the next
16    five, six days?
17              THE PROSPECTIVE JUROR:  I'm scheduled to work
18    Thursday and Friday.
19              MR. SEVERO:  Would you lose your job if you didn't
20    show up?
21              THE PROSPECTIVE JUROR:  I would lose money.
22              MR. SEVERO:  Well, I know.  I understand.
23              THE PROSPECTIVE JUROR:  Yeah.
24              MR. SEVERO:  But I want to know if you would lose
25    your job?
```

01:27PM  5
01:27PM  10
01:28PM  15
01:28PM  20
01:28PM  25

```
 1              THE PROSPECTIVE JUROR:  No, I don't think so.

 2              MR. SEVERO:  The defendant in a criminal case is

 3    presumed innocent.

 4              Do you understand that?

 5              THE PROSPECTIVE JUROR:  Can you repeat yourself,

 6    please?

 7              MR. SEVERO:  A defendant in a criminal case, such

 8    as Dr. Shah in this case, is presumed innocent.

 9              Do you understand that?

10              THE PROSPECTIVE JUROR:  Yes.

11              MR. SEVERO:  Okay.  So if the judge all of a sudden

12    in a fit of optimism said this is over, I'm going to send you

13    back to the jury room, how would you vote?

14              THE PROSPECTIVE JUROR:  Innocent until proven

15    guilty.

16              MR. SEVERO:  Innocent until proven guilty.

17              Which means not guilty now?

18              THE PROSPECTIVE JUROR:  Right.

19              MR. SEVERO:  Is that -- you understand that?

20              THE PROSPECTIVE JUROR:  Yes.

21              MR. SEVERO:  Okay.  However, if a police officer

22    testifies in this case, you would probably find everything he

23    says or she says to be credible?

24              THE PROSPECTIVE JUROR:  Most of it, yes.

25              MR. SEVERO:  I'll reserve, Your Honor.
```

01:28PM (line 5)
01:28PM (line 10)
01:29PM (line 15)
01:29PM (line 20)
01:29PM (line 25)

|   |   |
|---|---|
| | 1 |

THE COURT:  All right.  Let me follow up and ask
you a few questions about that, ma'am.

You think police officers are perfect people?

THE PROSPECTIVE JUROR:  I would say some are; and
some aren't.

THE COURT:  So, on occasion, a police officer can
do a bad thing.

Would you agree with that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Would you agree that since police
officers are not perfect people, that on occasion, they can
make a mistake?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Okay.  Ladies and
gentlemen, I just need a couple minutes with the lawyers in
the hallway.  Please stand, stretch.  We'll be back in touch.

(Sidebar conference.)

THE COURT:  Okay.  Counsel, in the beginning -- I'm
getting a little concerned both sides are looking for that
perfect jury.  There ain't no such thing.  I do want to allow
both sides further questions of everybody.  But again, from
where I'm sitting, we've let some pretty good people go by
that are certainly fair and impartial, and we're getting
people that are, from where I'm sitting, not as good as some
jurors.  This latest one who I assume is your challenge for

cause, which I'm going to deny is because she's just trying

to, I believe, get out of jury service.

As I understand it, she did request Judge Block --

Judge Block did a detailed inquiry into her finance and

aspects.  She can serve.  Totally understand.  If given her

answers you don't want to have her on the jury, that's why

you have peremptories.  I'm not going to excuse her for

cause.

Please feel free to say anything you want on the

record to disagree with that.

MR. SEVERO:  No, Your Honor.  Obviously, I am

concerned about her answers, and the fact -- I know security

well.  My son runs a security company.  He's a former cop.  I

know how that works.  So I -- I'm concerned about security

people because they -- they are -- I don't -- I mean this

offensively, they want to be cops.  That was my concern with

her.  Sometimes we excuse people because we don't like the

way they look or they wink.  They blink a certain way.  So

I -- I -- I don't disagree that perhaps some of the people

we've let go are pretty good.

THE COURT:  I don't disagree with anything you

said.  You have your peremptories.  It's just -- I'm just

laying out there.  Nothing inappropriate or improper.  It's

just a concern that the crowd is getting slimmer, and then I

just saw -- I thought, some really good people.  I'm not

|  |  |
|---|---|
| 1 | picking on the defense.  I -- both sides that, you know, |
| 2 | there's no such thing as a perfect juror.  So I throw that |
| 3 | for thought. |
| 4 | MR. SEVERO:  That's fine.  I appreciate that, sir. |
| 01:33PM 5 | (Sidebar concluded.) |
| 6 | THE COURT:  Okay.  I believe we are now starting |
| 7 | the fifth round of peremptory challenges.  And the Government |
| 8 | is up first. |
| 9 | MS. WAIER:  The Government would like to thank and |
| 01:34PM 10 | excuse Juror No. 1, Mr. Perotin. |
| 11 | THE COURT:  Mr. Perotin, thank you for your time, |
| 12 | sir. |
| 13 | THE PROSPECTIVE JUROR:  Thank you. |
| 14 | THE CLERK:  Dian Leinweber, L-E-I-N-W-E-B-E-R. |
| 01:34PM 15 | THE COURT:  Good afternoon, ma'am.  Did we |
| 16 | pronounce your name correctly? |
| 17 | THE PROSPECTIVE JUROR:  Leinweber. |
| 18 | THE COURT:  Leinweber. |
| 19 | Can you serve on this case, ma'am? |
| 01:34PM 20 | THE PROSPECTIVE JUROR:  Yes. |
| 21 | THE COURT:  Terrific.  Could I have you take a seat |
| 22 | there. |
| 23 | Okay.  Ma'am, does anybody at the Government table |
| 24 | look familiar to you? |
| 01:35PM 25 | THE PROSPECTIVE JUROR:  No. |

| | | |
|---|---|---|
| | 1 | THE COURT:  How about anybody at the defense table? |
| | 2 | THE PROSPECTIVE JUROR:  No. |
| | 3 | THE COURT:  Okay.  Any of those names that I |
| | 4 | mentioned could be witnesses or referred to in the evidence |
| 01:35PM | 5 | sound familiar to you? |
| | 6 | THE PROSPECTIVE JUROR:  No. |
| | 7 | THE COURT:  Any problems accepting those three |
| | 8 | fundamental principles of our criminal justice system we've |
| | 9 | talked about? |
| 01:35PM | 10 | THE PROSPECTIVE JUROR:  No. |
| | 11 | THE COURT:  Have you had any prior problems or |
| | 12 | disputes with the IRS? |
| | 13 | THE PROSPECTIVE JUROR:  No. |
| | 14 | THE COURT:  Any training, education, or experience |
| 01:35PM | 15 | in the mental health field? |
| | 16 | THE PROSPECTIVE JUROR:  No. |
| | 17 | THE COURT:  Ever been a victim of a crime? |
| | 18 | THE PROSPECTIVE JUROR:  No. |
| | 19 | THE COURT:  Have any problem evaluating the |
| 01:35PM | 20 | credibility of a witness from law enforcement like any other |
| | 21 | witness? |
| | 22 | THE PROSPECTIVE JUROR:  No. |
| | 23 | THE COURT:  Do you have any close immediate family |
| | 24 | member, or close personal friend in law enforcement? |
| 01:36PM | 25 | THE PROSPECTIVE JUROR:  I have a Godson on the |

```
 1    San Diego Police Department.
 2               THE COURT:  So am I to assume you have a high
 3    opinion of law enforcement?
 4               THE PROSPECTIVE JUROR:  Yes.
 5               THE COURT:  Do you believe that law enforcement --
 6    though, a person in it, could do bad things?
 7               THE PROSPECTIVE JUROR:  Yes.
 8               THE COURT:  Do you believe that a person in law
 9    enforcement could make mistakes on occasion?
10               THE PROSPECTIVE JUROR:  Yes.
11               THE COURT:  So there's nothing that you think could
12    impact your ability to be fair and impartial to both sides in
13    this case?
14               THE PROSPECTIVE JUROR:  No.
15               THE COURT:  Any problem following the instruction
16    that I said if there's anything in the media or the press
17    touching on this case, you won't read, watch, or listen to
18    it?
19               THE PROSPECTIVE JUROR:  No problem.
20               THE COURT:  Could you look at that juror
21    information sheet.  And tell us a little bit more about
22    yourself.
23               THE PROSPECTIVE JUROR:  I'm Dian Leinweber.  I live
24    in Aliso Viejo.  I'm single.  No children.  I'm a technical
25    account manager for IBM.  I have not -- I've been called, but
```

01:36PM (line 5)
01:36PM (line 10)
01:36PM (line 15)
01:36PM (line 20)
01:37PM (line 25)

```
 1    have not served on a jury.  And I read and watch movies, but
 2    I don't have a favorite.
 3              THE COURT:  Okay.  Any show or movie that you've
 4    seen that you enjoyed, recently?
 5              THE PROSPECTIVE JUROR:  I saw Cinderella.
 6              THE COURT:  Okay.  And you enjoy it?
 7              THE PROSPECTIVE JUROR:  Yes.
 8              THE COURT:  Okay.  That's what I want to know.
 9    Well, welcome, ma'am.  Thank you for being here.
10              Ms. Waier?
11              MS. WAIER:  All right.  So you are an account
12    manager.
13              THE PROSPECTIVE JUROR:  Technical account manager.
14              MS. WAIER:  What are your duties?  Like what do you
15    do?
16              THE PROSPECTIVE JUROR:  I'm a relationship manager.
17    I have several accounts that I have developed and maintain a
18    relationship for.  To make sure that they're happy with their
19    support and products, and --
20              MS. WAIER:  Okay.  So you're doing more of the
21    customers-relations aspect?
22              THE PROSPECTIVE JUROR:  Yes.
23              MS. WAIER:  So you're not doing like technical
24    accounting or those kinds of things, are you?
25              THE PROSPECTIVE JUROR:  No.  No accounting.
```

|   |   |
|---|---|
| 1 | MS. WAIER:  No accounting.  Okay.  Just checking. |
| 2 | All right.  Don't have a problem with paying taxes. |
| 3 | THE PROSPECTIVE JUROR:  No. |
| 4 | MS. WAIER:  Okay.  No problems with the IRS. |
| 01:38PM  5 | THE PROSPECTIVE JUROR:  No. |
| 6 | MS. WAIER:  Investigative techniques okay?  All |
| 7 | right. |
| 8 | Can you be fair and impartial? |
| 9 | THE PROSPECTIVE JUROR:  Yes. |
| 01:38PM  10 | MS. WAIER:  Thank you. |
| 11 | THE COURT:  Mr. Severo. |
| 12 | MR. SEVERO:  Thank you, sir. |
| 13 | Ms. Leinweber, good afternoon.  The idea that the |
| 14 | Government has filed charges against my client, Dr. Shah, |
| 01:38PM  15 | does that create any kind of impression in your mind that he |
| 16 | must've done something wrong, and he is therefore, guilty? |
| 17 | THE PROSPECTIVE JUROR:  I don't know that he's done |
| 18 | anything wrong.  Obviously, it's -- something is perceived |
| 19 | that he's done wrong. |
| 01:39PM  20 | MR. SEVERO:  Very good.  So you wouldn't hold |
| 21 | that -- that's not evidence. |
| 22 | THE PROSPECTIVE JUROR:  No. |
| 23 | MR. SEVERO:  Pass for cause. |
| 24 | THE COURT:  All right.  I believe we're in the |
| 01:39PM  25 | fifth phase, still.  And defense has two peremptory |

```
 1    challenges.
 2           MR. SEVERO:  Thank you, Your Honor.  The defense
 3    would ask the Court to thank and excuse Juror No. 5,
 4    Ms. Antunez.
 5           THE COURT:  All right.  Ms. Antunez, thank you for
 6    your time.  Just let them know downstairs that you were
 7    excused.
 8           MR. SEVERO:  Do I get one more, Judge?
 9           THE COURT:  You do get one more, sir.
10           MR. SEVERO:  The defense would ask the Court to
11    thank and excuse Juror A 1, Ms. Sarreal.
12           THE COURT:  Very well.
13           Ms. Sarreal, thank you so much for your time.
14           Okay.  Melissa, could you please call two fine
15    citizens to the lectern, one at a time, please?
16           THE CLERK:  Nadine Ginzburg, G-I-N-Z-B-U-R-G.
17           THE COURT:  Good afternoon, Ms. Ginzburg.
18           THE PROSPECTIVE JUROR:  Good afternoon.
19           THE COURT:  Can you serve on this case, ma'am?
20           THE PROSPECTIVE JUROR:  Yes, sir.
21           THE COURT:  Terrific.  Could I have you take the
22    seat right there between Mr. Vaughn and Mr. Velasquez.  Okay.
23           THE CLERK:  Dionne Thomson, T-H-O-M-S-O-N.
24           THE COURT:  Good afternoon, Ms. Thomson.  Can you
25    serve on the case, ma'am?
```

01:39PM (line 5)
01:39PM (line 10)
01:40PM (line 15)
01:40PM (line 20)
01:41PM (line 25)

1        THE PROSPECTIVE JUROR:  Yes.

2        THE COURT:  Terrific.  Could I have you take that

3   last seat in the first row.  All right.  Well, you're pretty

4   close to one another.  Mr. Velasquez is sitting in between

01:41PM  5   you.  But I will go ahead and ask my questions to both of

6   you.  And if you could just let me know if there's anything

7   in the affirmative we need to know about.

8        Do you recognize, either of you, any of the

9   individuals at the Government's table?

01:41PM  10       Both saying, "no."

11       Do you recognize anybody at the defense table?

12       THE PROSPECTIVE JUROR:  No.

13       THE COURT:  Both saying, "no."

14       Do you recognize any of the names that I indicated

01:41PM  15  could be witnesses in this case or referred to in the

16  evidence?

17       THE PROSPECTIVE JUROR:  No.

18       THE PROSPECTIVE JUROR:  No.

19       THE COURT:  Both saying, "no."

01:42PM  20       Either of you have any problems accepting those

21  fundamental principles of our criminal justice system:  The

22  presumption of innocence, the burden of proof on the

23  Government to prove the defendant guilty beyond a reasonable

24  doubt, and a defendant's constitutional right to remain

01:42PM  25  silent and not present any evidence?

| | |
|---|---|
| 1 | THE PROSPECTIVE JUROR:  No problem. |
| 2 | THE COURT:  Either of you have had any problems or |
| 3 | disputes with the IRS? |
| 4 | THE PROSPECTIVE JUROR:  Do not have any. |
| 01:42PM 5 | THE COURT:  Neither of you have had such problems, |
| 6 | I'm glad to hear that. |
| 7 | Any of you, or either of you, have any training, |
| 8 | education, or experience in the mental health field? |
| 9 | THE PROSPECTIVE JUROR:  No. |
| 01:42PM 10 | THE PROSPECTIVE JUROR:  No, I don't. |
| 11 | THE COURT:  Okay.  Both say no.  Either of you ever |
| 12 | been a victim of a crime. |
| 13 | THE PROSPECTIVE JUROR:  No. |
| 14 | THE PROSPECTIVE JUROR:  Many years ago my car was |
| 01:42PM 15 | vandalized. |
| 16 | THE COURT:  All right.  So, Ms. Ginzburg, you |
| 17 | indicated that many years ago your car was broken into and |
| 18 | vandalized. |
| 19 | THE PROSPECTIVE JUROR:  Yes, correct. |
| 01:43PM 20 | THE COURT:  All right.  Was anything stolen? |
| 21 | THE PROSPECTIVE JUROR:  Yes, uh-huh. |
| 22 | THE COURT:  Did you report it to the police? |
| 23 | THE PROSPECTIVE JUROR:  Yes, I report to the |
| 24 | police. |
| 01:43PM 25 | THE COURT:  Were you satisfied with the way the |

```
 1    police handled the situation?

