1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

4   UNITED STATES OF AMERICA,          )
                                       )
5                                      )
                                       )
6                   Plaintiff,         )
                                       )
7                                      )
                                       )
8          Vs.                         )   No. SACR10-00070-CJC
                                       )
9                                      )
                                       )
10  HARSHAD SHAH,                      )
                                       )
11                                     )
                                       )
12                  Defendant.         )
                                       )
13  _____   )

14

15

16       REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              *JURY TRIAL, DAY 2*

18                 VOLUME II

19            SANTA ANA, CALIFORNIA

20          WEDNESDAY, JULY 15, 2015

21

22

23          MIRIAM V. BAIRD, CSR 11893
        OFFICIAL U.S. DISTRICT COURT REPORTER
24         255 East Temple Street, # 181-K
          LOS ANGELES, CALIFORNIA 90012
25                (213) 894-2853
               MVB11893@AOL.COM

1              **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**        JENNIFER L. WAIER
     **UNITED STATES OF AMERICA:**          AUSA - OFFICE OF US
4                                           ATTORNEY
                                            411 WEST FOURTH STREET
5                                           SUITE 8000
                                            SANTA ANA, CA 92701
6                                           714-338-3550

7

8

9    **IN BEHALF OF THE DEFENDANT,**        MICHAEL V. SEVERO
     **HARSHAD SHAH:**                      THE SEVERO LAW FIRM
10                                          70 SOUTH LAKE AVENUE SUITE
                                            945
11                                          PASADENA, CA 91101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                                  <u>INDEX</u>

2        <u>WITNESS:</u>                                                 <u>PAGE:</u>

3
         <u>Glenn Gomez, Witness, previously sworn</u>                    4
4        <u>DIRECT-EXAMINATION RESUMED</u>                                4
         **CROSS-EXAMINATION**                                        **33**
5        **REDIRECT EXAMINATION**                                     **85**
         **RECROSS-EXAMINATION**                                      **98**
6
                                    * * * * *
7

8        <u>EXHIBITS:</u>

9        Exhibit 5 received                                          9
         Exhibit 9 received                                          13
10       Exhibit 6 received                                          14
         Exhibit 8 received                                          19
11       Exhibit 6 received                                          27
         Exhibit 7 received                                          30
12       Exhibit 10 received                                         32
         Exhibit 1 received                                          33
13       defense Exhibit 13 received                                 75

14                                  * * * * *

15

16

17

18

19

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

4

```
 1          SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 15, 2015; 1300

 2                                 ---

 3                    (Open court - jury present.)

 4          THE COURT:  Please be seated, ladies and gentlemen.

 5          Please, continue Ms. Waier.

 6          Glenn Gomez, Witness, previously sworn

 7                 DIRECT-EXAMINATION RESUMED

 8    BY MS. WAIER:

 9    Q.   When we left, we were listening to a recording.  But

10    before I go back to that, I had talked about that sometimes

11    taxpayers call revenue agent and you can't always monitor

12    those.

13          Did that happen in this case?

14    A.   Yes.

15    Q.   Okay.  Can you tell the jury the first time it happened?

16    A.   On January 6th, 2010, Revenue Agent Michael Ham had sent

17    me an e-mail because he couldn't -- he wasn't able to have a

18    recording device on the telephone with his unsolicited phone

19    call with Dr. Shah.  And I believe Dr. Shah or Revenue Agent

20    Ham had advised Dr. Shah that he had the revenue agent

21    reports ready, and that he was going to fax them over -- or,

22    excuse me, he had them ready and he was -- he was ready to

23    deliver them.

24    Q.   And how do you know this?  Did Revenue Agent Ham tell

25    you?
```

```
1    A.   He sent me -- he -- I believe he -- he sent me an

2    e-mail.

3    Q.   Okay.

4         MR. SEVERO:  Move to strike speculation of the

5    witness.

6         THE COURT:  Overruled.

7         MR. SEVERO:  I believe.

8    BY MS. WAIER:

9    Q.   Anything else happen in that context?

10   A.   He had indicated that the revenue agent report was ready

11   and that he had a significant amount of bank documents, and

12   Dr. Shah wanted the information to be sent over to him and he

13   had told -- advised -- he -- Dr. Shah had asked the

14   information be faxed over to him, but -- but Revenue Agent

15   Ham told him that there was so much documentation, about

16   12 inches thick, that that was going to be merely impossible.

17   So, therefore, I believe Dr. Shah said, well, why don't we

18   just meet and --

19        MR. SEVERO:  May I inquire whether the witness is

20   actually referring to a document in front of him?  I see him

21   looking down.

22        THE COURT:  I don't believe so.

23        Are you referring --

24        THE WITNESS:  There is a document in front of me.

25        THE COURT:  Are you reading from it?
```

```
 1              THE WITNESS:  No, I'm not.

 2              That's what I thought.

 3              Thank you.

 4    BY MS. WAIER:

 5    Q.   So this contact occurred after the January 5th contact

 6    recording we just heard, but before the January 8th meeting

 7    we're talking about now?

 8    A.   Yes.

 9    Q.   So when he -- when Dr. Shah said, "just bring it to the

10    meeting," is that the January 8th meeting?

11    A.   That's correct.

12              THE REPORTER:  I'm sorry.  Ms. Waier, could you

13    slow down a little bit and get closer to the microphone?

14    BY MS. WAIER:

15    Q.   That's the January 8th meeting?

16    A.   Correct.

17              MR. SEVERO:  Speculation.  Asking what was intended

18    by Dr. Shah.

19              THE COURT:  Overruled.

20    BY MS. WAIER:

21    Q.   Was there another phone call?

22    A.   There was another phone call on January 7th.

23    Q.   Okay.  And did Revenue Agent Ham tell you what happened

24    during that call?

25    A.   He had faxed over the RAR to Dr. Shah and Dr. Shah had
```

UNITED STATES DISTRICT COURT

1    repeated, what I believe was on the monitored recording, is

2    that he had indicated something of the effect of "You're

3    killing me, Michael."

4    Q.    And that was the day before this monitored meeting?

5    A.    That's correct.

6    Q.    Do you know if on Jan -- on the January 5th call if the

7    defendant requested the RAR be faxed to him?

8    A.    Yes.

9    Q.    On January 6th?

10   A.    On the January 6th one.

11   Q.    At this time, let's go back to where we were and

12   Exhibit 4-A.  I believe we left off on Page 18.  We'll go

13   ahead and start from there.

14            (Audio recording played in open court.)

15   BY MS. WAIER:

16   Q.    Special Agent Gomez, what is that rustling that we hear

17   sometimes on the videotape -- I mean, on the videotape?

18   A.    That's Revenue Agent Ham walking.  Because the recorder

19   is -- is on his person, when you walk, you rub with the

20   recorder, and that's the rustling sound that you hear.

21   Q.    So that was the -- that was a Friday, the meeting

22   happened on a Friday morning.  And, then, on Monday, was

23   there monitored telephone calls between Revenue Agent Ham and

24   the defendant, Dr. Shah?

25   A.    Yes.

```
 1    Q.   And, basically, what had happened during the -- during
 2    the time between the meeting and that Monday?
 3    A.   During the time between the meeting that there was a --
 4    Q.   Well, Revenue Agent Ham was supposed to call from the
 5    meeting -- was Revenue Agent Ham supposed to call Dr. Shah on
 6    that Monday?
 7              MR. SEVERO:  Misleading.
 8              THE COURT:  Sustained.
 9              MS. WAIER:  Okay.
10    BY MS. WAIER:
11    Q.   Okay.  Did you have monitored phone calls on Monday,
12    January --
13    A.   January 11th, yes, we did.
14    Q.   All right.  And so -- and you monitored those calls?
15    A.   Yes.
16    Q.   Okay.
17              MS. WAIER:  May I approach, Your Honor?
18              THE COURT:  You may.
19              MS. WAIER:  Let the record reflect that I'm now
20    showing the witness Exhibit 5.
21    BY MS. WAIER:
22    Q.   What is it?
23    A.   It's a recorded -- well, this is a CD as well as a
24    recording transcript of our monitored call between IRS
25    Revenue Agent Michael Ham and Dr. Shah.
```

9

```
1    Q.   Did you monitor those calls or what occurred on

2    January 11, 2010?

3    A.   That's correct.

4    Q.   All right.  Then --

5             MS. WAIER:  I will ask that Exhibit 5 be admitted.

6             THE COURT:  Any objection?

7             MR. SEVERO:  No.

8             THE COURT:  Exhibit 5 will be received into

9    evidence.

10            (Exhibit 5 received.)

11   BY MS. WAIER:

12   Q.   I would like to direct your attention to Exhibit 5,

13   Special Agent Gomez.

14            Do you see it?

15   A.   Yes.

16   Q.   Okay.  What is it?

17   A.   It is a recorded transcript of the conversation between

18   IRS Revenue Agent Michael Ham and Dr. Shah.

19   Q.   Okay.

20            MS. WAIER:  At this time, I'd like to play

21   Exhibit 5.

22            THE COURT:  You may.

23            (Audio recording played in open court.)

24   BY MS. WAIER:

25   Q.   I'd like to direct your attention to Exhibit 9, Special
```

```
 1    Agent Gomez.
 2              Do you recognize it?
 3    A.   Yes.
 4    Q.   What is it?
 5    A.   It's a revenue agent report and income tax examination
 6    of changes.
 7    Q.   Did you -- did you direct that this report be done?
 8    A.   Yes.
 9              Generally speaking, what occurs here, this report
10    of 00 --
11    Q.   Correct.
12    A.   -- I believe that -- this report was made because
13    Revenue Agent Ham was having to give him something in return
14    for what was going on.
15    Q.   So this report was created in order to follow through
16    with the investigation?
17    A.   That's correct.
18    Q.   And -- and your intent this whole time is to figure out
19    what -- what is your intent of the investigation as you're
20    recording these things?
21    A.   Like I said, multiple times, the fact of the matter is
22    that going through --
23              MR. SEVERO:  Asked and answered.
24              THE COURT:  Overruled.
25              THE WITNESS:  Like I said, multiple times, going
```

1    through the process of a bribery investigation, taxpayers,

2    generally, they have -- they have the ability to back out at

3    any time, and the fact of the matter is -- is that we don't

4    know where his intent is, so we're going to continue on with

5    the process of determining what the true intent of the

6    taxpayer is.

7    BY MS. WAIER:

8    Q.   Being that you're giving him a -- are you giving him an

9    opportunity, then, to back out?

10   A.   Well, sure.

11            MR. SEVERO:   Objection.   Leading.

12            THE COURT:   Overruled.

13   BY MS. WAIER:

14   Q.   And you're just -- and are you just following the facts

15   to where the investigation leads you?

16   A.   Yes.

17   Q.   Okay.   So on the morning of January 12th, did you meet

18   with Revenue Agent Ham?

19   A.   Yes.

20   Q.   Why?

21   A.   Because that was the agreed-upon meeting time and date

22   and they had already had this discussion on the prior

23   telephone conversation.

24   Q.   So the meeting was to take place on January 12th, 2010,

25   at Dr. Shah's offices?

1    A.    That's correct.

2    Q.    And did you also have a safety concern?

3    A.    Very much so.

4    Q.    And, also, did you also have other concerns in terms of

5    Revenue Agent Ham's car?

6    A.    Absolutely.

7    Q.    What was that?

8    A.    The fact of the matter is that we don't -- we don't

9    necessarily -- if -- if -- if the true intent by the taxpayer

10   is to bribe the IRS official, we don't want Revenue Agent Ham

11   to have anything in his possession that can -- that can make

12   it confusing where he would have money or items inside his

13   car that would be deemed inappropriate, so we would -- I ask

14   cooperating IRS officials that are involved with these kind

15   of investigations to make sure that your car is clean and

16   make sure you have no money, and basically your driver's

17   license.  That's what we ask.

18   Q.    And did you also give revenue agent a recording device?

19   A.    Yes.

20   Q.    Is it on his person?

21   A.    Yes.

22   Q.    Was there also video?

23   A.    Yes.

24   Q.    Okay.  Did you also make sure that Revenue Ham has the

25   Exhibit 9, the revenue agent's report that we just discussed

```
 1   so that Dr. Shah could sign it?

 2   A.   Yes.  Yes.

 3            MS. WAIER:  I'd like to ask that Exhibit 9 be

 4   admitted into evidence.

 5            THE COURT:  Any objection?

 6            MR. SEVERO:  No, Your Honor.

 7            THE COURT:  Exhibit 9 will be received into

 8   evidence.

 9            (Exhibit 9 received.)

10   BY MS. WAIER:

11   Q.   And is Exhibit 9, is that the revenue agent report?

12   A.   That's correct.

13   Q.   The report shows no tax due and owing for tax years

14   2006, 2007, and 2008?

15   A.   That's correct.

16   Q.   Did you go to the -- Dr. Shah's offices with Revenue

17   Agent Ham?

18   A.   Did I go inside?

19   Q.   No, did you -- did you go --

20   A.   Accompany him, yes.

21   Q.   Okay.  And so you arrived before the meeting?

22   A.   Yes.

23   Q.   And you were monitoring --

24   A.   Yes.

25   Q.   -- the recordings during the January 12th, 2010, visit?
```

1    A.   Yes.

2           MS. WAIER:  May I approach, Your Honor?

3           THE COURT:  You may.

4           MS. WAIER:  Let the record reflect that I just

5    handed Special Agent Gomez Exhibit 6.

6    BY MS. WAIER:

7    Q.   Do you recognize it?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   It's a re -- it's a DVD of the recorded conversation

11   between IRS Revenue Agent Michael Ham and Dr. Shah.

12          MS. WAIER:  Your Honor, I'll ask that Exhibit 6 be

13   admitted.

14          THE COURT:  Any objection?

15          MR. SEVERO:  No.

16          THE COURT:  Exhibit 6 will be received into

17   evidence.

18          (Exhibit 6 received.)

19   BY MS. WAIER:

20   Q.   Special Agent Gomez, I'd like to direct your attention

21   to Exhibit 6-A.