 2              THE PROSPECTIVE JUROR:  They were nice.  They

 3    couldn't find the person.  But they increased patrol in the

 4    area.

 5              THE COURT:  Okay.

 6              THE PROSPECTIVE JUROR:  So overall, I was

 7    satisfied.

 8              THE COURT:  All right.  Do you either of you have

 9    any problems evaluating the credibility of a witness from law

10    enforcement like any other witness?

11              THE PROSPECTIVE JUROR:  I don't.

12              THE COURT:  Did you agree, or do you have a comment

13    to what I had indicated earlier, police officers or people

14    involved in law enforcement are people, just like judges,

15    lawyers, and all of the other professions or fields that

16    people come from.  Which means you can have bad people in

17    those positions; you can have people who are good people.

18    You can have good people who make honest mistakes.

19              Do you agree with that, generally?

20              THE PROSPECTIVE JUROR:  Yes.

21              THE PROSPECTIVE JUROR:  Yes.

22              THE COURT:  Both indicating the affirmative.

23              There could be some media coverage on the case,

24    either of you have any problem not listening, watching, or

25    reading any media coverage on the case?
```

01:43PM
01:43PM
01:43PM
01:44PM
01:44PM

```
 1              THE PROSPECTIVE JUROR:  No, I don't.

 2              THE COURT:  Could we, then, hear a little bit more

 3    about each of you.  We'll start with Ms. Ginzburg, if you

 4    have the microphone, and tell us about yourself; and then

 5    we'll turn over to Ms. Thomson.

 6              THE PROSPECTIVE JUROR:  My name is Nadine Ginzburg.

 7    I live in Laguna Niguel.  I am married.  One son, 19.

 8    Currently I'm unemployed.  I never was selected for a jury,

 9    but I come for my jury summons every time I receive them.

10    Okay.  Favorite movie or book.  The book will be Three

11    Musketeers by Alexandre Dumas.  And the favorite movie,

12    Avatar.

13              THE COURT:  Well, welcome.

14              Ms. Thomson.

15              THE PROSPECTIVE JUROR:  My name is Dionne Thomson,

16    and I live in Mission Viejo.  I'm married with two daughters,

17    six and seven years old.  I am a first grade teacher with

18    Saddleback Valley Unified School District.  And I've been

19    called for jury before, but never been on a -- on a jury.

20              And I like suspense movies.

21              THE COURT:  Any one suspense movie that comes to

22    mind?

23              THE PROSPECTIVE JUROR:  Misery.

24              THE COURT:  All right.  Well, welcome.

25              Ms. Waier, any questions?
```

1          MS. WAIER:  Getting over the *Misery* thing.  All

2     right.  Let's start with Ms. Ginzburg.

3          Are you currently -- are you looking for work, are

4     you retired, or are you just unemployed, or --

01:46PM  5          THE PROSPECTIVE JUROR:  I got laid off two years

6     ago.  I've been looking, but nothing came up in the area.

7     I'm not ready to relocate.  So I keep my eyes on if there is

8     any contracts that will be open.

9          MS. WAIER:  What kind of work are you looking for?

01:46PM  10          THE PROSPECTIVE JUROR:  I used to work in

11     insurance department and pharmaceutical company.

12          MS. WAIER:  All right.  No bad feelings about the

13     IRS.

14          THE PROSPECTIVE JUROR:  No.  No.

01:46PM  15          MS. WAIER:  No problem with investigative

16     techniques.

17          THE PROSPECTIVE JUROR:  Yes.  I do have problems

18     with investigative techniques.

19          MS. WAIER:  Tell me about that.

01:46PM  20          THE PROSPECTIVE JUROR:  Anything obtained

21     by -- what you said -- recorded.

22          MS. WAIER:  Uh-huh.

23          THE PROSPECTIVE JUROR:  Person being unaware of it,

24     I will not consider it as evidence.

01:46PM  25          MS. WAIER:  Okay.  So even if Judge Carney says to

1    you, you must consider it as evidence, you cannot do so?  Is

2    that what I'm understanding?

3            THE PROSPECTIVE JUROR:  If judge says you must

4    consider, yeah, I will listen to it, I will read it, or

01:47PM  5    whatever.  I don't know in what form it comes, but, to me, it

6    cannot enforce me to make a decision the person is guilty.  I

7    cannot that.

8            MS. WAIER:  Okay.  All right.  Thank you.  I'd like

9    to talk to Ms. Thomson.

01:47PM  10           THE PROSPECTIVE JUROR:  Uh-huh.

11           MS. WAIER:  Do you have the same problems with

12   investigative techniques?

13           THE PROSPECTIVE JUROR:  No.

14           MS. WAIER:  Okay.  So you understand that that's

01:47PM  15   appropriate and okay; is that right?

16           THE PROSPECTIVE JUROR:  Yes.

17           MS. WAIER:  Okay.  So if the judge tells you that

18   you are to consider that as evidence, that's something you

19   can do?

01:47PM  20           THE PROSPECTIVE JUROR:  Yes.

21           MS. WAIER:  Okay.  Any problem with taxes?

22           THE PROSPECTIVE JUROR:  No.

23           MS. WAIER:  Okay.  And I think that's all I have.

24           THE COURT:  All right.

01:47PM  25           MS. WAIER:  I reserve.

[UNITED STATES DISTRICT COURT]

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 01:48PM | 5 |

1        THE COURT:  Okay.

2        MR. SEVERO:  Good afternoon ladies.  Ms. Ginzburg,

3    you don't mean that you would disobey the Court's order;

4    right?  You wouldn't do that.

01:48PM  5        THE PROSPECTIVE JUROR:  No, I won't disobey the

6    Court's order.  I will read and listen to whatever.

7        MR. SEVERO:  You will listen to the evidence, give

8    it the weight that you think is fair to give to that

9    evidence, and then make a decision based on that; true.

01:48PM  10        THE PROSPECTIVE JUROR:  I consider this type of

11    collecting evidence inappropriate.

12        MR. SEVERO:  Under every circumstance?

13        THE PROSPECTIVE JUROR:  Only maybe in a case of

14    terrorism, I would accept it.  But private life, I value

01:48PM  15    private life of people highly, and I don't understand how

16    can -- I consider it to trick people into doing something or

17    saying something that they will regret later.

18        MR. SEVERO:  All right.  Ms. Thomson, you don't

19    feel that way, you do?

01:49PM  20        THE PROSPECTIVE JUROR:  No.

21        MR. SEVERO:  Do you think that because the

22    defendant has been charged with a crime, he must be guilty of

23    it.

24        THE PROSPECTIVE JUROR:  No.

01:49PM  25        MR. SEVERO:  You do understand that the Government

```
 1    has the burden of proof?
 2              THE PROSPECTIVE JUROR:  Yes.
 3              MR. SEVERO:  You do understand that that's a rather
 4    high burden.  It's the highest burden in our system, proof
 5    beyond a reasonable doubt.
 6              THE PROSPECTIVE JUROR:  Yes.
 7              MR. SEVERO:  Right.
 8              THE PROSPECTIVE JUROR:  Uh-huh.
 9              MR. SEVERO:  And you would be okay holding
10    Government to that standard.
11              THE PROSPECTIVE JUROR:  Yes.
12              MR. SEVERO:  And even if the defendant were to
13    exercise his right not to testify, you wouldn't hold that
14    against him?
15              THE PROSPECTIVE JUROR:  No.
16              MR. SEVERO:  You would be ordered not to.
17              THE PROSPECTIVE JUROR:  Right.
18              MR. SEVERO:  You would be able to follow that.
19              THE PROSPECTIVE JUROR:  Yes.
20              MR. SEVERO:  How but you, Ms. Ginzburg, would you
21    be able to follow an instruction that says that the defendant
22    doesn't have to testify?  There's a microphone next to you.
23              THE PROSPECTIVE JUROR:  Yes, absolutely.
24              MR. SEVERO:  Pass for cause.
25              THE COURT:  Very good.  Ms. Ginzburg, I just want
```

01:49PM

01:49PM

01:49PM

01:49PM

01:50PM

```
 1    to follow up with you a little bit.  And I want to say at the

 2    outset, I appreciate you being very candid in response to the

 3    questions.  Your responses actually did not trouble me.

 4        Your concerns is exactly what our founders had.

 5    And in the bill of rights, there always has to be good cause

 6    or what we call probable cause for the Government or law

 7    enforcement to do any type of surveillance or using these

 8    investigative techniques that Ms. Waier was asking you about.

 9    And, in fact, under California law, my understanding,

10    California state law, is that citizens can't record the

11    conversations of somebody else without their consent.

12        THE PROSPECTIVE JUROR:  Uh-huh.

13        THE COURT:  So your reaction and your views were

14    not surprising to me.  And I didn't think would serve as a

15    problem.  Assuming, assuming, that you will keep an open

16    mind, and you will listen to the recordings that were taken

17    by law enforcement in this case, which have been determined

18    to be lawful.  The law enforcement had the right to take

19    them.

20        That doesn't mean what's said on them is truthful

21    and accurate and how much weight to give it, but what we -- I

22    guess, we need to know is the mere fact that this was a

23    recording done, is that going to prevent you from keeping an

24    open mind and give both sides a fair trial?

25        THE PROSPECTIVE JUROR:  Let me try to state it.
```

01:50PM (line 5)
01:50PM (line 10)
01:51PM (line 15)
01:51PM (line 20)
01:51PM (line 25)

1    Like right now, when I hear that something was recorded, I

2    don't consider it evidence of guilt.

3              THE COURT:  Okay.

4              THE PROSPECTIVE JUROR:  99 percent -- I mean, you

01:52PM    5    will tell me to consider -- I don't want to lie to you.  My

6    mind is set completely against violation of people's privacy.

7    Except for the cases when people's lives have to be saved.

8              THE COURT:  And I appreciate that in connection

9    with terrorism.  And I understand that.  But there are many

01:52PM   10    areas of the criminal law where these types of techniques are

11    used.  For example, it's not this case.  This case has

12    nothing to do with drugs.  But drug cartels, drug gangs, they

13    use the phones.  They use other communication devices.  And

14    whether that be informants, whether that be intercepting

01:52PM   15    those calls, law enforcement is listening.

16              Do you have a problem, even in those contexts, with

17    law enforcement?

18              THE PROSPECTIVE JUROR:  Maybe I don't have problem

19    to prevent the crime.  But in a courtroom, if it's not a

01:53PM   20    terrorism and not human lives -- savings of human life

21    involved, I don't --

22              THE COURT:  You have an aversion to it.

23              THE PROSPECTIVE JUROR:  Yes, I'm sorry.

24              THE COURT:  All right.  Okay.  I just need a few

01:53PM   25    moments to talk to the lawyers again in the hallway.  And

```
 1   I'll be back in touch.  Please feel free to stand and
 2   stretch.
 3              THE PROSPECTIVE JUROR:  Your Honor, can I say
 4   something else?
 5              THE COURT:  Yes.
 6              THE PROSPECTIVE JUROR:  I don't know if this is
 7   pertinent or not.  And I wanted to disclose that I'm on the
 8   board of a credit union.  And I serve on that board with IRS
 9   employees, as well as an IRS attorney.
10              THE COURT:  All right.  Let me ask you a few
11   questions about it before the break.  Could we get the
12   microphone to Ms. Leinweber.
13              THE PROSPECTIVE JUROR:  Leinweber.
14              THE COURT:  Leinweber, I'm sorry.
15              Ms. Leinweber, so you sit on a board where there
16   are IRS personnel.  Anything about sitting on that board,
17   though, you think is going to make it difficult for you to be
18   fair and impartial to both sides in this case?
19              THE PROSPECTIVE JUROR:  No.  And I just wanted to
20   disclose it.
21              THE COURT:  Okay.  Well, thank you for letting us
22   know that.
23              Okay.  Let's take our few minute break.
24              (Sidebar conference.)
25              THE COURT:  Okay.
```

| | |
|---|---|
| 1 | MR. SEVERO:  That's a tough one. |
| 2 | THE COURT:  I assume you're challenging her, the |
| 3 | Government's challenge. |
| 4 | MS. WAIER:  Yes, Your Honor. |
| 01:56PM 5 | The Government challenge she told the Court that |
| 6 | she will not consider the evidence although the Court said it |
| 7 | was lawful and properly obtained, she still refuses to |
| 8 | consider the evidence.  This is not a terrorism case, this is |
| 9 | not a drug case. |
| 01:56PM 10 | MR. SEVERO:  I'll submit. |
| 11 | THE COURT:  All right.  Okay.  So we'll excuse her. |
| 12 | My records indicate we have two more rounds.  Six and seven. |
| 13 | So I -- there's only one peremptory for each side in each of |
| 14 | those rounds.  So you have two and you've got one holdover. |
| 01:56PM 15 | MR. SEVERO:  Right. |
| 16 | THE COURT:  So you have three. |
| 17 | MR. SEVERO:  I thought I had two.  I passed on |
| 18 | that. |
| 19 | MR. WILSON:  Then -- on the bottom. |
| 01:56PM 20 | MR. SEVERO:  I'm sorry. |
| 21 | MS. WAIER:  I have two. |
| 22 | THE COURT:  Yeah, you have two. |
| 23 | MR. SEVERO:  I started to short change myself. |
| 24 | MR. WILSON:  Negotiating against yourself. |
| 01:56PM 25 | THE COURT:  Okay. |