22          What's that?

23   A.   6-A is a recorded transcript of the monitored meeting

24   between Revenue Agent Mike Ham and Dr. Harshad Shah at his

25   place of business dated January 12, 2010.

```
 1   Q.   And the time?
 2   A.   9:38 a.m..
 3            MS. WAIER:  At this time, Your Honor, I'd like to
 4   play Exhibit 6.  I would just say, it's going to be playing a
 5   little bit different.  Sometimes there's video and sometimes
 6   there's not.  So I'm going to -- we'll just play it, and the
 7   jury can follow along.
 8            THE COURT:  Very well.
 9            (Audio recording played in open court.)
10            MS. WAIER:  Your Honor, just as a matter of
11   housekeeping before I start this, it's going to be probably
12   three hours.
13            Did you want me to stop at a particular time just
14   for our break just so I can monitor the time?
15            THE COURT:  We usually go about an hour-and-a-half.
16            MS. WAIER:  Okay.  So --
17            THE COURT:  We started at 1:00.  So we'll take a
18   break at, what, 2:30.
19            MS. WAIER:  So it's about an --
20            THE COURT:  About an hour.
21            MS. WAIER:  Okay.  Thank you.
22            (Audio recording played in open court.)
23   BY MS. WAIER:
24   Q.   Just for context, Special Agent Gomez, you're watching?
25   Are you watching this occur?
```

```
 1    A.    Yes.

 2    Q.    Does Revenue Agent Ham make it into the office?

 3    A.    No.

 4    Q.    So where is this happening?

 5    A.    In the parking lot.

 6    Q.    So, does -- so I know, does the defendant approach?

 7    A.    Yes.

 8    Q.    Before Revenue Agent Ham can get to the door?

 9    A.    Yes.

10    Q.    Okay.

11              (Videotape recording played in open court.)

12    BY MS. WAIER:

13    Q.    So, Special Agent Gomez, at this time, are you also

14    following Revenue Agent Ham and Defendant Shah?

15    A.    Yes.

16    Q.    Was this planned?

17    A.    No.

18    Q.    So, were you also trying to follow where they were

19    going?

20    A.    Yes.

21    Q.    Did you have some concerns?

22    A.    Yes.

23    Q.    Why?

24    A.    Any time you have a moving surveillance that is

25    unplanned, many things could happen.  And, again, safety is
```

```
1   our number one concern, so we really -- now we're out of our
2   element in the respects of where he's going and how it's
3   going to come about, but we did the best we could.  And we
4   did have multiple cars there, so we had a person ahead of
5   them.  We had a person be -- well, I was behind him, and we
6   had a constant -- constant visual on him, on his car and
7   where he was going?
8   Q.   Why?
9   A.   Again, we -- we don't know where he was going to be.
10  We -- we had an idea.  Obviously, it indicated that he was
11  going to be at a Starbucks near the Cerritos mall.  We were
12  somewhat familiar with that, but we had a number of
13  individuals that were in -- in the trail.  So, you know,
14  people get lost sometimes, traffic, what have you, accidents,
15  those are the concerns that can come about when you're on a
16  moving surveillance.
17  Q.   Also, how about Revenue Agent Ham's safety?
18  A.   Exactly.  I mean, it's -- it's always a safety concern.
19  Whenever you're moving around, it's always a safety concern,
20  and, you know, that is always the -- the number one priority
21  is to make sure -- that's the reason why I had a constant
22  vigilant visual on him.  I -- I had him always on my -- on my
23  sights all the way to when he parked.
24  Q.   And where did he park?
25  A.   He parked across the street from the Wells Fargo Bank.
```

```
 1    Q.   Okay.
 2              (Videotape recording played in open court.)
 3    BY MS. WAIER:
 4    Q.   So you recorded the drive.  We've not put that here
 5    because it would have just been car music?
 6    A.   That's all it would be.
 7    Q.   And you were -- and you were following -- and you were
 8    following both Dr. Shah and the defendant?
 9    A.   That's correct.
10    Q.   And they arrived at?
11    A.   It -- Revenue Agent Ham arrived at the Starbucks parking
12    lot and Dr. Shah went to the -- he went to, I think, the
13    Starbucks parking lot and told him he's going across the
14    street.  I think that's how it happened.
15    Q.   Well, let's listen to the recording.
16              (Audio recording played in open court.)
17    BY MS. WAIER:
18    Q.   So, is that after they met at the parking lot?
19    A.   The parking lot at Starbucks?
20    Q.   Uh-huh.
21    A.   Yes.
22    Q.   And, then, where did Dr. Shah go?
23    A.   Right across the street to the Wells Fargo Bank.
24    Q.   Okay.  I'd like to show you Exhibit 8.
25              Do you recognize it?
```

 1    A.   Yes.

 2    Q.   What is it?

 3    A.   It's Dr. Shah's professional corporation bank account.

 4         MS. WAIER:   Your Honor, the Government has filed a

 5    custodian of records declaration proving it's a business

 6    record and ask that it be admitted.

 7         THE COURT:   Any objection?

 8         MR. SEVERO:   May I have a moment?

 9         THE COURT:   You may.

10         MR. SEVERO:   No objection.

11         THE COURT:   Exhibit 8 will be received into

12    evidence.   You may publish it to the jury if you want.

13         (Exhibit 8 received.)

14    BY MS. WAIER:

15    Q.   So this is a Wells Fargo Bank statement?

16    A.   That's correct.

17    Q.   And it's for the professional corporation of Dr. Harshad

18    Shah?

19    A.   That's correct.

20    Q.   I'd like to direct your attention to Page 2.

21         Does the bank statement show a withdrawal made in

22    the branch store?

23    A.   Yes, on January 12th of $30,000.

24    Q.   If you look on the next page on Page 3, what is that?

25    A.   That's the withdrawal slip that Dr. Shah had withdrawn

```
 1    $30,000.
 2    Q.   Then on the next page, on Exhibit 4, Page 4 of
 3    Exhibit 8, what is that?
 4    A.   Those are photos that were taken by the bank of Dr. Shah
 5    withdrawing the money at the teller.
 6              MR. SEVERO:  Move to strike that answer.  The
 7    document speaks for itself.
 8              THE COURT:  Overruled.
 9    BY MS. WAIER:
10    Q.   And the time on that document is 10:35 a.m..
11              Do you see that on the bottom?
12    A.   Yes, I do.
13    Q.   Does that coincide with what your observations were at
14    the time?
15    A.   Yes.
16    Q.   Did you see Dr. Shah go into the bank?
17    A.   We saw him go into the bank, yes.
18              MR. SEVERO:  Move to strike the answer as
19    nonresponsive.  We --
20              THE COURT:  Overruled.
21    BY MS. WAIER:
22    Q.   Was Dr. Shah observed coming back to the car after going
23    into the bank and withdrawing the $30,000?
24    A.   Yes.
25    Q.   Is this a video.  Is this -- I know we're on video.
```

```
 1              Is this at the parking lot we were just talking
 2     about?
 3     A.   Yes.
 4     Q.   All right.
 5              MR. SEVERO:  This needs further foundation.
 6              THE COURT:  Why don't you stop and lay the
 7     foundation.
 8              MS. WAIER:  Stop it.
 9              Okay.
10     BY MS. WAIER:
11     Q.   So, is this the parking lot that we've been talking
12     about where the meeting is taking place?
13     A.   This is the Starbucks parking lot where Dr. Shah parked
14     adjacent to Revenue Agent Ham.
15     Q.   Okay.  And where are -- where is the -- I don't want to
16     get into investigative techniques --
17     A.   Right.
18     Q.   -- but are -- are you recording straight on?
19     A.   Yes.
20     Q.   And you're present -- you're present there for this?
21     A.   I am present.
22     Q.   Who is that (indicating) gentleman?
23     A.   Entering into the car, is Dr. Shah.
24     Q.   Who's car is that?
25     A.   That's Revenue Agent Ham.
```

```
 1    Q.   Where is Revenue Agent Ham?

 2    A.   Sitting in the driver's side.

 3    Q.   And had Dr. Shah just come back from the bank?

 4    A.   Yes.

 5              (Videotape recording played in open court.)

 6    BY MS. WAIER:

 7    Q.   Is this where Dr. Shah has handed the $30,000 over to

 8    Revenue Agent Ham?

 9              MR. SEVERO:  Objection.  That calls for

10    speculation.  There's no indication.

11              THE COURT:  Overruled.

12              THE WITNESS:  Yes.

13              (Videotape recording played in open court.)

14    BY MS. WAIER:

15    Q.   And when he's saying -- when -- when Revenue Agent Ham

16    is saying, "Can you sign these documents," is that Exhibit 9

17    that Revenue Agent Ham was given before he met with Dr. Shah?

18    A.   Yes.

19              MR. SEVERO:  There's no foundation.  Speculation.

20              THE COURT:  Overruled.

21              You can cross-examine on all these grounds.

22    BY MS. WAIER:

23    Q.   And what -- and Exhibit 9 is the revenue agent report

24    showing zero tax due and owing?

25    A.   That's correct.
```

```
 1                (Videotape recording played in open court.)
 2    BY MS. WAIER:
 3    Q.   Do you recognize the gentleman in the photo -- in the
 4    video?
 5    A.   The one that is off the screen, but the one in white?
 6    Q.   Yes.
 7    A.   Yes.
 8    Q.   Who is that?
 9    A.   That's Dr. Shah.
10    Q.   And is he leaving Revenue Agent Ham's car?
11    A.   That's correct.
12    Q.   Okay.
13                (Videotape recording played in open court.)
14    BY MS. WAIER:
15    Q.   So, at this time, you are monitoring the recording and
16    now we're moving again; right?
17    A.   Pardon me?
18    Q.   They're moving to a different location again?
19    A.   That's correct.  That's correct.
20    Q.   And, at that time, based on the recording we were
21    listening to, where did you -- where were you going?
22    A.   We were -- the intention was to go back to the office.
23    Q.   Okay.  And then did you notice at a time that -- that
24    changed?
25    A.   It did change.  We saw Revenue Agent Ham pull over and
```

```
 1    Dr. Shah was saying something through the window, and we
 2    could hear him on the recording, and it indicated that it was
 3    a Staples store.
 4    Q.   Let's stop.
 5               (Videotape recording played in court.)
 6    BY MS. WAIER:
 7    Q.   So, then, did you follow with Dr. Ham [sic] and Revenue
 8    Agent Shah [sic] to Staples?
 9    A.   Dr. Shah and Revenue Agent Ham?
10    Q.   Yes.
11    A.   Yes.
12    Q.   To the Staples?
13    A.   Yes.
14    Q.   Okay.  Is this recording at the Staples parking lot?
15    A.   That's correct.
16               (Videotape recording played in open court.)
17    BY MS. WAIER:
18    Q.   Do you recognize what is now being played?
19    A.   That's a video recording of -- of the parking lot.  It's
20    kind of blurry, but I believe -- well --
21    Q.   You want to keep playing?
22    A.   Yeah, please.
23               (Videotape recording played in open court.)
24    BY MS. WAIER:
25    Q.   So because we're moving, is it hard to set up
```

```
 1   surveillance?
 2   A.   Absolutely.  It's difficult when you're on a moving
 3   surveillance.  And, like I said, we had a team of people out
 4   there in different cars and -- and such.  So to establish a
 5   stationary position to get a -- an eye view, a visual, we had
 6   to situate that.
 7   Q.   Is it even -- isn't it even more difficult when you're
 8   not directing where people are going?
 9   A.   It's extremely difficult.
10   Q.   Were you directing where Dr. Shah and Revenue Agent Ham
11   were going?
12   A.   No.
13   Q.   Who was?
14   A.   Dr. Shah.
15             MR. SEVERO:  Move to strike that.  Speculation of
16   the witness.  No foundation.
17             THE COURT:  As framed, sustained.
18   BY MS. WAIER:
19   Q.   You were monitoring; right?
20   A.   I was monitoring.
21   Q.   Did you direct either Dr. Shah or Revenue Agent Ham to
22   go to staples?
23   A.   No.
24   Q.   Why did you go to Staples?
25   A.   When we were listening to the recording, Dr. Shah had
```

```
 1   indicated he wanted to go to Staples.  So we were moving on
 2   surveillance.
 3   Q.   Okay.  And so can you -- do you know whose car that is?
 4   A.   Revenue Agent Ham is to the right and Dr. Shah is to the
 5   left.  And that is Revenue Agent's -- excuse me -- that is
 6   Revenue Agent Ham's car.
 7   Q.   And do you know what's in the trunk?
 8   A.   Bank statements.
 9            (Videotape recording played in open court.)
10   BY MS. WAIER:
11   Q.   So, are you -- are you watching this as it's going on?
12   A.   Yes.
13   Q.   Okay.  And so where does Dr. Shah go?
14   A.   He -- he leaves Revenue Agent Ham and he goes towards
15   the Staples store.
16            (Videotape recording played in open court.)
17   BY MS. WAIER:
18   Q.   Does he come back to Revenue Agent Ham's car?
19   A.   Yes.
20            (Videotape recording played in open court.)
21            MS. WAIER:  I think this is a request time to stop,
22   Your Honor.
23            THE COURT:  Ladies and gentlemen, we'll take our
24   afternoon break.
25            THE CLERK:  All rise.
```

```
 1                    (Open court - jury not present.)

 2                      (Recess from 2:28 p.m. to 2:44 p.m.)

 3                    THE CLERK:  All rise.

 4                    (Open court - jury present.)

 5                    THE COURT:  Please proceed, Ms. Waier.

 6                    MS. WAIER:  Your Honor, before I start, as a

 7      housekeeping matter, I just want to make sure that I did move

 8      Exhibit 6 into evidence.  If I didn't, I'd like to ask that

 9      it be received now.

10                    THE COURT:  Is Exhibit 6 received?

11                    THE CLERK:  I didn't have it.

12                    THE COURT:  Any objection?

13                    MR. SEVERO:  No.

14                    THE COURT:  Exhibit 6 will be received into

15      evidence.

16                    MS. WAIER:  Thank you.

17                    (Exhibit 6 received.)

18      BY MS. WAIER:

19      Q.   Before we start, I'd like to direct your attention to

20      Exhibit 7.

21                    Do you recognize Exhibit 7?

22      A.   Yes.

23      Q.   What is it?

24      A.   It's currency, cash, copies of it.

25      Q.   Okay.  And currency from what?
```

1   A.   This is what Revenue Agent Ham had received from

2   Dr. Shah and the respects of the $30,000 in cash.

3            MS. WAIER:  I'd ask that Exhibit 7 be admitted.

4            MR. SEVERO:  No chain of custody.

5            THE COURT:  Pardon?

6            MR. SEVERO:  I haven't heard a chain of custody.

7            THE COURT:  All right.

8            MS. WAIER:  I'll go ahead and -- just for the

9   record, we are on page -- exhibit -- of Exhibit 6-A we're on

10  Page 35, Line 5.

11           (Videotape recording played in open court.)