```
 1              (Sidebar conference concluded.)
 2              THE COURT:  Ms. Ginzburg, after discussion with the
 3    lawyers, taking into account your views, given the fact that
 4    this case does involve recordings that were done by law
 5    enforcement, this probably isn't the best case for you.  So
 6    I'm going to ask that you report back down to the jury
 7    assembly room, and let them know that I excused you from this
 8    case.  Thank you.
 9              THE PROSPECTIVE JUROR:  Sorry, Your Honor.
10              THE COURT:  No, there's no apology.  I appreciate
11    your honesty.
12              All right.
13              THE CLERK:  James Quigley.  Q-U-I-G-L-E-Y.
14              THE COURT:  Hello, Mr. Quigley.
15              Can you serve on this case, sir?
16              THE PROSPECTIVE JUROR:  Yes, I can.
17              THE COURT:  Terrific.  Can I have you take a seat
18    between Mr. Vaughn and Mr. Velasquez?
19              Okay.  Mr. Quigley, could you please take a look at
20    the folks at the Government's table, let me know if you
21    recognize any of them?
22              THE PROSPECTIVE JUROR:  I don't.
23              THE COURT:  How about any of the individuals at
24    defense counsel table?
25              THE PROSPECTIVE JUROR:  Nope.
```

```
 1              THE COURT:  Did you recognize any of the names that

 2     I had indicated might be witnesses in this case or be

 3     referred to in the evidence that could be presented?

 4              THE PROSPECTIVE JUROR:  No.

 5              THE COURT:  Do you have any problems accepting

 6     those three fundamental principles of our criminal justice

 7     system?

 8              THE PROSPECTIVE JUROR:  Nope.

 9              THE COURT:  All right.  Any prior disputes or

10     problems with the IRS we should know about.

11              THE PROSPECTIVE JUROR:  No.

12              THE COURT:  Any training, education, or experience

13     in the mental health field?

14              THE PROSPECTIVE JUROR:  I've been a teacher for a

15     long time.  So I've dealt with a lot of students with

16     learning disabilities, and so on.  And I have OCD, so I've

17     been treated for it, so --

18              THE COURT:  Okay.  Thank you for disclosing that to

19     us.

20              You ever been a victim of a crime, sir?

21              THE PROSPECTIVE JUROR:  About 20 years ago my

22     apartment was burglarized.

23              THE COURT:  All right.  And that obviously wasn't a

24     pleasant experience.

25              Did law enforcement come to the scene or to your
```

```
 1   apartment?
 2           THE PROSPECTIVE JUROR:  They did.  They did.  They
 3   weren't able to find any of the stuff.  But they came and
 4   took the reports.
 5           THE COURT:  All right.  Do you have a high opinion,
 6   a low high opinion of law enforcement?
 7           THE PROSPECTIVE JUROR:  Somewhat high.  General for
 8   civil servants.
 9           THE COURT:  Do you agree with what I had said
10   before that you could have good cops, bad cops, cops that can
11   make mistakes in judgment?
12           THE PROSPECTIVE JUROR:  Yeah, absolutely.
13           THE COURT:  All right.  Any problem, then,
14   evaluating the credibility of a witness from law enforcement
15   like any other witness.
16           THE PROSPECTIVE JUROR:  No.
17           THE COURT:  Do you have any problem not reading,
18   watching, or listening to any media coverage of the case?
19           THE PROSPECTIVE JUROR:  No.
20           THE COURT:  Could you tell us a little bit more
21   about yourself and give us that information on the juror
22   information sheet.
23           THE PROSPECTIVE JUROR:  My name is Patrick Quigley.
24   I live in Irvine.  I'm divorced.  I have two kids, 15 and 12.
25   I've been a teacher for about a quarter of a century here
```

01:58PM (line 5)
01:58PM (line 10)
01:59PM (line 15)
01:59PM (line 20)
01:59PM (line 25)

|  | 1 | with math and physics.  I'm employed at Saddleback College. |

1    with math and physics.  I'm employed at Saddleback College.

2    I've never served on a jury before.  My favorite book would

3    be *The End of Faith* by Sam Harris.  Favorite movie would be

4    *Avengers*.

01:59PM  5         THE COURT:  Well, welcome, sir.

6         Ms. Waier.

7         MS. WAIER:  You say you teach math and --

8         THE PROSPECTIVE JUROR:  Physics.

9         MS. WAIER:  Yeah.  That's something I don't know

01:59PM 10    anything about.

11         Do you like teaching?

12         THE PROSPECTIVE JUROR:  Yes, I love it.

13         MS. WAIER:  Okay.  Do you ever deal with any

14    students that have been depressed?

02:00PM 15         THE PROSPECTIVE JUROR:  Oh, yeah.  Yeah.

16         MS. WAIER:  Not because of what you did.

17         THE PROSPECTIVE JUROR:  Usually right after a test,

18    but, yeah.

19         MS. WAIER:  Okay.  And does that impact their

02:00PM 20    ability to learn or be students?

21         THE PROSPECTIVE JUROR:  Not generally, no.

22         MS. WAIER:  What about paying taxes?  I know

23    no one likes it, but you understand that's an obligation.

24         THE PROSPECTIVE JUROR:  I actually derive a lot of

02:00PM 25    satisfaction from paying my taxes, so --

1              MS. WAIER:  You do?

2              THE PROSPECTIVE JUROR:  Yes.

3              MS. WAIER:  No problems with the IRS?

4              THE PROSPECTIVE JUROR:  No.

02:00PM    5              MS. WAIER:  How about investigative techniques?

6              THE PROSPECTIVE JUROR:  No.

7              MS. WAIER:  Okay.  Thank you.

8              THE COURT:  Mr. Severo.

9              MR. SEVERO:  Thank you.

02:00PM   10             Good afternoon, Mr. Quigley.  Sir, your -- you say

11    you have gotten treatment for your OCD?

12             THE PROSPECTIVE JUROR:  Yes.

13             MR. SEVERO:  How long have you suffered from OCD.

14             THE PROSPECTIVE JUROR:  My whole life, basically,

02:00PM   15    yeah.

16             MR. SEVERO:  When were you first diagnosed?

17             THE PROSPECTIVE JUROR:  Oh, it would have been

18    about five or six years ago.  Official diagnosed, yeah.

19             MR. SEVERO:  Okay.  And the treatment is what?

02:01PM   20    Drugs?

21             THE PROSPECTIVE JUROR:  Drugs for a while and --

22    and conditioning and so on, yeah.

23             MR. SEVERO:  Conditioning.

24             All right.  Has it -- did the condition impact your

02:01PM   25    life negatively in any way?

1          THE PROSPECTIVE JUROR:  No.  No.  I don't have to

2     keep checking my garage door every five minutes.

3          MR. SEVERO:  That's good.

4          There might be some testimony in this case

02:01PM  5     concerning one of the witnesses who suffers from -- may

6     suffer from some mental health issues.

7          Would you be able to look at that witness as just

8     another witness whose credibility you have to judge without

9     trying to empathize with the fact that he, too, may be

02:01PM 10     suffering from mental health.

11          THE PROSPECTIVE JUROR:  Yes.  Yes.

12          MR. SEVERO:  You are a college professor?

13          THE PROSPECTIVE JUROR:  Yes, now.

14          MR. SEVERO:  You mean, this is recent?

02:02PM 15          THE PROSPECTIVE JUROR:  Well, I started off

16     teaching middle school and then high school and college for

17     the last 15 years, yeah.

18          MR. SEVERO:  College for the last 15 years, okay.

19          Do you have any law enforcement -- friends in law

02:02PM 20     enforcement?

21          THE PROSPECTIVE JUROR:  No.

22          MR. SEVERO:  Any people you know in law

23     enforcement?

24          THE PROSPECTIVE JUROR:  I'm sure I have students

02:02PM 25     who are now in law enforcement, but none that I keep track

```
 1   of.
 2              MR. SEVERO:  None that you know.
 3              THE PROSPECTIVE JUROR:  No.
 4              MR. SEVERO:  Or associate with?
 5              THE PROSPECTIVE JUROR:  No.
 6              MR. SEVERO:  And you can evaluate the credibility
 7   of a law enforcement witness the same level as any other?
 8              THE PROSPECTIVE JUROR:  I would think so, yes.
 9              MR. SEVERO:  We all depend on law enforcement to
10   some degree, in one fashion or another.  But does that --
11   that doesn't give you any -- that wouldn't give you any cause
12   to believe that they are more credible just because they're
13   in law enforcement.
14              THE PROSPECTIVE JUROR:  No, it would depend on the
15   law enforcement system that wouldn't necessarily be any
16   individual law enforcement officer necessarily was more or
17   less reliable on any particular instance.
18              MR. SEVERO:  Right.
19              So you listen to what he has to say.  You would
20   listen to the cross-examination that would be conducted, and
21   then evaluate that testimony on that basis?
22              THE PROSPECTIVE JUROR:  Yes.
23              MR. SEVERO:  Okay.  Very good.
24              Pass for cause.
25              THE COURT:  Very well.
```

|  | 1 | All right.  We're in the sixth phase of peremptory |
|---|---|---|
|  | 2 | challenges.  The Government is up first with one and the |
|  | 3 | defense has one. |
|  | 4 | MS. WAIER:  The Government would like to thank and |
| 02:03PM | 5 | excuse Juror No. 3, Ms. Pearson. |
|  | 6 | THE COURT:  Ms. Pearson, thank you so much for your |
|  | 7 | time, ma'am.  If you could just report back down to the jury |
|  | 8 | assembly room, let them know that I excused you. |
|  | 9 | THE CLERK:  Phuong Nguyen, N-G-U-Y-E-N. |
| 02:04PM | 10 | THE COURT:  Hello, Ms. Nguyen. |
|  | 11 | How are you, ma'am? |
|  | 12 | THE PROSPECTIVE JUROR:  Good. |
|  | 13 | How are you? |
|  | 14 | THE COURT:  Fine. |
| 02:04PM | 15 | Can you serve on this case? |
|  | 16 | THE PROSPECTIVE JUROR:  Yes. |
|  | 17 | THE COURT:  Terrific. |
|  | 18 | Could I have you take that seat between Ms. Clark |
|  | 19 | and Mr. Vaughn? |
| 02:04PM | 20 | Ms. Nguyen, you probably know the drill, huh? |
|  | 21 | Okay.  You let me know when you're ready. |
|  | 22 | THE PROSPECTIVE JUROR:  Okay. |
|  | 23 | THE COURT:  Any of the people at the Government's |
|  | 24 | table look familiar to you? |
| 02:05PM | 25 | THE PROSPECTIVE JUROR:  No. |

|  |  |
|---|---|
| 1 | THE COURT:  How about anybody at the defense table? |
| 2 | THE PROSPECTIVE JUROR:  No. |
| 3 | THE COURT:  Do any of those names that I mentioned |
| 4 | sound familiar to you? |
| 02:05PM  5 | THE PROSPECTIVE JUROR:  No. |
| 6 | THE COURT:  Do you have any problems accepting |
| 7 | those three fundamental principles of our criminal justice |
| 8 | system? |
| 9 | THE PROSPECTIVE JUROR:  No. |
| 02:05PM  10 | THE COURT:  Have you had any prior disputes or |
| 11 | problems with the IRS? |
| 12 | THE PROSPECTIVE JUROR:  No. |
| 13 | THE COURT:  Do you have any training, education, or |
| 14 | experience in the mental health field? |
| 02:05PM  15 | THE PROSPECTIVE JUROR:  My son had an IEP.  He's -- |
| 16 | he was in kindergarten last year and -- we found out he had |
| 17 | ADHD, but since January, he's been fine. |
| 18 | MR. SEVERO:  I'm actually not hearing any of that. |
| 19 | THE COURT:  Okay. |
| 02:05PM  20 | MR. SEVERO:  I'm trying real hard. |
| 21 | THE PROSPECTIVE JUROR:  Oh. |
| 22 | My son had an IEP in kindergarten last year, but |
| 23 | since January, he's been okay. |
| 24 | MR. SEVERO:  Thank you. |
| 02:06PM  25 | THE PROSPECTIVE JUROR:  And I have a cousin who has |

```
 1    depression, because I know that's going to come up --
 2              THE COURT:  All right.
 3              THE PROSPECTIVE JUROR:  -- but I don't -- I don't
 4    communicate with her, and she's all the way in Texas.  That's
 5    all I know.
 6              THE COURT:  I appreciate you telling us that.
 7    Thank you.
 8              Ever been a victim of a crime, ma'am?
 9              THE PROSPECTIVE JUROR:  Yes.
10              My mom's house was broken into and we were robbed.
11    It was a while ago, maybe 12, 15 years ago.  And I was living
12    there at the time.
13              THE COURT:  Okay.
14              THE PROSPECTIVE JUROR:  So police came out, took
15    reports, but they weren't able to find any of our --
16              MR. SEVERO:  Is the microphone working?
17              THE PROSPECTIVE JUROR:  Can you hear me?
18              THE COURT:  I think we can hear you now.
19              THE PROSPECTIVE JUROR:  Okay.
20              THE COURT:  You're good to go.
21              THE PROSPECTIVE JUROR:  Okay.  So I was saying that
22    my mom's house was broken into -- my mom's house was broken
23    into about 12 or 15 years ago and we had stuff that was
24    stolen, but police came out and took reports, but they
25    couldn't find our stuff.
```

1        THE COURT:  Do you have a high opinion of law

2    enforcement?

3        THE PROSPECTIVE JUROR:  Generally, positive

4    experience.  Nothing negative.

02:07PM   5        THE COURT:  Do you agree with what we've talked

6    about before that you could have good cops; bad cops, cops

7    that can make a mistake in judgment?

8        THE PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Are you going to have any problems

02:07PM  10    evaluating the credibility of a witness from law enforcement

11    like any other witness?

12        THE PROSPECTIVE JUROR:  No problem.

13        THE COURT:  Any problems not watching, listening or

14    reading to any media coverage about the case?

02:08PM  15        THE PROSPECTIVE JUROR:  No problem.

16        THE COURT:  Could you tell us a little bit more

17    about yourself and address the issues on the juror

18    information sheet?

19        THE PROSPECTIVE JUROR:  Okay.  My name is Phuong

02:08PM  20    Nguyen.

21        THE COURT:  Now you went off again.  It's

22    obviously, malfunctioning.

23        THE PROSPECTIVE JUROR:  Okay.  I live in Orange,

24    and I'm married.  I have two kids, four and a six-year-old.

02:08PM  25    Both are boys.  I am a pharmacist with Kaiser Permanente, and

```
 1    I have been in the jury Box 4 times.  Served on two juries;

 2    one civil, one criminal.  We were able to come up with a

 3    verdict for both.