12  BY MS. WAIER:

13  Q.   What happened next?

14  A.   What happens next, is we follow Revenue Agent Ham and we

15  also had, I believe, someone follow Dr. Shah away from the

16  site.  And we followed Revenue Agent Ham back to a mutual

17  meeting site and we had individuals inventory him to make

18  sure that his car -- the pre --

19           MR. SEVERO:  Sorry, Your Honor, I think this is

20  hearsay at this point.  Unless --

21           THE WITNESS:  I checked the car.

22           THE COURT:  No.  No.  Wait.

23           THE WITNESS:  I'm sorry.

24           MR. SEVERO:  I think this part of it needs further

25  foundation so as not to be hearsay.

```
 1              THE COURT:  I don't believe so, but why don't you
 2      get a question in.
 3              MS. WAIER:  Okay.
 4      BY MS. WAIER:
 5      Q.   So after you met Revenue Agent Ham at the mutual meeting
 6      place, what happened next?
 7      A.   We went to the mutual meeting place, I -- he departed
 8      out of the vehicle.  I checked the car and then we -- we all
 9      walked into the mutual meeting place, and other agents had
10      removed his device, the recording device from him, and we had
11      secured the -- the cash.  And --
12      Q.   So Exhibit 7, is that the cash that was secured?
13      A.   That's correct.
14              MS. WAIER:  I move into evidence Exhibit 7.
15              MR. SEVERO:  I still don't think there was chain of
16      custody.
17              THE COURT:  Overruled.
18              I -- I assume Exhibit 7 is a copy of the cash that
19      was received.
20              MS. WAIER:  Yes, Your Honor.
21              THE WITNESS:  Yes, sir.
22              THE COURT:  All right.  And why don't you, just for
23      the record, to address the objection, once the cash was
24      seized, what happened?
25
```

1    BY MS. WAIER:

2    Q.    What happened?

3    A.    Once the cash was seized, we counted it, we had double

4    counted the money.  Another agent counted it first, I counted

5    it second.  So we made sure that -- excuse me.  We had made

6    sure that the amount, whatever we counted, was correct.

7    Q.    How much was there?

8    A.    $30,000.

9    Q.    Okay.  Then what happened to the money?

10   A.    We had put them in evidence envelopes, and I had secured

11   those -- that -- that -- the cash, I believe.  And then we

12   took it back to our office and we submitted it into -- gave

13   it to the evidence custodian, and we submitted it and put it

14   into our safe.

15   Q.    Were photocopies made?

16   A.    Yes.

17   Q.    And is Exhibit 7 true and correct copies of the

18   photocopies of the bills?

19   A.    Yes, because I made them.

20             MS. WAIER:  I asked that Exhibit 7 be admitted?

21             THE COURT:  Any further objection?

22             MR. SEVERO:  No.

23             THE COURT:  Exhibit 7 will be received into

24   evidence.

25             **(Exhibit 7 received.)**

UNITED STATES DISTRICT COURT

```
 1   BY MS. WAIER:

 2   Q.   Now, we've heard on the tape about a technical letter.

 3        Was a technical letter sent to Defendant Shah?

 4   A.   Yes.

 5   Q.   Okay.  I'd like to direct your attention to Exhibit 10.

 6   Back up.

 7        Another thing, was there anything else that you

 8   secured from -- that you secured from Revenue Agent Ham's

 9   car?

10   A.   From Revenue Agent Ham's car, we had secured -- when he

11   arrived back into the meeting site, we had secured the --

12   the -- the audio recorders and had secured all the

13   information from the recording devices.

14   Q.   What about the signed revenue agent reports?

15   A.   Yes, we had secured that, as well.

16   Q.   And that's already in exhibit -- it's already in

17   evidence as Exhibit 9?

18   A.   That's correct.

19   Q.   And then Exhibit 10, what's that?

20   A.   Exhibit 10 is the technical letters that Revenue Agent

21   Ham had referenced in their meeting that he was going to have

22   sent over to Dr. Shah to appease him to indicate that

23   everything was agreed upon.

24        MS. WAIER:  I move Exhibit 10 into evidence.

25        THE COURT:  Any objection?
```

```
 1              MR. SEVERO:  No, Your Honor.

 2              THE COURT:  Exhibit 10 will be received into

 3      evidence.

 4              (Exhibit 10 received.)

 5      BY MS. WAIER:

 6      Q.   Now, during this time period, December 2009,

 7      January 2010, was Revenue Agent Ham -- was -- was Mr. Ham a

 8      revenue agent?

 9      A.   Yes.

10      Q.   Are you the custodian at this particular time of Revenue

11      Agent Ham's personnel file?

12      A.   Yes.

13      Q.   And I'd like to direct your attention to Exhibit 1.

14              What is that?

15      A.   It's a notification of personnel action, a Form 50.

16      Q.   For two different years?

17      A.   For two different years, 2009 and 2010.

18      Q.   Did you secure these copies from the personnel file of

19      Revenue Agent Ham?

20      A.   Yes.

21      Q.   And are those kept in the normal course of business by

22      the Internal Revenue Service?

23      A.   Yes.

24              MS. WAIER:  I move to admit Exhibit 1.

25              THE COURT:  Any objection.
```

```
 1              MR. SEVERO:  No, Your Honor.
 2              (Exhibit 1 received.)
 3   BY MS. WAIER:
 4   Q.   And based on these records, during the relevant time
 5   period, Revenue Agent Ham was, in fact, a revenue agent with
 6   the Internal Revenue Service?
 7   A.   That's correct.
 8   Q.   After the letter was sent to Dr. Shah, the transmittal
 9   letter, what happened next?
10   A.   I complete my investigative report.
11   Q.   And did you, ultimately, arrest Dr. Shah?
12   A.   Yes, we did.
13   Q.   When was that?
14   A.   It was in April of 2010.
15              MS. WAIER:  Nothing further, Your Honor.
16              THE COURT:  Very well.
17                        CROSS-EXAMINATION
18   BY MR. SEVERO:
19   Q.   Afternoon, sir.
20   A.   Afternoon.
21   Q.   You -- you started with TIGTA 25 years ago?
22   A.   It was actually the inspection division when I first
23   started.
24   Q.   The inspection division of IRS?
25   A.   Of the Internal Revenue Service.
```

1    Q.   So you did work for IRS for a while?

2    A.   Yes, I did.

3    Q.   And, at some point, I think in the '90s, the inspection

4    division was then split off?

5    A.   That's correct.

6    Q.   All right.  So, at some point, the -- the IRS guided

7    TIGTA's or what was the inspection division's policies; is

8    that true?

9    A.   I'm not too certain about that.

10   Q.   Now, your -- your background is in taxation?

11   A.   I was a former revenue officer for the Internal Revenue

12   Service.

13   Q.   You're a revenue agent?

14   A.   Revenue officer.

15   Q.   What's the difference?

16   A.   The difference is that we collect delinquent taxes and

17   delinquent tax returns.

18   Q.   All right.  You're the collector?

19   A.   I'm the proverbial tax collector.

20   Q.   And then -- then you moved to the inspection division?

21   A.   That's correct.

22   Q.   So it's sort of got promoted up the ranks?

23   A.   I wouldn't say it was a promotion, it was -- it was a

24   career opportunity.

25   Q.   Lateral move at some point?

1    A.    Yes, it was a lateral, and then it was a -- it was a --

2    it was a career opportunity, a better career opportunity.

3    Q.    So you were not -- you were not a law enforcement agent

4    in your background?

5    A.    No.

6    Q.    Your -- you training in the inspection division -- well,

7    you had training in taxation as a revenue officer, didn't

8    you?

9    A.    In the respects of taxation, what are you referring to?

10   Q.    General principles of tax -- preparation of taxes and --

11   and -- and tax forms?

12   A.    We came across tax returns, yes, we had.

13   Q.    You actually didn't have to work with a tax return, you

14   just had to work with the result of that tax return?

15   A.    Yes.  Yes.

16   Q.    So your training had nothing to do with taxation?

17   A.    Well, we worked in the peripheral of collecting the

18   delinquent taxes, yes.

19   Q.    So when a taxpayer would say, I don't owe this money,

20   you didn't get involved in telling him why?

21   A.    If the taxpayer said he didn't owe the money, then we

22   would secure a financial statement.

23   Q.    From?

24   A.    From the taxpayer.

25   Q.    Okay.  But if he didn't owe the money because he

UNITED STATES DISTRICT COURT

```
 1   thought there were -- what you were trying to collect was
 2   wrong, how did you discuss with him his tax returns and --
 3   and the fact that he owed money without some background in
 4   that -- in that discipline?
 5   A.   Well, as a result of the -- the collection activity,
 6   what ends up happening is that the revenue officer receives
 7   an account because of the individual not paying the tax
 8   liability or not filing the tax return.
 9   Q.   Okay.  As a -- as an -- as a TIGTA officer or what was
10   an inspect -- inspection division officer, you received law
11   enforcement training?
12   A.   Yes.
13   Q.   Did you go to a law enforcement academy?
14   A.   Yes, sir.
15   Q.   Which?
16   A.   Federal Law Enforcement Training Center in Glynco,
17   Georgia.
18   Q.   Okay.  And that was what, in --
19   A.   1990.
20   Q.   -- 1990?
21   A.   1991.
22   Q.   Okay.  And then your first -- you then moved into an
23   area -- what's your first assignment?
24   A.   Meaning?
25   Q.   After the academy?
```

1    A.   I go back to my office in Laguna Niguel, and I am

2    assigned investigations.

3    Q.   Just like you're doing now?

4    A.   That's correct.

5    Q.   Okay.  There are no specific areas of training for

6    surveillance?

7    A.   Well, we learned that in the academy.

8    Q.   What do you get, about eight hours?

9    A.   I can't tell you exactly how many hours.

10   Q.   You don't recall?

11   A.   Don't recall.

12   Q.   When -- when you first received a call on this case, you

13   received the call from Mr. Ham?

14   A.   That's correct.

15   Q.   And that was in November of 2009?

16   A.   That's correct.

17   Q.   That conversation, how long was that conversation?

18   A.   Probably 20 minutes, 30 minutes.  I'm not too certain.

19   I -- I really don't know.

20   Q.   And this was all on the phone?

21   A.   Yes.

22   Q.   At some point, did you meet with him?

23   A.   Yes.

24   Q.   When?

25   A.   I believe in -- in December of 2009.

```
 1    Q.   How many meetings did you have with him before you
 2    chose -- you decided to set up a sting operation?
 3    A.   I'm not certain.
 4    Q.   More than one?
 5    A.   How many meetings I had with Revenue Agent Ham?
 6    Q.   Yes.
 7    A.   I know I had a meeting with him in December.  I'm not
 8    certain exactly how many meetings we had accordingly.  I
 9    can't -- I can't tell you that.
10    Q.   Would your notes reflect that?
11    A.   It should reflect that.
12    Q.   Your -- during these meetings, did you ask -- did
13    Mr. Ham inform you that he had been -- he had revealed his
14    mental health issues to Dr. Shah?
15    A.   There -- there was a mention of this, yes.
16    Q.   Passing mentioned?
17    A.   Yes.
18    Q.   Did you try to inquire as to how much he had disclosed?
19    A.   He had indicated that he had mentioned to Dr. Shah that
20    he had some past mental issues.
21    Q.   That's about all he told you?
22    A.   And he also -- I think he referenced that in an e-mail
23    to me, subsequent to my telephone call with him.
24    Q.   When did he first disclose that information to you?
25    A.   I -- I believe it -- it was either that day that I spoke
```

```
 1    to him on the telephone or it was the subsequent of the
 2    e-mail.
 3    Q.   That day, meaning the first time?
 4    A.   November -- it was November 19, yeah.
 5    Q.   Did you inquire further as to the nature of the
 6    relationship between -- that had developed between Mr. Ham
 7    and Dr. Shah?
 8    A.   Meaning?
 9    Q.   As a result of the disclosure, did he tell you how many
10    times or how much he had disclosed?
11    A.   No.
12    Q.   Was that of no concern to you?
13    A.   It was a concern of mine, yes.  But what I gather from
14    Dr. Ham -- excuse me.  Dr. Shah -- Revenue Agent Ham was the
15    fact that he said that in regards to developing a rapport
16    with him --
17    Q.   Right.
18    A.   -- and that was it, generally speaking.
19    Q.   So, what was it that was concerning you when --
20    A.   Well --
21    Q.   When he told you these things?
22    A.   Well, personally, I don't think that I'm very
23    comfortable exposing my personal life to anyone inside the
24    job.  That's -- that's my nature, and I think that's --
25    that -- that's just my standard.  So when you provide that
```

1    information over, in particular to a taxpayer, there's a

2    little bit of a concern there.

3    Q.   No professional concern?

4    A.   There is a professional concern, yes.

5    Q.   What would be the professional concern?

6    A.   Because he just allowed the fact that, you know, I -- I

7    have a mental issue.  He's a psychiatrist.

8    Q.   Right.

9         And that would develop sort of a more closer

10   relationship between a suspect and a revenue agent; correct?

11   A.   I don't know about that.  I don't believe so.  That

12   doesn't necessarily mean that.

13   Q.   Okay.  Were you aware, at any point, the extent of

14   Revenue Agent Ham's period of mental -- of disability that

15   kept him from his job at the IRS?

16   A.   At any point?

17   Q.   At any point.

18   A.   Later on, I was.

19   Q.   At what point?

20   A.   I became.

21        Much later after the investigation was more or less

22   closed.

23   Q.   In fact, after he was -- after Dr. Shah had already been

24   indicted; correct?

25   A.   I believe so, yes.

1    Q.   So you were not aware at the time the -- the sting was

2    set up that Mr. Ham had been out on seven years disability

3    for mental health issues?