 4              And favorite movie, Sound of Music.

 5              THE COURT:  Well, welcome.

 6              THE PROSPECTIVE JUROR:  Thank you.

 7              THE COURT:  Ms. Waier?

 8              MS. WAIER:  No questions.

 9              THE COURT:  All right.  Mr. Severo?

10              MR. SEVERO:  Good afternoon, Ms. Nguyen.

11              THE PROSPECTIVE JUROR:  Hi.

12              MR. SEVERO:  That would be Dr. Nguyen?

13              THE PROSPECTIVE JUROR:  Right.

14              MR. SEVERO:  Thank you.

15              Your -- you served on a civil jury and a criminal

16    jury?

17              THE PROSPECTIVE JUROR:  Yes.

18              MR. SEVERO:  And you noted, I'm sure, that the

19    burden of proof in a civil case for the plaintiff, which is

20    the Government in a criminal case, but in a civil case, the

21    plaintiff only has to prove the case by a preponderance of

22    the evidence?

23              THE PROSPECTIVE JUROR:  Right.

24              MR. SEVERO:  Just ever so slightly?

25              THE PROSPECTIVE JUROR:  Right.
```

```
 1              MR. SEVERO:  But you know the difference, here,

 2     it's proof beyond a reasonable doubt; correct?

 3              THE PROSPECTIVE JUROR:  Yes.

 4              MR. SEVERO:  Do you know -- you can tell that

 5     difference?

 6              THE PROSPECTIVE JUROR:  Yes.

 7              MR. SEVERO:  All right.  Thank you.

 8         There might be some talk in this case that was

 9     recorded that was kind of guy talk or related to a girl, not

10     anyone in particular, but would that be offensive to you?

11              THE PROSPECTIVE JUROR:  Well, I don't -- I wouldn't

12     condone it, but, I mean, I can sit through and listen to it.

13              MR. SEVERO:  Okay.

14         Not necessarily something you want to hear, but --

15              THE PROSPECTIVE JUROR:  Right, not something I want

16     my sons to do.

17              MR. SEVERO:  It's not terrible, but --

18              THE PROSPECTIVE JUROR:  Yeah.

19              MR. SEVERO:  -- I mean, it's -- it is two men

20     talking.

21              THE PROSPECTIVE JUROR:  Right.

22              MR. SEVERO:  That's not going to affect your

23     ability to hold the Government to the standard of proof to

24     which they are obligated.

25              THE PROSPECTIVE JUROR:  Right.
```

1           MR. SEVERO:  Very good.

2           Do you deal with doctors often?

3           THE PROSPECTIVE JUROR:  I'm in an office sitting in

4      front of a computer looking at lab tests and talking to

02:10PM    5      patients, so I don't really have a lot of interactions

6      face-to-face with doctors or patients.  It's all by phone and

7      computers.

8           MR. SEVERO:  I see.

9           So you get -- so you actually fill prescriptions?

02:10PM   10           THE PROSPECTIVE JUROR:  No, I'm a clinical

11      pharmacist.  So, in the area I work, I work in the committing

12      clinic, the blood thinner, and I also work in the asthma

13      clinic.

14           MR. SEVERO:  Okay.

02:11PM   15           THE PROSPECTIVE JUROR:  So a lot a lot of it is

16      looking at the computer, looking at lab tests, calling

17      patients to make adjustments to medications.

18           MR. SEVERO:  Do you have any opinions of doctors

19      one way or another?

02:11PM   20           THE PROSPECTIVE JUROR:  No.

21           MR. SEVERO:  There's good ones, there are bad ones,

22      like the rest of us?

23           THE PROSPECTIVE JUROR:  Right.

24           MR. SEVERO:  Pass for cause.

02:11PM   25           THE COURT:  Very well.

```
 1                I believe we're still in the sixth phase, and
 2       Defense has one challenge in that phase?
 3                MR. SEVERO:  May I have a moment, Your Honor?
 4                THE COURT:  You may.
 5                MR. SEVERO:  The defense would ask the Court to
 6       thank and excuse Juror No. 5, Mr. Quigley.
 7                THE COURT:  Very well.
 8                Mr. Quigley, thank you for your time, sir.
 9                If you could report back down to the jury assembly
10       room and let them know that I excused you, sir...
11                THE PROSPECTIVE JUROR:  Thank you.
12                THE CLERK:  Sharon Kuritzky K-U-R-I-T-Z-K-Y.
13                THE COURT:  Good afternoon, ma'am.
14                THE PROSPECTIVE JUROR:  Good afternoon.
15                THE COURT:  Can you serve on the case?
16                THE PROSPECTIVE JUROR:  I'm able to.
17                THE COURT:  Okay.  You look like you wanted to say
18       something?
19                THE PROSPECTIVE JUROR:  Well, to get to the
20       questions that you'll eventually get to --
21                THE COURT:  Yes?
22                THE PROSPECTIVE JUROR:  -- my husband is a reserve
23       police officer, so I don't know if that's an issue.  In terms
24       of the IRS, I only had once -- well, once we were audited.
25       That was semi okay.  Not great, but semi okay.  Once there
```

[UNITED STATES DISTRICT COURT]

was something where I know everything I did was as clean as

it could be, and basically, I received a ton of paperwork and

it was $200.  And even though I felt I was 100 percent right,

I decided I would rather waste $200 than my time trying to

02:13PM  fight the IRS.  So it's a little bit of a prejudice, so I

figured I'll just --

THE COURT:  Well, that was very good.  I'm glad you

told me.

Do you think, though -- let me try to start off a

02:14PM  different way.  One of the wonderful things about the system,

is that people come to this case with different experiences

and life experiences, and I embrace that.  And the fact that

you had dealings with the IRS, that might make you more

suited to understand the evidence as it's presented.  We're

02:14PM  not going to be trying your dispute.  It's going to be this

dispute, but you will have an appreciation or understanding

that some others might not have.

But what I can't have or what we -- which is a

problem, is if there's something about that past experience

02:14PM  where you cannot be fair to either the Government in this

case, which includes the IRS, or the defense.  And you got to

let me know.

Let me give you a real bad example.  In a criminal

case, not this -- not the facts of this case.  I -- when I

02:15PM  was a state judge.  I would have cases involving drunk

driving.  Tragically, there were many people that came to
serve on a jury and they've lost a loved one, and, in fact, a
mother has lost a son.  The defendant's on trial for drunk
driving.  I don't think that that mother -- that's a good
case for her.

THE PROSPECTIVE JUROR:  Right.

THE COURT:  Similarly, I've had people say, you
know, I was convicted of drunk driving and it was a
misdemeanor, so I could serve on the case, and it's ruined my
life.  It's ruined my marriage, et cetera, et cetera.  That
might be not the best case either.  So you can kind of see
where maybe your past experience is going to be a problem and
an issue, you can't give the parties a fair trial.

You have experience and affiliation with law
enforcement, and then you also have experiences with the IRS
that haven't been great, but do you think that either of
those issues are going to be a problem to give these parties
a fair trial?

THE PROSPECTIVE JUROR:  Well, in truth, I don't
really know until I know what the situation is.  I mean, I
can't really answer a question if I don't really know all of
the particulars of that question.

THE COURT:  That's a very understandable answer.
And one of the things that we cannot do and the lawyers get
in trouble if they try, is we can't argue the evidence --

1          THE PROSPECTIVE JUROR:  No.  I understand.  Right.

2          THE COURT:  -- or we would never get it.  But your

3     response suggests to me, and I don't want to put words in

4     your mouth, and please don't let me, is that you don't have

02:17PM   5     this bias that there's no way I can be fair to the Government

6     and the IRS because they're always wrong, or I can't be fair

7     to the defense because I love law enforcement and I don't

8     care what the law enforcement witness says; it has to be the

9     truth.  I'm not sensing that from you.  You're saying, you

02:17PM  10     know, the IRS, they're not perfect people.  They could be

11     wrong.  And I'm not saying every police officer and person in

12     law enforcement is a perfect citizen.

13          Is that fair, or am I overstating or understating?

14          THE PROSPECTIVE JUROR:  It's probably true.  I

02:17PM  15     don't know until I -- I don't know what I don't know.  So...

16          THE COURT:  Okay.  I'm going to have you, then,

17     take the seat, but I appreciate you disclosing that to me.

18          THE PROSPECTIVE JUROR:  My name is Sharon Kuritzky.

19     I live in Lake Forest.  Married with two children.  I was a

02:18PM  20     schoolteacher.  I just retired.  The employer was Saddleback

21     Valley Unified School District.  I've never been on a jury

22     before.  My favorite book or movie, it's probably a book no

23     one has heard of, but it was called *The Color of Water*.  And

24     I just thought it was a very interesting book about a time in

02:18PM  25     our history and how our country is so different at different

1    times in terms of people and how they relate.

2              THE COURT:  Well, thank you so much.

3              We've kind of gone reverse order.  I needed that.

4    We're going to be taking a break soon, ladies and gentlemen,

02:18PM  5    but we're getting to the end of the process, and I thought we

6    would try to get to that before we took the break.

7              Ms. Kuritzky, I appreciate you telling us a little

8    bit about yourself.  Let me go back to some of the earlier

9    questions that I've got to ask you.

02:19PM  10             Do you know anybody on the Government's table or

11   anybody on the defense table?

12             THE PROSPECTIVE JUROR:  No.  Don't recognize

13   anybody.

14             THE COURT:  Any of those witnesses that I said

02:19PM  15   could be testifying or referred to in the evidence sound

16   familiar to you?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  No.

19             Any problems accepting those fundamental principles

02:19PM  20   of our criminal justice system?

21             THE PROSPECTIVE JUROR:  No.

22             THE COURT:  You said "no."

23             We talked about your issues with the IRS, I

24   appreciate that.

02:19PM  25             Do you have any training, education, or experience

1    in the mental health field?

2           THE PROSPECTIVE JUROR:  No training, but I did have

3    a husband who had problems with depression, a psychotic

4    breakdown, and that led to him not telling the truth about

02:20PM  5    things.  It was explained to me that it's not quite the same

6    as a lie because when you have a breakdown, you really don't

7    know the difference between the truth and the lie.

8           THE COURT:  All right.  Thank you for sharing that

9    with us.

02:20PM  10          I know it wasn't pleasant.

11          Have you ever been a victim of a crime?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  You're going to have any problems

14   evaluating the credibility of a law enforcement witness like

02:20PM  15   any other witness?

16          THE PROSPECTIVE JUROR:  I don't think so.

17          THE COURT:  All right.  And you're going to have

18   any problems not reading, watching or listening to any media

19   coverage during the case if that comes up?

02:20PM  20          THE PROSPECTIVE JUROR:  If I'm told not to, I won't

21   do it.

22          THE COURT:  All right.  And you gave us the

23   information we need to know about you.

24          Ms. Waier, do you have any questions?

02:20PM  25          MS. WAIER:  Couple.

1          Okay.  You talked about you had a husband that had

2     depression?

3          THE PROSPECTIVE JUROR:  Yes.

4          MS. WAIER:  And you -- you talked about that maybe

02:20PM  5     he might have had some credibility issues with you?

6          THE PROSPECTIVE JUROR:  Not just with me.  In

7     general.

8          MS. WAIER:  In general?

9          THE PROSPECTIVE JUROR:  Yeah.

02:21PM 10          MS. WAIER:  Okay.  Do you think that people with

11    depression have credibility issues.

12          THE PROSPECTIVE JUROR:  Well, I don't know that.

13          Yeah.  We all see the world through our own eyes.

14    And their eyes -- and their vision is disported by what's

02:21PM 15    going on in their head.

16          MS. WAIER:  So if somebody were to testify in this

17    courtroom that had depression, would your perspective come in

18    to how you look at their testimony?

19          THE PROSPECTIVE JUROR:  Yeah.  There's always three

02:21PM 20    sides to everything; your side, my side and the truth.  So I

21    don't know.

22          MS. WAIER:  Okay.  Well, we're talking about your

23    side, if the judge says, look, you can't let your --

24          THE PROSPECTIVE JUROR:  Right.

02:21PM 25          MS. WAIER:  Let what you already know, right,

1    things that you already know about depression and different

2    things, can you not let that come in when you're looking at

3    testimony from -- coming from someone that used to have

4    depression?

02:21PM    5         THE PROSPECTIVE JUROR:  I think I could.

6         MS. WAIER:  Well, I have to have more than a think,

7    because this is --

8         THE PROSPECTIVE JUROR:  Yeah.

9         MS. WAIER:  -- really, really, really important.

02:22PM   10    And so I want to make sure that when you're here, you're able

11    to really be --

12         THE PROSPECTIVE JUROR:  I guess.

13         MS. WAIER:  -- fair and impartial.

14         THE PROSPECTIVE JUROR:  Okay.  I think I would try,

02:22PM   15    but when you talk about is there some doubt, I think I have

16    some doubt because of my past experience.

17         MS. WAIER:  Okay.  Because, you know, when we come

18    in --

19         THE PROSPECTIVE JUROR:  Yeah.

02:22PM   20         MS. WAIER:  -- you have to be able to -- this is a

21    very important proceeding.

22         THE PROSPECTIVE JUROR:  Sure.

23         MS. WAIER:  I just want someone to be as fair as

24    possible.  And, as you say, you look through it through your

02:22PM   25    own eyes, and sometimes your eyes are colored by your