4    A.   I knew that had he had an issue.  He had indicated that

5    he had some issues, and he was gone from work.  I didn't

6    really delve too far into it.  He had --

7    Q.   There was no concern to you?

8    A.   No, there was a concern.  I think that he had indicated

9    that there was some concern that he -- he had some mental

10   issues and he was gone for a period of time.

11   Q.   What was the concern that you would have had or you

12   had with respect --

13   A.   Well, it's always.

14   Q.   If I may.

15   A.   Okay.

16   Q.   Hold on, because we're -- we're both talking at the same

17   time.

18        What was the concern that -- what concerned you

19   about his having been away from his job for mental health

20   disability?

21   A.   Because of the fact that it -- this is related to a

22   psychiatrist, he had -- he had indicated to Dr. Shah that he

23   had a mental illness.  It's -- it correlates to that

24   commonality.

25   Q.   You're saying that it -- that it actually raises a

```
 1   doctor/patient relationship?

 2   A.    I never said that.

 3   Q.    No.

 4         But it -- wouldn't that -- isn't that what your

 5   concern was?

 6   A.    No, not ever.

 7   Q.    All right.

 8   A.    No.  Not a doctor patient/relationship, no.  I think

 9   that he -- you -- he exposed himself.  If -- if a taxpayer --

10   if a taxpayer had seen that there was an exposed area, like a

11   mental illness, and he's a psychiatrist, then I think that

12   relates to a vulnerability.

13   Q.    Whose vulnerability?

14   A.    Mr. Ham.

15   Q.    So at the time that you -- you stepped into this case --

16   well, let me back up.  Strike that.

17         Your -- you teach some of these bribery awareness

18   courses; right?

19   A.    They're presentations.

20   Q.    They're presentations?

21   A.    Yes.

22   Q.    How long are they?

23   A.    Could be an hour, hour-and-a-half, two hours.

24   Q.    And how often do revenue agents have to attend those?

25   A.    It had been yearly.  They're periodic.
```

1    Q.   Are they mandatory?

2    A.   They were mandatory.

3    Q.   Well, that's --

4    A.   I'm not certain about their policies.

5    Q.   Do you know if they're mandatory -- they were mandatory

6    at the -- between 2008 and 2010?

7    A.   I'm not certain if they were mandatory.

8    Q.   So TIGTA doesn't dictate to the IRS when its agents are

9    supposed to attend these awareness conferences?

10   A.   I don't believe they dictate that; however, I have given

11   presentations to new revenue agents, several times to large

12   groups of revenue agents in an orientation phase.

13   Q.   Right.

14        Those are mandatory?

15   A.   Like I said, I'm not certain what their -- their

16   requirements are deemed as mandatory, but that's what I'm

17   called to do, and I do that.

18   Q.   Are they part of their training?

19   A.   Yes, it is.  I believe so.

20   Q.   All right.  And as part of your presentation, you teach

21   them that when they receive an overture of some sort, they

22   are to call TIGTA?

23   A.   I give them the guidance that, yes, if there's an

24   overture, to call TIGTA.

25   Q.   And that's what they are supposed to do; correct?

1    A.    Yes, that's what we instruct them to do.

2    Q.    And you instruct them to call TIGTA, no one else; true?

3    A.    We general -- we would like them to call TIGTA.

4    Q.    And the reason you'd want them to call TIGTA and not

5    contact anyone else is because you don't know who else might

6    be involved in a potential bribery scheme; true?

7    A.    No.  More times than not, the protocol is always to talk

8    to the manager first -- first line.  It is always the

9    protocol in the -- that IRS structure.  However, I've given

10   presentations when I've advised IRS employees to report to

11   TIGTA immediately.  And the reason being is because we -- we

12   want to have as close to the -- to the time frame as when

13   that situation had been discussed.

14   Q.    You never got a call from officer, or, rather, Revenue

15   Agent Raghaven about any bribery overtures by Dr. Shah, did

16   you?

17   A.    No.

18   Q.    And you didn't get a call from Gloria Witherspoon, the

19   manager for Mr. Ham about any bribery overtures?

20   A.    No.

21   Q.    Your testimony this morning was that TIGTA oversees the

22   IRS?

23   A.    We protect the integrity of the Internal Revenue

24   Service.

25   Q.    You sort of like the Internal Affairs Division; right?

1    A.    You can kind of say that.

2    Q.    In fact, you have two divisions within TIGTA, don't you?

3    A.    Internal audit and -- and investigations.

4    Q.    And the internal audit is what?

5    A.    They -- they audit functions of the IRS.

6    Q.    Financial?

7    A.    That's the other side of the house.  I -- I'm not privy

8    to that.

9    Q.    You don't -- you don't know what the other side does?

10   A.    I generally don't -- I don't really know what they do.

11   I -- outside of the fact that they do audits of IRS

12   functions.

13   Q.    When Mr. Ham called you in November of 2009, what was it

14   that he cited as the overture?

15   A.    Primarily, he had offered him -- he offered free

16   psychiatric care, which there is an indicator right there of

17   an issue.  He had offered to -- to have him -- or his family

18   members work for him, which is an indication, as well as

19   referencing the prior revenue agent, Raghaven, had a meet --

20   dealings with Dr. Shah and there was -- was -- to believe to

21   be an overture there of them speaking in -- in Hindi, I

22   believe, and indicating that -- to let the -- to make this

23   audit go away.

24         So there was roughly about three indicators that

25   when I received that information, out of my experience, I

 1   believe that that was -- it was possibly an overture.

 2   Q.   Did they tell you -- did he tell you -- strike that.

 3        Did Mr. Ham tell you that the conversation with

 4   Ms. Raghaven had taken place six months earlier or five

 5   months earlier?

 6   A.   No, I don't believe so.

 7   Q.   Would that have made any difference to you?

 8   A.   No.  No.

 9   Q.   The passage of time would have made no difference?

10   A.   As long as the experience was there, I -- I think that,

11   you know, we're going to try to vet out all that information,

12   anyway.  I would have had to interview Ms. Raghaven, as well.

13   So it's just -- it's just the -- the preliminary information

14   that I'm getting from him, and, you know, we -- we make my --

15   my supervisory management chain makes that determination

16   based upon what I find through my interview of Revenue Agent

17   Ham.

18   Q.   What you were confronted with was a civil audit that was

19   being conducted of Dr. Shah's business and personal tax

20   returns; correct?

21   A.   That's correct.

22   Q.   And, in this situation, with the audit, you did not

23   instruct Mr. Ham to simply tell Dr. Shah if -- if, in fact,

24   there were overtures to instruct them that he would have to

25   report those?

1    A.    Excuse me?  Can you repeat that question?

2    Q.    Sure.  Let me clarify it.  Try something a little better

3    than that.

4              Isn't the practice to or shouldn't the practice be

5    to inform the taxpayer that any overtures will be reported to

6    authorities?

7    A.    No.

8    Q.    Why not?

9    A.    If -- if they're -- what we're trying to do is find the

10   intentions, and we just want to find the intent of the

11   taxpayer.

12   Q.    So you don't care about whether he actually does follow

13   through, you just want to go -- you don't want to stop the

14   intention.  You just want to know -- you want to sort of

15   unearth somebody who is trying to bribe an IRS official?

16   A.    We want to determine whether the intent of the taxpayer

17   is to compromise the IRS official.

18   Q.    I know that's the line, but what I'm trying to get at

19   is, it is not part of the procedure to prevent --

20   A.    That's correct.

21   Q.    -- the thing from going further?

22   A.    Not to prevent it.

23   Q.    That's it?

24   A.    Not to prevent it, yes.

25   Q.    You don't want to prevent it, you just want to --

```
 1    A.   We want to find out the true intent.

 2    Q.   Give me a chance to finish --

 3    A.   I'm sorry.

 4    Q.   -- my question.  I know we're -- we both may be guilty

 5    of that, but I don't want to get the court reporter mad at

 6    us.

 7              Your -- you don't want to -- I'm sorry.  Let me

 8    restate it.

 9              You don't want to prevent it.  You want to follow

10    through and see if -- if a crime can be committed?

11    A.   Not if a crime can be committed.  We want to find out

12    what the mindset of the taxpayer is and if he is -- if he is

13    going down that road to compromise the revenue agent, that's

14    what we want to determine.

15    Q.   You don't want to stop it, though?

16    A.   We're not going to stop it.

17    Q.   You didn't tell Mr. Ham tell him not to do this, that

18    it's reportable?

19    A.   No.

20    Q.   And, in fact, what you did do is to develop further not

21    just the intent, but the actual act?

22    A.   We developed the -- the actual act?

23    Q.   Sure.

24              You had discovered the intent when the overtures

25    made and reported to you?
```

1    A.   That's correct.

2    Q.   Right?

3         That, essentially, accomplishes your objective,

4    doesn't it?

5    A.   Not necessarily, like I said before, bribery overtures

6    are bribery investigations they start up.  We get the

7    allegations.  At any period of time, the taxpayer can -- can

8    remove himself from the situation at any period of time.  And

9    it --

10   Q.   How often does that happen?

11   A.   Often.

12   Q.   So how -- you get a lot of these?

13   A.   We've -- we've gotten a lot of them.  I -- I've

14   investigated quite a few bribery investigations where it went

15   nowhere.

16   Q.   Right.

17        So --

18   A.   So getting to -- okay.

19   Q.   Hold on.

20        Your -- you're ascertaining the taxpayer's intent

21   is accomplished once he makes that overture, he or she makes

22   that overture, and continues to state it repeatedly; right?

23   A.   Sorry --

24   Q.   I mean -- let me do it this way:  You get the call from

25   Ham regarding the -- the things he thinks were overture;

```
 1    right?

 2    A.    That's correct.

 3    Q.    You concur that these may be overtures?

 4    A.    May be, yes.

 5    Q.    So you set up the sting?

 6    A.    We set up a monitored call, again --

 7    Q.    It's a sting --

 8    A.    Well, you can -- that's your term.  That is not my term.

 9    We make -- we -- we schedule a monitored call to determine if

10    the individual is going to repeat the overture or not.

11    Q.    Right.

12            Because you're trying to ascertain the intent of

13    the individual?

14    A.    That's correct.

15    Q.    And, in that first call, that you set up --

16    A.    Right.

17    Q.    -- was it January 5th?

18    A.    Somewhere in there, yes.

19    Q.    You -- was there a repeat of that?

20    A.    He had indicated -- I believe he indicated on that

21    monitored call that you're going to owe me, you're going to

22    owe me for the rest of your life.

23    Q.    No.  I think he said you're going to work for me --

24    A.    Work for me, I'm sorry.

25    Q.    -- for the rest of your life.  And "you're going to work
```

1    for me for the rest of your life," in your mind, is a repeat

2    of the overture; correct?

3    A.    No, that was just an indicator.  Another indicator.

4    Q.    All right.  Another indicator of the intent?

5    A.    That's right.

6    Q.    That accomplishes your objective?

7    A.    I -- there is no objective.  We're just trying to find

8    out whether this individual is intent on compromising this

9    indi -- this revenue agent.

10   Q.    Agent Gomez, the actual intent is to try and follow

11   through and see if you can an arrest somebody; true?

12   A.    That's not true.

13   Q.    Well, isn't that what you did here?

14   A.    It is what we did there, yes, but that is not our

15   intention.  Our intention is to find out whether the taxpayer

16   is truly in his mindset going to compromise this revenue

17   agent to break the law.

18   Q.    Well -- but you know this -- bribing the agent was not

19   going to be comprised because he's the one who reported it;

20   right?

21   A.    That's true.

22   Q.    Yeah.

23          So although you have -- all you have to do now is

24   you know you have a revenue agent who is being -- who is

25   complying with IRS regulations.  You're turning to the

1    taxpayer now and you're not going to stop him from -- from

2    going further on this; true?

3    A.   Well, no.

4    Q.   Not true?

5    A.   Well, let me explain.  Can I explain?

6    Q.   No.  I'd like to know if you're not going to stop him

7    once you know your IRS -- your agent is not going to be

8    compromised?

9    A.   Okay.  No, we're not going to stop him.  Okay?

10            Can I elaborate?

11   Q.   Well, what you're going to do is you're going to try to

12   arrest him?

13   A.   No.

14   Q.   No?

15   A.   That --

16   Q.   All right.

17            You never spoke with Dr. Shah personally, did you?

18   A.   Not --

19   Q.   Not until you arrested him; true?

20   A.   That's correct.

21   Q.   Yeah.

22            Did you arrest him at home?

23   A.   Yes.

24   Q.   Okay.

25            You've got a cooperating revenue agent and he tells

1    you that he's about to deliver a report -- a revenue agent

2    report with a tax change to Dr. Shah; correct?

3    A.   Yes.

4    Q.   And you -- your undercover -- strike that.

5            Before you embark on this undercover operation with

6    Mr. Ham as your agent, so-to-speak, would it not have been

7    important to ensure that the tax that was being sought to be

8    collected was correctly computed?

9    A.   Can you repeat that again?

10   Q.   Yes.

11   A.   I'm sorry.

12   Q.   Before you embarked on the undercover sting --

13   A.   Okay.

14   Q.   -- would it have not been important to determine that

15   the tax that was sought to be collected as a result of that

16   report it was going to generate was correctly computed?

17   A.   We do not interfere into the regular processes of audit.

18   Q.   So your answer is, no, it doesn't matter how it's

19   computed?

20   A.   I'm not saying -- I just don't interfere with the tax

21   audit.

22   Q.   Well, I understand you don't interfere.  I'm not asking

23   you -- I'm not asking you that.

24   A.   Okay.

25   Q.   What I'm asking you is wouldn't it have been important,

```
 1    from your standpoint, to make sure that whatever tax is
 2    sought to be collected, which is part of this thing, was
 3    correctly computed?
 4    A.   That's without -- that's -- that's out of my purview.
 5    Q.   The answer is no, you don't care whether it's correctly
 6    computed?
 7    A.   It's not that I don't care.  It's just that's out of my
 8    purview.
 9    Q.   Well -- okay.  It's not -- it's -- it doesn't matter to
10    you one way or the other whether it's computed correctly?
11    A.   Well, I'm assuming it is computed correctly.
12    Q.   That's right.
13              Your -- your assumption is it's computed correctly,
14    but why would you have them fax the report to you?
15    A.   To me?
16    Q.   Yes.
17    A.   Because I needed to see where -- what he was talking
18    about.
19    Q.   You know what I'm talking about?  You asked --
20    A.   I didn't -- I didn't itemize that report.
21    Q.   All right.
22              You told or instructed Mr. Ham not to do or contact
23    Dr. Shah unless he talked to you first; is that true?
24    A.   Yes.
25    Q.   Because you wanted to direct how that contact was going
```

UNITED STATES DISTRICT COURT

1    to be made; correct?