```
 1    experiences.
 2            THE PROSPECTIVE JUROR:  Right.
 3            MS. WAIER:  So you're telling me that your
 4    experiences with depression would color your view.
 5            THE PROSPECTIVE JUROR:  Unfortunately, I think
 6    you're correct.
 7            MS. WAIER:  Okay.  It's not unfortunately, I'm
 8    just -- I'm just trying to get --
 9            THE PROSPECTIVE JUROR:  I'm trying to be honest
10    here, too.
11            MS. WAIER:  And that's all I want.  And I just want
12    to get to the truth.  I just want a fair and impartial jury.
13    And it sounds like because of your background, that will be
14    difficult for you?
15            THE PROSPECTIVE JUROR:  Okay.
16            MS. WAIER:  Okay.
17            I also want to talk also about the IRS.
18            THE PROSPECTIVE JUROR:  Uh-huh.
19            MS. WAIER:  And you brought that up.  And I think
20    you brought that up because you had a serious concern; right?
21            THE PROSPECTIVE JUROR:  True.
22            MS. WAIER:  Okay.  And, again, you said I have my
23    view, they have their view, you have your view.
24            Is your view colored by your experiences with the
25    IRS?
```

1          THE PROSPECTIVE JUROR:  It could be.  Only in the

2     sense that I consider it a large bureaucracy, that's hard to

3     deal with, and my goal is to always not deal with the IRS.

4          MS. WAIER:  I think that's mostly everybody's

02:23PM   5     goal --

6          THE PROSPECTIVE JUROR:  Yeah.

7          MS. WAIER:  -- right?

8          THE PROSPECTIVE JUROR:  Yeah.

9          MS. WAIER:  And that's okay.  We can all have those

02:23PM   10     things where, you know, the IRS is what the IRS is; right?

11          THE PROSPECTIVE JUROR:  Uh-huh.

12          MS. WAIER:  But the bottom line is, can you be fair

13     and impartial to the Government; meaning that, hey, look,

14     sometimes crimes happen and the IRS is involved?

02:23PM   15          THE PROSPECTIVE JUROR:  I think in that case, I

16     can.

17          MS. WAIER:  Okay.  More so than the depression?

18          THE PROSPECTIVE JUROR:  Yes.

19          MS. WAIER:  So it sounds like a depression is

02:23PM   20     something you probably --

21          THE PROSPECTIVE JUROR:  I lived through.  The other

22     was I just didn't want to deal with the IRS.

23          MS. WAIER:  Right.  But -- understandable.

24          THE PROSPECTIVE JUROR:  Yes.

02:23PM   25          MS. WAIER:  But there -- I see a distinction and

```
 1    difference --

 2              THE PROSPECTIVE JUROR:  Yeah, there's a difference.

 3              MS. WAIER:  -- than dealing with somebody that --

 4              THE PROSPECTIVE JUROR:  Uh-huh.

 5              MS. WAIER:  -- might have depression because your

 6    views distinctly color that view?

 7              THE PROSPECTIVE JUROR:  My experience.

 8              MS. WAIER:  Okay.  Thank you.

 9              THE COURT:  Mr. Severo?

10              MR. SEVERO:  Thank you, Your Honor.

11              Can I get you to move that a little --

12              THE PROSPECTIVE JUROR:  Okay.

13              MR. SEVERO:  At this age, I need all the help I can

14    get.

15              Thank you.

16              Irrespective of your experience, you could listen

17    to the testimony of an individual who is admittedly -- was

18    admittedly been diagnosed with depression and evaluate the

19    testimony fairly, couldn't you?

20              THE PROSPECTIVE JUROR:  I think that's where I have

21    the trouble because when I was in this situation and we would

22    go to a psychologist together, if I were only listening he

23    made sense.  But since I knew the facts behind what was being

24    said, it wasn't true.

25              MR. SEVERO:  Could you think that all people that
```

02:23PM   5
02:24PM  10
02:24PM  15
02:24PM  20
02:24PM  25

1    suffer from depression are deceitful?

2         THE PROSPECTIVE JUROR:  No.  But, like I told you

3    in the beginning, the doctor explained it to me.  He wasn't

4    deceitful.  He saw it that way, but it wasn't the truth based

02:25PM    5    on hard numbers that could be shown.

6         MR. SEVERO:  Did the doctor say that everybody who

7    suffers from depression --

8         THE PROSPECTIVE JUROR:  No.  He said if you have a

9    psychotic breakdown you don't know the difference between

02:25PM   10    fact and reality.

11         MR. SEVERO:  Right.

12         So what I'm saying to you is that there is a

13    difference between just being -- having suffered

14    depression --

02:25PM   15         THE PROSPECTIVE JUROR:  Sure.

16         MR. SEVERO:  -- and having a psychotic breakdown?

17         THE PROSPECTIVE JUROR:  Yeah.

18         MR. SEVERO:  Right?

19         THE PROSPECTIVE JUROR:  Yeah.

02:25PM   20         MR. SEVERO:  So the -- if the evidence is that the

21    individual may have suffered from depression, but there is no

22    evidence of a psychotic breakdown, then you can set aside

23    that feeling that you have and evaluate that testimony;

24    correct?

02:25PM   25         THE PROSPECTIVE JUROR:  I think so.

```
 1              MR. SEVERO:  Yeah.  And evaluate it fairly;
 2     correct?
 3              THE PROSPECTIVE JUROR:  I think so.
 4              MR. SEVERO:  All right.  Very good.
 5              We all know that the IRS is a -- I'll call it a
 6     necessary evil.  We've got to have money in the Government so
 7     we can function.
 8              But you don't -- you're not suggesting that you
 9     would be any less receptive to testimony from IRS agents just
10     because they're from the IRS and because you've had those
11     difficulties; correct?
12              THE PROSPECTIVE JUROR:  No.  Uh-huh.
13              MR. SEVERO:  However, you would still hold the
14     Government to prove beyond a reasonable doubt; correct?
15              THE PROSPECTIVE JUROR:  Uh-huh.  That's the law.
16              MR. SEVERO:  That's the law.  You can follow that,
17     can't you?
18              THE PROSPECTIVE JUROR:  Uh-huh.
19              MR. SEVERO:  Yes?
20              THE PROSPECTIVE JUROR:  Yes.
21              MR. SEVERO:  Thank you.
22              Pass for cause.
23              MS. WAIER:  Reserve.
24              THE COURT:  Okay.  Ladies and gentlemen, I just
25     need a few minutes to talk to the lawyers again.  Why
```

1    don't -- you know, we've been going at it a while.  Why don't

2    we go ahead and take another break and we'll pick back up in

3    about another 15 minutes.

4              (Open court - jury not present.)

02:27PM    5         THE COURT:  I believe all the potential jurors are

6    now taking their break and outside the courtroom.

7              Ms. Waier, you have a challenge for cause?

8              MS. WAIER:  Yes, Your Honor.

9              Obviously, Revenue Agent Ham has depression.

02:27PM   10    They're going to be calling a psychiatrist.  He did go

11    through a psychiatric breakdown in 2001, which made him leave

12    his job.  And she -- this juror said that if that person had

13    had a psychiatric breakdown or depression, she would not

14    give -- she could not look at the credibility through

02:28PM   15    unbiased eyes.  Therefore, based on that, I think she was

16    very honest, the Government believes that she should be

17    dismissed for cause.

18              THE COURT:  All right.  Mr. Severo?

19              MR. SEVERO:  Well, I think that's -- that somewhat

02:28PM   20    misstates both the evidence and the -- the prospective

21    juror's position.  First of all, the -- the -- I don't

22    believe there's any evidence that I have seen that the

23    individual who will testify had a psychotic breakdown.

24    That's quite different than a psychiatric breakdown.  I -- I

02:28PM   25    don't know where the psychiatric breakdown comes in, but

```
 1    the -- the -- the prospective juror talks about her husband

 2    having had a psychotic breakdown, which is a much more severe

 3    manifestation of a mental health issue than what will come

 4    from the witness stand here.

 5              And I think she -- the prospective juror whose name

 6    now escapes me -- Kazinsky [sic] or --

 7              THE COURT:  Kuritzky.

 8              MR. SEVERO:  Was able to separate the two and said

 9    if there is no evidence of a psychotic breakdown, then I can

10    evaluate the depression, the individual's testimony like any

11    other testimony.

12              So I don't believe that the challenge for cause

13    should lie on this.

14              THE COURT:  Well, I -- I tend to agree with you,

15    and I have a little bit of a different take.  What she said

16    is, person who has depression and suffers from a psychotic

17    breakdown is -- thinks they're telling them the truth.  That

18    doesn't seem to me to be that -- an unreasonable reaction.

19    She did say she would try to do her best to keep an open

20    mind.  She did in response to Mr. Severo's questions say that

21    she doesn't believe everybody who's depressed is distorting

22    the truth.

23              MR. SEVERO:  Right.

24              THE COURT:  And that's why we have peremptories.

25    And I could understand if the Government wants to use its
```

02:28PM (line 5)
02:29PM (line 10)
02:29PM (line 15)
02:29PM (line 20)
02:30PM (line 25)

```
 1   last peremptory on her, it would be totally legitimate.  But
 2   to excuse her from the case for being honest and then not, in
 3   my opinion, indicating bias towards one side or the other of
 4   the just saying that I think a witness who suffers from
 5   depression and has a psychotic breakdown in his or her own
 6   mind is telling the truth, because that's what they believe;
 7   that, to me, is not a grounds to disqualify them for cause.
 8            MR. SEVERO:  Thank you, Your Honor.
 9            THE COURT:  Okay.  So we'll take our break.
10            What I'm -- in the seventh round, Ms. Waier has one
11   left, and then you'll have your two.
12            MS. WAIER:  So I have one left through the whole
13   jury panel.
14            THE COURT:  Correct.
15            MS. WAIER:  That's how it works.  Because we've
16   been just seating everybody in --
17            THE COURT:  Correct.
18            MS. WAIER:  -- the jury veneer.
19            THE COURT:  Correct.
20            MS. WAIER:  Okay.
21            THE COURT:  Correct.
22            MR. SEVERO:  I'm sorry.  You have --
23            MS. WAIER:  One.
24            MR. SEVERO:  -- one.  I have two.  That's what I
25   got.
```

|   |   |
|---|---|
| 1 | THE COURT:  Yep. |
| 2 | MS. WAIER:  Right. |
| 3 | But I can do it to the whole jury panel. |
| 4 | THE COURT:  Yes. |
| 02:31PM 5 | MR. SEVERO:  To the whole jury panel? |
| 6 | THE COURT:  Yes. |
| 7 | Okay.  All right.  We'll take our break. |
| 8 | (Recess from 2:30 p.m. to 2:44 p.m.) |
| 9 | (Open court - jury present.) |
| 02:44PM 10 | THE COURT:  Hello, ladies and gentlemen. |
| 11 | Okay.  We are, I believe, now in the seventh round |
| 12 | of peremptory challenges.  The Government has one peremptory |
| 13 | challenge. |
| 14 | MS. WAIER:  Your Honor, the Government would like |
| 02:44PM 15 | to thank and excuse Juror No. 5, Ms. Kuritzky. |
| 16 | THE COURT:  Ms. Kuritzky, thank you so much for |
| 17 | your time, ma'am.  If you could just report back down to the |
| 18 | jury assembly room. |
| 19 | THE CLERK:  LaTonya Bridgette, B-R-I-D-G-E-T-T-E. |
| 02:45PM 20 | THE COURT:  Ms. Bridgette? |
| 21 | THE PROSPECTIVE JUROR:  Yes. |
| 22 | THE COURT:  Good afternoon. |
| 23 | THE PROSPECTIVE JUROR:  Hi. |
| 24 | THE COURT:  Can you serve on this case, ma'am? |
| 02:45PM 25 | THE PROSPECTIVE JUROR:  I can. |

| | | |
|---|---|---|
| | 1 | THE COURT:  Terrific. |
| | 2 | Could I have you take that seat? |
| | 3 | THE PROSPECTIVE JUROR:  (Complies.) |
| | 4 | THE COURT:  All right.  Ms. Bridgette, you ready to |
| 02:45PM | 5 | go? |
| | 6 | THE PROSPECTIVE JUROR:  I'm ready. |
| | 7 | THE COURT:  All right.  Do any of the individuals |
| | 8 | at the Government's table look familiar to you, ma'am? |
| | 9 | THE PROSPECTIVE JUROR:  No. |
| 02:45PM | 10 | THE COURT:  How about any of the individuals at |
| | 11 | Defense table? |
| | 12 | THE PROSPECTIVE JUROR:  Nope. |
| | 13 | THE COURT:  Do you know any of the witnesses that I |
| | 14 | indicated may be testifying or may be referred to in the |
| 02:45PM | 15 | evidence? |
| | 16 | THE PROSPECTIVE JUROR:  No. |
| | 17 | THE COURT:  Do you have any problems following |
| | 18 | those three fundamental principles of our criminal justice |
| | 19 | system? |
| 02:46PM | 20 | THE PROSPECTIVE JUROR:  No. |
| | 21 | THE COURT:  Do you have any prior disputes or |
| | 22 | problems with the IRS we need to know about? |
| | 23 | THE PROSPECTIVE JUROR:  No. |
| | 24 | THE COURT:  Do you have any training, education or |
| 02:46PM | 25 | experience in the mental health field? |

1          THE PROSPECTIVE JUROR:  Yeah.  Actually, work for a

2   community-based program where mental health is involved for

3   children in foster care, I'm sorry.

4          THE COURT:  In foster care.

02:46PM  5          And tell me what are your duties and

6   responsibilities with the foster care agency?

7          THE PROSPECTIVE JUROR:  Well, I work with a team of

8   professionals; a facilitator, a therapist, a patient advocate

9   and a psychiatrist.  I'm the child and family specialist.  I

02:46PM 10   provide individual rehabilitation sessions for the client.

11   So I pretty much work with them on specific behaviors and

12   provide interventions.

13          THE COURT:  Do you work with the county?  Are you

14   employed --

02:46PM 15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  -- by the count?

17          THE PROSPECTIVE JUROR:  Yeah.  Yes, I am.

18          THE COURT:  So you're with social services?

19          THE PROSPECTIVE JUROR:  Yeah.

02:47PM 20          It's Starved Youth Children and Family Services.

21          THE COURT:  And have you ever been a victim of a

22   crime?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  Have you -- you've dealt with law

02:47PM 25   enforcement, obviously, in your capacity.