2    A.   We wanted to monitor it.

3    Q.   You wanted to monitor the -- the -- the contact and you

4    told him to go ahead and send him the -- what we will call

5    the $410,000 report?

6    A.   I believe Dr. Shah requested the fax over to him, the

7    RAR report.

8    Q.   Isn't it a fact that -- that he was trying -- Dr. Shah

9    was trying to not talk to the agent at that point and the

10   agent insisted to -- he wanted to tell him over the phone

11   how -- what the report was, what the outcome of the report

12   was?

13   A.   According to the -- the recordings that we heard, I

14   think that's -- that's what you had indicated, so yes.

15   Q.   So -- so Dr. Shah doesn't want to talk right then, but

16   the agent is pushing because he's being monitored and he

17   can't do it from home.  He -- he's pushing to tell him the --

18   the result of his report.  Do you recall that?

19   A.   I recall that he wasn't pushing.  It was an agreed-upon

20   time that he was supposed to return a call to him indicating

21   what the results of the audit was going to be.

22           Now, he was going to press to have a meeting with

23   him to show him the document.

24   Q.   Right.

25           But before then, in that call, he told him what the

1   outcome was?

2   A.   I think he -- yes.

3   Q.   And that's -- he drew an immediate reaction from

4   Dr. Shah, "Michael, you're killing me."

5        Do you recall that?

6   A.   Yes, I do.

7   Q.   Your -- did you ask Agent Ham -- Revenue Agent Ham

8   before he -- he provided the figures or sent the report

9   whether his computation was correct?

10  A.   No.

11  Q.   And, of course, you didn't check with any of his

12  superiors to determine how competent Mr. Ham was?

13  A.   No.

14  Q.   You didn't check -- strike that.

15       Did you know that Mr. Ham had just come back to

16  work within just a few months before November of '09?

17  A.   I -- I didn't know it, I don't believe, at that time.

18  Q.   Right.

19       At the time that you set up the sting, you didn't

20  know that?

21  A.   During our monitoring of it, I didn't know that.

22  Q.   Right.

23       And -- and Mr. Ham didn't tell you?  He didn't

24  disclose it, of course?  You didn't know and he didn't tell

25  you --

A.   Well -- well, I'm not certain whether he had -- he had
said it in passing.  I'm not -- I can't recall.  It's about
six years ago.  So I can't recall whether he said it in
passing that he was gone for a period of time or not.  It
kind of goes in jumbled in that respect.
Q.   Doesn't it raise an issue, in your mind, when you have
an individual who's been away for seven years on mental
health disability, and he is giving you this bribery overture
information?  Don't you do any checking to see whether this
revenue agent is, in fact, firing on all pistons, to be
colloquial?
A.   My -- my assessment of Dr. Ham -- of Revenue Agent Ham,
he was sharp and he was to the point, and he knew exactly
what the audit was in the respects of how he was dealing with
Dr. Shah.  He had indicated straight to me that Dr. Shah was
combative; that he was not -- he didn't have any books and
records; and that it delayed the audit procedure extensively.
And Mr. Ham, based on my experience of dealing with revenue
agents, they have a very difficult position when they are
trying to validate what is on those tax returns.
         So getting back to Revenue Agent Ham, my dealings
with him, he was -- he was always very articulate and very to
the point.  So I had no other reason to think otherwise.
Q.   If you had known that he was out for seven years because
he couldn't handle the stress of the job, that he couldn't

1    keep up with the changes, that he was having trouble

2    maintaining or keeping up with his work inventory, would that

3    have had any impact on that opinion you just gave us?

4    A.   Well, you're now talking -- you're asking me to

5    speculate going back -- going to -- going backwards.  Because

6    I didn't know -- I didn't know anything of that nature at

7    that point in time.  What I knew was at face value in

8    November is that this man was very sharp and he knew exactly

9    what he was talking about in the respects of that

10   examination.

11   Q.   Okay.  I understand you're towing that line, but let me

12   ask you again --

13            MS. WAIER:  Objection.  Move to strike the comments

14   of Counsel.

15            THE COURT:  Overruled.

16   BY MR. SEVERO:

17   Q.   If you had known about his seven-year hiatus from his

18   job because of his inability to -- to keep up with the work,

19   by his own statement --

20            MS. WAIER:  Objection.  This assumes facts not in

21   evidence.

22            MR. SEVERO:  No.  I'm giving him a hypothetical.

23   Okay.  Let me -- let me do it again.  I'll strike that.  Let

24   me rephrase.

25

```
 1    BY MR. SEVERO:

 2    Q.   If you had known that Mr. Ham was out on a seven-year

 3    disability, work stress related, because he couldn't keep up

 4    with his job, and that he had been seen by several

 5    psychiatrists during that time, would that have raised any

 6    concern about his ability to communicate with you what truly

 7    was going on with Dr. Shah?

 8    A.   First of all, I didn't know that.

 9    Q.   I know.

10    A.   Okay.  I didn't know that.

11    Q.   I'm asking you if you had known.

12    A.   If I would have known that, then I would have probably

13    have gone to his supervisor, just to -- to validate, hey, is

14    the -- at that time, if there was a coach, is he doing the

15    job.  And from all indications that I had later on, was he

16    was doing the job and he was doing it very well.

17    Q.   You -- obviously, you have done this before.  So I'm

18    going to try and see if I can get you to focus in on this.

19              Your --

20              MS. WAIER:  Objection.  Your Honor, move to strike.

21              THE COURT:  Denied.

22              They are both doing it to each other.

23              So if we get a question, and then if you could just

24    answer his question precisely...

25              THE WITNESS:  Sure.
```

1          THE COURT:  And I know Ms. Waier will follow up if

2     she wants an explanation.

3          Thank you.

4     BY MR. SEVERO:

5     Q.   What you have just told us -- told the jury; that is,

6     that had you known these facts that I've been telling you

7     about, the mental health issues, you would have gone to a

8     supervisor to make sure this guy was -- this fellow was doing

9     the job correctly; is that true?

10    A.   It would have been true.

11    Q.   Yes.

12         Okay.  And if you had known that the -- the tax

13    computation on that report was hugely overstated, would you

14    have let the report go out to the taxpayer in order to start

15    this sting operation?

16    A.   Like I said before, we don't get involved with that

17    civil audit.

18    Q.   That's not my question, though.

19    A.   And I -- go ahead.

20    Q.   You asked for the reports to be faxed to you?

21    A.   That's correct.

22    Q.   Is it just so that you can complete your file?

23    A.   Yes.

24    Q.   So you don't look at it?

25    A.   We look at it to figure out what the figure is, but it

```
 1    wouldn't matter which figure it is.  If it's a zero, it's a
 2    zero.  I just need that documentation.  That's part of --
 3    that's part of the process.
 4    Q.   So you don't care if the computation is -- the -- the
 5    true tax owed is a third of what was being requested?  You
 6    don't care about that?
 7    A.   A third?
 8    Q.   A third?
 9    A.   A third of the tax computation, I don't understand what
10    you're --
11    Q.   Okay.  If he said -- let me -- let me give you numbers.
12    If he -- it didn't matter to you that the actual tax
13    liability was 150,000 instead of 410,000?
14    A.   It wouldn't matter.
15           MR. SEVERO:  I just need a moment, Your Honor.
16    BY MR. SEVERO:
17    Q.   On the -- with respect to this surveillance that -- that
18    you started on, I think it's the 12th of January, what we saw
19    in the --
20    A.   You mean the last meeting?
21    Q.   The last meeting.
22           You didn't -- Mr. Ham was not armed, was he?
23    A.   No.
24    Q.   You -- and you -- understandably, there's always safety
25    concerns when you have an agent on the field undercover;
```

1    correct?

2    A.    You claim him as being undercover.  He was a

3    confidential -- I mean, not a confidential, but he was a

4    cooperating informant.

5    Q.    So you have a cooperating -- fine.  I'll use your term.

6          You have a cooperating witness?

7    A.    Yes.

8    Q.    And you want to protect that witness?

9    A.    That's correct.

10   Q.    And that's the safety concern; correct?

11   A.    Oh, yeah.  IRS employee safety concern.

12   Q.    You didn't have any concerns known to you that Dr. Shah

13   was particularly dangerous to the safety of the individual,

14   specifically?

15   A.    No.

16   Q.    The concerns you voiced here in your testimony are

17   general safety concerns for -- in all cases?

18   A.    In all cases.

19   Q.    You also didn't have any concerns that Dr. Shah would

20   hurt Mr. Ham; right?

21   A.    We had no indication of that.

22   Q.    Which is the reason you let him sit in the car for an

23   hour out of -- practically out of view without your being

24   right on top of him; right?

25   A.    I don't recall us being there for an hour and not out

```
 1    of -- out of view.  I -- we had a number of different

 2    vehicles out there.  Some didn't have a recording device, but

 3    we had a visual on the individuals.

 4    Q.   Right.

 5              How many members on the team?

 6    A.   At least six.

 7    Q.   Were you the one manning the camera?

 8    A.   No.

 9    Q.   Were you sitting by the camera?

10    A.   No.

11    Q.   Where were you?

12    A.   I was in another vehicle.

13    Q.   Okay.  Are you -- are you seeing anything?

14    A.   I'm listening and I'm seeing.

15    Q.   What are you seeing?

16    A.   I'm seeing the peripheral of Mr. Ham's vehicle.

17    Q.   So you're not seeing -- what I'm trying to get at is

18    you're not actually seeing the -- the filming that's going

19    on -- not the visual monitoring?

20    A.   I can't see the visual monitoring.

21    Q.   Okay.  How close were you to -- to the car that Mr. Ham

22    was in?

23    A.   I really -- I can't really say, but I would approximate

24    maybe 30, 40 yards, maybe.  30, 40 yards.

25    Q.   Were you in the same parking lot?
```

```
1    A.   Yes, we were in the same parking lot, yes.

2    Q.   As far as the January 5th -- strike that.

3              The first monitored call here came on January 5th,

4    correct?

5              And we can use the transcripts, if I -- if we may.

6    I don't --

7    A.   Okay.

8    Q.   -- necessarily want to play the -- the tapes.

9    A.   January 5th?

10   Q.   Yes.

11   A.   The first monitored call, I believe so, yes.

12   Q.   And there was no concern -- strike that.

13             There was no overture there on that conversation

14   until there was a statement about working for you -- for me

15   for the rest of your life, or words to that effect?

16             I'm going to direct your attention to Page 7 on

17   transcript of January 5th.

18             MR. SEVERO:  If I may, Your Honor?

19             THE COURT:  You may.

20   BY MR. SEVERO:

21   Q.   Starting five lines from the top of Page 7, "Dr. Shah, I

22   want to come to some conclusion and finish it up.  Make the

23   installment and we work together after we finish this."

24             Ham:  "Okay.  Now, do you want" --

25             Shah:  "You're going to work for me.  You're going
```

```
 1    to work for me for the rest of my life."
 2              You considered that an overture?
 3    A.   I considered that -- it was something of a question mark
 4    in the respects -- it wasn't a direct overture.
 5    Q.   Right.
 6    A.   But it was a question mark.  It was something that --
 7    that triggered that there was something wrong here.
 8    Q.   Okay.  Up until that point, it seemed like a normal
 9    taxpayer-revenue-agent kind of discussion?
10    A.   In the respects of Mr. Ham and Dr. Shah -- in that
11    conversation?
12    Q.   Yes.  Arguing about how much, how much tax I owe.
13    A.   Yeah, they go back and forth.
14    Q.   Right.
15    A.   Yeah.
16    Q.   And the -- the one line about "You're going to work for
17    me for the rest of my life," it raised a question mark, but
18    there was no directness in that -- in that statement?
19    A.   That's correct.
20    Q.   Because you don't really know what the -- what the
21    taxpayer means by that?
22    A.   That's correct.
23    Q.   Are revenue agents allowed to work part-time outside --
24    if you know, outside their jobs advising others?
25    A.   No.  In tax situations, no.
```

1    Q.    Okay.  In accounting situations, perhaps?

2    A.    No.

3    Q.    No?  None of that?

4    A.    It's my understanding they are not supposed to.

5    Q.    Right.

6          Okay.  So -- what -- at that point, you -- you have

7    no confirmation of the so-called intent of the taxpayer;

8    correct?

9    A.    We had the first int -- I had the first interview with

10   Mr. Ham, who had relayed that information over to me.  Then

11   we -- I spoke to Ms. Raghaven.  So there was another

12   indication that there was some issues related to this -- to

13   the overture, and then we make the monitored call.

14          Now, I --

15   Q.    Before you get there, because you said something.  You

16   spoke to Ms. Raghaven?

17   A.    I did.  I interviewed her.

18   Q.    When?

19   A.    I would have to refer back to my notes.

20   Q.    After Mr. Ham called you, of course?

21   A.    Of course, yes.

22   Q.    And she told you the same thing, that he had said make

23   this thing go away?

24   A.    I believe so, yes.

25   Q.    And that -- that also was not a clear indication of the

1    intent of the taxpayer?

2    A.   It's another red flag, yes.

3    Q.   Okay.  Make the -- make this go away is not something

4    that people want tax audits to do, go away?

5    A.   I -- you know, again, it's -- what that conversation or

6    at least what was told to me, there were some troubling

7    aspects to it primarily when you go into an -- their native

8    language, reference to their ethnicity, and then make it go

9    away, within that parameter, it didn't sound like it was what

10   Dr. Shah wanted was legal.  But, again, what we're trying

11   to -- what we're trying to find out is his true intent.  So

12   we make this monitored call and reference to what you just --

13   that exhibit.

14   Q.   Okay.  So not having been able to gather any damning

15   evidence from the first call, you decide to set up another

16   one; is that correct?