```
 1              Do you have a high opinion of law enforcement is
 2   it?
 3              THE PROSPECTIVE JUROR:  I wouldn't necessarily say
 4   a "high opinion."  I would agree with what you said earlier
 5   as far as some people make good decisions and some people
 6   make poor decisions.  So, you know...
 7              THE COURT:  That's what we needed to know.  Thank
 8   you.
 9              So you're not going to have a problem evaluating
10   the credibility of a witness from law enforcement like any
11   other witness?
12              THE PROSPECTIVE JUROR:  No, not at all.
13              THE COURT:  Going to have any problems following
14   the admonition or instruction that I'll give, do not watch,
15   view or listen to anything touching on the case?
16              THE PROSPECTIVE JUROR:  No.
17              THE COURT:  Would you be kind enough just to tell
18   us a little bit more about yourself and address the issues on
19   the juror information sheet?
20              THE PROSPECTIVE JUROR:  Sure.
21              My name is LaTonya Bridgette.  I am in Anaheim,
22   California, of course.  Single.  I don't have any children
23   that I actually birthed, but I adopted my younger brother and
24   sister, ages are 4 and 18.  I'm a child and family specialist
25   employed by Starved Youth Children and Family Services.  I
```

02:47PM (lines 5, 10, 15, 20)
02:48PM (line 25)

```
 1    never served, and I don't have a favorite movie or book, but

 2    one movie that I can watch over and over again is The Prince

 3    of Egypt.

 4              THE COURT:  Okay.  Well, welcome.

 5              Ms. Waier, any questions for Ms. Bridgette?

 6              MS. WAIER:  Briefly.

 7              So any problems with the IRS?

 8              THE PROSPECTIVE JUROR:  No.

 9              MS. WAIER:  Okay.  No problem with the fact that we

10    have to pay taxes?

11              THE PROSPECTIVE JUROR:  No.

12              MS. WAIER:  Okay.  How about investigative

13    techniques?

14              THE PROSPECTIVE JUROR:  No.

15              MS. WAIER:  Okay.  You can be fair and impartial?

16              THE PROSPECTIVE JUROR:  I can.

17              MS. WAIER:  Thank you.

18              THE COURT:  Mr. Severo?

19              MR. SEVERO:  Good afternoon, Ms. Bridgette.

20              THE PROSPECTIVE JUROR:  Good afternoon.

21              MR. SEVERO:  Your job involves interaction with

22    psychiatrists?

23              THE PROSPECTIVE JUROR:  Yes.

24              MR. SEVERO:  Do you have an opinion one way or

25    another about psychiatrists, in general?
```

1          THE PROSPECTIVE JUROR:  No.

2          MR. SEVERO:  Is it like police officers; some are

3    good, some are not so good?

4          THE PROSPECTIVE JUROR:  Of course.  That's

02:49PM  5    everybody.

6          MR. SEVERO:  Like everybody else.

7          So no biases for or against?

8          THE PROSPECTIVE JUROR:  No.

9          MR. SEVERO:  All right.  In your job, I assume that

02:49PM 10    you come across children who have been subjected to some sort

11    of criminal conduct?

12          THE PROSPECTIVE JUROR:  Yes.

13          MR. SEVERO:  Is that very often?

14          THE PROSPECTIVE JUROR:  Sometimes I have -- I deal

02:49PM 15    with clients that are on probation, but not -- not too often.

16    It just depends on the case, I guess.

17          MR. SEVERO:  Do you have to deal with police

18    officers, as well?

19          THE PROSPECTIVE JUROR:  Not police officers.  Like

02:49PM 20    I said, maybe a probation officer --

21          MR. SEVERO:  Right.

22          THE PROSPECTIVE JUROR:  -- but not a police

23    officer.

24          MR. SEVERO:  So there is no -- not a lot of

02:49PM 25    interaction with law enforcement?

```
 1                    THE PROSPECTIVE JUROR:  No.

 2                    Again, it's just probation officers.  If there's a

 3       case where there is an emergency or an incident and the

 4       family needs us, then maybe an incident report may be done,

 5       the family might have to call the police officer.  It just

 6       depends on the case and what the situation is with the

 7       family.

 8                    MR. SEVERO:  Very well.

 9                    Pass for cause.

10                    THE COURT:  All right.

11                    MR. SEVERO:  Thank you.

12                    THE PROSPECTIVE JUROR:  You're welcome.

13                    THE COURT:  I believe we're in the final round.

14       And, Mr. Severo, you have two peremptories that you can

15       exercise.

16                    MR. SEVERO:  The defense accepts the jury as

17       presently constituted.

18                    THE COURT:  Very well.

19                    All right.  If I could have everybody except Ms.

20       Decock and Ms. Thomson, stand and raise your right hand,

21       please.

22                    (Jury panel sworn.)