17   A.   Well --

18   Q.   On the 8th?

19   A.   On the 8th?  Can you --

20   Q.   Actually, that's a --

21   A.   Isn't that a meeting?

22   Q.   That's a meeting.

23   A.   That's a meeting, right.

24   Q.   They set up that meeting?

25   A.   They set up that meeting.

1    Q.    Right.

2                And, in that meeting --

3                MR. SEVERO:  And I'm going to refer, Your Honor, to

4    the January 8th -- I don't recall the -- actually, I think

5    it's Exhibit 4-A.  Yes, Exhibit 4-A.

6    BY MR. SEVERO:

7    Q.    On the second page of Exhibit 4-A at Line 11, "Michael,

8    you're going to kill me."

9                He's reacting to the $410,000 assessment; is

10   that --

11   A.    Can you put me back to where I'm at -- I'm supposed to

12   be on the exhibit?  I'm sorry.

13   Q.    It's Exhibit 4-A.

14   A.    4-A.

15   Q.    And Page 2 of the exhibit.

16   A.    Page 2.

17   Q.    Down to Line 11.

18   A.    Okay.

19   Q.    Sorry.  I didn't know you weren't there.

20   A.    Exhibit 4-A, Page 2 of line -- wait a minute.

21                This is January 8th?

22   Q.    Yes.

23   A.    Page 2 of Line 11?

24                It -- mine says, "yeah."

25   Q.    "Michael, you're going to kill me"?

```
1    A.   No, it doesn't say it there.

2    Q.   It doesn't say that?

3              THE COURT:   Line 3, I believe.

4              THE WITNESS:   Yes, Line 3.

5              MR. SEVERO:   You know -- I know why.  Why that's

6    happening.  I'm not looking at the exhibit.  I was looking at

7    the transcript, but it was my own transcript.  I apologize,

8    Your Honor.

9              That's correct.  Line 3, thank you, Judge.

10   BY MR. SEVERO:

11   Q.   "Michael, you're going to kill me; right"?

12             And this was in relationship to the 400-plus

13   thousand dollars assessment; correct?

14   A.   Yes.

15   Q.   And Mr. -- during this conversation, Mr. Ham continues

16   to press the $410,000 assessment; correct -- or threatened

17   assessment?

18             MS. WAIER:   Objection, Your Honor.  The transcript

19   speaks for itself.

20             THE COURT:   Overruled.

21             THE WITNESS:   The term of "threatened," I think --

22   BY MR. SEVERO:

23   Q.   Okay.  What is happening here is that that revenue agent

24   report is not an assessment itself, is it?

25   A.   That is the proposal.
```

1    Q.   It's a -- it's -- okay.  It's a proposed assessment?  So

2    he -- so Mr. -- excuse me.

3         Mr. Ham is pushing the proposed assessment?  He's

4    not backing off of that; correct?

5    A.   Well, he's advising him this is a big -- this is the

6    product of what I came to from reviewing the bank statements.

7    Q.   Right.

8         And, obviously, this is causing some anxiety for

9    Dr. Shah who is trying to say that the assessment should be a

10   lot less?

11        MS. WAIER:  Objection, Your Honor.  Lacks

12   foundation.  Calls for speculation regarding anxiety.

13        THE COURT:  Overruled.

14   BY MR. SEVERO:

15   Q.   Let me direct your attention to Page 5 of the exhibit.

16   Starting at Line 3, this is Dr. Shah saying, "I think the

17   number is more like 40,000 per year."

18        It starts that way; correct?

19   A.   That's correct.

20   Q.   And as you get down to Line 10, Mr. Ham says, "In other

21   words, it would be like 40,000" -- "120,000 would be" --

22   that's what he says; correct?

23   A.   Michael Ham says that, yes.

24   Q.   But -- and after they discuss what it's -- it is or

25   should be, at Page 6, Line 3, Dr. Shah says, "So 50 times

1    three" after all of that discussion -- "it's 50 times 3, 150.

2    I give you a check and you go away."

3              Now, you didn't think that was 150,000 payable to

4    Mr. Ham.  You didn't take that that way when you heard it,

5    did you?

6    A.   I'm taking everything at -- at face value.

7    Q.   Right.

8              So -- and he's trying to say he would pay the

9    $150,000 in tax and you go away; correct?

10   A.   Now, I am not a revenue agent, but from what I gathered

11   at this point in time, when they're talking a negotiation,

12   Dr. Shah did not give any documents.

13   Q.   Right.  I understand that.

14   A.   So he's now trying to verbally cut a corner and

15   negotiate with him without any documentation to prove it's

16   150,000.

17   Q.   Thanks.  I understand that.

18             But he is telling him I will give you 150,000.  You

19   go away.  Next year, you work for me?

20   A.   That's what he's saying.

21   Q.   Right.

22             Next year, you work for me, what -- did that raise

23   any -- another red flag in your head?

24   A.   Yes.

25   Q.   A little one; right?

1    A.    Yeah.  Yes.

2    Q.    Not a real significant one.

3    A.    It -- like I said, it's a red flag.

4    Q.    But the agent is not backing off, is he?

5    A.    Meaning?

6    Q.    Mr. Ham is saying, "I would have to change this.  I

7    can't justify it and so forth"?

8    A.    Yes, he says that.  It does say that.

9    Q.    The -- the conversation at Page 7 repeats in terms of

10   40,000 per year, interest in penalties, $50,000 per year.  I

11   think -- at Page 7, Line 24, Dr. Shah repeats, "It would be

12   150, 120, 140, whatever it comes to, to pay you off."  That's

13   a little bit farther down on 26.

14         Do you see that?

15   A.    Yes, I do.

16   Q.    That -- to pay you off was not a bribery overture, he

17   was trying to pay the tax; correct?  Or at least making an

18   offer to pay tax; correct?

19   A.    That's -- that's what it seems like, yes.

20   Q.    Right.

21         It is after that that the first actual figure to be

22   paid to Ham comes out?

23   A.    I believe so, yes, according to the transcripts.

24   Q.    So didn't it appear to you that the $410,000 figure was

25   causing some concerns to Dr. Shah because he didn't feel he

1    was correct?

2    A.   I'm not certain what he felt outside of the fact that

3    there was no documentation that he had provided --

4    Q.   I'm asking --

5    A.   I'm not certain.  I'm not certain.

6    Q.   I'm asking for your impression, you -- when -- when you

7    heard this, it didn't -- it didn't -- it didn't figure in

8    your calculus that this would be a problem -- that there was

9    a problem here with the $410,000 figure?

10   A.   Like I said, I don't get involved with the civil audit.

11   If that's the figure that it came from -- because I didn't

12   review the bank statements.  And that's the figure he came

13   with, that's the figure Revenue Agent Shah came with [sic].

14   Q.   And that's the figure you wanted him to press, didn't

15   you?

16   A.   I didn't want him to press anything.  He's going to --

17   he's going to conduct this audit the way he normally would

18   conduct an audit.  So he's going to provide the revenue agent

19   report to the taxpayer, to Dr. Shah, to what he had found.

20   Q.   Did you come to learn that, in fact, the tax liability

21   was, indeed, about $150,000?

22   A.   Yes.

23   Q.   And that Dr. Shah did, indeed, pay that?

24   A.   I think it was a little higher than 150, I thought.

25   Q.   154?

1    A.   Somewhere up in there.

2    Q.   Right.

3    A.   I thought it was like 168, but it -- we're splitting

4    hairs.

5    Q.   Okay.  And, again, that -- the fact that the actual tax

6    liability was a lot less than was being pressed was of no

7    moment to you?

8    A.   This is all after the fact.

9    Q.   Sort of?

10   A.   I believe -- well, my -- my investigation was closed

11   after he went through the appeals process.  So this was all

12   after the fact.

13   Q.   Your -- as I recall, you did receive an e-mail from

14   Mr. Gomez -- not from Mr. Gomez.  You're Mr. Gomez.  From

15   Mr. Ham in November -- on November 20th.

16        Did you ask him to write down a summary of a case's

17   history?

18   A.   Write down his interaction.  I --

19   Q.   Right.

20   A.   I'm going to reference back to that -- I don't know if I

21   have it here.

22        Is it an exhibit here?

23        I don't know if I have it as an exhibit.  But I --

24        MR. SEVERO:  Your Honor, I have -- have provided

25   the Government previously with what we have marked as Defense

1    Exhibit 13.

2              THE COURT:  Very well.

3              MR. SEVERO:  I'd ask that it be admitted into

4    evidence.

5              MS. WAIER:  Objection.  Hearsay.  Out-of-court

6    statement.

7              MR. SEVERO:  It's actually -- so I can describe

8    it -- an e-mail from Mr. Ham to Mr. Gomez.  Well, the Court

9    has one of our books.

10             THE COURT:  I do.

11             You're offering it for the truth and as a party

12   admission?

13             MR. SEVERO:  Yes, sir.

14             THE COURT:  Objection is overruled.

15             MR. SEVERO:  May I publish?

16             THE COURT:  You may.  Exhibit --

17   BY MR. SEVERO:

18   Q.   You have a copy of our defense book?

19   A.   I'm looking at it right now.

20             THE COURT:  Exhibit 13 will be received into

21   evidence.

22             Thank you.

23             **(Defense Exhibit 13 received.)**

24   BY MR. SEVERO:

25   Q.   I think what has happened is that there might be a

```
 1    Government 13.
 2              THE COURT:  Defense Exhibit 13.
 3              MR. SEVERO:  Thank you.
 4    BY MR. SEVERO:
 5    Q.   In this -- -- it's kind of hard to read up there.
 6              In this e-mail, he -- Mr. Ham summarized for you
 7    the interaction with Dr. Shah; correct?
 8    A.   Yes.
 9    Q.   And, actually, what he said to you was that the
10    taxpayer -- TPH means taxpayer?
11    A.   TP means taxpayer, and I believe TPH means taxpayer
12    husband.
13    Q.   Okay.  That's true.
14              This was a -- Dr. Shah and his wife were on the
15    return; correct?
16    A.   I think so, yes.
17    Q.   All right.  So the -- TP -- TPH means, in this case,
18    who?
19    A.   Dr. Shah.
20    Q.   So TPH, Dr. Shah, has been alluding to getting this
21    matter settled and what can you do for me, in quotes.  That's
22    all he said about bribery overtures; isn't it, in that
23    e-mail?
24    A.   On the e-mail.
25    Q.   Is that right?
```

```
 1    A.   That's on the e-mail.

 2    Q.   Right.

 3         And as far as any permanent record of what the

 4    overtures are, we only have this e-mail because everything

 5    else was conversations that you seemed to recall?

 6    A.   I interviewed Mr. Ham.

 7    Q.   Right.  Understand.

 8         This -- you interviewed him before this e-mail?

 9    A.   Yes.

10    Q.   Yeah.

11         Did you ask him to correct this and to tell you

12    what the actual overtures were when he sent you this e-mail?

13    A.   I'm not certain if I -- I -- I am not certain if I would

14    have ever asked him to correct that e-mail.

15    Q.   You didn't think anything of it when he didn't detail

16    the bribery overtures that he had told you about on the

17    phone?

18    A.   We had already discussed it.

19    Q.   You had already discussed it over the phone?

20    A.   Yes.

21    Q.   This -- what was the purpose of this e-mail?

22    A.   Summary of the case history.  That's what it says.  So

23    that's --

24    Q.   This should be accurate, shouldn't it?

25    A.   Should be accurate.
```

 1    Q.   I'm sorry?

 2    A.   Yes.

 3    Q.   Should be accurate?

 4    A.   Yes.

 5    Q.   Should be complete?

 6    A.   Complete from Mr. Ham's standpoint, yes.

 7    Q.   Yes.

 8         And then on the third paragraph starting where it's

 9    actually underlined here, it says, "RA," I assume that's

10    Revenue Agent; correct?

11    A.   Yes.

12    Q.   "And Dr. Shah have discussed" -- "discussed RA's mental

13    condition of major depression on an ongoing basis since

14    May 15th, 2009, meeting."  It was Dr. -- strike that.

15         It was Mr. Ham that said that he had done this to

16    find an area of common ground?

17    A.   Yes.

18    Q.   So by the time you got involved, they have been

19    discussing the -- Agent Ham, Dr. Shah have been discussing

20    Mr. Ham's mental problems for six months on an ongoing basis,

21    according to this --

22    A.   I -- I am not certain of all of that.  I came on in

23    November of 2009, and their prior dialogue in relation to his

24    mental health, he had mentioned it to me that had he

25    mentioned it to Dr. Shah, that there was -- he had a history

UNITED STATES DISTRICT COURT

```
 1    of mental health issues.

 2    Q.   That's what he said --

 3    A.   Yes.

 4    Q.   But he didn't -- in this e-mail, he tells you it's on an

 5    ongoing basis; correct?

 6    A.   Yes.

 7    Q.   That didn't raise any issues in your -- in your mind as

 8    to the capabilities of Mr. Ham in -- in relationship to his

 9    ability to do his work?

10    A.   No.

11         In the respects of meeting Mr. Ham and talking to

12    him over the telephone, it appeared that he had his full

13    faculties when he was doing this audit.

14    Q.   You're really qualified to make that call?

15    A.   I -- you -- you -- it's my assessment when I interview

16    him.  That's it.

17    Q.   In this e-mail, he also gives you a rundown of the

18    adjustments he's making; correct?

19    A.   Yes.

20    Q.   To the tax return?

21    A.   Yes.

22    Q.   This is on November 20th?

23    A.   Right.

24    Q.   When was it that he completed his report?

25    A.   I believe it was after this.
```

1    Q.   Yes, like a month later; right?

2    A.   At least.

3    Q.   Did you not ask what the delay was?

4    A.   It was a bank -- bank -- it was my understanding that he

5    didn't get a complete picture of the bank documents because

6    there was no books and records from Dr. Shah.  So he had --

7    he had to wait for the bank documents.

8    Q.   Right.

9         Actually, he says that on the line above, the --

10   the numbers here, the bag --

11   A.   Received --

12   Q.   Bank summons details of deposits due to be received on

13   12/7.  So that's where the delay was.  He was waiting for

14   those?

15   A.   That's correct.

16   Q.   Do you know if it changed any of this?

17   A.   I would imagine -- yes, it had changed.

18   Q.   Upwards?

19   A.   Yes, I think so.

20   Q.   Now, in -- after the -- after the October -- strike

21   that.