23                    THE COURT:  If you could, please, be seated.

24                    And, then, if I could have Ms. Thomson and Ms.

25       Decock, please stand, and raise their right hand?
```

02:50PM (lines 5, 10, 14, 20)
02:51PM (line 25)

1          (Alternate jurors sworn.)

2          THE COURT:  If you could, please, be seated.

3          And for you good folks in the audience, we're not

4     going to need you on this case.  I appreciate your time,

02:51PM  5     greatly.  Again, we couldn't do what we needed to do if you

6     didn't show up.  Please go down to the jury assembly room and

7     let them know that you were excused.

8          It's always interesting, ladies and gentlemen,

9     sometimes some of the people that I excuse there at the end.

02:52PM 10     They have a big smile of relief, but they're still on the

11     list.  And, like I said, I think this is an interesting case.

12     It's an important case, but from your perspective, it's a

13     relatively short case.

14          I know after this case is over, I have several

02:52PM 15     cases.  One is going to be eight or nine weeks long.  There's

16     a chance that their names could be on that list.  They'll

17     have to come and so, you know, they think they got out of it,

18     but they didn't.

19          Again, I want to reiterate how much I appreciate

02:52PM 20     you being here.  I do -- believe me, I do realize the

21     inconvenience of sitting on a jury, and I know I'm probably

22     singing a note to the chore.  But it is so important.  The

23     little work that I do internationally, that I'm aware of, in

24     so many countries, they don't live by the rule of law.  And

02:53PM 25     it -- what makes our country so great, it is the rule of law

1   and it's the rule of law decided by good folks like you on

2   how our Government functions; what's right and what's wrong.

3   And unless you embrace that and you're willing to invest in

4   it, we're going to lose it.  And so I just want to thank you

02:53PM  5   again on behalf of the parties, on behalf of the Court, and

6   on behalf of your country for your service.

7            What I'm going to do is give you some preliminary

8   jury instructions.  It's only going to be about ten minutes

9   at the most, and then we're going to take another break, and

02:53PM  10  Melissa is going to take you back to the jury room, show you

11  the jury room, and answer any questions you might have.

12           I really want you to be as comfortable as you can

13  be over the next few days as we have this trial.  It's a

14  beautiful courtroom.  As you found out, the acoustics aren't

02:54PM  15  so great if people are away from the microphone.

16           You will find that in the jury room, we have soft

17  drinks.  We have coffee.  We have water.  You can, obviously,

18  drink all of that in the jury room, but when you're in court,

19  the only thing we allow in the courtroom is water because

02:54PM  20  none of us are perfect, and we want to keep this courtroom

21  beautiful the way it is.  And if you spill coffee, coke, or

22  soda, you're going to stain the carpet and so we don't allow

23  it in.

24           If you have any issues, any problems, please tell

02:54PM  25  Melissa and she will let me know, and then I need to let the

1    lawyers and the parties know, and I will respond to it

2    immediately.  All right?

3            So if you could just get comfortable, and I'm just

4    going to read some preliminary instructions to you.

02:55PM  5    You are now the jury in this case, and I want to

6    take a few minutes to tell you something about your duties as

7    jurors and give you some preliminary instructions.  At the

8    end of the trial, I will give you more detailed written

9    instructions that will control your deliberations.  When you

02:55PM  10   deliberate, it will be your duty to weigh and to evaluate all

11   of the evidence received in the case, and, in that process,

12   to decide the facts.  To the facts as you find them, you will

13   apply the law as I give it to you whether you agree with the

14   law or not.  You must decide the case solely on the evidence

02:55PM  15   and the law before you, and you must not be influenced by any

16   personal likes or dislikes, opinions, prejudices or sympathy.

17           Please do not take anything I may say or do during

18   this trial as indicating what I think of the evidence or what

19   your verdict should be.

02:55PM  20   That is entirely up to you.

21           This is a criminal case brought by the

22   United States Government.  The Government charges the

23   defendant, Dr. Shah, with bribing a revenue agent of the

24   Internal Revenue Service, in violation of 18, U.S.C., Section

02:56PM  25   201(B)(1).  The charge against him is contained in the First

1    Superseding Indictment.  The indictment simply describes the

2    charge the Government brings against him.  The indictment is

3    not evidence and does not prove anything.

4            Dr. Shah has pleaded not guilty to the charge and

02:56PM  5    is presumed innocent unless and until the Government proves

6    him guilty beyond a reasonable doubt.  In addition, Dr. Shah

7    has the right to remain silent and never has to prove

8    innocence or to present any evidence.

9            The evidence you are to consider in deciding what

02:56PM  10   the facts are consist of one, the sworn testimony of any

11   witness; NUMBER two, the exhibits which are received in

12   evidence; and three, any facts to which the parties agree.

13           The following things are not evidence and you must

14   not consider them as evidence in deciding the facts of this

02:57PM  15   case:

16           Number one, statements and arguments of the

17   attorneys.  Number two, questions and objections of the

18   attorneys.  Number three, testimony that I instruct you to

19   disregard.  And number four, anything you may see or hear

02:57PM  20   when the court is not in session even if what you see or hear

21   is done or said by one of the parties or by one of the

22   witnesses.

23           Evidence may be direct or circumstantial.  Direct

24   evidence is direct proof of a fact such as a testimony by a

02:57PM  25   witness about what that witness personally saw or heard or

did.

Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which one fact can find another fact.

You are to consider both direct and circumstantial evidence; either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

There are Rules of Evidence that control what can be received in evidence.  When a lawyer asks a question, or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered or the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means when you are deciding the case, you must not consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to

1    believe.  You may believe everything a witness says or part

2    of it or none of it.  In considering the testimony of any

3    witness, you may take into account; one, the witness's

4    opportunity and ability to see or hear or know the things

02:59PM    5    testified to.

6              Number two, the witness's memory.

7              Number three, the witness's manner while

8    testifying.

9              Number four, the witness's interest in the outcome

02:59PM   10    of the case, if any.

11              Number five, the witness's bias or prejudice, if

12    any.

13              Number six, whether other evidence contradicted the

14    witness's testimony.

02:59PM   15              Number seven, the reasonableness of the witness's

16    testimony in light of all the evidence; and number eight, any

17    other factors that bear on believability.

18              The weight of the evidence as to a fact does not

19    necessarily depend on the number of witnesses who testify

02:59PM   20    about it.

21              I will now say a few words about your conduct as

22    jurors.  First, keep an open mind throughout the trial and do

23    not decide what the verdict should be until you and your

24    fellow jurors have completed your deliberations at the end of

03:00PM   25    the case.

Second, because you must decide this case based only on the evidence received on the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case, or to the issues it involves during the course of your jury duty.

Thus, until the end of the case or until I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet chat room, blog, Web site or other feature.  This applies to communicating with your fellow jurors until I give you the case for deliberations, and it applies to communicating with everyone else, including your family members, your employer, the media or press, and the people involved in the trial; although you may notify your family and your employer that you have been seated as a juror in the case.

But if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the case, not to discuss the matter and to report the contact to the Court.

Because you will receive all the evidence and legal instruction you may properly consider to return a verdict, do

not read, watch or listen to any news or media accounts or

commentary about the case or anything to do with it.  Do not

do any research, such as consulting dictionaries, searching

the Internet or using other reference materials, and do not

make any investigation or in any way try to learn about the

case on your own.

            The law requires these instructions to ensure the

parties have a fair trial based on the same evidence that

each parties has had an opportunity to address.  A juror who

violates these restrictions jeopardizes the fairness of these

proceedings, and a mistrial could result that would require

the entire trial process to start over.  If any juror is

exposed to any outside information, please notify the Court

immediately.

            If you wish, you may take notes to help you

remember the evidence.  If you do take notes, please keep

them to yourself until you and your fellow jurors go to the

jury room to decide the case.  Do not let notetaking distract

you from being attentive.  When you leave court for recesses,

your notes should be left in the courtroom.  No one will read

your notes.

            Whether or not you take notes, you should rely on

your own memory of the evidence.  Notes are only to assist

your memory.  You should not be overly influenced by your

notes or those of your fellow jurors.

1          After our break, ladies and gentlemen, the next

2     phase of the trial will begin.  Each side can make an opening

3     statement.  An opening statement is not evidence.  It is

4     simply an outline to help you understand what the party

03:02PM   5     expects the evidence will show.  A party is not required to

6     make an opening statement.

7          The Government will then present evidence and

8     counsel for the defendant may cross-examine them.  Then, if

9     the defendant chooses to offer evidence, counsel for the

03:03PM  10     Government may cross-examine.

11          After the evidence has been presented, I will

12     instruct you on the law that applies to the case and the

13     attorneys will make closing arguments.  After that, ladies

14     and gentlemen, you will go to the jury room to deliberate on

03:03PM  15     your verdict.

16          One other item, ladies and gentlemen, I don't want

17     you to have the wrong impression of the lawyers or the

18     parties, is I've told them in no way are they to curry your

19     favor or to engage you during the trial.  And when you're

03:03PM  20     coming to the court, when you're leaving the court, you might

21     come across them in the courtroom, you might come across them

22     in the hallway or the elevator, and if it looks like they're

23     looking by you or past you, please do not think that they're

24     being rude.  They're just trying to stay out of trouble with

03:04PM  25     me.  Okay?

1          So why don't we take a short break.

2          Melissa, how much time do you need?

3          THE CLERK:  Fifteen minutes.

4          THE COURT:  Melissa needs about 15 minutes, and

03:04PM  5   then we'll pick back up.  We'll have the reading of the

6   indictment and then we'll go right into opening statements.

7          THE CLERK:  All rise.

8          (Open court - jury not present.)

9          THE COURT:  Okay.  Any questions?

03:04PM  10   No?

11          Okay.  Take your break.  We'll pick back up in

12   about 10 or 15 minutes.

13          MR. SEVERO:  Thank you, Your Honor.

14             (Recess from 3:05 p.m. to 3:20 p.m.)

03:21PM  15          THE CLERK:  All rise.

16          (Open court - jury present.)

17          THE COURT:  Please be seated, ladies and gentlemen.

18          Ms. Waier, is the Government prepared to read the

19   First Superseding Indictment?

03:21PM  20          MS. WAIER:  Yes, Your Honor.

21          Defendant Harshad Shah is charged in a First

22   Superseding Indictment.  It reads:

23          United States of America vs. Harshad Shad, the

24   Grand Jury charges a violation of Title 18, United States

03:21PM  25   Code, Section 201(B)(1).  Beginning on or about January 8th,

1    2010, and continuing until on or about January 12th, 2010, in

2    Orange County, within the Central District of California,

3    defendant Harshad Shah directly and indirectly corruptly

4    gave, offered and promised a thing of value; namely, money in

03:22PM   5    the amount of approximately $30,000 to a public official;

6    namely, a revenue agent of the Internal Revenue Service, the

7    IRS, with the intent to one, influence an official act; two,

8    influence the public official to commit or aid in committing

9    or collude in or allow any fraud or make opportunity for the

03:22PM  10    commission of any fraud on the United States; and three, to

11    induce the public official to do and admit to do an act in

12    violation of the lawful duty of such official, specifically

13    having the IRS revenue agent fraudulently conclude an IRS

14    audit of Defendant Shah by falsely recording an IRS record

03:23PM  15    that there was no income tax due and owing by Defendant Shah

16    for tax years 2006, 2007, and 2008, when, in fact, a

17    substantial income tax was due and owing by Defendant Shah

18    for each tax year.

19              THE COURT:  Very well.

03:23PM  20              Ladies and gentlemen, again, the indictment simply

21    describes the charge that the Government is bringing against

22    Dr. Shah.  The indictment is not evidence and does not prove

23    anything.

24              Ms. Waier, is the Government ready to give its

03:23PM  25    opening statement?

1          MS. WAIER:  I am, Your Honor.

2          THE COURT:  Please proceed.

3          MS. WAIER:  "You will work for me.  You will work

4     for the rest of my life.  I am giving you the greatest

5     opportunity ever."  The evidence will show that those are the

6     words of Defendant Harshad Shah when he propositioned Revenue

7     Agent Michael Ham to forego taxes for three tax years, 2006,

8     2007, and 2008 in return for $30,000 in cash.

9               Now, who is this defendant?

10               Defendant is a psychiatrist.  You all heard that

11     during jury selection.  He has an office in Long Beach.  And

12     although he paid taxes for tax years 2006 and 2007, and

13     grossed over $300,000 a year, he didn't pay any taxes.  When

14     he filed his taxes he had so many deductions that he didn't

15     have to owe any taxes based on his self-prepared tax returns.

16               Because of that, the IRS selected him for an audit,

17     and Revenue Agent Michael Ham of the Internal Revenue Service

18     was selected to do his corporate tax return audit for

19     three years; 2006, 2007, and 2008.

20               IRS Revenue Agent Ham, at the time, was a

21     Government official.  He worked for and on behalf of the

22     United States of America to collect taxes.  In that respect,

23     he would conduct audits, and audits are objective things that

24     the IRS does to determine whether the taxpayer owes nothing

25     more, which we call that a "no change;" whether they owe

1    additional taxes due and owing; or if there is to be a

2    refund.  And he was selected, Revenue Agent Ham, to audit the

3    corporation of the defendant.

4         Now, Revenue Agent Ham is now since retired and is

03:25PM  5    no longer part of the IRS.  However, at the time, in 2010,

6    and 2009, he was a revenue agent.

7         The audit of Shah -- of Defendant Shah occurred for

8    three years.  It started in March of 2009.  It started like

9    every other audit.  The IRS Revenue Agent Michael Ham opened

03:26PM  10   up the case, sent a letter to the defendant, and asked for

11   the corporate records in order to do the audit.

12        He asked for all of the records that were used for

13   the tax return, which should have been handy and -- and the

14   defendant should have been readily able to produce them.

03:26PM  15   However, Dr. Shah's corporation had no books and records.

16        While the audit was going on in the corporate

17   taxes, Dr. Shah's individual 2007 1040 tax form was also

18   chosen, by random, for audit by the Internal Revenue Service.

19   And that 1040 audit was given to a revenue agent by the name

03:26PM  20   of Mike Raghaven.  And you're going to hear from her.  And

21   you're going hear just like Revenue Agent Shah [sic] -- I'm,

22   Revenue Agent Ham, she sent out a letter informing the

23   defendant that he was being audited and for records.  And

24   you're going to hear that the defendant did not respond to

03:27PM  25   the letter, which Special Agent Raghaven had to actually call

         1    the defendant.  And during a telephone call, the defendant

         2    said -- started asking questions.

         3              Are you from India?

         4              I'm from India.  I'm -- because I'm from India,

03:27PM  5    you're from India, your my sister, I'm your brother, let's

         6    just make this go away.

         7              Revenue Agent Raghaven reported this to her

         8    supervisor, and the audit was then taken away from her and

         9    given to Revenue Agent Ham.

03:27PM 10              In November of 2009, the similar fashion, the

        11    evidence will show that the defendant started making bribe

        12    overtures to Revenue Agent Ham.

        13              In terms of free psychiatric medical care after the

        14    exam was completed, Revenue Agent Ham had told the defendant

03:28PM 15    that he had depression and had suffered from depression in

        16    the past.  Although it was under management and it did not

        17    affect Revenue Agent Ham's job, he had broached the subject

        18    with Defendant as a way of meeting some common ground because

        19    the defendant was a psychiatrist.

03:28PM 20              During November of 2009, Defendant offered free

        21    psychiatric medical care when this thing was over.  He also

        22    asked Revenue Agent Ham if he would work part-time for him,

        23    and then went a step further and also said, hey, I can employ

        24    your wife, or maybe another relative.

03:28PM 25              Because Revenue Agent Ham was told that he should

1    report such bribe overtures to TIGTA, that's exactly what he

2    did.

3           So what's TIGTA?

4           TIGTA is the Treasury Inspector General for Tax

03:29PM    5    Administration, and you are going to meet Special Agent Glen

6    Gomez.  And his job is not -- he does not work on behalf of

7    the IRS.  TIGTA is a separate agency.

8           And his job is to look into and investigate when

9    bribe overtures are made in the middle of audits.  He also

03:29PM   10    investigates revenue agents and how they do their job.  But

11    it's a separate and apart -- separate and different agency.

12    And so Revenue Agent Ham called Special Agent Gomez and said,

13    this is what's going on.

14           Now, Special Agent Gomez has nothing to do with the

03:29PM   15    audit.  He is not an accountant.  He does not conduct audits.

16    That's something that Revenue Agent Ham does.

17           And so, basically, during the time that Revenue

18    Agent Ham was reporting it to Special Agent Gomez, Special

19    Agent Gomez asked:  Where are you in the audit?

03:30PM   20           And this audit had been going on since March, so he

21    was at the very tail end of the audit.

22           And Special Agent Gomez said to Revenue Agent Ham,

23    look, don't -- when you're finished with the audit, give me a

24    call, and we'll move from there.  And Revenue Agent Ham

03:30PM   25    finished the audit and determined that for the three tax

years, Defendant Shah owed approximately $410,000.  And that

was because Defendant Shah did not have any books and records

of the corporation, and Special Agent Ham was working from

bank deposits and bank reports.

Special Agent Gomez had nothing to do with the

audit.

Once he determined it was over, what's called a

"Revenue Agent Report" was done by Revenue Agent Ham.  That

happened to be the end of the audit, and then the revenue

agent meets with the taxpayer, tells them what the result is.

In this case, the taxpayer owes $410,000.  It's then signed

and the audit is concluded.  You either pay the tax or you

don't.  You can either appeal it.  There's a lot of very

different rights that you can do once this is over as a

taxpayer.

So what happened next is, Special Agent Gomez

wanted to see what was going on.  He's an objective person

looking into whether or not bribe overtures were being made.

And so what happened?

He put a recording device on Revenue Agent Ham to

make a phone call to find out what's going on.  And, in that

phone call, Revenue Agent Ham tells Defendant Shah, you owe

$410,000.

And Revenue Agent Ham said, you know, I'm done.

This is where we're at.

1    Defendant Shah wanted to meet and go over it.  And

2    at the end of the conversation, he said something curious.

3         (Audio recording played in court.)

4         MS. WAIER:  The call then concluded where the

03:32PM  5    defendant and Revenue Agent Ham were going to meet on January

6    8, 2010 at the offices of Defendant Shah.  During the

7    meeting, the defendant offers $15,000 to Revenue Agent Ham if

8    he can get the taxes down to approximately $150,000.

9         (Audio recording played in open court.)

03:33PM  10        MS. WAIER:  It was Defendant who first offered the

11   $15,000.  And Revenue Agent Ham said to the defendant, look,

12   if you have a problem with my numbers, you think they're not

13   right, don't pay me any money.  You know, you should take

14   that up with either show me why I'm wrong or don't pay me the

03:33PM  15   money.

16        And so then, Defendant Shah says, well, it was

17   really just a guess; however, I have a different offer for

18   you.  I'll give you $30,000 if you make the tax liability to

19   be nothing.

03:34PM  20        Now, during these conversations -- go ahead and

21   play that.

22        (Audio recording played in open court.)

23        MS. WAIER:  During these conversations, Revenue

24   Agent Ham was telling Defendant this is illegal because he

03:35PM  25   wanted the defendant to understand this is an illegal

1    transaction.

2            Here is the back and forth that occurred over that.

3            (Audio recording played in open court.)

4    MS. WAIER:  So despite the fact that Revenue Agent

03:36PM  5    Ham said it was illegal, the defendant offered the $30,000

6    for no tax due and owing.  And, in this conversation, Dr.

7    Shah acknowledges the illegal nature of the transaction by

8    introducing code language.

9            He says he doesn't want to talk about $30,000.

03:36PM  10   Let's not talk about money.  Instead, he wants to call it

11   apples.

12           (Audio recording played in court.)

13   MS. WAIER:  So they leave with the understanding

14   that Revenue Agent Ham was going to try to get the Revenue

03:37PM  15   Agent Report which at first said that Defendant owed $410,000

16   to zero.

17           And what Revenue Agent Ham said is, I've got to

18   talk to my boss, and let's see If I can do this.  So, on

19   January 11th, he calls the defendant and says, I can get it

03:37PM  20   down to zero.

21           And, on January 12th, 2010, the defendant and

22   Revenue Agent Ham met at Defendant's place of business.  And

23   during that meeting, Dr. Shah took Revenue Agent Ham to his

24   bank.  He walked in.  He withdrew $30,000 in cash, met

03:37PM  25   Revenue Agent Ham in the bank parking lot, and exchanged that

| | |
|---|---|
| 1 | $30,000 for the Revenue Agent Report that shows he owed zero |
| 2 | for tax years 2006, 2007, and 2008.  The Revenue Agent Report |
| 3 | had zero tax due and owing for all three years. |
| 4 | Now, after the exchange was done, the defendant and |
| 03:38PM 5 | Revenue Agent Ham went to a Staples in order to exchange some |
| 6 | bank documents.  And during the entire conversation, Revenue |
| 7 | Agent Ham made clear that this was illegal and mentioned it |
| 8 | approximately eight different times.  You'll hear that in the |
| 9 | recordings. |
| 03:38PM 10 | You will also hear that Revenue Agent Ham calls |
| 11 | Shah "The Boss," and says it was Shah's idea, not his. |
| 12 | And while they're waiting for these copies, |
| 13 | Defendant Shah tells Revenue Agent Ham that he is working for |
| 14 | him now and that in order not to get caught, Revenue Agent |
| 03:39PM 15 | Ham should buy gold with the money because there will be no |
| 16 | trace of it.  He should take a trip to Hawaii with the money. |
| 17 | He should structure the deposits $5,000 at a time so that |
| 18 | Revenue Agent Ham wouldn't get caught with all of the cash. |
| 19 | Dr. Shah was creative enough to say it's lotto winnings. |
| 03:39PM 20 | Dr. Shah told Revenue Agent Ham open a new bank |
| 21 | account in a post office box, not to tell anyone. |
| 22 | He also said, hey, don't be a crook.  You better |
| 23 | make sure you're going to come through with all that.  I'm |
| 24 | trusting you.  And Dr. Shah said if he was an IRS agent, he |
| 03:39PM 25 | would have collected bribes. |

1          At the end of this case, I'm going to ask you to

2     return a verdict that is consistent with the evidence, which

3     is guilty on the single count Superseding Indictment because

4     Defendant Harshad Shah paid $30,000 to Revenue Agent Ham in

03:40PM  5     exchange for no tax due and owing liability for 2006, 2007,

6     and 2008 tax years.

7          Thank you.

8          THE COURT:  Mr. Severo, are you ready to give the

9     defense opening statement?

03:40PM 10     MR. SEVERO:  Yes, Your Honor.

11          Please the Court and Counsel.  And good afternoon

12     again, ladies and gentlemen.

13          I am going to try and turn this on here for a

14     moment.  Hopefully it works.

03:40PM 15          Ladies and gentlemen, this case is about the IRS

16     through a vindictive and incompetent revenue agent cheating a

17     taxpayer.  You only heard a very small portion of the story

18     as it came out from Ms. Waier, but you will -- you will hear

19     during the course of the -- of this case that Dr. Shah is,

03:41PM 20     indeed, a medical doctor.  He's a psychiatrist.  He's been

21     a -- in private practice for decades.

22          In March of 2009, the IRS assigned an audit to be

23     conducted and assigned Revenue Agent Ham, Mike Ham to do it.

24          Of course, you will hear that Revenue Agent Ham had

03:41PM 25     been with the IRS for a little while -- from '94 to '95 to

1    2001, and, at which time, he filed for disability; disability

2    that he said he needed to get off work because he was being

3    overwhelmed by the following aspects of my job:  Keeping

4    current with tax and regulations and procedures; keeping the

03:42PM   5    inventory balanced at the one-third beginning, middle and

6    report stages; the tight and constant accountings for work

7    hours applied to each case; and the responsibility for

8    accuracy and fairness to both the IRS and the taxpayers.

9          He was overwhelmed by his inability to come -- to

03:42PM   10    accurately and fairly do his job.

11          Well, that whole disability thing lasted for seven

12    years, during which time he collected $3,800 a month while he

13    was on leave, telling all of the evaluators and psychiatrists

14    that he had -- he could not do the job because the job was

03:43PM   15    stressing him out.

16          Of course, during that time, he consistently

17    omitted telling the -- these doctors about his significant

18    mental health history before he went on disability.  And, in

19    fact, he forgot to tell them that he had previously, years

03:43PM   20    before, attempted suicide.  This is a very disturbed person.

21          In continuing to collect his disability, he claimed

22    to suffer from lack of memory, from lack of concentration,

23    and irregular moods and emotions.  You will learn that

24    during -- during this time that he was on leave, he told the

03:44PM   25    treating psychiatrists that he had engaged in insurance fraud

by remarrying his first wife so that she could get health

insurance through the Government.  This is evidence -- the

evidence will be -- it will come directly from him that this

ex-wife was living in another state and was living with a

boyfriend someplace else.

Finally, in 2008, and during that time, the -- the

office of Workers' Compensation programs, which is the OWCP,

it is the Internal system for Workers' Compensation for

Government workers, continually evaluated this -- this man.

And in the last several evaluations, he could not convince

them that his mental health problem was stress related or,

rather, job related.  Couldn't convince them.

It got so bad, he gave up his claim, abandoned it,

and went back to work after having claimed for all these

years that he had suffered from lack of concentration, poor

memory and the inability to regulate his emotions.  Goes back

to work.

When he goes back to work, he is considered a

trainee because he's been out so long.  And he is assigned a

coach to help him try to get back to work.

Well, he gets Dr. Shah's audit.  He sends a letter

out and in the first conversation, no sooner had he started

working on this audit that Dr. Shah -- that he and Dr. Shah

became very contentious.  So contentious that Dr. Shah called

the IRS and demanded the removal of Mr. Ham.  In the face of

1    the complaint, Mr. Ham is called into his supervisor's office

2    and now he's just back to work.  He's got all these problems

3    and he is asking -- he's being complained about.

4         You should know that, and you will hear that early

03:46PM  5    on in 2009 -- early in 2009, he went back to one of his

6    treating physicians and asked for a quote/unquote mental

7    holiday because he couldn't handle this job.

8         This will become very important because of what

9    followed.  Soon after he gets the -- the audit assigned to

03:47PM  10    him and after the complaint is lodged, he goes back and

11    expands the audit.  The original audit was for 2007.  He

12    expands the audit to '06, '07, and '08.

13         And -- over the next several months, this is March

14    of 2009 -- over the next several months, Dr. Shah kept

03:47PM  15    requesting the documents in order to be able to work with the

16    IRS to try to resolve the audit.

17         Now, you will hear that there -- there will be no

18    evidence that there were any overtures regarding bribery or

19    any type of move between March and January of 2010.  There

03:48PM  20    were constant conversations about getting the records and

21    those records would not be provided to Dr. Shah, as he has a

22    right under the Taxpayer's Bill of Rights, he has a right to

23    obtain the records from the IRS.

24         They wouldn't give it to him.  You know when he got

03:48PM  25    them, after he was cornered.  And I'll -- I'll get back to

1        this point.  But after he was cornered and handed money over

2        to Mr. Ham, then he got the records.

3               And how did that -- all that happen?

4               Well, soon after Dr. Ham -- or, rather, Dr. Shah

03:48PM  5      and Mr. Ham met, Mr. Ham began to confide in Dr. Shah and

6        tell him about his mental health issues.

7               Now, Dr. Shah is a psychiatrist.  He's got -- you

8        will hear testimony that he has a certain responsibility,

9        ethical responsibility when he is asked and told about mental

03:49PM  10     health issues.

11              In fact, one of the real big problems that Dr. Shah

12       faced with Mr. Ham was that he was -- had prior suicide

13       attempts in his mental health history.  So he had that --

14       that -- that -- what Mr. Ham did there is create not just a

03:49PM  15     common ground, which is what -- your -- he will tell you he

16       was trying to do, what he did was he created a

17       physician/patient relationship, a close bond with Dr. Shah.

18       A bond that became friendly.

19              You will hear a recording where he says Dr. Shah

03:50PM  20     tells him listen, you are my brother.  You're like my

21       patient.  That's the kind of relationship that was forged

22       between these two people.

23              And all this time, it was relatively friendly until

24       Mr. Ham decided that he should contact agent -- well, TIGTA,

03:50PM  25     Treasury Inspector General For Tax Administration.  And