22        After the January 8th, meeting, you met with Mr. --

23   with Agent Ham, did you?

24   A.   After the January 8th meeting?

25   Q.   All right.  Let me -- let me be more specific.  Let me

 1   restate the question.

 2           After Mr. Ham met with Dr. Shah in January 8th of

 3   2010 --

 4   A.   Okay.

 5   Q.   -- which is recorded in Exhibit 4.  After that, you met

 6   with Mr. Ham, did you?

 7   A.   Yes.

 8   Q.   Did you tell Mr. Ham to create a new IRS report to show

 9   taxes to be zero?

10   A.   If that's what Dr. Shah wanted and that's what it was

11   discussed -- let me see if -- I don't want to speak out of

12   line without reading or referencing the transcript.  But if

13   that's what they discussed, in that monitored call, or

14   monitored meeting, then that's what was instructed to do,

15   yes.

16   Q.   But do you recall in the monitored meeting, the first

17   thing that was done was $150,000 tax and you work for me next

18   year?  Do you recall that?

19   A.   Yes, I do.

20   Q.   And then they may have discussed a $15,000 payment for

21   the $150,000 tax, do you recall that?

22   A.   Yes, I do.

23   Q.   And then they talked about a $30,000 payment for no tax?

24   A.   That's correct.

25   Q.   Those are the three options they had?

1    A.    That's right.

2    Q.    You went with the third option?

3    A.    No, it's not what I went for the third option.  That's

4    what was understood, I believe, from the -- from the meeting.

5    That was the third option.  And from what it appeared to be,

6    that's what it was going to go on.

7    Q.    Right.

8          That's because Mr. Ham -- as I -- as we read this,

9    led it down to that zero tax, didn't he?

10   A.    It was Dr. Shah mentioning of the 30,000.

11   Q.    Did you instruct Mr. Ham, then, to go through and -- to

12   go ahead and -- and create a zero report?

13   A.    Yes.

14   Q.    Did you see the zero report before it was given to

15   Dr. Shah?

16   A.    I may have seen it that morning, but I can't really

17   recall.

18   Q.    And then at the -- at the meeting in the parking lot on

19   January 12th, Ham has Dr. Shah sign a false IRS report

20   showing zero?

21   A.    That's correct.

22   Q.    In fact, after that -- after the payment was made, and

23   the tax report of -- the zero tax report was signed, you

24   still had Mr. Ham send a technical letter -- I think it's

25   exhibit --

```
1   A.   Ten.

2   Q.   I'll get there.

3           It's Exhibit 10; correct?

4   A.   Correct.

5   Q.   You had him prepare that?

6   A.   Yes.

7   Q.   What was the purpose of that?

8   A.   That's what the -- that was the agreed-upon situation

9   from the meeting that if he was going to pay him the 30,000

10  or the three apples, that he was getting a no-liability tax

11  assessment.

12  Q.   Why did that make a difference at this point?  By then,

13  he's already, in your mind, committed the offense?

14  A.   That's what was agreed upon.  He was waiting for that

15  technical letter, and these are the technical letters.

16  Q.   Did that make any difference to you in the investigation

17  of this case?

18  A.   You know, I think it completed the -- it completed the

19  aspect of what was agreed upon.

20  Q.   Completed the aspect of what was going to be agreed

21  upon.  The offense had already been committed; correct?

22  A.   Correct.

23          MR. SEVERO:  I need just one moment.  I'm almost

24  done.

25
```

```
1    BY MR. SEVERO:

2    Q.   You were aware that Dr. Shah had been asking for the

3    records, that the records that the IRS had be given to him.

4              Were you aware of that?

5    A.   You mean the statements and such?

6    Q.   Yes.

7    A.   Yes.

8    Q.   And that they were not given to him until after he

9    delivered the $30,000?

10   A.   It was my under -- it was my understanding and according

11   to the -- to watching the -- the recording, and the review of

12   it, they agreed upon giving those statements when they met on

13   the 12th.  He was going to provide those statements.  That's

14   the reason why they went to Staples, is to provide those

15   statements.

16   Q.   To copy the statements that were in the trunk of

17   Mr. Ham's car?

18   A.   Correct.  It's my understanding, yes.

19   Q.   And do you know how long Mr. Ham had had those

20   statements?

21   A.   I'm not certain.

22   Q.   Essentially, then, what this -- what we did here -- what

23   you did here was you used the civil audit to conduct the

24   criminal investigation; correct?

25   A.   I used a civil audit to conduct a criminal
```

```
 1   investigation, I didn't use a civil audit.  The civil audit

 2   was automatic -- it was going.  It -- it was going through

 3   the natural progression of a civil audit.

 4   Q.   Right.

 5        And you used that to conduct the criminal

 6   investigation?  Without it, you couldn't have done it?

 7   A.   I think you're trying to put words in my mouth.  That is

 8   not how it is operated.  That is not how it's done.

 9        We receive allegations of bribery and we want to

10   find the intent of the individual whether he wants to

11   compromise the Internal Revenue Service or the IRS revenue

12   agent.  That is our job.  So we're going to find out what the

13   individual's intent -- at any given point, he can back out.

14   And, in fact, Revenue Agent Ham had told him that it was

15   illegal.  So he told him it was illegal multiple times.

16   Q.   You didn't try -- you didn't -- you didn't try to stop

17   this by simply informing him that it would be reported?

18   A.   No.

19        MR. SEVERO:  I have nothing further.

20        THE COURT:  Ms. Waier?

21              REDIRECT EXAMINATION

22   BY MS. WAIER:

23   Q.   Special Agent Gomez, you were asked questions regarding

24   why it was a concern that Revenue Agent Ham had talked with

25   Dr. Shah about his mental condition, and you had mentioned
```

```
 1    something about vulnerability.
 2              Can you explain that to the jury?
 3    A.    Taxpayers --
 4              MR. SEVERO:  Objection.  Vague.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Taxpayers, generally -- and it's a
 7    general feeling, is that they're in a -- they don't want to
 8    be audited and they don't want their taxes collected when
 9    you're -- when you're in that situation in dealing with the
10    IRS.
11              MR. SEVERO:  Move to strike.  No foundation.
12              THE COURT:  Overruled.
13              THE WITNESS:  Whenever you provide any information
14    that can be vulnerable.  It is -- it is my training and my
15    feeling is that a taxpayer would -- could use that to their
16    advantage or try to use that to their advantage.
17    BY MS. WAIER:
18    Q.    What do you mean by that, "use it to their advantage"?
19    A.    Well, because in this circumstance, Revenue Agent Ham
20    had an issue with depression and Dr. Shah had -- was a
21    psychiatrist, you can -- you can manipulate that kind of
22    situation, and we would prefer never to disclose that kind of
23    information to a taxpayer because they could try to use that
24    in -- in some different ways to manipulate that audit.
25    Q.    So, are you saying that the taxpayer could exploit --
```

1    I'm sorry -- exploit the revenue agent based on the personal

2    information?

3    A.    Could have, yes.

4    Q.    At any time, were you ever concerned that there was a

5    doctor/patient relationship between Dr. Shah and Revenue

6    Agent Ham?

7    A.    No.

8    Q.    Did the tapes bear that out?

9    A.    No.

10   Q.    You were asked questions about how you didn't stop it.

11   You didn't stop this bribery attempt.

12             Are you required to do that?

13   A.    No.

14   Q.    Are you required to report it to the taxpayer?

15   A.    No.

16   Q.    And although you didn't stop it, did you encourage it

17   either?

18   A.    No.

19   Q.    And in the tapes that we've heard, were there -- was

20   there mention that this was illegal?

21   A.    Multiple times.

22   Q.    And, at any time, could the defendant walk away?

23   A.    Absolutely.

24   Q.    And the time after the $30,000 was paid and the

25   transmittal letter was sent a couple of weeks later, could

```
 1   the defendant have called and said it was a mistake, I'm
 2   sorry, let's move on?
 3   A.   Absolutely.
 4           MR. SEVERO:  Objection.  That -- that's a
 5   hypothetical.  It's incomplete.  Calls for speculation.
 6           THE COURT:  Argumentative, too.
 7           Sustained.
 8           The answer will be stricken.
 9   BY MS. WAIER:
10   Q.   Throughout any of the tapes, did Defendant Shah back out
11   at any time?
12   A.   Back out of the audit?
13           MR. SEVERO:  Objection.  Vague.  He doesn't
14   understand the question.
15           THE COURT:  Overruled.
16           If you understand the question, sir, please answer.
17   If not, let Ms. Waier know.
18           THE WITNESS:  I'm unclear of the question.
19   BY MS. WAIER:
20   Q.   Did -- did Dr. Shah ever back away from the bribe?
21   A.   No.
22   Q.   I'd like to talk about January 5th that the -- the
23   Exhibit 3-A.  And if you look at the very bottom on Page 6,
24   Line 26, you see where Dr. Shah says --
25           MR. SEVERO:  Which exhibit?
```

1              MS. WAIER:  3-A, Page 6, line 26.

2    BY MS. WAIER:

3    Q.   "I want to come to some conclusion and finish it up,

4    making installment, and we work together after we finish

5    this."

6    A.   Yes.

7    Q.   Is that an indicator?

8    A.   Yes.

9    Q.   And then the next page, on Page 7, that's the line that

10   you talked about with Mr. Severo; is that right?

11   A.   Excuse me.  Say that again.

12   Q.   On Page 7 of 3-A, Line 1, that's the line "You're going

13   to work for me" --

14   A.   Yes.

15   Q.   -- "you're going to work for me for the rest of my

16   life"?

17   A.   Yes.

18   Q.   Because of that, on January 8th, that means he was

19   already scheduled by the taxpayer and Revenue Agent Ham; is

20   that right?

21   A.   That's correct.

22   Q.   In fact, if you look -- and I want to go back on

23   Exhibit 3-A, Page 2, Line 20, Dr. Shah says, "Can we set up

24   an appointment?"

25   A.   Yes.

1    Q.   So Dr. Shah asks for the appointment?

2    A.   That's correct.

3    Q.   Wasn't something that Revenue Agent Ham asked?

4    A.   No.

5    Q.   Okay.  If you look on Page 3 of Exhibit 3-A, Line 15,

6    Ham says, "I've got some total figures for you.  Do you want

7    me to give you those so you can kind of put that in the back

8    of your mind and be thinking on it, or what?"

9         And Dr. Shah says, "Go ahead."

10        So, there, Dr. Shah is asking for the figures?

11   A.   That's correct.

12   Q.   On January 8th, you were asked questions on Page 6 of

13   Exhibit 4-A, Mr. Severo was talking to you about "So 50 times

14   3 is 150," Line 3.

15        And Revenue Agent Ham says on Line 11, "I can't

16   just capriciously change it;" right?

17   A.   That's correct.

18   Q.   Revenue Agent Ham needed some documentation?

19        MR. SEVERO:  Objection.  Calls for speculation.

20        THE COURT:  Sustained.

21   BY MS. WAIER:

22   Q.   And you were asked questions on Exhibit -- on Page 7 of

23   Exhibit 4-A, and Mr. Severo asked you, on the very bottom,

24   that -- so -- so Revenue Agent Ham said, "So, in other words,

25   you give me a check for the IRS for that amount," and then

1    the next line is "that a week later we figure out a dollar

2    amount, then I will give it to you."

3             Is that a bribe overture?

4    A.   That is an overture.

5    Q.   You continue, he says, "I'm going to be very blunt with

6    you."  That's Mr. -- that's Mr. Shah; right?

7    A.   That's correct.

8    Q.   And then he says on Line 17, "I'm going to give you

9    $15,000 cash"?

10   A.   That's correct.

11   Q.   Is that the first mention of cash ever?

12   A.   That was the first time.

13   Q.   Was that introduced by Revenue Agent Ham?

14   A.   No.

15   Q.   If you look on Page 10 of Exhibit 4-A, Line 19, Revenue

16   Agent Ham is saying, "This is illegal;" right?

17   A.   That's correct.

18   Q.   Did Dr. Shah back away?

19   A.   No.

20   Q.   In Exhibit 4-A, Page 12, Line 12, so Revenue Agent Ham

21   is asking for Shah to give him something for his files;

22   right?

23   A.   That's correct.

24   Q.   So that he can substantiate something in order to get

25   the report passed by his supervisors?

1    A.    That's correct.

2    Q.    And that's why Shah wanted the bank documents?

3    A.    That's correct.

4    Q.    In fact, if you look on Page 13, Line 8, Ham says, "You

5    got to give me some kind of documentation;" right?

6    A.    Correct.

7    Q.    "So I can put it in my file for my boss."

8          Again, on Page 16, Line 4, Ham says, "This is

9    illegal;" right?

10   A.    That's correct.

11   Q.    The response was, "Who cares."

12         Did Dr. Shah back away?

13   A.    No.

14   Q.    Now, Revenue Agent Ham told Dr. Shah, "Look, if you

15   think I got this wrong, I don't want to take your money;"

16   right?

17   A.    That's correct.

18   Q.    If you look on Page 19 of Exhibit 4-A, Lines 13 through

19   18, Ham says, "If you don't think you really owe that, I

20   don't want to take your money."

21         And it is Shah, next, that says, the defendant,

22   "Let me give you another offer"?