```
 1    Mr. Gomez took over the investigation.

 2              At this point, there is still no talk about paying

 3    money to anybody or anything else.  There's no assessment

 4    being made.

 5              What Mr. Ham did is in speaking with Mr. Gomez,

 6    Agent Gomez, he told him that he had come up with a $410,000

 7    assessment.  It worked out like this (indicating).

 8              That's not a very good view.

 9              But Mr. Ham came up with a 369,888 total tax and

10    penalty for the three years.  That was before interest.  When

11    you added interest to it, it's $410,000.

12              The evidence will be, ladies and gentlemen, that

13    that overstated the tax owed by Mr. -- by Dr. Shah by

14    239 percent.  Because, as Dr. Shah told Agent Ham or Revenue

15    Agent Ham then, look, I have a figure.  I think what I owe is

16    about 40 per year.  40 or 50 -- 150.  You will hear the

17    recording.  150.

18              Well, he turned out to be right.  Because after he

19    was charged in this case, the US Tax Court, this matter went

20    to the US Tax Court and the IRS reviewed its figures and

21    said, oops, yeah, you're right.  You should have paid

22    154,000.

23              The -- the -- Mr. Ham created an atmosphere of such

24    an enormous pressure, $410,000 was the assessment, and he --

25    and Mr. Ham, you will hear, all the recordings would not back
```

1    out of that.

2              You will learn through several witnesses, including

3    expert witnesses, and you will hear from an expert witness by

4    the name of Ted Meyer.  Ted Meyer was a territory manager at

03:53PM  5    the end of his career with the IRS; a career that had spanned

6    34 years.  He was one of the managers in this area.

7              Mr. Meyer will testify that Mr. Ham's computation

8    was not only wrong, but very wrong completely from the

9    outset.

03:53PM  10             This -- this 239 percent increase in the tax

11   situation, combined with the friendly, I am your patient,

12   I've confided in you -- you will hear testimony at one point

13   that he -- that Dr. Shah says, hey, let me -- I'll pay the

14   IRS the money, and then I'll take care of you.

03:53PM  15             Well, then like -- at that point, he had confided

16   so much in Dr. Shah that Dr. Shah felt that he had to care

17   for Mr. Ham as his patient.  That was what the conversation

18   was.

19             What happened, though, is when it went to TIGTA and

03:54PM  20   Mr. Gomez.  Agent Gomez, you'll hear, has no training in

21   taxation, nor was there any indication or will there be any

22   evidence that he tried to have the threatened assessment

23   checked by supervisors.

24             You will hear testimony from Rick Spear, who was

03:54PM  25   the Deputy Chief of the criminal division of the IRS.  And

1    he'll tell you that when it came to these kinds of sting

2    operations, because that's what this was -- and the proper

3    procedure was to have a supervisor check those figures, make

4    sure that assessment was right, and even have a U.S. Attorney

03:55PM    5    check it or a Department of Justice Attorney check it.  That

6    should have been the procedure followed.  Not the procedure

7    at TIGTA.  But that's the wrong procedure.

8             So when he goes back to Agent Ham, Revenue Agent

9    Ham consistently and -- and forcefully, kept saying, well,

03:55PM    10    can you pay the $410,000 over time, he wasn't backing out.

11            Dr. Shah fell in the trap set by the Government.

12    He said, look, if I pay 15 -- 150,000, which is what he ended

13    up owing, I'll give you 15 grand.  This -- we're two friends

14    talking by then.  And he, indeed, ended up paying.  They

03:56PM    15    trapped him into paying the $30,000.

16            It was not until after that that he got the records

17    and after he was indicted he was able to prove that he didn't

18    owe -- Dr. Shah was able to prove that he didn't owe the

19    $410,000, that he owed only $154,000.

03:56PM    20            The pressure was so intense that Mr. Ham aided by

21    Agent Gomez on -- on any one day would call three or four

22    times to try to talk to Shah about getting him to make an

23    offer of bribery.  That's how all of that came about.  That,

24    we will claim -- we will show you during the course of this

03:56PM    25    trial was entrapment.  And at the end of this case, we'll ask

1    you to bring the only fair verdict in this matter and that

2    would be not guilty.

3            Thank you.

4            THE COURT:  All right.  Ladies and gentlemen, I

03:57PM  5    know you were here early, so I made the executive decision

6    we're going to break now.

7            The hours of operation, we will start very promptly

8    at 8:30.  The lawyers, I've told, I'm a time freak because

9    your time is very important to me and I want them to be ready

03:57PM  10   to go.  I told them any sidebars or hearings outside your

11   presence are going to be at a real minimum.  We'll do

12   whatever work we have to do after you're gone.

13           So we'll start promptly at 8:30.  I think Melissa

14   is going to ask you to be here about 8:15.

03:57PM  15           Is that right, Melissa?

16           THE CLERK:  Yes.

17           THE COURT:  And if we can start before 8:30, we'll

18   start, but hopefully no later than 8:30.  Then we'll take a

19   morning break.  We'll take an hour lunch break, and then

03:57PM  20   we'll take an afternoon break.  And my hope is to break

21   between 4:30 and 5:00, unless we can finish up a witness.

22           My hope is that the trial will be over this week.

23   And I'll -- I'll give you an update certainly by Thursday on

24   how we're doing.  And if we have to go into the following

03:58PM  25   week, we can -- we can talk about that.  But let's hope with

1    working with the attorneys on the after hours, we'll be able

2    to get this case to you by the end of this week.

3          I do have to give you one instruction since this is

4    our first break.  If you could get comfortable, it only takes

03:58PM  5    a minute to read it.

6          Remember until the trial is over, do not discuss

7    this case with anyone, including your fellow jurors, members

8    of your family, people involved in the trial, or anyone else,

9    and do not allow others to discuss the case with you, this

03:58PM  10    includes discussing the case in Internet chatrooms or through

11    Internet blogs, Internet bulletin boards, e-mails or text

12    messaging.  If anyone tries to communicate with you about the

13    case, please let me know about it immediately.

14          Do not read, watch or listen to any news reports or

03:59PM  15    other accounts about the trial or anyone associated with it,

16    including any online information.  Do not do any research

17    such as consulting dictionaries, searching the Internet or

18    using other reference materials, and do not make any

19    investigation about the case on your own.

03:59PM  20          Finally, keep an open mind until all of the

21    evidence has been presented and you have heard the arguments

22    of Counsel, my instructions on the law, and the views of your

23    fellow jurors.

24          All right.  Ladies and gentlemen, again, thank you

03:59PM  25    for showing up, thank you for being on this trial, thank you

1    for your patience.  Have a good night, and we'll see everyone

2    around 8:15.

3                THE CLERK:  All rise.

4                (Open court - jury not present.)

04:00PM  5                THE COURT:  All right.  Please be seated.

6                Is there anything we need to discuss?

7                MS. WAIER:  I -- yes, Your Honor.

8                I couldn't help but notice in the opening statement

9    that the defendant is bringing up insurance fraud and there

04:00PM  10   has been no insurance fraud.  The Government checked into it.

11   And I know the defense knows that they never applied for and

12   never obtained any benefits.  I know they know that because I

13   know they talked to Revenue Agent Ham.  So I don't know how

14   that would be admissible.

04:00PM  15               THE COURT:  Well, as you know, Ms. Waier, the

16   opening statements is -- is not evidence, and I've already

17   told them that.  And I will be reiterating that at the end of

18   the case.  And we'll just see what the witnesses say and what

19   they're asked and about cross-examination.  But it's duly

04:01PM  20   noted that you believe there was no insurance fraud.

21               I assume, Mr. Severo, you're going to be using some

22   document that you found in the records where Agent Ham

23   indicated to a therapist or somebody that he submitted

24   insurance for his ex-wife?

04:01PM  25               MR. SEVERO:  That's correct.

1          THE COURT:  Okay.  So we'll see -- see what

2     happens.

3          MS. WAIER:  Okay.

4          MR. SEVERO:  Thank you, Your Honor.

04:01PM   5          THE COURT:  Okay.  I'll see everybody.  If you

6     could be here no later than 8:15, as well.

7          Have a good night.

8          THE CLERK:  Court is adjourned.

9          (Proceedings concluded at 4:01 p.m.)

10                    CERTIFICATE

11     I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

12     TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

13     THE ABOVE MATTER.

14     FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

15     REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

16     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

17

18     /s/ Miriam V. Baird              09/08/2015

19     MIRIAM V. BAIRD                         DATE
       OFFICIAL REPORTER
20

21

22

23

24

25

UNITED STATES DISTRICT COURT