23   A.    That's correct.

24   Q.    Bribe?

25   A.    Absolutely.

1    Q.   "In fact, if you can make this go away, I can increase
2    your payment;" right?
3    A.   That's correct.  That's what he said.
4    Q.   Bribe?
5    A.   Yes.
6    Q.   Introduced by Ham or Shah?
7    A.   Shah.
8    Q.   In fact, the revenue agent says, "Hey, I'm fine with
9    $15,000;" right?
10   A.   That's correct.
11   Q.   Who ups it to 30?
12   A.   Dr. Shah.
13   Q.   Not you, not TIGTA --
14            MR. SEVERO:  Objection.  Argumentative.
15            THE COURT:  Overruled.
16   BY MS. WAIER:
17   Q.   Not you?
18   A.   Not me.
19   Q.   Not Revenue Agent Ham?
20   A.   No.
21   Q.   That's the first time $30,000 is placed on the table?
22   A.   That's correct.
23   Q.   In fact, Dr. Shah substantiates that by "$10,000 per
24   year"?
25   A.   That's correct.

```
 1    Q.   And, again, on Page 20, Line 18, Ham says, "Look, if you
 2    think you only owe $150,000 legally" -- and Shah says, "I
 3    don't know.  It's just too much of a headache."
 4    A.   That's correct.
 5    Q.   So Shah could have backed out at that time?
 6    A.   Absolutely.
 7    Q.   He didn't?
 8    A.   You're right, he didn't.
 9    Q.   And then in the transcript, there's an introduction of
10    what I call "coded language".
11              What is "coded language"?
12              MR. SEVERO:  Objection.  No foundation.
13              THE COURT:  As framed, sustained.
14    BY MS. WAIER:
15    Q.   Do you know what "coded language" is?
16    A.   Well, what was reflective from the conversation from
17    Dr. Shah to Revenue Agent Ham was the fact he didn't want to
18    discuss --
19              MR. SEVERO:  Objection.  That's nonresponsive.
20    Calls for a "yes" or "no" answer.
21              THE COURT:  Sustained.
22              THE WITNESS:  Do I know what a coded language --
23    okay.
24    BY MS. WAIER:
25    Q.   Whose idea was it not to speak about the $30,000 --
```

1   A.   Dr. Shah.

2   Q.   Well, let me finish.

3        Whose idea was it to speak -- not speak about the

4   $30,000 in cash?

5   A.   Dr. Shah.

6   Q.   Does that also indicate to you an intent?

7   A.   Absolutely.

8   Q.   What does it indicate to you?

9   A.   That he is -- that his mindset at that point in time was

10  to compromise Revenue Agent Ham into a bribe.

11  Q.   And that he knew it was illegal?

12  A.   Yes.

13  Q.   And he introduced apples?

14  A.   Correct.

15  Q.   You were asked questions about the revenue agent report,

16  the one that was faxed to you that showed approximately

17  $400,000 in tax due and owing, and you were asked questions

18  about whether you knew if it had gone down to a lower amount.

19       And did you look into why it went down to a lower

20  amount?

21  A.   Did I look into it?  Yes.

22  Q.   And what did you -- what did you learn?

23  A.   I learned that Dr. Shah had hired a professional and

24  they -- they -- the resurrected his books and records in

25  order for them to get a clear understanding of his tax or --

1  of his tax situation.

2  Q.   So, basically, a tax professional had come in and was

3  able to substantiate deductions?

4          MR. SEVERO:  This is speculation and based on

5  hearsay.

6          THE COURT:  Sustained.

7  BY MS. WAIER:

8  Q.   You were asked questions regarding whether or not you

9  believe that Revenue Agent Ham was competent during this

10  time?

11  A.   Correct.

12  Q.   And throughout your dealings, did you believe him to be

13  competent?

14          MR. SEVERO:  Objection.  No foundation.

15          THE COURT:  Overruled.

16          THE WITNESS:  Yes, I believed he was competent.

17  BY MS. WAIER:

18  Q.   And why did you believe that?

19  A.   Just my -- my conversation with him.  He was very

20  articulate.  Very sharp.  He knew exactly what was going on

21  with the audit.  It's just -- I interview a lot of people in

22  this job, and there are some people that you -- you're

23  missing pieces in some regards of their dialogue.  Mr. Ham

24  was not like that.  He -- he was complete in what he was

25  trying to do, and that was to complete the audit.

```
 1    Q.   In fact, during these tapes, he is concerned about

 2    Dr. Shah's future compliance; isn't that right?

 3    A.   Yes.

 4    Q.   An d Dr. Shah acknowledges many times in -- in the tapes

 5    that --

 6               MR. SEVERO:  Leading.

 7               THE COURT:  Sustained.

 8    BY MS. WAIER:

 9    Q.   Does Dr. Shah acknowledge in here that he doesn't -- he

10    doesn't have the documentation?

11    A.   That's correct.

12    Q.   In fact, does Dr. Shah mention that he was talking to

13    other tax preparers, but they would require lots and lots of

14    documentation?

15               MR. SEVERO:  Leading.

16               THE COURT:  Overruled.

17               THE WITNESS:  Yes, that's correct.

18    BY MS. WAIER:

19    Q.   Although you had a recorded conversation on January 5th,

20    and then again you had a meeting on January 8th where

21    Dr. Shah learned that this was illegal, he never backed out?

22    A.   That's correct.

23    Q.   How about on the 12th?

24    A.   He never backed out.

25    Q.   How about when he got the transmittal letter?
```

```
 1    A.   He never backed out.
 2            MS. WAIER:  I have no further questions.
 3                        RECROSS-EXAMINATION
 4    BY MR. SEVERO:
 5    Q.   Your concern with the sharing of mental health
 6    information is that there can be manipulation?
 7    A.   To some degree.
 8    Q.   You were concerned that the taxpayer would manipulate
 9    the agent?
10    A.   It could be.
11    Q.   How about the other way around, the agent could use the
12    relationship to manipulate the taxpayer?
13    A.   Well, he's a doctor, and the other individual -- in this
14    circumstance, he's the doctor and Revenue Agent Ham was the
15    one with the mental illness.
16    Q.   Right.
17            But --
18    A.   I don't know if he can manipulate it.  I'm not certain.
19    Q.   Your -- your job is to maintain the integrity of the
20    IRS?
21    A.   That's correct.
22    Q.   And the integrity of the IRS is the integrity of Revenue
23    Agent Ham; correct?
24    A.   Of all IRS employees.
25    Q.   In this case --
```

```
 1    A.    Yes.
 2    Q.    -- you were protecting the integrity of Revenue Agent
 3    Ham?
 4    A.    Yes.
 5    Q.    And it would be your concern that Revenue Agent Ham's
 6    integrity would not be compromised?
 7    A.    That's correct.
 8    Q.    So you didn't -- wouldn't want him to use the mental
 9    health issue to position himself such that he would receive a
10    bribe offer?
11    A.    Can you clarify that, please?
12    Q.    Yeah, of course.
13          Your first job is to make sure that your revenue
14    agents don't get bribed?
15    A.    That's correct.
16    Q.    And you want to make sure that the agent doesn't
17    position himself in such a way that would allow him to get a
18    bribe from a taxpayer; right?
19    A.    Yes.
20    Q.    So the -- the real concern you had here was -- or,
21    perhaps, if you had known more about the mental health
22    issues, was making sure that Revenue Agent Ham didn't
23    manipulate the situation such that he would position himself
24    to get a bribe; right?
25    A.    No.
```

1    Q.   Not right.  Okay.

2          Your -- your assessment of Mr. Ham is based, in

3    part, on the fact that he knew what was going on with the

4    audit?

5    A.   In part.

6    Q.   But you don't know anything about audits?

7    A.   I know some because of my 25 years with the -- actually,

8    33 years with the Internal Revenue Service, I know some.  I

9    mean, that's part of the job.

10   Q.   You didn't care anything about the audit, did you?

11   A.   I don't interfere into the audit.

12   Q.   Well, if you knew something about what was going on with

13   the audit, then you should have made an assessment as to --

14   with respect to the correctness of the audit?

15   A.   No.

16   Q.   No?

17         The mental health issues didn't raise any concerns,

18   in your mind, as to the truthfulness of Mr. Ham?

19   A.   No.

20         MR. SEVERO:  That's all I have.

21         THE COURT:  Very well.

22         Ladies and gentlemen, we'll break for the day.  I

23   have a couple instructions I need to give you.

24         You heard testimony and you heard recordings of

25   certain conversations that were received in evidence.

1    Transcripts of the recordings were provided to help you

2    identify speakers and to help you decide what the speaker

3    said.  Please understand that the recordings are the

4    evidence, not the transcripts.  If you heard something

5    different from what appears in any of the transcripts, what

6    you heard is controlling.

7         Then I'm going to give that cautionary instruction,

8    since we're breaking for the day, that please remember until

9    the trial is over, do not discuss this case with anyone,

10   including your fellow jurors, members of your family, people

11   involved in the trial or anyone else, and do not allow others

12   to discuss the case with you.  This includes discussing the

13   case in Internet chatrooms or through Internet blogs,

14   Internet bulletin boards, e-mails or text messaging.

15        If anyone tries to communicate with you about the

16   case, please let me know about it immediately.  Do not read,

17   watch or listen to any news reports or other accounts about

18   the trial or anyone associated with it, including any online

19   information.  Do not do any research such as consulting

20   dictionaries, searching the Internet or using other reference

21   materials.  Do not make any investigation about the case on

22   your own.

23        Finally, keep an open mind until all of the

24   evidence has been presented and you have heard the arguments

25   of Counsel, my instructions on the law, and views of your

```
 1    fellow jurors.

 2              I also neglected to excuse the agent.  You can step

 3    down.  You are excused.

 4              And we will start again, ladies and gentleman,

 5    promptly at 8:30.  So if you can get here about 8:15, and

 6    have a great night.

 7              THE CLERK:  All rise.

 8              (Open court - jury not present.)

 9              THE COURT:  All right.  I know everyone is tired.

10    I just wanted to get a sense, Ms. Waier, where are we in the

11    Government's case.

12              MS. WAIER:  Almost done.

13              THE COURT:  Okay.

14              MS. WAIER:  I think one more witness and I'm -- I'm

15    done.

16              THE COURT:  All right.  And who is that agent --

17    who is that witness going to be?

18              MS. WAIER:  It's going to be Revenue Agent Melanie

19    Yu.

20              THE COURT:  Very well.

21              And, then, the defense will go, and, Mr. Severo, do

22    you have any sense just so -- for timing?

23              MR. SEVERO:  Actually, I would say -- we should be

24    done with the evidence.  If we can't get it done by the end

25    of tomorrow, we should be done by the end -- by -- by noon
```

1    Friday.

2              THE COURT:  Noon Friday.  Okay.

3              MR. SEVERO:  I'm giving myself some space here for

4    this reason.  I have one witness who I just informed this

5    morning -- I -- I thought that the Government had at least

6    two more witnesses.  Apparently, that's been cut back a bit.

7    And I moved him to Friday.  And he's a doctor and he can't --

8    he's moving patients from one side to the other.  So I -- I

9    am hoping that I don't run out of witnesses tomorrow.

10             THE COURT:  Okay.

11             MR. SEVERO:  I do want -- I know the Government had

12   Ms. Witherspoon on-call -- on the list.  I -- we had expected

13   that she would be called, and I would ask that they produce

14   her for us tomorrow.

15             MS. WAIER:  Your Honor, I let her off subpoena a

16   while ago, on Wednesday.  So they can subpoena her.  I don't

17   have her.

18             THE COURT:  I mean, it would make a lot of sense,

19   though -- because I would hate to have to hold this trial up

20   while we go get her here.  So any efforts you can do, Ms.

21   Waier, to coordinate it, it would greatly be appreciated by

22   me and by the jury, I'm sure because I don't want to hold up

23   the trial.

24             MS. WAIER:  Your Honor, I was very clear on my

25   witness list that I was not promising on calling anybody and

UNITED STATES DISTRICT COURT

1     anything.  I'm just -- I'm being --

2              MR. SEVERO:  I'm not suggesting there was any foul

3     play here at all.  I'm not saying that.  I would never do

4     that.  I -- I would do it, but not -- not --

5              THE COURT:  I don't -- I don't see what -- why Ms.

6     Waier, you would be adverse to just, as a favor to the Court

7     and to the jury, to try to coordinate and get this person

8     here because I'm going to tell you, if you won't do that,

9     then I'm going to hold up the trial or declare a mistrial.

10    If you want that witness here, that witness will be here, and

11    I'll use my subpoena power.  And if you want me to send the

12    marshals to go bring her here, I can do that.  I'm trying to

13    do this the nice way.

14             MS. WAIER:  Your Honor, I'm saying that she's

15    retired and we will call her, and I -- or I can get just the

16    contact information, and I can get her here.  I don't know.

17    She's not under subpoena.  So I will do my very best.  My

18    very best.

19             THE COURT:  That's all I'm asking.

20             MS. WAIER:  Okay.

21             THE COURT:  That's all I'm asking.

22             And I would think that if she got a call from you,

23    she would receive it much more favorably as opposed to a call

24    from Mr. Severo, not taking disparaging --

25             MR. SEVERO:  I agree with you completely on that.

1    I mean, she doesn't know me -- yes.

2            MS. WAIER:  So -- so now just to get a sense of

3    their witnesses, are they calling Ms. Witherspoon and Revenue

4    Agent Ham?

5            MR. SEVERO:  Yes.  We're calling Revenue Agent Ham,

6    Ms. Witherspoon, and I have Mr. Drabkin, Mr. Meyer,

7    Mr. Spear, and Dr. Kanbam.

8            THE COURT:  And Kambam you're anticipating going

9    Friday morning?

10           MR. SEVERO:  I -- I would think that Dr. Kanbam --

11   I will -- if I'm allowed, I -- I would take him out of order

12   even if I'm not done with my other witnesses.

13           THE COURT:  Right.

14           MR. SEVERO:  Because he's kind of a special

15   scheduling issue, if the Court -- if there's not --

16           THE COURT:  I would allow that under 611.  I'm just

17   worried that -- I'd like to get the trial done by Friday.

18           MR. SEVERO:  Yes.

19           THE COURT:  So you're pretty confident you'll be

20   finished by noon Friday because the jury is going to want to

21   know?

22           MR. SEVERO:  These are long trial days by every

23   measure.  So I -- I -- we will try to -- yes, I'm reasonably

24   confident that we can get it done by then.

25           THE COURT:  Okay.  So, then, we should probably

 1   plan, then, tomorrow evening -- I know everybody will be

 2   tired, but just to go over one more time the jury

 3   instructions and the verdict.

 4              MR. SEVERO:  Very well.

 5              THE COURT:  That will be our last opportunity to do

 6   it.

 7              MR. SEVERO:  Yes.

 8              THE COURT:  Okay?

 9              MR. SEVERO:  That would be fine.

10              THE COURT:  All right.  Thank you.

11              MR. SEVERO:  Thank you, sir.

12              THE CLERK:  Court is adjourned.

13              (Proceedings concluded at 5:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

 4    THE ABOVE MATTER.

 5    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

 6    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

 7    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9    /s/ Miriam V. Baird              09/08/2015

10    MIRIAM V. BAIRD                          DATE
      OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT