**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,           )
                                    )
                 Plaintiff,         )        __CERTIFIED__
                                    )
        vs.                         )     Case No.
                                    )     8:10-cr-00070-CJC-1
HARSHAD SHAH,                       )
                                    )     Volume 1
                 Defendant.         )
_____)

REPORTER'S TRANSCRIPT OF

JURY TRIAL – DAY 2

WEDNESDAY, JULY 15, 2015

8:29 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO–SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST FOURTH STREET, ROOM 1-191
SANTA ANA, CALIFORNIA 92701-4516
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1              **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4              EILEEN M. DECKER
               United States Attorney
5              BY:  JENNIFER WAIER
                    Assistant United States Attorney
6              United States Courthouse
               411 West Fourth Street
7              Suite 8000
               Santa Ana, California 92701
8              (714) 338-3505

9     **FOR THE DEFENDANT:**

10             THE SEVERO LAW FIRM
               BY:  MICHAEL V. SEVERO, ESQ.
11             79 South Lake Avenue
               Suite 945
12             Pasadena, California 91101
               (626) 844-6400
13
               WILSON TAX LAW GROUP
14             BY:  JOSEPH P. WILSON, ESQ.
                    DANIEL W. LAYTON, ESQ.
15             10832 Lemon Drive
               Suite C609
16             Yorba Linda, California 92886
               (714) 463-4430

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                          **I N D E X**

2     **WITNESSES**                                        **PAGE**

3     **RENA HENRY, CALLED BY THE PLAINTIFF**
          Direct Examination by Ms. Waier                    4
4         Cross-Examination by Mr. Layton                   37
          Redirect-Examination by Ms. Waier                 58
5         Recross-Examination by Mr. Layton                 60

6     **MYTRYEE RAGHAVEN, CALLED BY THE PLAINTIFF**
          Direct Examination by Ms. Waier                   64
7         Cross-Examination by Mr. Severo                   72
          Redirect Examination by Ms. Waier                 92
8         Recross-Examination by Mr. Severo                 93

9     **GLENN GOMEZ, CALLED BY THE PLAINTIFF**
          Direct Examination by Ms. Waier                   94

10

11

12

13

14                           **EXHIBITS**

                                                      **WITHDRAWN**
15                                           **IN**       **OR**
      **EXHIBIT**                        **EVIDENCE**  **REJECTED**
16
      15 - Examining Officer's Activity      16
17         Report for Shah's Audit
                                            110
18     3 - 1/5/2010 Audio Recording

19     4 - 1/8/2010 Audio Recording         116

20

21

22

23

24

25

                    **UNITED STATES DISTRICT COURT**

```
 1              SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 15, 2015

 2                            8:29 A.M.

 3                             - - -

 4              THE COURT:  Good morning, ladies and gentlemen.

 5  Please be seated.

 6         Ms. Waier, is the Government ready to call their first

 7  witness?

 8              MS. WAIER:  Yes, Your Honor.

 9              THE COURT:  Please do so.

10              MS. WAIER:  The Government calls Revenue Agent Rena

11  Henry.

12              THE COURT:  Very well.

13         Good morning, ma'am, if you could please come forward.

14  We're going to have you take the oath and have you take the

15  stand.

16         RENA HENRY, PLAINTIFF'S WITNESS, WAS SWORN

17              THE COURTROOM DEPUTY:  Please state your full name

18  and spell your last name for the record.

19              THE WITNESS:  Rena Henry, H-e-n-r-y.

20              THE COURT:  Please proceed.

21                      DIRECT EXAMINATION

22  BY MS. WAIER:

23  Q    Good morning, Ms. Henry.  The first question I have is,

24  what do you do for a living?

25  A    I'm a revenue agent for the Internal Revenue Service.
```

Timestamps in left margin: 08:29AM (line 5), 08:29AM (line 10), 08:30AM (line 15), 08:30AM (line 20), 08:30AM (line 25).

UNITED STATES DISTRICT COURT

1    Q    How long have you been doing that?

2    A    29 years this month.

3    Q    That's a long time.  Can you tell the jury what a revenue

4    agent does.

08:30AM 5    A    We audit individuals, partnerships and corporations.

6    Q    And when you do an audit, is there a Revenue Agent

7    Report?

8    A    Yes, it is.

9    Q    What's a Revenue Agent Report?

08:31AM 10   A    That's the audit findings.  It could be a note change

11   where we accept the tax return as filed, if any changes are

12   made.  You know, that's all reflected in the Revenue Agent

13   Report.

14   Q    So in the Revenue Agent Report, that comes at the very

08:31AM 15   end of the audit?

16   A    Yes.

17   Q    And that's done by revenue agents like yourself?

18   A    Yes.

19   Q    And that's done after reviewing records?

08:31AM 20   A    Yes.

21   Q    Well, how does a normal or typical audit begin?

22   A    Well, you contact the taxpayer and you -- you contact the

23   taxpayer and you set up an appointment.  Sometimes if they get

24   a representative involved, usually we might just deal directly

08:31AM 25   with the representative.

**UNITED STATES DISTRICT COURT**

1          And from there, like I said, we set the appointment and

2     then you submit a document request requesting the documents

3     that you'd like to review.  And then during the course of the

4     audit, you might have to request more additional information,

08:32AM 5     and so you issue another document request.  And so you make

6     your audit determination from there.  You might have to verify

7     expenses, verify income, and then prepare the report and have a

8     closing conference going over the findings.

9     Q    How do the audits come to you as a revenue agent?

08:32AM 10    A    They're assigned to us.  The manager assigns us our cases.

11    Q    So you can't go and pick somebody to audit; is that

12    right?

13    A    That is correct.

14    Q    Do you know how those cases are selected for audit?

08:32AM 15    A    They're selected randomly typically, yeah.

16    Q    And you talked about how the audit begins, and it's

17    usually with some contact with the taxpayer, telling the

18    taxpayer that they are going to be audited; is that right?

19    A    Either the representative or the taxpayer directly.

08:33AM 20    Q    So the taxpayer doesn't have to be involved, they could

21    hire a representative?

22    A    Yes.

23    Q    And then that way the representative would have all the

24    contact with you?

08:33AM 25    A    Yes.

**UNITED STATES DISTRICT COURT**

Q     Does that happen?  Have you had audits where it's just a

representative?

A     Yes.  Because once a power of attorney is on file, then,

you know, we deal strictly with the representative.

08:33AM 5  Q     And at the -- when the audit's beginning, is it common to

ask the taxpayer for documents?

A     Yes.

Q     What are you asking for typically?

A     Well, if it's expenses, we're asking for them to provide

08:33AM 10 documentation to verify their expenses, our deductions.  And if

there's a question with the income, we do an income probe.

And, you know, we might do a bank deposit analysis to verify

the income.  That's just one method that, you know, we might

end up using.

08:34AM 15 Q     So one of the goals with sending the letter and starting

the audit is to get documents from the taxpayer to substantiate

things that are on their tax return?

A     Yes.

Q     Now, you're also -- you've been a coach; right?

08:34AM 20 A     Yes.  Yeah.  On-the-job training coach.

Q     All right.  Can you tell the jury what a coach is.

A     Well, the on-the-job training first starts off as

classroom training.  And then from there, after they complete

the classroom training, then they're assigned a coach by senior

08:34AM 25 agent, you know, like myself.  And then we just help them to

1    work their cases that they are assigned.

2    Q    So if you have a coach -- if a revenue agent has a coach,

3    does that mean they're incompetent?

4    A    No, because that's just the typical process during the

08:35AM 5    training phase of, you know, the job.  And I have to go through

6    the same thing.  I had classroom training.

7            MR. SEVERO:  Objection.  Nonresponsive after the

8    first sentence.

9            THE COURT:  Overruled.

08:35AM 10    Did you finish your answer, ma'am?

11    Q    BY MS. WAIER:  Did you have to go through the same thing?

12    Had you had coaches over the years?

13    A    Yes, I did.

14    Q    Can you tell the jury about that, about why you would

08:35AM 15    have a coach later on.

16    A    It's all part of the on-the-job training.

17            MR. LAYTON:  Objection.  Irrelevant.

18            THE COURT:  Overruled.

19    Q    BY MS. WAIER:  Can you tell them about the on-the-job

08:35AM 20    training and the coach program.

21    A    Well, when the trainee is assigned a case, then we help

22    them, you know, get their audit started.  You know, just

23    basically help them to train them through the process of doing

24    the audits.

08:35AM 25    Q    So during your 29-year career, have you had coaches?

**UNITED STATES DISTRICT COURT**

```
 1   A      Yes.

 2   Q      Even though you were a revenue agent for some time?

 3   A      Yes.

 4   Q      Okay.  And why would you have a coach?

 5   A      Because -- okay, I'll use this as an example.  Like if

 6   you -- we have different phases of training.  When I first

 7   started, we were doing just Schedule As.  Then I had to have

 8   training for corporations and, you know, for the corporate tax

 9   law.  Then I had to have flow-thru training, which is S corps

10   and partnerships, which the tax law can get really complicated

11   in that area.  So more of the seasoned senior agents who

12   already worked those type of cases, you know, we have to help

13   the trainees along during that process.

14   Q      So the flow-thru training comes later?

15   A      Yes.  Because that's more of the complicated part of the

16   tax law.

17   Q      So those -- the flow-thru training would be given to a

18   more senior or someone -- a revenue agent that already had the

19   training and experience to qualify for that?

20   A      Yes.

21   Q      And so you were the coach for Revenue Agent Ham for his

22   flow-thru training?

23   A      Yes.

24   Q      So Revenue Agent Ham had gone through other training that

25   made him qualify to go through the flow-thru training?
```

**UNITED STATES DISTRICT COURT**

```
 1   A      Yes.

 2   Q      Did you find him to be a competent revenue agent?

 3   A      Yes.

 4          MR. SEVERO:  Objection.  Improper opinion.  No

 5   foundation.

 6          THE COURT:  Overruled.  Why don't we just have one

 7   attorney object.

 8          MR. SEVERO:  All right.  Thanks.

 9   Q   BY MS. WAIER:  So how were you assigned to coach Revenue

10   Agent Ham?

11   A      Management, you know, asked me to be a coach for the

12   flow-thru training.

13   Q      And you had more than one training?

14   A      Yes, I did.

15   Q      And can you just explain what the flow-thru training is

16   in very big picture terms to the jury.

17   A      Auditing S corporations and partnerships.

18   Q      Okay.  And when you have trainees, are they assigned

19   trainee cases?

20   A      Yes.

21   Q      Can you tell the jury what a trainee case is.

22   A      Well, it's just a regular -- it's a tax return, but that's

23   what the trainee is using to, you know, learn how to audit

24   those type of tax returns.

25   Q      So your trainees are given specific audits that deal with
```

```
 1    the subject matter that they're learning; is that right?

 2    A    Flow-thru entities, yes.

 3    Q    So they're assigned some audits that are flow-thrus; is

 4    that right?

 5    A    Correct.

 6    Q    And then they attend the training or they --

 7    A    No.

 8    Q    They attend the training and then they do these flow-thru

 9    audits?

10    A    Correct.  The classroom training and the on-the-job

11    training is the actual auditing of the flow-thru tax returns.

12    Q    And they're given more than one trainee case?

13    A    Yes.

14    Q    So after they finish the classroom, then you're the

15    coach, what's your role?

16    A    My role is to make sure they're following all the

17    procedures and, you know, making sure they're taking time, the

18    actions on their case, so that the case can move along in a,

19    you know, smooth manner -- timely manner, I should say.

20    Q    So you have interaction with the trainee during this

21    time?

22    A    Yes.

23    Q    And you're able to assess whether they're handling the

24    job appropriately and properly; is that right?

25    A    Yes.
```

08:38AM  5
08:38AM 10
08:38AM 15
08:39AM 20
08:39AM 25

| | |
|---|---|
| 1 | Q    And so you were the training coach for Revenue Agent Ham |
| 2 | during the time that the audit of Dr. Shah was assigned to him? |
| 3 | A    Yes. |
| 4 | Q    Was Dr. Shah's audit a training case? |
| 08:39AM 5 | A    Yes. |
| 6 | Q    Because it was an S corporation? |
| 7 | A    Yes. |
| 8 | Q    Okay.  And it originally was for one year; is that right? |
| 9 | A    Yes. |
| 08:39AM 10 | Q    2007? |
| 11 | A    Yes. |
| 12 | Q    And as you're having contacts -- you're having contacts |
| 13 | from the very beginning of that audit with special agent Ham; |
| 14 | is that right? |
| 08:40AM 15 | A    Yes. |
| 16 | Q    And during that time, did you believe that Revenue |
| 17 | Agent Ham was -- |
| 18 |         MR. LAYTON:  Objection.  Leading. |
| 19 |         THE COURT:  Again, who's objecting? |
| 08:40AM 20 |         MR. LAYTON:  I'm the guy.  I'm going to be doing the |
| 21 | cross. |
| 22 |         MR. SEVERO:  Sorry, about that, Your Honor.  We have |
| 23 | mixed signals. |
| 24 |         THE COURT:  The objection was? |
| 08:40AM 25 |         MR. LAYTON:  Leading.  Leading, Your Honor. |

                 1          THE COURT:  Overruled.  I don't think she got the

                 2    question out.

                 3    Q     BY MS. WAIER:  During that time was Revenue Agent Ham a

                 4    competent revenue agent?

08:40AM          5    A     Yes.

                 6    Q     He was doing his job appropriately and properly?

                 7    A     Yes.

                 8    Q     In this case you talked to Dr. Shah; is that right?

                 9    A     Yes.

08:41AM         10    Q     How did that come about?

                11    A     I went out on the initial interview.

                12    Q     Well, before we get to the initial interview in May,

                13    let's talk about March.  In March of 2009, was the audit open

                14    into Dr. Shah's S corporation --

08:41AM         15    A     Yes.

                16    Q     -- for the year 2007?

                17    A     Yes.

                18    Q     And are you aware that a letter went out to Dr. Shah

                19    around March 17, 2009?

08:41AM         20    A     Yes.

                21    Q     And is that -- was that typical in the audit process?

                22    A     Yes.

                23    Q     And shortly thereafter, you had contact with the

                24    defendant, Dr. Shah; is that right?

08:41AM         25    A     Yes.

```
 1   Q    And at this time, I'd like to direct your attention to --

 2   there should be a book in front of you to Exhibit 15.

 3   A    Right here?

 4   Q    It's the smaller book.  I'd like to direct your attention

08:42AM  5   to Pages 11, 12, 13, and 14.

 6   A    Okay.

 7   Q    Do you recognize those pages?

 8   A    Yes.

 9   Q    And if you look through the very first page of the -- of

08:42AM 10   Exhibit 15, if you go to the very first page -- are you there?

11   A    Yes.

12   Q    Do you recognize that?

13   A    Yes.

14   Q    What is it?

08:42AM 15   A    I talked to the group manage --

16   Q    Before we get there on Exhibit 15, Page 1 -- go to

17   Page 1, do you recognize that document, the entire document?

18   It's called "Examining Officer's Activity Report."

19   A    Oh, yes.  You know what, I thought you were talking about

08:43AM 20   this, where the Post-it note is over it.

21   Q    No, Page 1 of the entire exhibit.

22   A    Okay.

23   Q    Do you recognize that?

24   A    Yes.

08:43AM 25   Q    Okay.  Can you tell the jury what an Examining Officer's
```

**UNITED STATES DISTRICT COURT**

1    Activity Report is.

2    A    We have to make our comments when we have any contact with

3    the taxpayer representative.  We have to, you know, make our

4    remarks.  And then any work that we do on our case files, we

08:43AM 5    have to document what we did.  So it's basically just

6    documenting the work you did on the audit, any contacts that

7    you've had with either the representative or the taxpayer.

8    Q    When you say "we," are you referring to revenue agent?

9    A    Yes.

08:43AM 10    Q    So I'd ask for Exhibit 15 to be admitted into evidence.

11              THE COURT:  Any objection?

12              MR. LAYTON:  We have a hearsay objection on this,

13    Your Honor.

14              THE COURT:  You want to lay a little more foundation

08:44AM 15    for business records?

16              MS. WAIER:  Yes.

17    Q    So is the Examining Officer's Activity Report part of the

18    IRS audit file?

19    A    Yes.

08:44AM 20    Q    Is it kept in the regular course of business by the

21    Internal Revenue Service?

22    A    Yes.  We have to document everything in here.

23    Q    And those notes are taken for the business purposes and

24    the runnings of the Internal Revenue Service?

08:44AM 25    A    Yes.

**UNITED STATES DISTRICT COURT**

```
 1              MS. WAIER:  Your Honor, I'd ask that Exhibit 15 be
 2    admitted.
 3              THE COURT:  Exhibit 15 will be received into
 4    evidence.  You may publish it to the jury.
 5              (Exhibit No. 15 received.)
 6    Q    BY MS. WAIER:  At this time let's focus --
 7              MR. LAYTON:  Your Honor -- actually I'll follow up
 8    on recross.
 9              THE COURT:  All right.
10    Q    BY MS. WAIER:  Let's focus on Page 12 of the exhibit.
11    A    Okay.  Now, this is 12 of 39 you're looking at?
12    Q    Yes, 12 of 39.
13    A    All right.
14    Q    I know there's some other Bates numbers, but let's look
15    at Page 12 of 39.  Do you recognize that document?
16    A    Yes.
17    Q    Is that your document?
18    A    Yes.
19    Q    And are those notes of a conversation with Dr. Shah?
20    A    Yes.
21    Q    Okay.  So just to put it back to where we are, a letter
22    goes out on March 17, according to this document.  And I want
23    to show you on Exhibit 1, can you pull up Page 1, please, of
24    Exhibit 15.  Can you focus on the first entry.
25         Ms. Henry, do you see that entry for March 17, 2009?
```

08:44AM (line 5)
08:44AM (line 10)
08:45AM (line 15)
08:45AM (line 20)
08:46AM (line 25)

A      Yes.

Q      Okay.  Can you tell the jury just what's going on.

A      Well, we have a program that we have to establish our cases on, and you enter their return information.  It's a computer program that we have, and so he's establishing the case in our RGS system and then entering the tax return information.  He pulled -- checked the transcripts that he pulled to make sure the information is matching.

We get a classification check sheet for the issues to be audited, so he -- I guess he input that.  And he researched the corporation on Accurate, which is a research tool that we have if we want to find information on a taxpayer corporation, and he didn't find any telephone number that could be filed for the corporation.

Because sometimes, you know, we'll call the taxpayer directly sometimes, and, you know, talk to them.  That will be the initial contact versus a letter.  And so then he prepared the contact letter.  And we have to issue a Publication 1, which is the taxpayer's right, and the Notice 609, which is the Privacy Act.

And the IDR is an Information Document Request.  And it looks like he prescheduled an appointment here on May 4th.

Q      May 4th, 2009, is that a long time to allow the taxpayer to gather documents?

A      You know what, they like for us to open up the case -- oh,

excuse me, let me back up.  They prefer for us to start our

first appointment, like 45 days after we are assigned the case,

when we first put time on it.  And first putting time means,

you know, when we're doing our preaudit analysis.

08:48AM 5  Q    And in this case it was scheduled so far out because

Revenue Agent Ham had to --

MR. LAYTON:  Objection.  Leading.

THE COURT:  Sustained.

Q    BY MS. WAIER:  Did Revenue Agent Ham have to go through

08:48AM 10  flow-thru classroom training on this case?

A    Yes.

Q    Okay.  And that occurred after he opened the --

MR. LAYTON:  Objection.  Leading.

THE COURT:  Sustained.

08:48AM 15  Q    BY MS. WAIER:  Okay.  Let's look at the document, the

entire document.  Go back to Exhibit 1.  Do you see an entry on

the bottom that says "March 30th, 2009, through 5/1/2009"?

A    Yes.

Q    Okay.  Can you tell the jury what that entry is about.

08:49AM 20  A    Oh, that's just when -- the classroom training is first,

and then the on-the-job training is after they've completed --

the trainees have completed the classroom training.

Q    And you were part of that on-the-job training?

A    Yes.

08:49AM 25  Q    Okay.  So we just went through the -- a letter went out

```
 1   on March 17, 2009, and then you -- then the taxpayer ended up

 2   calling or having contact with the Internal Revenue Service.

 3   Are you aware of that?

 4   A    Yes.

 5   Q    Can you tell the jury about that?

 6   A    Well, he contacted Mike first -- well, Mike and the

 7   taxpayer had the initial contact, and I guess there was --

 8              MR. LAYTON:  Objection, Your Honor.  Hearsay.

 9              THE COURT:  Overruled.

10              THE WITNESS:  And they had -- you know, they had a

11   conversation, and I had to intervene because there was some

12   conflict between the two of them.  And so my job was to try to,

13   you know, to get -- you know, find out, you know, what Mike

14   told me happened.  And then I had to eventually talk to the

15   taxpayer to find out, you know, what happened -- well, hear his

16   side of the story.

17   Q    BY MS. WAIER:  Okay.

18   A    Yeah.

19   Q    Did you talk to Revenue Agent Ham about it?

20   A    Yes, I did.

21   Q    And did you determine whether or not his actions were

22   appropriate?

23   A    Yes.  That was my job.

24   Q    Okay.  And were his actions appropriate with this

25   taxpayer?
```

**UNITED STATES DISTRICT COURT**

1          MR. LAYTON:  Objection.  Opinion.

2          THE COURT:  Overruled.  No need to stand.  Just go

3    ahead and make your objection being seated.  Be more

4    comfortable.

08:50AM 5          THE WITNESS:  Yes.

6    Q    BY MS. WAIER:  So did you talk to Defendant Shah in March

7    of 2009?

8    A    Yes.

9    Q    And can you tell the jury how that conversation went.

08:51AM 10   A    I need to refer to this.

11   Q    Okay.

12   A    Yeah.

13   Q    Page 12 of Exhibit 15.

14   A    Let's see.  Actually --

08:51AM 15          MR. LAYTON:  Objection, Your Honor.  Improper

16   exhibit to refresh recollection without foundation.

17          THE COURT:  Overruled.

18   Q    BY MS. WAIER:  Go ahead and refer -- if you need to

19   refresh your recollection, just refer to the document you need

08:51AM 20   to and let me know when you're ready.

21   A    Okay.  When I talked to --

22   Q    Hold on.  Let me reask.  Is your recollection refreshed

23   from looking at the document?

24   A    Yes.  I'm just nervous.

08:51AM 25   Q    Understandable.  You never testified before, have you?

**UNITED STATES DISTRICT COURT**

A     No.

Q     Okay.  So can you tell the jury about that conversation.

A     When I talked to the taxpayer, he mentioned to me that he never told Mike that he never had any books or records.  You know, he needed time, you know to get the records involved -- I mean, to get the records, you know, for us to do the audit.

And, you know, so I was basically just trying to find out -- well, he said he needed more time.  And he mentioned, you know, that the agent hung up on him and that Mike was misquoting him and --

MR. LAYTON:  Objection.  Is she reading?  I don't know.

THE COURT:  She's indicating what the defendant said to her.

MR. LAYTON:  It just looked to me like she was reading.

THE COURT:  Overruled.

Q     BY MS. WAIER:  I'm sorry.  So he -- so basically, I just want to back up to give the jury context.  There was -- the letter went out on March 17 and there was a conversation that occurred between Revenue Agent Ham and the taxpayer; is that right?

A     Yes.

Q     And if you look at Exhibit 1, Page 1, entering March 20th, 2009, I'd like to draw your attention to that, the

```
 1   second entry.
 2   A    Okay.  I don't have my reading glasses, so can you --
 3   Q    Ms. Henry, you can just look in the book, too, if you
 4   want.
 5   A    Okay.  I still didn't bring my reading glasses.
 6   Q    So on Page 1, we just talked about how you talked to
 7   Revenue Agent Ham about his side of the story.  Does March 20,
 8   2009, capsulate his side of the story?
 9   A    I'm sorry.  Repeat that again.
10   Q    Does March 20th, 2009, talk about Revenue Agent Ham's
11   side of the conversation?
12        MR. LAYTON:  Objection.  Hearsay.
13        THE COURT:  Why don't you rephrase your question.
14   Q    BY MS. WAIER:  Can you tell the jury what the March 20,
15   2009 entry is about.
16   A    The entry is about the conversation that, you know, Mike
17   and the taxpayer had.  And I guess they were just having a
18   conflict, you know, between each other.
19   Q    And basically the taxpayer -- basically did Dr. Shah want
20   additional time to produce the documents?
21   A    Yes.
22   Q    And did Dr. Shah tell Revenue Agent Ham that he had no
23   books -- the corporation does not keep books and records?
24   A    That's the information that Mike gave to me, yeah.
25        MR. LAYTON:  Objection.  Hearsay.
```

08:53AM (line 5)
08:54AM (line 10)
08:54AM (line 15)
08:54AM (line 20)
08:55AM (line 25)

**UNITED STATES DISTRICT COURT**

1        THE COURT:  Overruled on that ground.

2        Maybe not lead so much.

3        MS. WAIER:  All right.

4   Q    That's also reflected in the document on March 20, 2009?

08:55AM 5   A    Yes.

6   Q    Okay.  And when the taxpayer is calling -- when you had

7   the conversation with the taxpayer, was he asking for

8   additional time?

9   A    Yes.  I -- you know, I have to -- I got to -- let me just

08:55AM 10  reflect back to this.

11  Q    Okay.  Because this was in 2009, so it's understandable.

12  Go ahead and take your time.

13  A    Now we're talking about March 20; right?

14  Q    Right.  Three days after the letter went out.

08:56AM 15  A    Now you're asking if he asked me for more time?

16  Q    Uh-huh.

17  A    Yes.  Yes.  Yeah, based on what I wrote in here, yes.

18  Q    And did the taxpayer, Dr. Shah, ask you to have the audit

19  occur at your offices?

08:56AM 20  A    Yes, he did.

21  Q    Is that proper?

22  A    Well, typically they want us to look at the books and

23  records at the place of business, because it's just more

24  convenient, because that's where the records are located.  Yes.

08:56AM 25  Q    So did you explain that to Dr. Shah, that --

| | |
|---|---|
| 1 | A     Yes.  Yeah, in my case history here, I did, yes. |
| 2 | Q     -- that the audit would have to take place where the |
| 3 | books and records are kept? |
| 4 | A     Yes. |
| 08:56AM 5 | Q     And that would be at his offices? |
| 6 | A     At his business office. |
| 7 | Q     Okay.  And did you also -- did he also complain about |
| 8 | Revenue Agent Ham? |
| 9 | A     Yes. |
| 08:57AM 10 | Q     What did he say? |
| 11 | A     Well, one thing he said that he -- I'm sorry.  I just -- |
| 12 | let's see. |
| 13 |         MR. LAYTON:  Objection, Your Honor.  She's reading. |
| 14 |         THE COURT:  She's refreshing her recollection to |
| 08:57AM 15 | answer the question.  Overruled. |
| 16 |     Once you've read it -- |
| 17 |         MR. LAYTON:  Could we know what exhibit she's |
| 18 | looking at? |
| 19 |         THE COURT:  She's looking at the activities report, |
| 08:57AM 20 | Exhibit 15. |
| 21 |         THE WITNESS:  I'm sorry.  Ask the question again. |
| 22 | Q     BY MS. WAIER:  Did Dr. Shah have some complaints about |
| 23 | Revenue Agent Ham? |
| 24 | A     Yes.  One thing that I wrote in here is he says Mike was |
| 08:57AM 25 | giving him -- |

1          MR. LAYTON:  Objection, Your Honor.

2          THE WITNESS:  --a lecture on how to run his

3    business.  Okay, well --

4          THE COURT:  Wait a minute.

08:58AM 5    Ladies and gentlemen, why don't you give us just a moment.

6    I need to talk to the lawyers and the witness, and we'll get

7    this a little bit more smoother and efficient.

8          THE COURTROOM DEPUTY:  All rise.

9          **(Out of the presence of the jury.)**

08:58AM 10         THE COURT:  All right.  This isn't going to work.

11         MR. LAYTON:  Your Honor --

12         THE COURT:  No.  No, don't raise your hand.  Let me

13   indicate, this is clearly a business record, all right.  The

14   witness is not a professional witness.  I think it's unfair to

08:58AM 15   the witness leading questions and then objecting on relevancy

16   or improper opinion.  What we need is good questions.

17         And then, ma'am, if you can't remember and you want to

18   refresh your recollection by referring to Exhibit 15, please do

19   so.  But once you've refreshed your recollection, if you can

08:59AM 20   put it aside and then answer the question.  And take as much

21   time as you need.

22         THE WITNESS:  Okay.  Yeah, because we're talking --

23         THE COURT:  It's not a test.  But what I prefer not

24   happen is you just read the exhibit to the jury.  You need to

08:59AM 25   respond with a question.  But in fairness to you, if you need

```
  1   to look at the document, refresh your recollection about what
  2   was said to you, what you said, by all means do that.  Do you
  3   understand?
  4              THE WITNESS:  Yes.
  5              THE COURT:  Okay.
  6              THE WITNESS:  I'll try my best.
  7              THE COURT:  All right.  And again, you don't need to
  8   stand when you make an objection.
  9              MR. LAYTON:  It's a habit, Your Honor.  I'm sorry.
 10   And thank you very much.
 11              THE COURT:  Okay.  So do we have a clear
 12   understanding how we're going to do this?
 13              MS. WAIER:  Yes.
 14              THE COURT:  So no leading questions.  Just ask
 15   question, for example, "Did you mention this topic to
 16   Dr. Shah?"
 17        "Yes."
 18        "What did he say?"
 19        And then if you need to refresh your recollection as to
 20   what he said to you, by all means, do that.  But just don't
 21   read from the document, okay?
 22              THE WITNESS:  Okay.  Okay.  So look at it, put it
 23   aside, and then --
 24              THE COURT:  Put it aside and then answer it.  And
 25   take as much time as you need.  Okay?
```

```
 1              THE WITNESS:  Okay.

 2              THE COURT:  Does that work?  All right.

 3              MS. WAIER:  I mean, just for the record, to be fair,

 4    this was six years ago, so I think just as long as the witness

 5    is allowed to take as much time as she needs to refresh her

 6    recollection.

 7              THE COURT:  I said that.

 8              MS. WAIER:  No.  No.  I'm just letting her know.

 9    It's not a quick -- not quick.

10              THE WITNESS:  Can I just mention something?  It's

11    kind of hard for me to remember everything word for word.  I

12    mean, I just basically overall was -- you know, I thought I was

13    going to be asked more questions like that, just basically

14    overall in general what went on between the two of them.  But

15    trying to remember everything word for word, yeah, it's kind of

16    hard for me to do.

17              THE COURT:  All you can do is your best.

18              THE WITNESS:  Okay.  And recollection.

19              (In the presence of the jury.)

20              THE COURT:  Ms. Waier, please continue.

21    Q    BY MS. WAIER:  Before the break, you were asked about a

22    telephone call that you had with Dr. Shah on March 20th, 2009.

23    A    Yes.

24    Q    Can you generally tell the jury what happened during that

25    conversation.
```

```
 1   A    That we would allow him enough time, and that I would have

 2   to go to his place of business so that, you know, we could at

 3   least get the audit started at that point.  Yeah, you know, to

 4   get the records started.  We were -- I guess we ultimately

 5   decided to do the initial interview at his place of business.

 6   Q    And do you recall during that conversation whether or not

 7   Dr. Shah had any complaints about Revenue Agent Ham?

 8   A    He did have complaints.

 9   Q    Okay.  And did you find the complaints were justified?

10   A    No.

11        MR. LAYTON:  Objection.  Never mind, Your Honor.

12   Q    BY MS. WAIER:  I'm sorry, did we get the answer?

13        THE COURT:  "No."

14   Q    BY MS. WAIER:  So did you find the complaints were

15   justified?

16   A    No.

17   Q    Did you have another conversation with Dr. Shah five days

18   later?

19   A    Yes.

20   Q    Can you tell the jury about that phone call in general?

21   A    Can I refer to the exhibit real --

22   Q    Do you need to refresh your recollection?

23   A    Yeah.

24   Q    And for the record, are you reviewing Exhibit 15?

25   A    Yes, I am.
```

**UNITED STATES DISTRICT COURT**

```
     1   Q      Page 14?

     2   A      Yes.

     3   Q      Has your recollection been refreshed?

     4   A      Yes.

09:05AM  5   Q      Can you please tell the jury what occurred during the

     6   March 25th, 2009 phone call you had with Dr. Shah.

     7   A      Well, he mentioned that he called the inspector treasury,

     8   I guess, because he had a complaint about Mike.  And I also,

     9   you know, was trying to explain to him the conversation that

09:06AM 10   Mike and I had had.  And, you know, I basically told him there

    11   was like a miscommunication, it sounds like.

    12          But before I could finish trying to explain all of my

    13   conversation to him, you know, he hung up on me.  And then I

    14   also mentioned, you know, that I -- you know, I could go out on

09:06AM 15   the first appointment, you know, to make sure everything goes

    16   okay.

    17   Q      Can you tell the jury what the inspector in general is,

    18   this phone call?

    19   A      Any complaints, like misconduct with an employee, they're

09:06AM 20   usually contacted by a taxpayer or representative, if they

    21   think that there was some type of misconduct involved.

    22   Q      Is that TIGTA?

    23   A      TIGTA, yes.

    24   Q      So Dr. Shah had told you that he had contacted TIGTA

09:06AM 25   during that call?
```

| | |
|---|---|
| 1 | A     Yes.  Yes. |
| 2 | Q     Were you able to verify whether Dr. Shah did call TIGTA? |
| 3 | A     No. |
| 4 | Q     He did or he did not contact TIGTA?  Do you know if he |
| 09:07AM 5 | contacted TIGTA? |
| 6 | A     I do not know. |
| 7 | Q     So you dealt with a lot of taxpayers over your 29 years? |
| 8 | A     Yes. |
| 9 | Q     How many audits have you conducted? |
| 09:07AM 10 | A     I cannot tell you. |
| 11 | Q     Because there's just so many? |
| 12 | A     Yeah.  Over 29 years, yes. |
| 13 | Q     And in terms of this taxpayer, how would you classify his |
| 14 | conduct? |
| 09:07AM 15 | MR. LAYTON:  Objection.  Calls for improper |
| 16 | character witness. |
| 17 | THE COURT:  Sustained. |
| 18 | Q     BY MS. WAIER:  In terms of other taxpayers you dealt |
| 19 | with, is this pretty typical?  Do you see these kinds of things |
| 09:07AM 20 | so early on in an audit? |
| 21 | MR. LAYTON:  Same objection, Your Honor. |
| 22 | THE COURT:  A little overbroad.  Can we have a |
| 23 | little more specificity, Ms. Waier. |
| 24 | MS. WAIER:  Sure. |
| 09:07AM 25 | Q     In terms of this taxpayer's conduct and reactions, is it |

```
 1    pretty typical what you see in normal audits that you've

 2    conducted?

 3    A    No.

 4    Q    How is it not typical?

 5    A    Well, it's not typical in the sense that -- I guess the

 6    way the whole first initial contact, you know, transpired.

 7    And, I mean, in that particular sense, you know, like I think

 8    calling the call center, I think it was something about him

 9    calling and putting a complaint there, and then with the

10    inspector general.  So typically that does not happen.

11    Q    And were you able to determine from talking with Revenue

12    Agent Ham and talking with the defendant in this case, was

13    Revenue Agent Ham acting appropriately?

14    A    He was acting appropriately.

15    Q    Did you go out on the first initial contact with Revenue

16    Agent Ham in March of 2009?

17    A    Yes.

18    Q    And so you met Dr. Shah for the first time, then?

19    A    Yes.

20    Q    And do you -- and let me back up.  During this time in

21    March that you were the coach for Revenue Agent Ham, did you

22    find that in being his coach that he was acting appropriately

23    in the other cases he was auditing as well?

24              MR. LAYTON:  Objection.  Irrelevant.

25              THE COURT:  Sustained.
```

09:08AM (line 5)
09:08AM (line 10)
09:09AM (line 15)
09:09AM (line 20)
09:09AM (line 25)

```
 1   Q    BY MS. WAIER:  Did you find that Revenue Agent Ham's

 2   demeanor, when you were working with him, to be appropriate?

 3   A    It was appropriate.

 4   Q    When you met Dr. Shah, how was his demeanor in March of

 5   2009?

 6   A    Everything went well during that meeting.

 7   Q    So was it very different than your initial phone calls

 8   with him?

 9   A    Yes.

10   Q    Did he apologize during that meeting?

11   A    Yes.

12   Q    And what was he apologizing for?

13   A    I guess the conflict that they -- the both of them had at

14   the very --

15              MR. LAYTON:  Objection.  Speculation.

16              THE COURT:  Overruled.

17         What were you saying, ma'am?

18              THE WITNESS:  The way the audit started out, you

19   know.  And I just want to call it a conflict, you know, the

20   conflict between the two of them and, you know, apologizing for

21   that, how things started off.

22   Q    BY MS. WAIER:  And then from then on was it cordial

23   between Revenue Agent Ham and the taxpayer?

24   A    During that meeting it was.  I didn't have any, you know,

25   other contact after that, because on-the-job training, my job
```

was, you know, at the very beginning.  So during the course of

the audit, yeah, I didn't know anything.

Q     But that May 15, 2009 meeting went smoothly?

A     Yes.

09:11AM  Q     So much, in fact, you left?

A     Yes.

Q     Now, we talked at the beginning that the initial audit

started with just one year, 2007.  Did there come a time that

it was expanded to multiple tax years?

09:11AM  A     Yes.

Q     Okay.  I'd like to direct your attention to Page 2 of

Exhibit 15.

A     Okay.  Wait a minute.  I'm sorry.  Which page again?

Q     Page 2 of Exhibit 15.  It should be on the bottom.  2 of

09:12AM  39.

A     Okay.  So I have to go back -- oh, wait a minute.  2.  I'm

sorry.  Where are we at?

Q     I would like you to look at the May 22nd, 2009 entry.

A     You want me to just --

09:12AM  Q     Let me know once you've had a chance to review it.

A     Okay.  Because this is his entry, not mine.

Q     Uh-huh.

A     Okay.  I've read it.

Q     Do you remember having a conversation with Revenue

09:13AM  Agent Ham regarding expanding the tax years?

```
 1   A     Yes.

 2   Q     Can you tell the jury about that.

 3   A     Since there was a problem with the income and expenses for

 4   the one initial year, then we typically have to expand the

 5   audit to the prior and subsequent year when we find a problem

 6   in the one year or adjustments.  Like if we have adjustments in

 7   one year, then typically we expand to the prior and subsequent

 8   year.

 9   Q     Were you aware that Revenue Agent Ham ran a BizStats on

10   this?

11               MR. LAYTON:  Objection.  Leading.

12               THE COURT:  Overruled.

13               THE WITNESS:  Yes.

14   Q     BY MS. WAIER:  Can you tell the jury what a BizStats is.

15   A     It gives you business statistics, typically what -- you

16   know, like profit percentages, gross profit percentages, just

17   to see if -- it's a tool we use just to see if income or

18   expenses are kind of in line with those percentages.  So, you

19   know, we use that as an audit tool.

20   Q     Okay.  And was Dr. Shah's 2007 return in line with the

21   BizStats?

22   A     Mike would have to answer that question.

23   Q     Okay.  Well, let's look at Exhibit -- let's look at

24   Exhibit -- Page 2, May 22nd, 2009, that entry.

25   A     Uh-huh.
```

09:13AM (line 5)
09:13AM (line 10)
09:13AM (line 15)
09:14AM (line 20)
09:14AM (line 25)

1    Q    It says, "Revenue agent ran a BizStats P&L, the result in

2    179,000 variance between the BizStats and the file return."

3    What does that mean, "variance"?

4    A    That was -- wait a minute.  Can I just look at this for a

09:15AM 5    minute, please?

6    Q    Yes, please.

7    A    It appears as though he looked at the income and did a

8    BizStats analysis or comparison on the BizStats, yeah.

9    Q    So what does that variance mean?

09:15AM 10   A    That the income was off by that amount or underreported.

11   Maybe that's a better term for me to use by that amount.

12   Q    So it was underreported, according to this record, by

13   $177,000?

14   A    Yes.

09:15AM 15   Q    And did Revenue Agent Ham get your concurrence to open up

16   and expand the tax years from 2007 to 2006, 2007 to 2008?

17   A    Yes.

18   Q    And you agreed with that strategy?  Did you agree with

19   that strategy?

09:15AM 20   A    Yes.

21   Q    Why did you agree with that strategy?

22   A    Because there was a problem in the initial year, an

23   indication that the income was understated.  And so we would

24   have to expand the audit to the prior and subsequent year to

09:16AM 25   make sure the same issue -- you know, make a determination if

```
  1    it existed or not in the prior and subsequent years.

  2    Q    Okay.  And I'd also like to direct your attention again

  3    to the May 22nd, 2009 entry.  It notes in addition to income

  4    there's also a reference to expenses.  Do you see that?

09:16AM 5   A    Yes.

  6    Q    Okay.  Is that another indicator looking at expenses?

  7    A    Yes.

  8    Q    And in this case was there an indicator that played into

  9    your opinion to expand the tax years?

09:16AM 10  A    Based on his BizStats analysis, yes.

 11    Q    Okay.  In terms of expenses, can you tell the jury what

 12    that was all about.

 13    A    That the expenses appeared to be overstated on the tax

 14    return.

09:17AM 15  Q    There's usually, like, three -- I think you said there's

 16    three indicators usually.  Is it you look for income, expenses,

 17    underreporting?  What do you usually look for?  Are you looking

 18    for -- in terms of audits?

 19    A    Well, we're just verifying that the return is

09:17AM 20  substantially correct as far as the income and the expenses.

 21    Q    So Revenue Agent Ham did not make the decision on his own

 22    to expand the tax years?

 23    A    He did not.

 24    Q    And during the meeting that you attended on May 15, 2009,

09:17AM 25  with the taxpayer and Revenue Agent Ham, was Revenue Agent Ham
```

1  acting in accordance with how a revenue agent should act?

2  A     Yes.

3  Q     And during the time that you were his coach, was he --

4  was Revenue Agent Ham acting as a competent revenue agent?

09:18AM 5  A     Yes.

6  Q     During that time did you have any concerns at all whether

7  or not he was a competent revenue agent?

8  A     No concerns.

9          MS. WAIER:  Your Honor, I'm done.  Thank you.

09:18AM 10          THE COURT:  Cross-examination.

11                      **CROSS-EXAMINATION**

12  BY MR. LAYTON:

13  Q     Hi, Ms. Henry.

14  A     Hi.

09:20AM 15  Q     As you can see, this is Exhibit 15 again.  Is this the

16  same document you were just looking at in the direct

17  examination?

18  A     Establish -- oh, wait a minute.  Could you go down again.

19  Oh, no, these aren't my notes.  This isn't my activity on here.

09:20AM 20  This isn't the one.  This is not mine.

21  Q     This is Exhibit 15; correct?

22  A     Yes, but my activity record was just those three that were

23  being referred to.  I saw Melanie's name up at the top.  So

24  I -- but anyway, this is not my -- these are not my comments.

09:21AM 25  Q     Okay.

**UNITED STATES DISTRICT COURT**

```
 1   A     Or my actions taken, I should say.

 2   Q     When you -- whose actions are these?  This is Exhibit 15;

 3   right?  This is what you were looking at?

 4              MS. WAIER:  Objection.  Lacks foundation.

 5              THE COURT:  Overruled.

 6   Q     BY MR. LAYTON:  Whose actions are these?

 7   A     This is the agent's, but these aren't my actions.

 8   Q     So what were you looking at?  Were you looking at

 9   specific dates when you were talking about your actions?  Is it

10   this document you were looking at, Exhibit 15?

11   A     Yeah, but what I'm saying, this particular activity sheet

12   is not mine.  Mine was only like three -- it was like a

13   separate -- because I was the coach.

14   Q     Okay.  Thank you.  But you were looking at this when you

15   were testifying; right?

16              MS. WAIER:  Your Honor, can she finish her answer?

17              THE COURT:  I think she finished it.

18         What was your question?

19   Q     BY MR. LAYTON:  You were looking at Exhibit 15 when you

20   were testifying; correct?

21   A     Yes.

22   Q     But these aren't your notes?

23   A     Those are the notes that the agent -- these are all of the

24   agent's actions.  The notes that the agent was making regarding

25   the, you know, interaction that him and I had together, that's
```

1     on this case history sheet.  I had a separate one that I did

2     separate from the agent.

3     Q    Did you look at your separate notes when you were

4     testifying just now?

09:22AM 5   A    Yes, I was looking at my own separate ones.  It was like

6     three pages, and it says "OJT Coach" on it.

7     Q    Okay.  Which exhibit was that?

8              MS. WAIER:  Exhibit 15.

9              MR. LAYTON:  15?  It's all one exhibit?

09:23AM 10            THE WITNESS:  12 of 39 is where mine starts.  I had

11    an entry for March 20th and one for March 25th.

12    Q    BY MR. LAYTON:  This is what you were looking at; is that

13    correct?

14    A    Yes.  And there was like -- March 20th continued on the

09:23AM 15  second page, and then the very last page was for March 25th.

16    Q    Okay.  And is that all of your notes?

17    A    Yes, it is.

18    Q    That's two entries; correct?

19    A    Well, actually this is a continuation from the first page.

09:23AM 20  Q    Right.

21    A    Page 12.

22    Q    There were three pages?

23    A    Yes.  March 20th started on that page there, and then it

24    continued on 13 of 39.  And then March 25th I made an entry on

09:24AM 25  Page 14 of 39.

**UNITED STATES DISTRICT COURT**

```
 1   Q    And that's the one we're looking at?

 2   A    Yes, sir.

 3   Q    So that's all of your notes; correct?

 4   A    Correct.

 5   Q    But you refreshed your recollection as to an in-person

 6   interview with Dr. Harshad Shah; correct?

 7   A    The in-person interview where we met -- the three of us

 8   met together?

 9   Q    Yes.

10   A    Yes, that was the initial interview where the agent and

11   the taxpayer met at his office.

12   Q    Okay.  And is that interview in your three pages of

13   notes?

14   A    No.  And it wouldn't be.

15   Q    Didn't you testify that you document in your notes any

16   contact with the taxpayer?

17   A    The agent does that.  The agent is the one responsible for

18   conducting the interview.  And then in their case -- see, the

19   only reason why I have to do this was because of the conflict

20   that, you know, was started at the very beginning of the audit.

21   And so typically I wouldn't have done this, but I had to so

22   that I could document everything.  But the agent is more

23   responsible for the interview, making the notes for the

24   interview, doing the interview summary and having it in their

25   own case file.  So that's -- that wasn't my job.
```

```
 1    Q    Thank you.

 2    A    I'm sorry.

 3    Q    Okay.  So your answer is -- I mean, you did testify

 4    that -- I mean, you're a revenue agent; correct?

 5    A    Yes.

 6    Q    And you're required to put in your case history any

 7    contact with the taxpayer, "yes" or "no"?

 8    A    Yes.

 9    Q    But your notes don't show the in-person interview with

10    Dr. Shah that you talked about; correct?

11    A    Correct.

12    Q    And so when you were talking about the in-person

13    interview with Dr. Shah, whose notes were you referring to?

14              MS. WAIER:  Objection, Your Honor.  Misstates

15    testimony.

16              THE COURT:  Overruled.  If you were referring to

17    notes to talk about that initial meeting.

18              THE WITNESS:  Repeat the question again.

19    Q    BY MR. LAYTON:  I believe you just testified that you

20    refreshed your recollection about what happened during the

21    meeting, correct, the in-person meeting?

22    A    Yes.

23    Q    And whose notes did you use when you refreshed your

24    recollection?

25    A    I was -- it was the -- well, wait a minute.  The
```

1    initial -- I didn't even -- the agent is the one that did the

2    initial interview and made all the comments regarding, you

3    know, the interview.

4    Q     Right.  So was it his notes that you looked at?

09:27AM 5    A     No.  I was right there with him.  And like I said, that

6    was his responsibility to, you know, make the notes and

7    everything for the -- write all of his notes down for the

8    interview.

9    Q     You had to refresh your recollection with respect to what

09:28AM 10   happened during the phone calls; is that correct?

11              MS. WAIER:  Objection.  Misstates testimony.

12              THE WITNESS:  My --

13              THE COURT:  Overruled.

14              THE WITNESS:  Yeah, between me and the taxpayer, I

09:28AM 15   did have to, right.  But that was before the interview that I

16   was refreshing my memory on.

17   Q     BY MR. LAYTON:  Thank you.

18   A     Like these three pages here (indicating).

19   Q     Ms. Henry, I'm going to be asking you a lot of "yes" or

09:28AM 20   "no" questions, okay.  If you'll please -- when I ask you a

21   "yes" or "no" question, please answer "yes" or "no."  And if

22   there's any further explanation, it can be elicited during the

23   recross or the redirect.

24   A     Okay.

09:28AM 25              MS. WAIER:  Objection, Your Honor.  Improper.

1          THE COURT:  Overruled.

2     Q    BY MR. LAYTON:  You looked at your notes, these three

3     pages, to refresh your recollection as to what happened during

4     the phone calls; correct?

09:28AM 5  A    Yes.

6     Q    And that was because it was a long time ago; is that

7     correct?

8     A    Yes.

9     Q    And your memory on this subject is -- is so much -- is so

09:29AM 10 far back that it requires you to look at these notes to bring

11    forth what happened; is that accurate?

12    A    Yes.

13    Q    And so when you testified about what happened during the

14    interview in person with Dr. Shah, what -- did you use anything

09:29AM 15 to refresh your recollection on that?

16    A    No.  No.

17    Q    So you're saying that you can -- you can't remember what

18    happened during those first two phone calls, but you can

19    remember exactly what happened during the in-person interview

09:29AM 20 without any notes?

21    A    Yes.

22    Q    Turning back, let's talk about the -- all these pages in

23    Exhibit 15 that are before your notes.  Turning to Exhibit 15,

24    all these pages before, can you look at them?  All these pages

09:30AM 25 before.

```
 1   A      Uh-huh.

 2   Q      Just flip through them, please.

 3   A      Yes.  It's a lot.

 4   Q      Okay.  How many of those pages are notes that you

 5   personally took?

 6   A      None.

 7   Q      Most of those pages belong to Revenue Agent Ham; correct?

 8   A      Yes.

 9   Q      And you -- do you -- you don't know about things that

10   he -- you don't know about all the things that he left out of

11   those notes; is that correct?

12   A      No.

13   Q      It's not correct?  You know about all the things that

14   he's left out of his notes?

15   A      Repeat the question again, please.

16   Q      Is it possible -- I'm going to give you a new question,

17   so I'll strike that one.

18          Is it possible that Revenue Agent Ham did not include

19   things in his notes that were part of the case?

20   A      Yes.

21   Q      So you can't tell the Court or the jury whether or not

22   Revenue Agent Ham's notes are accurate reflections of

23   everything that happened; is that correct?

24   A      Yes.

25   Q      And do you know, you know, whether he -- let me ask
```

09:31AM (line 5)
09:31AM (line 10)
09:31AM (line 15)
09:32AM (line 20)
09:32AM (line 25)

1    you -- strike that.

2         Is it possible that he lied in some of his notes and you

3    don't know about that?  Let me strike that.

4         Is it possible he lied in some of his notes?

09:32AM 5         MS. WAIER:  Your Honor, calls for speculation.

6         THE COURT:  Sustained.

7    Q    BY MR. LAYTON:  Would you know if any of his notes were

8    inaccurate?

9    A    No.

09:33AM 10   Q    So you can't really tell us whether anything in all these

11   pages of notes, except for the ones you wrote, are accurate; is

12   that correct?

13   A    Correct.

14   Q    Do you know whether any of the -- other than the ones you

09:33AM 15   had personal involvement in, do you know whether any of the

16   notes of Revenue Agent Ham reflect an accurate recordation of

17   things at or near the time that those things happened?

18   A    No.

19        MR. LAYTON:  Your Honor, I believe this exhibit was

09:34AM 20   moved into evidence as a business record.  I'd like the Court

21   to reconsider that decision.

22        THE COURT:  Okay.  We can deal with that at the

23   break.

24

09:34AM 25   Q    BY MR. LAYTON:  One more question on this.  Was it your

```
 1   job to maintain these records?

 2   A     No.

 3   Q     Exhibit 15, it was not your job?

 4   A     No.

 5   Q     You did not maintain -- did you maintain the

 6   administrative audit file for the examination of Dr. Shah?

 7   A     When you say "maintain," can you be more specific.

 8   Q     Was it your job to keep the audit file?

 9   A     No.

10   Q     And it was --

11   A     Not as to coach.

12   Q     Right.  And not -- and that's true.  I mean, at any point

13   in time was it your job to keep that audit file?

14   A     No.

15   Q     Okay.  Thank you.

16         At what point in an agent's career does the agent undergo

17   the partnership training?

18   A     That depends on the budget.

19   Q     Okay.

20   A     So yeah, I can't --

21   Q     Generally.

22   A     Generally.  Really, to be honest, I can't answer that.

23   The newer agents got their partnership, the flow-thru training

24   a lot quicker than I did.  It was like a several-year period

25   before, you know.  So that's why I'm saying, it just depends on
```

09:34AM  5
09:35AM 10
09:35AM 15
09:35AM 20
09:36AM 25

**UNITED STATES DISTRICT COURT**

```
  1   the budget and -- so that's why I can't really answer that.

  2   Q    Is it your understanding that it's intended to be given

  3   at the beginning of a Revenue Agent's career?

  4   A    If they've had all the other training before that, then if

09:36AM 5   that's the next scheduled phase of training, whether it's

  6   sooner or later, then it will be sooner.

  7   Q    Okay.  How long does it take to do the first step in

  8   training?  Let's talk about -- how many stages of training are

  9   there up to the partnership one?

09:36AM 10  A    Let's see.  You have just the regular 1040.  You have the

  11  corporation.  There's like three or four.

  12  Q    Okay.

  13  A    Three.

  14  Q    Assuming those are done, so the first part of the

09:37AM 15  training, how long does that take?  You said the 1040s.

  16  A    See, I can't -- the reason why I can't answer specifically

  17  is because when the newer agents -- when the newer agents came

  18  in and when I did it, you know, it can vary.  It just depends

  19  on how the -- whoever the coordinator of the training is, how

09:37AM 20  long the training is going to be.  I don't establish that.

  21  Q    Okay.  Does it take -- the training from start to finish,

  22  like when you start the training on Day 1 and you finally

  23  complete the training, you're saying it can take any amount of

  24  time?

09:37AM 25  A    Like for one certain phase of training, it could take,
```

1  like, you know, a few months.

2  Q    Okay.

3  A    A few-months' --

4  Q    Thank you.

09:37AM 5  A    -- classroom and on-the-job training.

6  Q    Okay.  And the few months, that's for Stage 1 -- or

7  Part 1; right?  Part 1.  And is that the same for the other

8  parts, Parts 2 and 3?

9  A    Not necessarily.  I can't answer that question

09:38AM 10 specifically.

11 Q    Okay.

12 A    Because it can vary.  That's what I'm trying to tell you.

13 It can vary.

14 Q    Is partnership training something that would happen after

09:38AM 15 somebody's been on the job as a revenue agent?  The first time

16 they get partnership training, does that happen after ten

17 years?

18         MS. WAIER:  Your Honor, asked and answered.

19         THE COURT:  Overruled.

09:38AM 20 Q    BY MR. LAYTON:  This is just to narrow it down.  If a

21 revenue agent has been a revenue agent for ten years, do they

22 then get partnership training for the first time?

23 A    That can happen.

24 Q    Why would that happen?

09:38AM 25 A    Because that's when the training would be scheduled.  It

UNITED STATES DISTRICT COURT

```
 1    has nothing to do with the agent.  It's just that whenever they

 2    decide that they have the budget, you know, to train the

 3    agents.

 4    Q    So you're saying somebody can be a revenue agent for ten

 5    years and never had partnership training?

 6    A    It happened to me.  That's what I'm trying to tell you.

 7    It took, like, several years before they finally decided, okay,

 8    we have the budget to train, you know.

 9    Q    And then if -- when you did that -- I'll move on from

10    that.

11         You testified that your job as an on-the-job training

12    coach was to make sure that the agent follows all procedures;

13    is that correct?

14    A    Yes.

15    Q    Are you hovering over the agent 24 hours a day?

16    A    No.

17    Q    Where were you -- where are you in relation to Agent Ham

18    in the office building during this period of time?

19    A    We set -- well, I sit on one end of the building, and he

20    was on the other end.  We were on the same floor.

21    Q    Okay.  So you couldn't --

22    A    Still within walking -- I mean, you know, close to each

23    other.

24    Q    Okay.  So when he was on the phone with Dr. Shah, for

25    example, you couldn't hear him?
```

**UNITED STATES DISTRICT COURT**

```
 1  A     Correct.

 2  Q     And you couldn't see him?

 3  A     Correct.

 4  Q     And when he was reviewing documents, for example, from

 5  Dr. Shah, you couldn't see them?

 6  A     Correct.

 7  Q     So you only knew about things -- is it correct to say

 8  that you only knew about things that Ham came to you about?

 9  A     Correct.

10  Q     You can clarify.  I'll allow you to clarify.

11  A     Okay.  I did have to do case reviews on the training

12  cases, so, you know -- and I had to, you know, make sure, you

13  know, at certain points.  So that was part of my job as a

14  coach, too, is to do case reviews.

15  Q     Okay.  And when you did case reviews, you generally --

16  you only knew about things that were in the case files; is that

17  correct?

18  A     Correct.

19  Q     So if you didn't put something in the case file, you

20  wouldn't see it; is that correct?

21  A     Correct.

22  Q     Okay.  Is it correct that you were his coach for

23  approximately eight weeks?

24  A     Correct.  To the best of my recollection, yes.

25  Q     Before that -- now I'm going to start again.
```

09:40AM (line 5)
09:40AM (line 10)
09:40AM (line 15)
09:41AM (line 20)
09:41AM (line 25)

1      Did the eight weeks start at approximately the beginning

2  of this case at issue here with Dr. Shah?

3  A    Yes.

4  Q    And then the eight weeks ended approximately, you know,

09:41AM 5  around or after the in-person interview with Dr. Shah?

6  A    Correct.

7  Q    So before this audit with Dr. Shah, did you have the

8  opportunity to review Ham's work?

9  A    On this particular case or -- I'm not understanding the

09:42AM 10  question totally.

11  Q    That's fine.  I'll give you a new question.

12  A    Okay.

13  Q    Did you know what Agent Ham had done for the eight years

14  approximately prior to this examination?

09:42AM 15  A    No.

16  Q    Did you know what he did for the eight years before that?

17  A    No.

18  Q    Okay.  Did you -- you stated you didn't have any

19  involvement -- let me ask you, did you have any involvement

09:42AM 20  with this case after the initial interview?  Let me strike

21  that.

22      After you stopped being on-the-job coach, did you have

23  any further involvement?

24  A    No.

09:42AM 25  Q    Okay.  So your total involvement was eight weeks.

```
 1   Nothing before, nothing after?

 2   A     Correct.

 3   Q     Okay.  And so your perception of Agent Ham's competence

 4   is based on eight weeks and only on what he presented to you;

 5   is that correct?

 6   A     Correct.

 7   Q     Do you think that qualifies you to be a person to comment

 8   on his overall competence?

 9   A     I could only base that on the experience I have with him

10   as his coach.

11   Q     Is that a "no"?

12              MS. WAIER:  Objection.  Asked and answered.

13              THE COURT:  Overruled.

14              THE WITNESS:  Okay.  Repeat that.

15   Q     BY MR. LAYTON:  Do you believe your eight weeks of

16   viewing only what he presented to you makes you qualified to

17   opine on his competence overall as an agent?

18   A     No.

19   Q     Thank you.

20         Is it correct that -- did Revenue Agent Ham tell you that

21   he hung up on Dr. Shah during the first phone calls?

22              MS. WAIER:  Objection --

23              THE WITNESS:  Yes.

24              MS. WAIER:  Objection.  Hearsay.  Lacks foundation.

25              THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MR. LAYTON:  Did he tell you how many times he hung up
 2   on Dr. Shah?
 3   A    No.
 4   Q    If I told you that he hung up on Dr. Shah three times
 5   during that initial conversation, would that change your
 6   opinion?
 7              MS. WAIER:  Objection.  Lacks foundation.
 8              THE COURT:  Sustained as framed.
 9   Q    BY MR. LAYTON:  During that conversation that you had
10   with -- or during at least one of the conversations with
11   Dr. Shah, Dr. Shah told you that he believed Agent Ham was out
12   to get him; is that correct?
13              MS. WAIER:  Objection.  Hearsay.
14              THE COURT:  Overruled.
15              THE WITNESS:  Correct.
16   Q    BY MR. LAYTON:  And he also told you that he was not
17   comfortable proceeding with him; is that correct?
18   A    Correct.
19   Q    And he also told you that Agent Ham was misquoting him;
20   is that correct?
21   A    Correct.
22   Q    And so he also asked if he could have a different revenue
23   agent; is that correct?
24   A    Correct.
25   Q    And he asked if he could have the audit at the IRS
```

1    office; is that correct?

2    A      Correct.

3    Q      And he also asked for more time; is that correct?

4    A      Correct.

09:46AM 5    Q      And you basically told them that he couldn't have a new

6    auditor; is that correct?

7    A      Correct.

8    Q      And you told him that he couldn't have the -- well, you

9    told him essentially that the audit would not take place at the

09:46AM 10   IRS office; is that correct?

11   A      Correct.

12   Q      And you didn't let him pick how much time he had to

13   respond; is that correct?  You didn't let him pick when he had

14   to meet with the auditor; is that correct?

09:46AM 15   A      I thought we agreed on the date from my --

16   Q      Okay.  That's a good answer.  Thank you.

17          I'll take that answer and go to the next question.

18   A      Okay.

19   Q      Okay.  Did he agree based on options you presented him,

09:47AM 20   or did he agree because that was his exact preferred date?

21   A      I thought it was a mutually agreed-upon date.

22   Q      Okay.  Is it correct that he had actually asked for more

23   time than you had set that time for the meeting; isn't that

24   correct?

09:47AM 25          MS. WAIER:  Objection.  Lacks foundation.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Overruled.
 2    Q    BY MR. LAYTON:  Didn't he want more than just the --
 3    A    Would you let --
 4    Q    Go ahead.
 5    A    I'm sorry.  To gets the documents -- more time to get the
 6    documents is what he was asking for.  But we just wanted to get
 7    the audit started and just at least get the initial interview
 8    out of the way.
 9    Q    Okay.  Did he have an option of not doing the interview?
10    Did you give him the option of not doing the interview?
11    A    No.
12    Q    Okay.  So he had to do the interview according to you; is
13    that correct?
14    A    Yes.
15    Q    Okay.  Was it his idea to have the interview?
16    A    We had to get the interview started.
17    Q    That's what the IRS asked for; right?
18    A    Right.
19    Q    So it was the IRS's idea to do the interview?
20    A    Yes.
21    Q    Okay.  So with respect to the training, did you
22    personally ever have to repeat the same phases of training?
23    A    Me personally?
24    Q    Yeah.
25    A    No.
```

**UNITED STATES DISTRICT COURT**

```
  1    Q     Did you identify any performance issues with Dr. Ham --
  2    I'm sorry -- with Agent Ham during that time when you were his
  3    coach?
  4    A     No.  Can I just --
  5    Q     If there's more questions --
  6    A     Okay.
  7    Q     You talked about BizStats earlier.  When the agent --
  8    when the IRS gets information from BizStats and compares it to
  9    the information on somebody's return, is BizStats 100 percent
 10    accurate as to the right amounts of income?
 11    A     No.
 12    Q     So is it correct to say that it's just a -- that it's
 13    just -- you know, it's better than a guess, but it's not really
 14    conclusive?
 15    A     Correct.  Correct.
 16    Q     So just because information was found on BizStats doesn't
 17    mean that that particular taxpayer is going to owe money; is
 18    that correct?
 19    A     Correct.
 20    Q     And is it appropriate to base, you know, the IRS'
 21    ultimate conclusion as to the tax owed just on BizStats?
 22    A     We can't do that.  We use it as a -- just as a tool, an
 23    indicator.
 24    Q     Right.  So by itself it really isn't used.  You actually
 25    have to do a real investigation; is that correct?
```

09:49AM  5
09:50AM 10
09:50AM 15
09:50AM 20
09:51AM 25

```
 1    A    Yes.

 2    Q    So a thorough investigation is really what helps you

 3    arrive at that end part?

 4    A    Yes.

 5    Q    And you weren't there for the majority of this -- the

 6    civil investigation; is that correct?

 7    A    Correct.

 8    Q    And so you don't know, you know, for example, if the tax

 9    court came to a much lower amount of tax; is that correct?

10    A    Correct.

11    Q    Did you testify earlier about the -- finding the

12    taxpayer's information on Accurate, searching for it?

13    A    The agent made that notation in their case history, yeah.

14    Q    Is it unusual to not find somebody's information in

15    Accurate?

16    A    It's not unusual.

17    Q    Would that be affected by an agent making a mistake, like

18    misspelling a person's name, the search?

19    A    That's possible.

20    Q    Were you aware of whether or not Agent Ham misspelled the

21    taxpayer's name in doing a search in Accurate?

22    A    I have no idea.

23    Q    Were you aware of what took place -- I mean -- were you

24    aware of any disclosures Revenue Agent Ham made -- no.

25         I have no more questions, Your Honor.
```

1         THE COURT:  All right.

2         MR. LAYTON:  Thank you very much.

3         MS. WAIER:  Briefly.

4                    **REDIRECT—EXAMINATION**

09:53AM 5   BY MS. WAIER:

6   Q    Do you have an independent recollection of your dealings

7   with Dr. Shah, other than reviewing your recollection?  Do you

8   have an independent recollection of it?

9   A    Yes.

09:54AM 10  Q    And why is that?  Why do you remember it after so many

11  years?

12  A    Because the whole meeting went smoothly and everything

13  went well.

14  Q    And that was very different than the conversations you

09:54AM 15  had with him on the phone?

16  A    Yes.

17  Q    And you have an independent recollection of your

18  conversations with Dr. Shah on the phone regardless of

19  refreshing your recollection; is that right?

09:54AM 20  A    Correct.

21  Q    Why do you remember those so well after so many years?

22  A    The conversations?

23  Q    Uh-huh.

24  A    Well, I couldn't remember all the details about it, but

09:55AM 25  just basically, you know, how the -- you know, how the

**UNITED STATES DISTRICT COURT**

1    conversations went, I just couldn't remember it.  Just in

2    general, I could remember, you know, what was going on.

3    Q     So you can remember the general tenor of the

4    conversation?

09:55AM 5    A     Yes.

6    Q     And you -- you testified that you were the coach for

7    Revenue Agent Ham during eight weeks; is that right?

8    A     Correct.

9    Q     And what were your contacts with Revenue Agent Ham over

09:55AM 10   that eight weeks?

11   A     Like how many times I met with him?

12   Q     No.  Just IN general, when you would meet with him.

13   A     Well, the case reviews and, you know, having to make, you

14   know, comments documented, you know, anything that was going on

09:56AM 15   with the case.

16   Q     And you were also available for any questions?

17   A     Correct.  Uh-huh.

18   Q     And after talking to Revenue Agent Ham and the taxpayer,

19   did you determine who was the problem in the relationship?

09:56AM 20           MR. LAYTON:  Objection.  Outside the scope of cross.

21           THE COURT:  Overruled on that grounds.  A little

22   overbroad.

23        Why don't you rephrase the question, Ms. Waier.

24   Q     BY MS. WAIER:  After talking with Revenue Agent Ham and

09:56AM 25   after talking with Dr. Shah, did you determine that -- what did

```
 1   you determine regarding Revenue Agent Ham's actions in terms of

 2   this audit -- of Dr. Shah's audit of what you saw?

 3   A    Well, from what the agent told me -- I mean, it appeared

 4   as though, you know, he wasn't, you know, the problem.

 5   Q    Who is "he"?

 6   A    The agent wasn't the problem.  And it appeared that, you

 7   know, the taxpayer, you know, was upset -- you know, had got

 8   upset.  And so that's why I wanted to hear both sides of the

 9   story and why I wanted to make sure I went out, you know, on

10   the initial appointment, to make sure, you know, I told the

11   taxpayer that, too, you know, to make sure everything went

12   smoothly.

13   Q    And at the initial appointment were you satisfied that

14   there was no more conflict?

15   A    Correct.  Yes.

16          MS. BACON:  No further questions.

17          THE COURT:  Anything further?

18                     RECROSS-EXAMINATION

19   BY MR. LAYTON:

20   Q    You don't really know -- you don't personally truly know

21   what Revenue Agent Ham said or did during that first phone call

22   with Dr. Shah; is that correct?

23   A    Correct.

24   Q    So your determination of who's right or who's wrong is

25   based on what Revenue Agent Ham said and your listening to
```

1      Dr. Shah and that's it; is that right?

2      A      Correct.

3      Q      And you don't know personally -- you personally don't

4      really know what happened after you left that initial interview

09:58AM 5      meeting; is that correct?

6      A      Correct.

7      Q      And did you do any further investigation into the

8      allegation, for example, that Dr. Shah hung up on -- I'm sorry,

9      if Revenue Agent Ham hung up on Dr. Shah?  Did you check phone

09:59AM 10     records, anything like that?

11     A      No.

12     Q      Okay.  So you didn't really do any independent

13     verification other than just listening to people talk; is that

14     correct?

09:59AM 15     A      I thought I mentioned -- I listened to what the taxpayer

16     had to say.

17     Q      Right.

18     A      And in my case history, I said that there was a

19     miscommunication.  I also mentioned that in my notes.

09:59AM 20     Q      Thank you.

21            Now, you didn't hang up on Dr. Shah, did you?

22     A      No.

23     Q      So you were able to tolerate Dr. Shah on the phone?

24     A      Yes.

09:59AM 25     Q      Okay.  And you were able to smooth things out with

**UNITED STATES DISTRICT COURT**

```
  1    Dr. Shah?
  2    A      Yes, I felt I did.
  3    Q      Right.  Is that because you're a better revenue agent
  4    than Revenue Agent Ham?
  5    A      No.
  6    Q      Okay.  But you were able to do these things when Revenue
  7    Agent Ham was not on his own; correct?
  8    A      Correct.
  9    Q      At the initial interview, do you recall what documents
 10    were available at that initial interview?
 11    A      To the best of my recollection, I don't believe that there
 12    was anything available then, but I can't remember for sure.
 13    Q      Okay.  You can't remember for sure.  Thank you very much.
 14    I'll take that.
 15         No more questions, Your Honor.
 16         THE COURT:  Very well.
 17         Ma'am, you can step down.  You're excuse.
 18         Ladies and gentlemen, why don't we give Debbie a rest.
 19    We'll take our morning break.
 20         THE COURTROOM DEPUTY:  All rise.
 21         (Out of the presence of the jury.)
 22         THE COURT:  I just want to put on the record my
 23    ruling on Exhibit 15.  Exhibit 15, I believe, is admissible,
 24    and I will keep it into evidence.  Ms. Henry was a qualified
 25    witness to lay the necessary foundation for business records.
```

```
 1    She has years of service with the IRS.  She's very familiar

 2    with the preparation of the activity report, such as

 3    Exhibit 15.  She actually took action on the file, made entries

 4    onto the report and was the on-training coach for Agent Ham.

 5    The entries in Exhibit 15 were made near or around the time the

 6    actions were taken by the relevant agents.  The report was kept

 7    in the course of business.  And making the report was a regular

 8    practice of the business.

 9         The fact that Ms. Henry did not make all the entries does

10    not show a lack of trustworthiness with respect to the source

11    of information or the circumstances of its preparation.  The

12    defense objections really go to the weight of Exhibit 15, not

13    its admissibility.

14         Is there anything the Government would like to say further

15    on that?

16              MS. WAIER:  No, Your Honor.

17              MR. LAYTON:  Nothing further.

18              THE COURT:  All right.  We'll take our break.

19              MR. SEVERO:  How long, Your Honor?

20              THE COURT:  We usually take about a 15-minute break.

21              (In the presence of the jury.)

22              THE COURT:  Ms. Waier, ready to call the next

23    witness?

24              MS. WAIER:  The Government calls Mytryee Raghaven.

25              THE COURT:  Very well.
```

Line timestamps: 10:02AM (line 5), 10:02AM (line 10), 10:02AM (line 15), 10:02AM (line 20), 10:17AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1          Good morning, ma'am.  If you could please come forward,
 2     I'm going to have you stand right here by the court reporter.
 3     We're going to administer the oath to you and have you take the
 4     witness stand.
 5          MYTRYEE RAGHAVEN, PLAINTIFF'S WITNESS, WAS SWORN
 6              THE COURTROOM DEPUTY:  Please state your full name
 7     and spell your last name for the record.
 8              THE WITNESS:  Mytryee Raghaven.
 9          What else do you want me to say?
10              THE COURTROOM DEPUTY:  Spell your last name.
11              THE WITNESS:  R-a-g-h-a-v-a-n.
12                        DIRECT EXAMINATION
13     BY MS. WAIER:
14     Q    Good morning.
15     A    Good morning.
16     Q    Can you tell the jury what you do for a living.
17     A    I'm a revenue agent for Internal Revenue Service.
18     Q    How long have you been doing that?
19     A    I started this job on September 15, 2008.
20     Q    What are your duties as a revenue agent?
21     A    My duties are -- like I get the tax returns.  I audit the
22     tax returns.
23     Q    And how do the tax returns come to you?
24     A    My manager gives it to me.  He assigns the tax returns to
25     me.
```

**UNITED STATES DISTRICT COURT**

Q    And were you assigned the defendant's audit?

A    Yes.  I got his 2007 tax return to audit the 1040.

Q    Can you tell the jury what a 1040 is.

A    1040 is the personal tax returns, that is, the 2007.  I
got it.

Q    That's not something you picked.  It was assigned to you?

A    No, I didn't pick it.  It's given to me by my manager.

Q    What did you do after you were assigned the audit?

A    Usually when we get the tax return, we have to go through
everything to make sure the address is right and everything,
and then I had to send the initial contact letter.  And then we
give ten days for them to respond.  So that's what I did.

Q    Did he respond?

A    No, I didn't get any response from him.

Q    Did you wait for a response?

A    Yes.  After the ten days was over, usually we give
additional one or two days.  And then the next procedure is if
I don't get it, I have to find it a telephone number.  There is
a research tool called Accurate.  Then I research through the
Accurate research tool.  I got his telephone number.  I didn't
know whether it was home number or cell phone.  I called that
number.

Q    And you had that personal return, the 1040?

A    Yes.

Q    So you were looking at his personal information as

```
 1   opposed to his corporation information?
 2   A    Yes, personal information.  Whatever the tax return
 3   information, yes.
 4   Q    So you didn't do Accurate when you sent the initial
 5   letter?
 6   A    No.
 7   Q    You only did Accurate when he failed to respond?
 8   A    Yes.  That's what we do, because usually taxpayers call us
 9   back.  If they don't, then we find out for the telephone
10   number.  I did the research on that.
11   Q    And did you find the number?
12   A    Yes.
13   Q    Did you call the number?
14   A    Yes.
15   Q    Did you talk to Dr. Shah?
16   A    Yes.  Dr. Shah, I called, and he responded.  And yes, I
17   did.
18   Q    Okay.  Do you remember that conversation?
19   A    Yes.  He said --
20   Q    Can you tell the jury about that conversation.
21   A    Yes.  He said he's driving back from a trip.  He's heading
22   towards Los Angeles.  He said he will call me back after he
23   heads back home.  I said, "Okay.  Fine."  I didn't want to
24   trouble him.  I said, "Okay.  Fine."  He called me back,
25   everything, two or three days.
```

1    Q     And this was in June of 2009?

2    A     Yes.

3    Q     Did he call you back in two to three days?

4    A     No, he didn't call me back in two or three days.

10:22AM 5    Q     So what did you do?

6    A     Again, I called the same number I had.  I called him back,

7    and he picked up the phone.

8    Q     Okay.  Can you tell the jury what happened during that

9    phone call.

10:22AM 10   A     Yes.  So we had small talk.  I told him that I'm an IRS

11   agent.  I got his 2007 tax return for audit.  He said "Okay."

12   We had small talk about that.  And then I told him the

13   procedure, that we had to make an appointment.

14   Q     Okay.  After you told him the procedure, what happened

10:22AM 15   next?

16   A     And then we had a little bit of small talk, and he said

17   that he is -- his corporate return was audited before.  At that

18   point he told me his corporate return was audited or under

19   audit.  I was not sure.

10:22AM 20         Then I asked him who was the revenue agent in that

21   corporation return.  So he says he doesn't remember the name,

22   but he said he came to his office -- that revenue agent came to

23   the office with his manager.  So that's all he told me.

24   Q     Did he also tell you what the outcome of the audit was?

10:23AM 25   A     Yes.  No, I asked him, "Okay, what is the outcome of the

1  audit?"

2       He said, "Oh, there is no change in that audit."

3       So at that point I ask him again who's the revenue agent.

4  I wanted to know because those two are related.  I wanted to

10:23AM  5  know how -- you know, usually if it's a corporate audit, we

6  have to know the shareholders.  So I didn't want to -- I wanted

7  to ask him about that.  But he didn't know the revenue agent

8  and anybody.  He didn't remember the name.

9  Q    So you needed to know the -- why did you need to know who

10:23AM 10  the agent was?

11  A    Because I need to talk to him.  Usually what happens, the

12  procedure is if the corporate audit is done, then the same

13  person will be doing the shareholder audit also.  It's to save

14  the taxpayer money and everything.  And it's easier for the

10:24AM 15  same person to do the same audit, not two different people.

16  Q    Okay.  And Dr. Shah had told you that the audit was

17  already -- the corporate audit was already completed?

18  A    Yes, that's what he told me.

19  Q    Okay.  What happened after that?

10:24AM 20  A    Then in the same time, then he made a little bit of

21  chitchat, and he found -- the last name he knows that I'm also

22  from India.  Then he says that, you know, there are so many

23  things going on in this world, and I know -- and he started

24  talking to me in Hindi saying, "We are brother and sister from

10:24AM 25  the same country.  Make this audit go away."

```
 1   Q      How did you take that?
 2   A      I thought, you know, in our culture, in Indian culture, if
 3   that's the case, it's like offering some kind of bribe or
 4   something.
 5          MR. SEVERO:  Objection.  Strike that.  No
 6   foundation.
 7          THE COURT:  Overruled.  It's her state of mind.
 8          THE WITNESS:  So since I come from India, there is a
 9   culture over there, I said, "Oh, my God," he's like -- he's
10   offering me bribe saying that, okay, to make it go away.  So I
11   ignore that comment.
12          But I told him, you know, we still have to make an
13   appointment.  And I had to do the audit.  I ignored his comment
14   as if I didn't hear it at all.
15   Q      BY MS. WAIER:  And you continued to tell him that --
16   A      "I need to make an appointment.  I need to do the audit."
17   Q      Had you ever had a taxpayer talk to you in Hindi like
18   that before?
19   A      No.
20   Q      Have you ever had this kind of conversation with a
21   taxpayer before?
22   A      No.
23   Q      Did it trouble you?
24   A      Yes.
25   Q      Why?
```

```
 1   A     Because we are -- when we first started this job, that's
 2   what he told us, anything like this happens, immediately we had
 3   to go and tell our managers, and we had to refer -- contact
 4   TIGTA people.
 5   Q     Did you find this to be appropriate?
 6   A     No.
 7   Q     After that happened, did the conversation end?
 8   A     Yes.  He said he's okay to make an appointment.  After
 9   that I don't know how the conversation ended.  Then I told him
10   he has -- "This doesn't happen in America."  And then, you
11   know, I still have to do the audit.  I put the phone down --
12   yeah, after that I don't know what was the conversation.
13   Because I was in state of shock because I never had this type
14   of conversation.  I was in a state of shock.
15   Q     And you told him that it was inappropriate?
16   A     I didn't say it was inappropriate.  I said, "This doesn't
17   happen here.  I have to do" -- "continue with the audit."
18   Q     What did you do next?
19   A     After that I put the phone down, I went to revenue
20   agent -- I don't know.  Somehow I knew that Mike Ham was doing
21   the corporate audit.  I don't know how I found out.  Maybe I
22   went -- I don't know how I found out, but I went to Revenue
23   Agent Ham, Mike Ham.  I asked him does he have this person's
24   corporate audit.
25             MR. SEVERO:  Your Honor, anything after that would
```

| | |
|---|---|
| 1 | be hearsay. |
| 2 | THE COURT:  Overruled.  Again, not for the truth or |
| 3 | state of mind.  It's the fact that was said, explained what she |
| 4 | did. |
| 10:27AM 5 | Q   BY MS. WAIER:  And what did Revenue Agent Ham tell you? |
| 6 | A   Mike Ham told me that, yeah, he started the audit.  He |
| 7 | says, "Oh, we haven't finished the audit.  We had only one |
| 8 | appointment."  It's still -- you know, he hasn't finished the |
| 9 | audit.  And I told him what Dr. Shah told me.  Because my |
| 10:27AM 10 | manager, John Bradley, was not in the office.  So Mike Ham said |
| 11 | go and talk to Gloria about this incident.  So immediately I |
| 12 | went to Gloria at the office.  I told her what happened. |
| 13 | Q   And then what happened with the 1040 audit? |
| 14 | A   Gloria took the case file from me.  She said she will |
| 10:28AM 15 | transfer the case to his group.  I don't know -- she said I |
| 16 | should not continue with the audit. |
| 17 | Q   So you alerted management? |
| 18 | A   Yes, immediately.  That is the protocol in our office. |
| 19 | That's what we are to do. |
| 10:28AM 20 | Q   And did you have any contact with Dr. Shah after that? |
| 21 | A   No. |
| 22 | MS. WAIER:  No further questions. |
| 23 | THE COURT:  Mr. Severo. |
| 24 | /// |
| 10:28AM 25 | /// |

**CROSS-EXAMINATION**

1       BY MR. SEVERO:

2       Q      Good morning.

3       A      Good morning.

10:28AM  5      Q      You were a revenue agent in 2008; correct?

6       A      I started as revenue agent in 2008.  September of 2008.

7       Q      And was this one of the first cases that was assigned to

8       you?

9       A      No.

10:28AM 10      Q      How long had you been a revenue agent once this case was

11      assigned to you?

12      A      Since I started in 2008.  So I don't remember the number

13      of cases that has been assigned to me before that -- before

14      this case.

10:29AM 15      Q      Before 2008 were you employed by the IRS?

16      A      No.  I started in audit in 2008.

17      Q      So what you're saying is you started as a revenue

18      agent --

19      A      Yes.

10:29AM 20      Q      -- in 2008?

21      A      Yes.

22      Q      And in 2008 you had gone through 1040 training already?

23      A      Yes.

24      Q      The training for personal taxes; correct?

10:29AM 25      A      Yes.  That is the first training we get.

**UNITED STATES DISTRICT COURT**

```
 1   Q    Right.  And is that the only training you had had?
 2   A    After that I had corporate training and flow-thru training
 3   later on --
 4   Q    Well --
 5   A    -- in 2009.
 6   Q    Right.  By the time you got to this tax rush --
 7   A    I had only 1040 training.
 8   Q    Let me finish the question before you start answering,
 9   because we're going to drive the court reporter batty --
10   A    Sure.
11   Q    -- if we don't try to do it that way.
12   A    No problem.
13   Q    You had -- you started in September of 2008, and it was
14   at that time you had your 1040 training; correct?
15   A    On September 15 I started in 2008.  We had one week of
16   orientation, then we came back to the office.  We had some
17   training in the office, then we went to the field training.
18   Q    Is that 1040 training?
19   A    Yes.
20   Q    Okay.  Does that -- that time period you talked about,
21   does that include more than just 1040 training?
22   A    No, just 1040 and Schedule C.
23   Q    All right.  Schedule C is what?  Why don't you explain
24   that.
25   A    Schedule C, Schedule E, Schedule D, everything is
```

Timestamps in left margin: 10:29AM (line 5), 10:29AM (line 10), 10:30AM (line 15), 10:30AM (line 20), 10:30AM (line 25)

```
 1    connected to 1040.

 2    Q    It's what you attached to your 1040; correct?

 3    A    Yes.

 4    Q    Right.  And that was for one week after September 15?

 5    A    What is one week after?

 6    Q    This training.  This 1040 training.

 7    A    That is the office we had the training, and then we had to

 8    go out, also, for the training.

 9    Q    All right.  And when did you have the corporate training?

10    That would be 1120; correct?

11    A    Yes, 1120.  I don't remember.  Sometime in 2009, I think I

12    have it.  Later on.  I don't remember the exact date for the

13    training for corporate.

14    Q    And when did you have your flow-thru training?

15    A    I don't remember the flow-thru training.  I think sometime

16    in 2010.  End of 2010, I think.

17    Q    So within about two years of being hired?

18    A    Yes.

19    Q    All right.  So when you were assigned to Dr. Shah's

20    1040 --

21    A    Yes.

22    Q    -- you don't remember if you had already had corporate

23    training?

24    A    I didn't have corporate training.  I know I didn't have

25    corporate training in the short amount of time, no.
```

10:30AM  5
10:31AM 10
10:31AM 15
10:31AM 20
10:31AM 25

```
  1  Q    I believe you said that you received this -- you
  2  testified that your assignment this -- this audit was in June
  3  of '09?
  4  A    Yes, in June of '09.
10:32AM 5  Q    So by June of '09 you still hadn't had your corporate
  6  training?
  7  A    No.
  8  Q    Now, you had had -- did you have any kind of bribery
  9  awareness training by June of '09?
10:32AM 10  A    When we went for orientation, they tell us about those
 11  things.  And then they said, "If any taxpayer talks to you in
 12  any inappropriate way" -- they tell us to call TIGTA.  So that
 13  is the training we get.
 14  Q    That's right.
10:32AM 15       So by the time you had a conversation with Dr. Shah --
 16  A    Yes.
 17  Q    -- in June of '09 --
 18  A    Yes.
 19  Q    -- where he said, "We're both Indians.  Let it go away,"
10:32AM 20  you already knew if it was improper, you had to call TIGTA;
 21  correct?
 22  A    Yes.  First we can go to the management and to the TIGTA.
 23  Q    You said earlier TIGTA.  You didn't say anything about
 24  the manager.  Now you're correcting that?
10:32AM 25  A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
       1   Q     All right.

       2   A     The management and the TIGTA, yeah.

       3   Q     So are you saying now that you don't have to call TIGTA,

       4   that you can go to your manager instead?

10:33AM  5   A     I said -- yes.  I can go to the manager, yes.

       6   Q     And you're sure about that?

       7   A     Yes.

       8   Q     You were in such a state of shock, because you thought

       9   that something had been offered to you, you didn't call TIGTA,

10:33AM 10   did you?

      11   A     I didn't call TIGTA, because I was still in a state of

      12   shock.  I didn't know how to deal with this, so I immediately

      13   went to Mike Ham and then went to the manager.

      14   Q     How long did the state of shock last?  A day, two, three?

10:33AM 15   A     Just -- I don't remember how long a state of shock lasts.

      16   Even now I'm still in a state of shock to hear that Dr. Shah --

      17   Q     I'm not asking you to tell us about today's state of

      18   shock.

      19   A     I don't remember how long it lasted.

10:33AM 20   Q     Right.  It lasted for such a long time that you had time

      21   to talk to Ham, right, about this?

      22   A     It was only as soon as they put the phone down immediately

      23   because Mike Ham, it was only a two-minute walk to his desk,

      24   and I asked him.

10:34AM 25   Q     Okay.  So when you hung up with Dr. Shah after having
```

**UNITED STATES DISTRICT COURT**

```
 1   that conversation --
 2   A     Uh-huh.
 3   Q     -- you immediately talked to Mr. Ham?
 4   A     Yes.
 5   Q     You already knew Mr. Ham had been assigned to his other
 6   audit; correct?
 7   A     His corporate audit?
 8   Q     Yes.
 9   A     Yeah.
10   Q     You already knew this?
11   A     I don't know how I knew, but I knew it was Ham.  So that's
12   why I went to him.
13   Q     So somehow, and you don't know how, you came across the
14   information that --
15   A     Yes.
16   Q     -- Mr. Ham was handling Dr. Shah; correct?
17   A     Yes.
18   Q     Now, when you went to Mr. Ham --
19   A     Uh-huh.
20   Q     -- for this, did he tell you to call TIGTA?
21   A     No.  He said --
22   Q     I'm just asking you.  Did he tell you to call TIGTA?
23   A     No.
24   Q     And after you spoke with Mr. Ham, you went to talk to
25   your manager?
```

**UNITED STATES DISTRICT COURT**

```
 1    A     Not my manager.  My manager was not around at that time,

 2    so I had to go to Mr. Ham's manager.

 3    Q     And who was that?

 4    A     Gloria Witherspoon.

10:35AM  5    Q     So you went to her -- his manager because Mr. Ham asked

 6    you to?

 7    A     He didn't -- he said, yes, go to her.  Because I told him

 8    John Bradley was not there, because my manager was not there,

 9    so I had to go to her.

10:35AM 10    Q     This happened the same day as the conversation?

11    A     Yes, same day of the conversation.

12    Q     So just so we have it clear, on the same day of the

13    conversation, you went to talk to Mr. Ham?

14    A     Uh-huh.

10:35AM 15    Q     "Yes"?

16    A     Yes.

17    Q     And then after that you went to talk to Gloria

18    Witherspoon; correct?

19    A     Yes.

10:35AM 20    Q     Okay.  And did Ms. Witherspoon tell you to call TIGTA?

21    A     No.

22    Q     You had a conversation -- let me ask you first, was your

23    conversation with Dr. Shah pleasant?

24    A     Yeah, it was pleasant.

10:36AM 25    Q     Was he rude to you?
```

```
 1   A     No.

 2   Q     He was -- he engaged you in small talk, you said?

 3   A     Yes.

 4   Q     And the small talk was about a swami?

 5   A     Something like that.  He was coming back -- I think he was

 6   driving back from Bakersfield after seeing the swami.

 7   Q     And swami is s-w-a-m-i?

 8   A     Yeah.

 9   Q     And that's sort of a religious person; right?

10   A     Yeah.

11   Q     And then he talked about the Tamil language, being Tamil,

12   T-a-m-i-l?

13   A     No, he said "You are" -- with my name, he said, "Are you

14   Indian?"

15         And I said, "Yes, I'm Indian.  I'm from India, because I

16   grew up in New Delhi."

17   Q     Okay.  All right.  Now, all this time you're speaking in

18   English?

19   A     Yes.

20   Q     All right.  How was his Hindi?

21   A     His Hindi was okay.

22   Q     You sure?

23   A     Yes.

24   Q     Now, when you called Dr. Shah, you got that number from

25   Accurate; correct?
```

A       Yes.  Yes.

Q       And did you notice in Accurate there were two Dr. Shahs
with the exact same name?

A       I don't remember that.  I got one number -- I took the
number and then tried to call that Dr. Shah.  That's it.

Q       How did you confirm that it was the Dr. Shah that was on
that return?

A       I asked, "Is this Dr. Shah?"  And he said "Yes."  So then
I identified myself.

Q       For the first time or the second time you called?

A       This is the first time I called him, when he was driving
from Bakersfield, I think.  He said he's from Bakersfield.
He's driving back home.

Q       All right.  It was not on that first interview or that
first phone call when he was driving that he told you about the
corporate return?

A       No.  He said -- not from the first -- second -- when I
called him second time, then he told me about the corporate
return.

Q       And you called the same number you called before?

A       Yes.

Q       All right.  Did you -- the conversation about being
Indian and the small talk and so forth was the second call?

A       Yes.

Q       And at the second call you called him, did he tell you

| | |
|---|---|
| 1 | where he was at that time? |
| 2 | A    No. |
| 3 | Q    So if I understand correctly, your training was that if |
| 4 | you had any kind of an overture, you should go to TIGTA or your |
| 10:39AM  5 | manager; correct? |
| 6 | A    Yes. |
| 7 | Q    All right.  But you didn't go to your manager? |
| 8 | A    My manager was not -- |
| 9 | Q    I understand.  You didn't go to your manager? |
| 10:39AM 10 | A    When my manager is not there, I cannot go to my manager. |
| 11 | He was not present in the office. |
| 12 | Q    You couldn't wait till the next day? |
| 13 | A    No.  We cannot wait till the next day. |
| 14 | Q    So you went to Witherspoon? |
| 10:39AM 15 | A    Yes. |
| 16 | Q    After you talked to Ham? |
| 17 | A    Yes. |
| 18 | Q    At some point in time did you tell him about his appeal |
| 19 | rights? |
| 10:39AM 20 | A    Yes.  That is the way we are to -- the first conversation |
| 21 | I have to say the appeal rights.  That is the procedure we have |
| 22 | to do it, Publication 1 and Notice 609.  We have to tell him |
| 23 | the taxpayer's right and appeal rights for any taxpayer. |
| 24 | Q    You didn't conduct the audit at all? |
| 10:39AM 25 | A    No. |

Q    This conversation that you had with -- the second

conversation you had with Dr. Shah occurred how long after the

first conversation?

A    Maybe after he travel back, maybe three or four days

10:40AM later.  Because I waited for him to call me since he didn't

call me.  So I had to call him back.

Q    All right.  So just so we get a timeline on this, on

June 9 you called him; correct?

A    I don't know the exact date, because he was supposed to

10:40AM call me -- I have to look at the date when he was supposed to

call me.  I don't exactly remember what day I called him.

Q    Okay.  Do you remember when you sent the letter, the

initial contact letter?

A    It's sometime in June.  But I don't know the exact date of

10:40AM the --

Q    So you sent the initial contact letter sometime in June.

You waited 11 or 12 days before you made the call?

A    Yes.

Q    And then when he said he will call you back, you waited

10:41AM how much longer?

A    Either two or three days.

Q    So essentially from the time of the contact letter to the

time of the second call, about 15 days?

A    15 to 20 days.

10:41AM Q    All right.  So somewhere in there?

```
 1   A    Give or take, yes.

 2   Q    All right.  And then the matter was taken out of your

 3   hands at that point?

 4   A    After the second call, yes, it was taken out of my hand.

 5   Q    All right.  So in that second call, did you set up an

 6   interview?

 7   A    No.

 8   Q    Did you set up -- did you ask him for records?

 9   A    No.

10   Q    The second call was just about talking again?

11   A    The second call was about to call him and make an

12   appointment, to schedule an appointment for the audit.

13   Q    Did you schedule and appointment?

14   A    Since he told me "make it go away," I was shocked, I

15   couldn't do it.  I still have to -- I told him I still have to

16   make an appointment -- you know, do an audit.

17   Q    Have you ever -- before that time, had you conducted

18   audits of other Indian people?

19   A    I don't remember.

20   Q    So when Ms. Waier asked you about whether anybody had

21   ever talked to you that way, it's because you probably hadn't

22   had another Indian talk to you; correct?

23   A    Later on I had Indian people.

24   Q    Not later on, before.

25   A    I don't remember.  I have to look at my case files.  Maybe
```

```
  1  I have had Indian people.  I don't remember.  I've done so many
  2  audits, I don't remember everybody's name.
  3  Q    And isn't it common for taxpayers who are being audited
  4  to be uncomfortable with these audits?
  5  A    I don't know.
  6  Q    "No"?
  7  A    I don't know.  I cannot say whether they are uncomfortable
  8  or comfortable.  I don't know.
  9  Q    Isn't it true that they get nervous when you call?
 10  A    I don't know.
 11  Q    All right.  Isn't it true that you often have to -- you
 12  often get things like, "How do I" -- "What do we have to do to
 13  resolve this?"
 14  A    I don't understand the question.
 15  Q    Don't people --
 16  A    Can you reask the question, please.
 17  Q    Sorry.  Don't people ask you, "Can we resolve this
 18  audit?" and "How do we resolve it?"
 19  A    Nobody ask me like that.
 20  Q    Nobody asked you that.  They just ask -- they just comply
 21  with your request?
 22  A    Exactly.
 23  Q    Right.  All right.  And he complied with your request,
 24  but you never asked to set an appointment with him?
 25  A    I did ask to make an appointment.  He never made an
```

10:42AM 5
10:42AM 10
10:43AM 15
10:43AM 20
10:43AM 25

1  appointment with me.

2  Q    I thought you said that the second call was about setting

3  an appointment, but you didn't get to that point because you --

4  you were in a state of shock?

10:43AM 5  A    I was in a state of shock.  But still we didn't go over

6  that till that letter.

7  Q    You didn't push to make an appointment?

8  A    After that I didn't push, no.

9  Q    Very well.  When was the first time you spoke to TIGTA?

10:44AM 10  Anybody at TIGTA?

11  A    I think in December of '09.

12  Q    That would have been about six months after the fact?

13  A    Yes.

14  Q    You spoke to this gentleman sitting in the middle here,

10:44AM 15  Mr. Gomez?

16  A    Mr. Gomez, yes.

17  Q    How many times did you meet with Mr. Gomez?

18  A    Once I met with Mr. Gomez in December.

19  Q    In December once?

10:44AM 20  A    Yes.

21  Q    How about before testifying here today, how many times

22  did you meet with him?

23  A    On Monday.

24  Q    Just once?

10:44AM 25  A    Once on Monday.

```
 1   Q    And by the way, are you local?

 2   A    No.  I moved to Virginia.

 3   Q    Okay.  So your meeting on Monday was after you were here

 4   already?

 5   A    Yes.

 6   Q    Okay.  And you went over your testimony?

 7   A    Yes.

 8   Q    And that was -- Ms. Waier was also there?

 9   A    Ms. -- yes.

10   Q    And did she ask you questions about what went on?

11   A    Yes, she was asking me what went on, the chronological

12   order.  That's it.

13             MR. SEVERO:  All right.  I just need a moment,

14   Your Honor.

15             (Brief pause.)

16   Q    BY MR. SEVERO:  And you made the entry in your -- you

17   prepared an examining officer's activity record on this?

18   A    I don't recall.

19             MR. SEVERO:  May I have a moment?

20             THE COURT:  You may.

21             (Counsel conferred off the record.)

22   Q    BY MR. SEVERO:  I'll show you what's been -- what's in

23   evidence as -- I think it's marked Exhibit 15.  It's Page 29 of

24   39 of that exhibit.  Do you recognize this form?

25   A    I do.
```

10:44AM (line 5)
10:44AM (line 10)
10:45AM (line 15)
10:46AM (line 20)
10:47AM (line 25)

Q     And is this the examining officer's activity record?

A     Yes.

Q     Now that you've seen this form, do you recall having

created one for this conversation you had with Dr. Shah?

10:47AM  A     I don't think so.  I don't think so.

Q     Aren't you required to do that?

A     I'm required to do that.  But since my case was taken

immediately, I didn't have a chance to.

Q     Well, let's see.  According to you, you opened this

10:47AM  record -- this audit in June of '09?

A     Yes.

Q     Wouldn't that have gone into the record -- into the

examining officer's activity record?

A     Usually when we immediately open it, we -- when we send

10:47AM  the letter, maybe I have to say that "On such and such date, I

send the initial contact letter."

Q     That's right, but you didn't do that, did you?

A     Maybe I waited to do it.  I don't remember.  Maybe I have

done it, I don't know.

10:48AM  Q     And you also had a conversation with him about 12 days

later; correct?

A     Yes.

Q     That would have been entered into the activity record?

A     I should enter in the activity card since the case -- you

10:48AM  know, immediately within half-hour it got transferred, I didn't

```
 1   have time to do anything.
 2   Q    Well, this case got transferred out to Mr. Ham on July 7?
 3   A    I don't remember the date when it got transferred.
 4   Q    If I told you that the -- well, let's see what the
 5   exhibit says.  Exhibit 15, right in the middle here, it says
 6   7/07 -- I don't know why this is not clear.  It says on July 7
 7   the case was reassigned to RA -- Revenue Agent Ham.  You see
 8   that?
 9   A    Yes.
10   Q    All right.  This would have been about -- if you see
11   here, the case was open on June 11; correct?
12   A    Okay.  Let me see.  This activity -- so up to 6/23, I did
13   write up to 6/23.  So that must be mine, then.
14   Q    Well, I'll tell you that this is not yours.  This is
15   actually Examining Officer Melanie Yu.
16   A    They changed it when they do the activity report.  So I'm
17   not sure whether this is mine or hers.  I have to check mine
18   because I haven't -- it's so long, I don't remember.
19   Q    So you think these are your notes?
20   A    Yes, up to 6/23, yes.
21   Q    Up to 6/23?
22   A    Yes.
23   Q    Up to 7/07?
24   A    7/07, I don't think I did that.
25   Q    Right.  So the conversation you had with Dr. Shah --
```

10:48AM    5
10:48AM   10
10:49AM   15
10:49AM   20
10:50AM   25

**UNITED STATES DISTRICT COURT**

```
         1   A     Yes.

         2   Q     -- is noted in on 6/23?

         3   A     Yes.

         4   Q     You put in an entry that says, "Call the taxpayer, once
10:50AM  5   in the morning and in the afternoon."

         6   A     Yes.

         7   Q     All right.  Now, before I go on with this, let me ask

         8   you --

         9   A     Yes.

10:50AM 10   Q     Your training requires that when you write a report or

        11   make an entry --

        12   A     Yes.

        13   Q     -- you put in all the information that is significant --

        14   A     Yes.

10:50AM 15   Q     -- about your contact with the taxpayer; correct?

        16   A     Yes.

        17   Q     All right.  So everything that we find here is what was

        18   significant to you at the time that you wrote these notes;

        19   true?

10:50AM 20   A     Yes.

        21   Q     All right.  So when you call on 6/23, "Call the taxpayer

        22   once in the morning and in the afternoon"?

        23   A     Yes.

        24   Q     "Both the times taxpayer said he will call back and did

10:50AM 25   not return the call."
```

**UNITED STATES DISTRICT COURT**

```
 1   A    Yes.

 2   Q    See that?

 3   A    Uh-huh.

 4   Q    Okay.  On the same day you make another entry.  Do you

 5   see the next one?

 6   A    Uh-huh.

 7   Q    It says, "Taxpayer called and told the agent that his

 8   S corporation has been audited and that there is no change."

 9   Do you see that?

10   A    Yes.

11   Q    And then you got information that Mike Ham --

12   A    Yes.

13   Q    -- was the agent.

14        Well, that tells you who gave you the information,

15   doesn't it?

16   A    Yes.  That's what I said.  I didn't remember how I got it.

17   Maybe he gave the information, yes.

18   Q    Right.  He gave it to you?

19   A    Yes.

20   Q    And he told you that Mr. Ham is in another group, and he

21   asked -- you asked the taxpayer to fax him -- fax you a copy of

22   the Revenue Agent Report and so forth; right?

23   A    Yes.

24   Q    And then you talked to the agent to -- rather to Mike

25   Ham; correct?
```

```
 1   A     Yes.

 2   Q     And Mike Ham told you that the audit hasn't been started?

 3   A     Yes.

 4   Q     So this case has been transferred to Mr. Ham.  Do you see

10:52AM 5   that?

 6   A     Yes.

 7   Q     This is all the significant information you got from this

 8   phone call; correct?

 9   A     Yes.

10:52AM 10   Q     But you were in such a state of shock, you forgot to

11   include the comment about him telling you that this matter

12   should go away?

13   A     No, I didn't do it.  I didn't write it because I had to

14   talk to the manager or whatever it is.

10:52AM 15   Q     It wasn't significant?

16   A     I was -- I didn't know if it was significant or not, but I

17   was in a state of shock when he told me.

18   Q     When did you write this note of 6/23?  I'm directing your

19   attention specifically to the second note on 6/23 where you

10:52AM 20   detail the information you got from Dr. Shah.

21   A     That's what I'm saying.  So I really don't know what is

22   going on, whether I wrote it or it looks like it's my writing,

23   but it's not, you know, Melanie Yu.  I don't think Melanie Yu

24   wrote this first four.  I think I wrote it.  But I didn't have

10:53AM 25   time to write -- I didn't put that, that he said "go away."
```

Both "brother and sister, make it go away," I didn't put it in

that data card.

Q    My question is, when did you write it?

A    The same day.

10:53AM  Q    Same day as it happened on June 23rd; right?

A    Yes.

Q    So your memory was fresh; correct?

A    Yes.

MR. SEVERO:  I have nothing further.

10:53AM            THE COURT:  All right.  Ms. Waier.

**REDIRECT EXAMINATION**

BY MS. WAIER:

Q    Why didn't you write Dr. Ham's bribe overture to you in

your activity report?

10:54AM  A    Because if the case transfer to somebody else, you know,

everything -- we don't put everything in that TIGTA card

because this is so sensitive matter.  So I discussed with the

manager.  I didn't tell Mike that -- you know, when I told him,

it just -- you know, I went and talked to the group manager.  I

10:54AM  didn't think that I should put it in that data card.  That is

whatever happens between me and the taxpayer.  But I didn't

think that I should put that also into the data card.

Q    Okay.  Why didn't you push to schedule the audit after

Dr. Shah made the bribe overture to you?

10:54AM  A    I want to talk to my manager before, whether I can make --

1    go ahead with the audit and everything.  I want to get the

2    direction from him, from my manager, because this is the first

3    time I ever had this type of situation.

4    Q    And there was a little -- there was talk on

10:55AM  5    cross-examination about whether you have audited other people

6    from India?

7    A    Yes.

8    Q    Have you audited other people from India?

9    A    I have audited other people from India, yes.

10:55AM 10   Q    Did they make similar comments to you like this?

11   A    No.  Never.

12   Q    Did they talk to you in Hindi?

13   A    No.  Never.

14   Q    Would you have thought that was appropriate?

10:55AM 15   A    No.

16            MS. WAIER:  No further questions.

17                      **RECROSS-EXAMINATION**

18   BY MR. SEVERO:

19   Q    So what was the offer?

10:55AM 20   A    There was no offer.  But I assume that -- I infer from his

21   comment that it's a bribe.

22   Q    You assumed it?

23   A    I inferred.  Because where I come from, in India that's

24   what they do.

10:55AM 25   Q    Has that ever happened to you before?

```
 1    A      No.

 2    Q      So you're really guessing about this, aren't you?

 3    A      Yes.

 4           MR. SEVERO:  Thank you.  Nothing further.

10:55AM 5    THE COURT:  All right.  You can step down, ma'am.

 6    You're excused.

 7           THE WITNESS:  Thank you.

 8           THE COURT:  Ms. Waier, ready to call the next

 9    witness?

10:56AM 10    MS. WAIER:  Special Agent Glenn Gomez.

11           THE COURT:  Very well.  Agent.

12    GLENN GOMEZ, PLAINTIFF'S WITNESS, WAS SWORN

13           THE COURTROOM DEPUTY:  Can you state your full name

14    and spell your last name for the record.

10:56AM 15    THE WITNESS:  Glenn Gomez, G-o-m-e-z.

16                    DIRECT EXAMINATION

17    BY MS. WAIER:

18    Q    Good morning, Revenue Agent Gomez.  Can you tell the jury

19    what you do.

10:56AM 20    A    I'm a special agent with the Treasury Inspector General

21    for Tax Administration.  I've been with -- otherwise known as

22    TIGTA.  I've been with TIGTA for approximately 25 years.

23    Q    What is TIGTA?

24    A    TIGTA is a separate agency away from the IRS.  They are a

10:57AM 25    component of the treasury department.  We oversee and protect
```

```
 1    the integrity of the Internal Revenue Service.  We have a
 2    unique position in that we do internal crimes as well as
 3    external crimes.  External crimes being bribery, assaults of
 4    federal officers and what have you.
10:57AM  5    Q    So TIGTA is not part of the Internal Revenue Service?
 6    A    That's correct.
 7    Q    It's a separate and distinct agency?
 8    A    That's correct.
 9    Q    Does TIGTA have their own regulations and policies?
10:57AM 10    A    Absolutely.
11    Q    Does the Internal Revenue Service dictate what TIGTA
12    does?
13    A    No.
14    Q    Does TIGTA follow the Internal Revenue Service policies?
10:57AM 15    A    In regards to TIGTA oversees the Internal Revenue Service.
16    So in the respects of the oversight of the Internal Revenue
17    Service, primarily in the aspect of the integrity of the
18    service, in particular in the investigations aspect, we follow
19    the policies of TIGTA in relation to whether there's criminal
10:58AM 20    violations or administrative violations of Internal Revenue
21    Service employees.  However, like I said before, we do external
22    crimes as well for those that actually attempt to assault or
23    threaten IRS employees, bribe employees and such.
24    Q    So investigations such as bribery cases, what policies do
10:58AM 25    you follow?
```

| | |
|---|---|
| 1 | A    We follow our internal -- our treasury inspector manual in |
| 2 | relation to -- and the -- excuse me -- and the criminal code in |
| 3 | relation to bribery overtures. |
| 4 | Q    You're not dictated by Internal Revenue Service policies? |
| 10:59AM 5 | A    No. |
| 6 | MR. SEVERO:  Asked and answered. |
| 7 | THE COURT:  Overruled. |
| 8 | Q    BY MS. WAIER:  Does TIGTA investigate tax fraud? |
| 9 | A    No. |
| 10:59AM 10 | Q    Who does? |
| 11 | A    Internal Revenue Service, Criminal Investigation. |
| 12 | Q    Is this case a tax fraud case? |
| 13 | A    No. |
| 14 | Q    Are bribery cases solely within the purview of TIGTA? |
| 10:59AM 15 | A    Yes. |
| 16 | Q    Are you the primary case agent that did the investigation |
| 17 | for this case? |
| 18 | A    Yes. |
| 19 | Q    How did the investigation start? |
| 10:59AM 20 | A    The investigation started when I received a phone call |
| 21 | from Internal Revenue Service, Revenue Agent Mike Ham. |
| 22 | Q    Is that typically how these cases come to you? |
| 23 | A    Yes. |
| 24 | Q    Now, how long have you been a special agent? |
| 11:00AM 25 | A    25 years. |

Q     And during that 25 years, have you investigated a lot of
bribery cases?

A     Many.

Q     Okay.  And out of those bribery cases, what's the
percentage that they actually -- that somebody's actually
charged?

A     I want to say that the majority, approximately 90 percent
of the time, most bribery cases don't come to fruition, that
most taxpayers back away for whatever reasons, a various amount
of reasons, or they don't repeat the overture.  There's many,
many reasons why a taxpayer doesn't follow through, but our
intent as TIGTA is to determine the intent of the taxpayer,
whether they are serious about making an overture or not.

Q     So when you start the investigation, do you -- are you
objective?

A     Absolutely.

Q     So you're just -- so for your investigation, you don't go
in thinking "We're going to get a bribery case out of this"?

A     Absolutely not.

Q     What do you do?  What is the intent of your
investigation?

A     We're trying to find out --

            MR. SEVERO:  Asked and answered.

            THE COURT:  Overruled.

            THE WITNESS:  We're trying to find out whether the

1    taxpayer is -- has the intent to compromise the Internal

2    Revenue Service employee.

3    Q     BY MS. WAIER:   Is your intent to entrap people?

4    A     Absolutely not.

11:01AM 5    Q     Is your intent to find the truth?

6    A     Absolutely.

7    Q     And when you do these investigations, is it your practice

8    to tell the revenue agent to offer a bribe?

9    A     Absolutely not.

11:01AM 10   Q     What do you do?

11   A     In the starting of bribery investigation, what we -- once

12   we receive the information that a taxpayer had made an

13   overture, we would like to have the IRS employee, the revenue

14   agent, to recontact the taxpayer, if that is within the purview

11:02AM 15   of what their normal business practices are, and to determine

16   whether the taxpayer is going to repeat that overture or not.

17         Like I said before, a majority of times we would make a

18   phone call or we would have contact with the taxpayer, and they

19   don't repeat their overture or they don't -- they just -- they

11:02AM 20   just avoid the context of the conversation altogether.  And

21   then generally speaking, the bribery investigation is closed at

22   that point in time.

23   Q     Because the taxpayer didn't have the intent, in your

24   mind?

11:02AM 25   A     That's correct.

**UNITED STATES DISTRICT COURT**

1    Q     And in those calls, is TIGTA initiating the revenue agent

2    to offer a bribe?

3    A     No.

4          MR. SEVERO:  Objection.  Leading.

11:02AM 5          THE COURT:  Overruled.

6          THE WITNESS:  No.

7    Q    BY MS. WAIER:  Why not?

8    A     Because that would be deemed as an entrapment.  And we go

9    so far away from the aspect of entrapment, that is not our job.

11:03AM 10   Our job is to find the truth in relation to what is the intent

11   of the taxpayer.  If that intent of the taxpayer is to

12   compromise the employee, then we're going to follow through

13   with that and just to determine how far that taxpayer is

14   willing to go.

11:03AM 15   Q     In fact, you don't get brownie points or special points

16   for bringing criminal cases, do you?

17   A     Absolutely not.

18          MR. SEVERO:  Objection.  Argumentative.

19          THE COURT:  Overruled.

11:03AM 20   Q    BY MS. WAIER:  Now, you talk about this -- well, does

21   bribery overtures occur in the course of audits?  Has that ever

22   happened?

23   A     Yes.

24   Q     Does TIGTA have any role at all in a civil audit?

11:03AM 25   A     Absolutely not.

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | Q      Does TIGTA determine any tax? |
| | 2 | A      Absolutely not. |
| | 3 | Q      Does TIGTA determine whether or not a taxpayer owes |
| | 4 | taxes? |
| 11:04AM | 5 | A      Absolutely not. |
| | 6 | Q      Is your intent to ever enter into a -- is your intent |
| | 7 | ever as TIGTA to ever put yourself into the audit? |
| | 8 | A      No. |
| | 9 | Q      In terms of what the taxpayer owes? |
| 11:04AM | 10 | A      Absolutely not. |
| | 11 | Q      Do you make that clear to the revenue agent? |
| | 12 | A      Absolutely. |
| | 13 | Q      So this case came to you as most typical bribe cases do? |
| | 14 | A      That's correct. |
| 11:04AM | 15 | Q      And I want to just back up a little bit.  Does TIGTA give |
| | 16 | any kind of training or seminars to revenue agents? |
| | 17 | A      We do.  I've conducted numerous presentations to employees |
| | 18 | in relation to bribery awareness.  And I've mentioned it more |
| | 19 | times -- every single presentation that I give is that our |
| 11:05AM | 20 | intention is not to entrap taxpayers, it's that to find the |
| | 21 | intent, the true intent of what the taxpayers is intending on |
| | 22 | doing, which is if the overture is coming forward, it's to |
| | 23 | compromise the employee. |
| | 24 | Q      And you give these seminars to new agents and senior |
| 11:05AM | 25 | agents? |

A     That's correct.

Q     And why do you do that?

A     Like I said, our mission is to protect the integrity of
the Internal Revenue Service.  And obviously the Internal
11:05AM   Revenue Service is -- it's an agency that most people don't
care for.  So thus we know that there are individuals,
taxpayers, who feel very exposed in relation to being audited
and having collection efforts against them.  So we have to be
very sensitive to what the -- what our employees -- what the
11:06AM   IRS employees are facing out there.

Q     And these seminars are just to give revenue agents
information on what to do if they --

A     That's correct.

Q     -- if they receive a bribe overture?

11:06AM   A     That's correct.

Q     So revenue agents are counseled to do what if they
receive a bribe overture?

A     They are advised to -- if they believe that they had
received an overture, they are advised to clarify -- if
11:06AM   possible, clarify the overture to determine the state of mind,
and then to stall.  And basically to contact us so we can make
a determination whether the intent is there or not.

Q     And to do that, do you sometimes have to record
conversations or contacts between the taxpayer and the revenue
11:07AM   agent?

```
 1    A    Yes.

 2    Q    Why do you do that?

 3    A    Because we don't want to go into a situation where it's a

 4  "he said, she said," it is to gather evidence if it is true

 5  that the taxpayer is to the point where he is -- he or she is

 6  intending on compromising the IRS employee.

 7    Q    And the recording also captures what the revenue agent is

 8  doing too; right?

 9    A    Absolutely.

10         MR. SEVERO:  Objection.  Leading.

11         THE COURT:  Sustained.

12         MR. SEVERO:  Move to strike the answer.

13         THE COURT:  Stricken.

14    Q    BY MS. WAIER:  So is one of the purposes of also

15  recording phone calls to capture what the revenue agent is also

16  saying?

17    A    That's correct.

18         MR. SEVERO:  Leading.

19         THE COURT:  Overruled.

20    Q    BY MS. WAIER:  So in bribery cases, it's common to have

21  monitored meetings or calls by TIGTA?

22    A    Yes.

23    Q    And when these are occurring, the revenue agents are

24  counseled to do what?

25    A    The revenue agents are instructed to clarify what the
```

11:07AM (line 5)
11:07AM (line 10)
11:07AM (line 15)
11:07AM (line 20)
11:08AM (line 25)

UNITED STATES DISTRICT COURT

```
 1    situation is.  And basically if an overture has been made and

 2    obviously the overture has been made before TIGTA contact,

 3    then, therefore, what we're trying to do is to determine

 4    whether the taxpayer is going to make that next step again to

 5    try to compromise the IRS employee.

 6        Like I said before, many times, more times than not, they

 7    don't.  They never repeat their offer or they don't -- they

 8    recant or they avoid the subject altogether.  So the

 9    investigation is generally closed at that point.

10    Q    And you close it?

11    A    We close it.

12    Q    Now, this investigation came to you in a typical way?

13    A    That's correct.

14    Q    And how did that occur?

15    A    That was by phone call.

16    Q    Was that in November of 2009?

17    A    I believe so, yes.

18    Q    Who called you?

19    A    Mike Ham.

20    Q    Do you remember the conversation?

21    A    I do.

22    Q    Can you tell the jury what Revenue Agent Ham told you?

23            MR. SEVERO:  Hearsay.

24            THE COURT:  I assume you're not offering for truth?

25            MS. WAIER:  Fact on listener, Your Honor.
```

11:08AM (line 5)
11:09AM (line 10)
11:09AM (line 15)
11:09AM (line 20)
11:09AM (line 25)

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Overruled.

2          MR. SEVERO:  If it's not offered for the truth, it's

3     irrelevant.

4          THE COURT:  Overruled.  State of mind impact on

11:09AM 5     listener to explain what he did and why he did it.

6          MS. WAIER:  Thank you, Your Honor.

7          THE WITNESS:  Revenue Agent Ham had called me and

8     advised me that Dr. Shah had reached out to him -- or actually

9     he had reached out to Dr. Shah, as I recall.  And they had a

11:10AM 10    rather combative starting point in relation to this starting of

11    the audit.  And he did not have any books and records, as I

12    recall.

13         And Revenue Agent Ham was having a difficult time to set

14    up an appointment with Dr. Shah.  And I believe Revenue

11:10AM 15    Agent Ham had advised me that he had had a conversation with

16    Revenue Agent Raghaven that indicated that Dr. Shah had made an

17    overture to Ms. Raghaven.

18         And Mr. Ham had also further advised me that Dr. Shah was

19    making an overture about attempting to compromise the audit to

11:11AM 20    lower down the audit, and that he would -- he said that he was

21    going to give him free medical care as well as, "If you can't

22    do that, then I would hire your family member."  So that was an

23    indicator -- a strong indicator that Dr. Shah was in the

24    mindset to compromise Revenue Agent Ham.

11:11AM 25    Q    BY MS. WAIER:  So when Revenue Agent Ham called you, he

```
 1    had talked about specific overtures that Dr. Shah made to him

 2    during the course of the audit?

 3    A    That's correct.

 4    Q    And he called you.  What did you do after you heard about

 5    these overtures?

 6    A    I believe I was asking him where about is he in the audit.

 7    Because we want to go with the aspect of the natural course of

 8    the audit, "Where are you?  When do you plan on recontacting

 9    him?" and what have you.  I believe that we may have met maybe

10    a week or two later, and I may have met with Mr. Ham.  And what

11    we were going to do is make a phone call to Dr. Shah to

12    determine where he was on this particular issue.

13    Q    Well, do you recall where Mr. Ham was in relation to

14    Dr. Shah's audit?

15    A    I believe that he was -- because Dr. Shah was not

16    providing him any documentation, that summonses were already

17    going out to secure financial records, so he can get a clear

18    picture of where his -- where the assessment was going to be,

19    because there was no books, records, from what I understood,

20    that he had received.  So he could not get an idea of his

21    financial picture to make an audit or an audit assessment

22    rather.

23    Q    Well, what was your understanding regarding the Revenue

24    Agent Report?

25    A    The Revenue Agent Report was coming towards the tail end
```

11:11AM 5
11:12AM 10
11:12AM 15
11:12AM 20
11:13AM 25

1    of it.  Because no books and records were forthcoming from

2    Dr. Shah, it was my understanding that he was waiting for the

3    bank statements so he can do a financial analysis of it.  And

4    it was getting towards the end of it.  That was my

11:13AM  5    understanding, I believe.

6    Q     And did you tell him not to contact you until he was

7    finished with the audit?

8    A     That's for -- yes, that's for the most part, yes.

9    Q     Okay.  So did Revenue Agent Ham contact you on

11:13AM 10    December 14 of 2009?

11    A     Can I look at -- is there an exhibit to that?

12    Q     Yes.  Can you look at Exhibit 15, Page 5.

13    A     Exhibit 15, Page 5?

14    Q     Correct.  And then the entry December 14, 2009.

11:14AM 15    A     Okay.  Yes.

16    Q     Okay.  Do you remember if you were contacted in December

17    of 2009 by Revenue Agent Ham?

18    A     Yes.

19    Q     And that was approximately how long after your first

11:14AM 20    initial contact with Revenue Agent Ham?

21    A     That was approximately a month later.

22    Q     All right.  And that time occurred because -- why was

23    there so much time between the initial contact and then finally

24    when you got contact from Revenue Agent Ham in December?

11:14AM 25    A     Why was there such a lag time between that month?

Q      Uh-huh.

A      I believe he was waiting for bank documents to get an idea of where the finality of the audit was going to be at.

Q      So were you waiting for him to finish the audit?

11:15AM  A      That's correct.

Q      And so he contacted you after he was done with the Revenue Agent Report?

A      That's correct.

Q      And that's because you have no part in the audit?

11:15AM  A      That's correct.

Q      And he contacted you and told you he was done with the Revenue Agent Reports for all three years?

A      That's correct.

Q      But there -- and so why did you want him to contact you 11:15AM before he contacted the taxpayer?

A      Because like I said before, we were -- we want to find out where the taxpayer is at in relation to the overture.  And because we had preliminarily had received the information in November of 2009, we already had an indicator that he was -- 11:16AM that he had made that step forward in attempting to compromise Revenue Agent Ham.  So what we wanted to do was make a monitor call to determine where the taxpayer, Dr. Shah, was heading to.

Q      And you wanted to make that monitor call within the natural course of what the audit would normally go through?

11:16AM             MR. SEVERO:  Objection.  Leading.

1          THE COURT:  Sustained.

2    Q    BY MS. WAIER:  So why did you wait so long to make the

3    phone call?

4    A    Because I advised Mr. Ham that, you know, I don't get

11:16AM  5    involved with the audits.  So what it is is that when you're in

6    the natural progression of the audit, when you get to the point

7    of completing your audit, then contact me and then we would

8    make the phone call.

9    Q    And why couldn't that phone call be done in December 15,

11:16AM 10    2009, or the end of December?

11    A    Well, I know that the IRS has moratorium in the last two

12    weeks of December.  So I don't know if they generally reach out

13    to taxpayers in the last two weeks of December.

14          MR. SEVERO:  Move to strike.  Speculation on the

11:17AM 15    witness.

16          THE COURT:  Overruled.

17          THE WITNESS:  But we were waiting for his finality

18    or completion of the audit in order for us to make -- in order

19    for us to make the call.

11:17AM 20    Q    BY MS. WAIER:  So did you set up a monitored call between

21    Revenue Agent Ham and Dr. Shah?

22    A    Yes.

23    Q    Okay.  I'd like you to look at Exhibit 3.

24          And at this time, let me --

11:17AM 25          May I approach, Your Honor?

**UNITED STATES DISTRICT COURT**

1          THE COURT:  You may.

2          MS. WAIER:  Let the record reflect that I've handed

3    Government's Exhibit 3, which is a CD.  Do you recognize it?

4          THE WITNESS:  I do.

11:18AM 5    Q    BY MS. WAIER:  What is it?

6    A    It is a CD of the recording that was made by me having

7    Revenue Agent Ham contact Dr. Shah on the telephone on

8    January 5th, 2010.

9    Q    Let me back up one question.  So after a bribe overture

11:18AM 10   is made to a revenue agent, do you give them any instruction as

11   to how to have future contact with a taxpayer?

12   A    Yes.

13   Q    What do you tell them?

14   A    We advise them not to have any contact with the taxpayer

11:18AM 15   without it being recorded.

16   Q    Why is that?

17   A    Because we don't want any -- we want it to be documented,

18   what is said by the revenue agent to the taxpayer.

19   Q    Now, Exhibit 3, were you physically there with Revenue

11:19AM 20   Agent Ham?

21   A    Yes.

22   Q    So you were listening, also, as you're recording it?

23   A    Yes.

24          MS. WAIER:  Your Honor, I ask that Exhibit 3 be

11:19AM 25   moved into evidence.

**UNITED STATES DISTRICT COURT**

|     |                                                              |
|-----|--------------------------------------------------------------|
| 1   | THE COURT:  Any objection?                                   |
| 2   | MR. SEVERO:  No.                                             |

         THE COURT:  Any objection?

         MR. SEVERO:  No.

         THE COURT:  Exhibit 3 will be received into

evidence.  You may play it for the jury.

11:19AM  **(Exhibit No. 3 received.)**

         MS. WAIER:  Before I play it at this time, I have

transcript books I'd like to hand out to the jury.

         THE COURT:  Please do.

Q    BY MS. WAIER:  I'd like to direct your attention to

11:20AM  Exhibit 3A --

         And, also, the jury, you should have Exhibit 3A.

         What is Exhibit 3A?

A    3A is the transcript of the recorded conversation between

Dr. -- the recorded and monitored conversation between Dr. Shah

11:20AM  and in Internal Revenue Service, Revenue Agent Mike Ham.

Q    That occurred on January 5th, 2010?

A    Correct.

         MS. WAIER:  At this time, Your Honor, I'm going to

go ahead and play the recording.

11:20AM  THE COURT:  All right.  And ladies and gentlemen, I

just want to give you a quick instruction.  The evidence is

actually the recording itself, not the written transcript you

have.  So you're going to have to rely on what you hear.  The

transcript is just an aid to help you listen as you follow

11:21AM  along, as you're listening to the recording.  All right.

**UNITED STATES DISTRICT COURT**

1          **(Audio recording played, not reported.)**

2    Q    BY MS. WAIER:  Is this what is called a preamble?

3    A    That's correct.

4    Q    It's just to show that you're monitoring the phone call?

11:22AM 5    A    That's correct.

6    Q    I notice when I heard it, the date, is that right or

7    wrong?

8    A    That's wrong.

9    Q    Okay.  It's just because it was a new year?

11:22AM 10   A    I believe, yeah.

11   Q    Happens to me all the time.

12        All right.  Go ahead.

13         **(Audio recording played, not reported.)**

14   Q    BY MS. WAIER:  Was another call then initiated?

11:23AM 15   A    That's correct.

16   Q    Okay.  Go ahead and play that.

17         **(Audio recording played, not reported.)**

18   Q    BY MS. WAIER:  Now, TIGTA can't always control when a

19   taxpayer calls a revenue agent; right?

11:30AM 20   A    That's correct.

21   Q    You can't sit next to him every minute of the day?

22        MR. SEVERO:  Leading.

23        THE COURT:  Overruled.

24   Q    BY MS. WAIER:  Was there contact that occurred shortly

11:30AM 25   after this call between Revenue Agent Ham and the taxpayer?

```
  1    A     I believe so.

  2    Q     Okay.  And do you have a recollection of what occurred?

  3               MR. SEVERO:  Objection --

  4               THE REPORTER:  I'm sorry.  I didn't hear you.

11:31AM  5               MR. SEVERO:  Well, maybe my objection was premature

  6    on that.

  7               THE COURT:  I think you were.

  8               MR. SEVERO:  I'll withdraw that.

  9               THE COURT:  I think the question, sir, was, do you

11:31AM 10    have a recollection of what was discussed in that follow-up

 11    conversation?

 12               THE WITNESS:  Right off the top, I really -- I need

 13    to see something, but I can't recall.

 14    Q     BY MS. WAIER:  What do you need to see?

11:31AM 15    A     I think there's an e-mail out there that would indicate

 16    what was discussed between Revenue Agent Ham and myself.  And I

 17    know that I generally -- if there is an unsolicited phone call

 18    that is received by the revenue agent and I can't monitor it,

 19    what I would advise him to do is to be very short.

11:31AM 20               MR. SEVERO:  There's a question pending, Your Honor.

 21               THE WITNESS:  I'm sorry.

 22    Q     BY MS. WAIER:  What do you advise the revenue agent to do

 23    if they get an unsolicited call from a taxpayer that you can't

 24    monitor?

11:32AM 25    A     I advise the revenue agent to be very short with the
```

**UNITED STATES DISTRICT COURT**

```
 1   taxpayer and to write notes and give me the specifics of what
 2   had occurred during that phone call.
 3   Q    Do you know if you have a copy of that e-mail with you or
 4   at the counsel table?
 5   A    I believe -- I believe -- I had seen it.  Now, I don't
 6   know if it's in this exhibit book.
 7            MS. WAIER:  Okay.  I'm going to move on, Your Honor.
 8   I'll just revisit that when we can get the document to refresh
 9   his recollection.
10            THE COURT:  Very well.
11   Q    BY MS. WAIER:  So there was some contact, but then the
12   meeting was supposed to occur on Friday, January 10?
13   A    That's correct.
14   Q    Okay.  Did you monitor that meeting?
15   A    That's correct.
16   Q    Why?
17   A    Again, what we were going to do was to determine the
18   intent of the taxpayer.  Like I said before, throughout the
19   process of a bribery investigation, there are multiple times
20   where we make monitored calls.  And whether it's multiple
21   monitored calls or multiple monitor meets, it just determines
22   whether the taxpayer has the true intent of bribing the public
23   official.
24   Q    Well, on the January 5th phone call, we just heard it,
25   could you determine his intent?
```

11:32AM (lines 5, 10, 15)
11:33AM (lines 20, 25)

**UNITED STATES DISTRICT COURT**

A     There was an indicator, I believe, on that last page, if

you want me to reread it, but I know what stuck out in my mind

when he had indicated, "You're going to work for me.  You're

going to work for me for the rest of my life."

       "What do you mean for the rest of your life?"

       "I will talk to you on Friday."  That was an indicator

that something was amiss, that there was an overture there.

And we could not -- we could not pin it down.  Obviously it's a

little ambiguous, so we're going to make -- we're going to have

that meeting and monitoring to find out, once again, where the

true intent is from the taxpayer.

Q     Okay.  I'd like to now --

       May I approach, Your Honor?

              THE COURT:  You may.

Q     BY MS. WAIER:  For the record, I'm handing you what has

been marked as Exhibit 4.  Do you recognize it?

A     Yes, I do.

Q     What is it?

A     It's a monitored recorded meeting between Internal Revenue

Agent Mike Ham and Dr. Shah, dated January 8, 2010.

Q     Is that when the next scheduled meeting was pursuant to

the January 5th phone call?

A     That's correct.

Q     I think I earlier misspoke.  I think I said January 10,

but it was --

```
 1    A     January 8.  That is what confused me.

 2    Q     Where was the meeting supposed to occur?

 3    A     At Dr. Shah's office.

 4    Q     Now is that problematic sometimes to have?

 5    A     Yes.

 6    Q     To have meetings at an office?

 7    A     Yes.

 8    Q     Why?

 9    A     Because we cannot control truly the safety of the revenue

10    agent.  You know, all we can do is monitor.  And we have a

11    group of agents that are in that area doing the monitoring.

12    But yeah, it can be problematic.

13    Q     So what is -- what is your No. 1 goal in terms of doing a

14    monitor call at an office?

15    A     No. 1 goal is to make sure our revenue agent is safe.

16    That's the No. 1 goal.  You know, that our employees are safe

17    as well as everyone being safe.  We don't want anyone being

18    harmed.

19    Q     Do you actually place a recording device on the agent?

20    A     Yes.

21    Q     And then are you in the area?

22    A     Yes.

23    Q     And are you monitoring the meeting as it's occurring?

24    A     Yes.

25    Q     Is Exhibit 4 the recording that you monitored on
```

**UNITED STATES DISTRICT COURT**

```
 1    January 8, 2010?

 2    A    Yes.

 3    Q    Did you actually go to the location with Revenue

 4    Agent Ham?

 5    A    Yes.

 6              MS. WAIER:  At this time, Your Honor, I'd like to

 7    admit Exhibit 4.

 8              THE COURT:  Any objection?

 9              MR. SEVERO:  No objection.

10              THE COURT:  Exhibit 4 will be received into

11    evidence.

12              (Exhibit No. 4 received.)

13    Q    BY MS. WAIER:  I'd like to direct your attention to

14    Exhibit 4A, Special Agent Gomez.

15    A    Yes.

16    Q    Do you see it?

17    A    Yes.

18    Q    What is it?

19    A    4A is a recorded transcript of the monitored and recorded

20    meeting of Internal Revenue Service Revenue Agent Mike Ham and

21    Dr. Shah.  And I believe it's at his place of business.

22              At this time, Your Honor, I'd like to play

23    Exhibit 4.

24              THE COURT:  You may.

25              (Audio recording played, not reported.)
```

UNITED STATES DISTRICT COURT

```
 1   Q    BY MS. WAIER:  Is this the same preamble that you do
 2   before a monitored meeting or call?
 3   A    Yes.
 4           MS. WAIER:  Your Honor, I just talked to defense
 5   counsel.  I want to make you aware, this tape is an hour and 38
 6   minutes.
 7           THE COURT:  All right.
 8           MS. WAIER:  So would you rather me start it and then
 9   stop in the middle or --
10           THE COURT:  Yeah.
11           MS. WAIER:  -- you want me to stop around noon?
12           THE COURT:  Around noon would be fine.
13           MS. WAIER:  All right.
14           (Audio recording played, not reported.)
15           MS. WAIER:  Your Honor, it's noon.
16           THE COURT:  All right.  Ladies and gentlemen, why
17   don't we take our lunch break.  Please remember those
18   admonitions:  Don't talk to anybody about the case, don't do
19   any independent investigation, and keep an open mind until
20   you've heard all the evidence and it's time to deliberate.
21   We'll take an hour lunch and pick back up at 1 o'clock.  Have a
22   nice lunch.
23           (Further proceedings reported by
24            Miriam Baird in Volume 2.)
25                     --oOo--
```

11:38AM (line 5)
11:38AM (line 10)
11:59AM (line 15)
11:59AM (line 20)

**UNITED STATES DISTRICT COURT**

1       *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5            I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  September 8, 2015*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN_*

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$177,000** [1] - 35:13

## '

**'09** [7] - 75:3, 75:4, 75:5, 75:9, 75:17, 85:11, 87:10

## /

**/S** [1] - 118:19

## 1

**1** [20] - 1:8, 14:16, 14:17, 14:21, 16:23, 17:18, 18:16, 21:24, 22:6, 47:22, 48:6, 48:7, 81:22, 115:13, 115:15, 115:16, 117:21
**1-191** [1] - 1:24
**1/5/2010** [1] - 3:18
**1/8/2010** [1] - 3:19
**10** [2] - 113:12, 114:24
**100** [1] - 56:9
**1040** [16] - 47:10, 65:2, 65:3, 65:4, 65:23, 71:13, 72:22, 73:7, 73:14, 73:18, 73:21, 73:22, 74:1, 74:2, 74:6, 74:20
**1040s** [1] - 47:15
**10832** [1] - 2:15
**11** [3] - 14:5, 82:17, 88:11
**110** [1] - 3:17
**1120** [2] - 74:10, 74:11
**116** [1] - 3:19
**12** [10] - 14:5, 16:10, 16:11, 16:12, 16:15, 20:13, 39:10, 39:21, 82:17, 87:20
**13** [2] - 14:5, 39:24
**14** [5] - 14:5, 29:1, 39:25, 106:10, 106:14
**15** [44] - 1:15, 3:16, 4:1, 14:2, 14:10, 14:16, 15:10, 16:1, 16:3, 16:5, 16:24, 20:13, 24:20, 25:18, 28:24, 33:3, 33:12, 33:14, 36:24, 37:15, 37:21, 38:2, 38:10, 38:19, 39:8, 39:9, 43:23, 46:3, 62:23, 63:3, 63:5, 63:12, 64:19, 73:15, 74:4, 82:23, 82:24, 86:23, 88:5, 106:12, 106:13, 108:9
**15-minute** [1] - 63:20
**16** [1] - 3:16
**17** [5] - 13:19, 16:22, 16:25, 19:1, 21:20
**179,000** [1] - 35:2

## 2

**2** [8] - 1:14, 33:11, 33:14, 33:16, 34:24, 48:8, 117:24
**20** [5] - 22:7, 22:14, 23:4, 23:13, 82:24
**2006** [1] - 35:16
**2007** [9] - 12:10, 13:16, 33:8, 34:20, 35:16, 65:2, 65:4, 67:11
**2008** [12] - 35:16, 64:19, 72:5, 72:6, 72:12, 72:15, 72:16, 72:20, 72:22, 73:13, 73:15
**2009** [31] - 13:13, 13:19, 16:25, 17:23, 18:17, 19:1, 20:7, 21:25, 22:8, 22:10, 22:15, 23:4, 23:11, 27:22, 29:6, 31:16, 32:5, 33:3, 33:18, 34:24, 36:3, 36:24, 67:1, 73:5, 74:11, 103:16, 106:10, 106:14, 106:17, 107:19, 108:10
**2010** [6] - 74:16, 109:8, 110:16, 114:20, 116:1
**2015** [3] - 1:15, 4:1, 118:15
**20th** [6] - 21:25, 22:10, 27:22, 39:11, 39:14, 39:23
**22nd** [2] - 33:18, 34:24, 36:3
**23rd** [1] - 92:5
**24** [1] - 49:15
**25** [3] - 94:22, 96:25, 97:1
**25th** [2] - 29:6, 39:11, 39:15, 39:24
**28** [1] - 118:8
**29** [4] - 5:2, 30:7, 30:12, 86:23
**29-year** [1] - 8:25

## 3

**3** [8] - 3:18, 48:8, 108:23, 109:3, 109:19, 109:24, 110:3, 110:5
**30th** [1] - 18:17
**338-3505** [1] - 2:8
**37** [1] - 3:4
**38** [1] - 117:5
**39** [8] - 16:11, 16:12, 16:15, 33:15, 39:10, 39:24, 39:25, 86:24
**3A** [4] - 110:10, 110:11, 110:12, 110:13

## 4

**4** [8] - 3:3, 3:19, 114:16, 115:25, 116:7, 116:10, 116:12, 116:23

## 411

**411** [2] - 1:24, 2:6
**45** [1] - 18:2
**463-4430** [1] - 2:16
**4A** [2] - 116:14, 116:19
**4th** [2] - 17:22, 17:23

## 5

**5** [2] - 106:12, 106:13
**5/1/2009** [1] - 18:17
**58** [1] - 3:4
**5th** [4] - 109:8, 110:16, 113:24, 114:22

## 6

**6/23** [8] - 88:12, 88:13, 88:20, 88:21, 89:2, 89:21, 91:18, 91:19
**60** [1] - 3:5
**609** [2] - 17:19, 81:22
**626** [1] - 2:12
**64** [1] - 3:6

## 7

**7** [2] - 88:2, 88:6
**7/07** [3] - 88:6, 88:23, 88:24
**714** [2] - 2:8, 2:16
**72** [1] - 3:7
**753** [1] - 118:8
**79** [1] - 2:11
**7953** [2] - 1:23, 118:20

## 8

**8** [4] - 114:20, 115:1, 116:1, 118:15
**8000** [1] - 2:7
**844-6400** [1] - 2:12
**8:10-cr-00070-CJC-1** [1] - 1:7
**8:29** [2] - 1:16, 4:2

## 9

**9** [1] - 82:8
**90** [1] - 97:7
**91101** [1] - 2:12
**92** [1] - 3:7
**92701** [1] - 2:7
**92701-4516** [1] - 1:24
**92886** [1] - 2:16
**93** [1] - 3:8
**94** [1] - 3:9
**945** [1] - 2:11

## A

**A.M** [2] - 1:16, 4:2

## able

**able** [6] - 11:23, 30:2, 31:11, 61:23, 61:25, 62:6
**above-entitled** [1] - 118:11
**absolutely** [13] - 95:10, 97:16, 97:19, 98:4, 98:6, 98:9, 99:17, 99:25, 100:2, 100:5, 100:10, 100:12, 102:9
**accept** [1] - 5:11
**accordance** [1] - 37:1
**according** [4] - 16:22, 35:12, 55:12, 87:9
**accurate** [5] - 43:11, 44:22, 45:11, 45:16, 56:10
**Accurate** [10] - 17:11, 57:12, 57:15, 57:21, 65:19, 65:20, 66:4, 66:7, 79:25, 80:2
**act** [1] - 37:1
**Act** [1] - 17:20
**acting** [5] - 31:13, 31:14, 31:22, 37:1, 37:4
**action** [1] - 63:3
**actions** [11] - 11:18, 19:21, 19:24, 38:1, 38:2, 38:6, 38:7, 38:9, 38:24, 60:1, 63:6
**activities** [1] - 24:19
**Activity** [4] - 3:16, 14:18, 15:1, 15:17
**activity** [12] - 37:19, 37:22, 38:11, 63:2, 86:17, 87:1, 87:13, 87:23, 87:24, 88:12, 88:16, 92:14
**actual** [1] - 11:11
**addition** [1] - 36:3
**additional** [4] - 6:4, 22:20, 23:8, 65:17
**address** [1] - 65:10
**adjustments** [2] - 34:6
**administer** [1] - 64:3
**Administration** [1] - 94:21
**administrative** [2] - 46:6, 95:20
**admissibility** [1] - 63:13
**admissible** [1] - 62:23
**admit** [1] - 116:7
**admitted** [2] - 15:10, 16:2
**admonitions** [1] - 117:18
**advise** [4] - 109:14, 112:19, 112:22, 112:25
**advised** [6] - 101:18, 101:19, 104:8, 104:15, 104:18, 108:4
**affected** [1] - 57:17
**afternoon** [2] - 89:5, 89:22
**agency** [3] - 94:24, 95:7, 101:5
**agent** [77] - 4:25, 5:4, 6:9, 7:25, 8:2, 9:2, 9:18, 10:2, 12:13, 13:4, 15:8, 21:9, 35:1, 37:1, 37:4, 37:7, 38:23,

38:24, 39:2, 40:10, 40:17, 40:22, 41:4, 42:1, 46:16, 48:15, 48:21, 49:1, 49:4, 49:12, 49:15, 52:17, 53:23, 56:7, 57:13, 57:17, 60:3, 60:6, 62:3, 64:17, 64:20, 67:11, 67:20, 67:22, 68:3, 68:7, 68:10, 70:20, 72:5, 72:6, 72:10, 72:18, 90:7, 90:13, 90:24, 94:11, 94:20, 96:16, 96:24, 98:8, 98:14, 99:1, 100:11, 101:25, 102:7, 102:15, 109:10, 109:18, 111:19, 112:18, 112:22, 112:25, 115:10, 115:15, 115:19

**Agent** [91] - 4:10, 5:6, 5:9, 5:12, 5:14, 9:21, 9:24, 10:10, 12:1, 12:17, 13:3, 18:6, 18:9, 19:19, 21:21, 22:7, 22:10, 22:22, 24:8, 24:23, 28:7, 31:12, 31:13, 31:16, 31:21, 32:1, 32:23, 33:25, 34:9, 35:15, 36:21, 36:25, 37:4, 44:7, 44:18, 44:22, 45:16, 49:17, 51:13, 52:3, 52:20, 53:11, 53:19, 56:2, 57:20, 57:24, 59:7, 59:9, 59:18, 59:24, 60:1, 60:21, 60:25, 61:9, 62:4, 62:7, 63:4, 70:23, 71:5, 88:7, 90:22, 94:10, 94:18, 96:21, 103:22, 104:7, 104:13, 104:15, 104:16, 104:24, 104:25, 105:24, 105:25, 106:9, 106:17, 106:20, 106:24, 107:7, 107:12, 107:21, 108:21, 109:7, 109:20, 110:15, 111:25, 112:16, 114:20, 116:4, 116:14, 116:20

**agent's** [3] - 38:7, 38:24, 46:16

**Agent's** [1] - 47:3

**agents** [15] - 5:17, 9:11, 46:23, 47:17, 49:3, 63:6, 100:16, 100:24, 100:25, 101:11, 101:16, 102:23, 102:25, 115:11

**ago** [2] - 27:4, 43:6

**agree** [4] - 35:18, 35:21, 54:19, 54:20

**agreed** [3] - 35:18, 54:15, 54:21

**agreed-upon** [1] - 54:21

**ahead** [8] - 20:3, 20:18, 23:12, 55:4, 93:1, 110:19, 111:12, 111:16

**aid** [1] - 110:24

**alerted** [1] - 71:17

**allegation** [1] - 61:8

**allow** [3] - 17:23, 28:1, 50:10

**allowed** [1] - 27:5

**altogether** [2] - 98:20, 103:8

**ambiguous** [1] - 114:9

**America** [1] - 70:10

**AMERICA** [1] - 1:5

**amiss** [1] - 114:7

**amount** [6] - 35:10, 35:11, 47:23, 57:9, 74:25, 97:9

**amounts** [1] - 56:10

**ANA** [3] - 1:17, 1:24, 4:1

**Ana** [1] - 2:7

**analysis** [5] - 7:12, 18:4, 35:8, 36:10, 106:3

**Angeles** [1] - 66:22

**ANGELES** [1] - 118:3

**answer** [16] - 8:10, 24:15, 25:20, 26:24, 28:12, 34:22, 38:16, 41:3, 42:21, 46:22, 47:1, 47:16, 48:9, 54:16, 54:17, 102:12

**answered** [4] - 48:18, 52:12, 96:6, 97:23

**answering** [1] - 73:8

**anyway** [1] - 37:24

**apologize** [1] - 32:10

**apologizing** [2] - 32:12, 32:20

**appeal** [3] - 81:18, 81:21, 81:23

**APPEARANCES** [1] - 2:1

**appeared** [3] - 36:13, 60:3, 60:6

**appointment** [22] - 5:23, 6:1, 17:22, 18:2, 29:15, 60:10, 60:13, 67:13, 69:13, 69:16, 70:8, 71:8, 83:12, 83:13, 83:16, 84:24, 84:25, 85:1, 85:3, 85:7, 104:14

**approach** [2] - 108:25, 114:13

**appropriate** [7] - 19:22, 19:24, 32:2, 32:3, 56:20, 70:5, 93:14

**appropriately** [5] - 11:24, 13:6, 31:13, 31:14, 31:22

**area** [3] - 9:11, 115:11, 115:21

**Argumentative** [1] - 99:18

**arrive** [1] - 57:3

**aside** [3] - 25:20, 26:23, 26:24

**aspect** [4] - 95:17, 95:18, 99:9, 105:7

**assault** [1] - 95:22

**assaults** [1] - 95:3

**assess** [1] - 11:23

**assessment** [2] - 105:18,

105:21

**assigned** [17] - 6:10, 7:24, 8:1, 8:21, 10:9, 10:18, 11:3, 12:2, 18:2, 65:1, 65:6, 65:8, 72:7, 72:11, 72:13, 74:19, 77:5

**assignment** [1] - 75:2

**assigns** [2] - 6:10, 64:24

**Assistant** [1] - 2:5

**assume** [2] - 93:20, 103:24

**assumed** [1] - 93:22

**assuming** [1] - 47:14

**attached** [1] - 74:2

**attempt** [1] - 95:22

**attempting** [2] - 104:19, 107:20

**attend** [2] - 11:6, 11:8

**attended** [1] - 36:24

**attention** [8] - 14:1, 14:4, 21:25, 33:11, 36:2, 91:19, 110:9, 116:13

**attorney** [2] - 7:3, 10:7

**Attorney** [2] - 2:4, 2:5

**Audio** [2] - 3:18, 3:19

**audio** [5] - 111:1, 111:13, 111:17, 116:25, 117:14

**audit** [99] - 5:5, 5:6, 5:10, 5:15, 5:21, 6:4, 6:6, 6:11, 6:14, 6:16, 7:16, 8:22, 10:23, 12:2, 12:4, 12:13, 13:13, 13:21, 15:6, 15:18, 21:6, 23:18, 24:2, 28:3, 30:20, 32:18, 33:2, 33:7, 34:5, 34:19, 35:24, 40:20, 46:6, 46:8, 46:13, 51:7, 53:25, 54:9, 55:7, 60:2, 64:21, 65:1, 65:2, 65:8, 67:11, 67:19, 67:24, 68:1, 68:2, 68:5, 68:12, 68:13, 68:15, 68:16, 68:17, 68:25, 69:13, 69:16, 70:11, 70:17, 70:21, 70:24, 71:6, 71:7, 71:9, 71:13, 71:16, 72:16, 75:2, 77:6, 77:7, 81:24, 83:12, 83:16, 84:18, 87:10, 91:2, 92:23, 93:1, 99:24, 100:7, 104:11, 104:19, 104:20, 105:2, 105:6, 105:8, 105:14, 105:21, 106:7, 107:3, 107:4, 107:9, 107:24, 108:6, 108:7, 108:18

**Audit** [1] - 3:17

**audit's** [1] - 7:5

**audited** [10] - 6:18, 17:10, 67:17, 67:18, 84:3, 90:8, 93:5, 93:8, 93:9, 101:7

**auditing** [3] - 10:17, 11:11, 31:23

**auditor** [2] - 54:6, 54:14

**audits** [14] - 6:9, 7:1, 8:24,

10:25, 11:3, 11:9, 30:9, 31:1, 36:18, 83:18, 84:2, 84:4, 99:21, 108:5

**available** [3] - 59:16, 62:10, 62:12

**Avenue** [1] - 2:11

**avoid** [2] - 98:20, 103:8

**aware** [7] - 13:18, 19:3, 34:9, 57:20, 57:23, 57:24, 117:5

**awareness** [2] - 75:9, 100:18

## B

**BACON** [1] - 60:16

**Baird** [1] - 117:24

**Bakersfield** [3] - 79:6, 80:12

**bank** [3] - 7:12, 106:3, 107:2

**base** [2] - 52:9, 56:20

**based** [5] - 23:17, 36:10, 52:4, 54:19, 60:25

**Bates** [1] - 16:14

**batty** [1] - 73:9

**begin** [1] - 5:21

**beginning** [7] - 7:5, 12:13, 33:1, 33:7, 40:20, 47:3, 51:1

**begins** [1] - 6:16

**belong** [1] - 44:7

**best** [4] - 26:6, 27:17, 50:24, 62:11

**better** [3] - 35:11, 56:13, 62:3

**between** [18] - 19:12, 21:21, 22:18, 27:14, 32:20, 32:23, 35:2, 42:14, 92:21, 101:24, 106:23, 106:25, 108:20, 110:13, 110:14, 111:25, 112:16, 114:19

**big** [1] - 10:16

**bit** [4] - 25:7, 67:16, 68:20, 100:15

**BizStats** [13] - 34:9, 34:14, 34:21, 35:1, 35:2, 35:8, 36:10, 56:7, 56:8, 56:9, 56:16, 56:21

**book** [4] - 14:2, 14:4, 22:3, 113:6

**books** [9] - 21:4, 22:23, 23:22, 24:3, 104:11, 105:19, 106:1, 110:7

**bottom** [2] - 18:17, 33:14

**Bradley** [2] - 71:10, 78:8

**break** [6] - 27:21, 45:23, 62:19, 63:18, 63:20, 117:17

**bribe** [12] - 69:3, 69:10, 92:13, 92:24, 93:21, 95:23, 98:8, 99:2, 100:13, 101:14,

101:17, 109:9
**bribery** [15] - 75:8, 95:3, 95:24, 96:3, 96:14, 97:2, 97:4, 97:8, 97:18, 98:11, 98:21, 99:21, 100:18, 102:20, 113:19
**bribing** [1] - 113:22
**Brief** [1] - 86:15
**briefly** [1] - 58:3
**bring** [2] - 22:5, 43:10
**bringing** [1] - 99:16
**brother** [2] - 68:24, 92:1
**brownie** [1] - 99:15
**budget** [4] - 46:18, 47:1, 49:2, 49:8
**building** [2] - 49:18, 49:19
**business** [16] - 15:15, 15:20, 15:23, 23:23, 24:6, 25:3, 25:13, 28:2, 28:5, 34:15, 45:20, 62:25, 63:7, 63:8, 98:15, 116:21
**BY** [74] - 2:10, 2:14, 3:3, 3:6, 3:9, 4:22, 8:11, 8:19, 10:9, 13:3, 16:6, 16:10, 18:9, 18:15, 19:17, 20:6, 20:18, 21:8, 22:14, 24:22, 27:21, 28:12, 28:14, 30:18, 32:1, 32:22, 34:14, 37:12, 38:6, 38:19, 39:12, 41:19, 42:17, 43:2, 45:7, 45:25, 48:20, 52:15, 53:1, 53:9, 53:16, 55:2, 58:5, 59:24, 60:19, 64:13, 69:15, 71:5, 72:2, 86:16, 86:22, 93:18, 94:17, 96:8, 98:3, 99:7, 99:20, 102:14, 102:20, 104:25, 108:2, 108:20, 109:5, 110:9, 111:2, 111:14, 111:18, 111:24, 112:14, 112:22, 113:11, 114:15, 116:13, 117:1

## C

**C609** [1] - 2:15
**CALIFORNIA** [5] - 1:2, 1:17, 1:24, 4:1, 118:4
**California** [4] - 2:7, 2:12, 2:16, 118:7
**CALLED** [3] - 3:3, 3:6, 3:9
**cannot** [5] - 30:10, 81:10, 81:13, 84:7, 115:9
**capsulate** [1] - 22:8
**capture** [1] - 102:15
**captures** [1] - 102:7
**card** [5] - 87:24, 92:2, 92:16, 92:20, 92:22
**care** [2] - 101:6, 104:21
**career** [3] - 8:25, 46:16, 47:3

**CARNEY** [1] - 1:3
**case** [53] - 8:21, 10:21, 11:12, 11:18, 12:4, 13:8, 15:4, 17:6, 17:25, 18:2, 18:5, 18:10, 24:1, 31:12, 36:8, 39:1, 40:18, 40:25, 41:6, 44:19, 50:11, 50:14, 50:15, 50:16, 50:19, 51:2, 51:9, 51:20, 57:13, 59:13, 59:15, 61:18, 69:3, 71:14, 71:15, 72:10, 72:14, 83:25, 87:7, 87:24, 88:2, 88:7, 88:11, 91:4, 92:15, 96:12, 96:16, 96:17, 97:18, 100:13, 117:18
**Case** [1] - 1:7
**cases** [19] - 6:10, 6:14, 8:1, 9:12, 10:19, 17:4, 31:23, 50:12, 72:7, 72:13, 95:24, 96:14, 96:22, 97:2, 97:4, 97:8, 99:16, 100:13, 102:20
**CD** [2] - 109:3, 109:6
**cell** [1] - 65:21
**center** [1] - 31:8
**Central** [1] - 118:7
**CENTRAL** [1] - 1:2
**certain** [2] - 47:25, 50:13
**CERTIFICATE** [1] - 118:1
**CERTIFIED** [1] - 1:6
**certify** [1] - 118:7
**chance** [2] - 33:20, 87:8
**change** [4] - 5:10, 53:5, 68:2, 90:8
**changed** [1] - 88:16
**changes** [1] - 5:11
**character** [1] - 30:16
**charged** [1] - 97:6
**check** [3] - 17:9, 61:9, 88:17
**checked** [1] - 17:7
**chitchat** [1] - 68:21
**chronological** [1] - 86:11
**circumstances** [1] - 63:11
**civil** [2] - 57:6, 99:24
**clarify** [5] - 50:10, 101:19, 101:20, 102:25
**classification** [1] - 17:9
**classify** [1] - 30:13
**classroom** [9] - 7:23, 7:24, 8:6, 11:10, 11:14, 18:10, 18:20, 18:22, 48:5
**clear** [5] - 26:11, 78:12, 88:6, 100:11, 105:17
**clearly** [1] - 25:13
**close** [3] - 49:22, 103:10, 103:11
**closed** [2] - 98:21, 103:9
**closing** [1] - 6:8
**Coach** [1] - 39:6
**coach** [27] - 7:19, 7:20, 7:21, 7:24, 8:2, 8:15, 8:20,

9:4, 9:21, 10:9, 10:11, 11:15, 12:1, 31:21, 31:22, 37:3, 38:13, 46:11, 49:12, 50:14, 50:22, 51:22, 52:10, 56:3, 59:6, 63:4
**coaches** [2] - 8:12, 8:25
**Code** [1] - 118:8
**code** [1] - 96:2
**collection** [1] - 101:8
**combative** [1] - 104:10
**comfortable** [3] - 20:4, 53:17, 84:8
**coming** [3] - 79:5, 100:22, 105:25
**comment** [5] - 52:7, 69:11, 69:13, 91:11, 93:21
**comments** [3] - 15:2, 37:24, 42:2, 59:14, 93:10
**common** [3] - 7:5, 84:3, 102:20
**compares** [1] - 56:8
**comparison** [1] - 35:8
**competence** [3] - 52:3, 52:8, 52:17
**competent** [4] - 10:2, 13:4, 37:4, 37:7
**complain** [1] - 24:7
**complaint** [2] - 29:8, 31:9
**complaints** [6] - 24:22, 28:7, 28:8, 28:9, 28:14, 29:19
**complete** [2] - 7:23, 47:23
**completed** [3] - 18:21, 18:22, 68:17
**completing** [1] - 108:7
**completion** [1] - 108:18
**complicated** [2] - 9:10, 9:15
**complied** [1] - 84:23
**comply** [1] - 84:20
**component** [1] - 94:25
**compromise** [7] - 98:1, 99:12, 100:23, 103:5, 104:19, 104:24, 107:20
**compromising** [1] - 102:6
**computer** [1] - 17:5
**concerns** [2] - 37:6, 37:8
**conclusion** [1] - 56:21
**conclusive** [1] - 56:14
**concurrence** [1] - 35:15
**conduct** [3] - 30:14, 30:25, 81:24
**conducted** [4] - 30:9, 31:2, 83:17, 100:17
**conducting** [1] - 40:18
**Conference** [1] - 118:12
**conference** [1] - 6:8
**conferred** [1] - 86:21
**confirm** [1] - 80:6
**conflict** [7] - 19:12, 22:18,

32:13, 32:19, 32:20, 40:19, 60:14
**conformance** [1] - 118:12
**confused** [1] - 115:1
**connected** [1] - 74:1
**contact** [39] - 5:22, 6:17, 6:24, 13:23, 15:2, 17:17, 17:18, 19:2, 19:7, 30:4, 31:6, 31:15, 32:25, 40:16, 41:7, 65:11, 70:3, 71:20, 82:13, 82:16, 82:22, 87:16, 89:15, 98:18, 101:21, 103:2, 106:6, 106:9, 106:20, 106:23, 106:24, 107:14, 108:7, 109:7, 109:11, 109:14, 111:24, 113:11
**contacted** [8] - 19:6, 29:20, 29:24, 30:5, 106:16, 107:6, 107:11, 107:15
**contacts** [5] - 12:12, 15:6, 59:9, 101:24
**context** [2] - 21:19, 98:20
**continuation** [1] - 39:19
**continue** [3] - 27:20, 70:17, 71:16
**continued** [3] - 39:14, 39:24, 69:15
**control** [2] - 111:18, 115:9
**convenient** [1] - 23:24
**conversation** [45] - 16:19, 19:11, 20:9, 21:2, 21:20, 22:11, 22:16, 23:7, 27:25, 28:6, 28:17, 29:9, 29:13, 33:24, 53:5, 53:9, 59:4, 66:18, 66:20, 69:20, 70:7, 70:9, 70:12, 70:14, 75:15, 77:1, 78:10, 78:11, 78:13, 78:22, 78:23, 80:22, 81:20, 82:1, 82:2, 82:3, 87:4, 87:20, 88:25, 98:20, 103:20, 104:15, 110:13, 110:14, 112:11
**conversations** [6] - 53:10, 58:14, 58:18, 58:22, 59:1, 101:24
**coordinator** [1] - 47:19
**copy** [2] - 90:21, 113:3
**cordial** [1] - 32:22
**CORMAC** [1] - 1:3
**corporate** [18] - 9:8, 67:17, 67:18, 68:5, 68:12, 68:17, 70:21, 70:24, 73:2, 74:9, 74:13, 74:22, 74:24, 74:25, 75:5, 77:7, 80:16, 80:18
**corporation** [10] - 12:6, 13:14, 17:11, 17:12, 17:14, 22:23, 47:11, 66:1, 67:21, 90:8
**corporations** [3] - 5:5, 9:8, 10:17

**corps** [1] - 9:9
**correct** [127] - 6:13, 11:5, 11:10, 36:20, 37:21, 38:20, 39:13, 39:18, 40:3, 40:4, 40:6, 41:4, 41:10, 41:11, 41:21, 42:10, 43:4, 43:7, 44:7, 44:11, 44:13, 44:23, 45:12, 45:13, 49:13, 50:1, 50:3, 50:6, 50:7, 50:9, 50:17, 50:18, 50:20, 50:21, 50:22, 50:24, 51:6, 52:2, 52:5, 52:6, 52:20, 53:12, 53:15, 53:17, 53:18, 53:20, 53:21, 53:23, 53:24, 54:1, 54:2, 54:3, 54:4, 54:6, 54:7, 54:10, 54:11, 54:13, 54:14, 54:22, 54:24, 55:13, 56:12, 56:15, 56:18, 56:19, 56:25, 57:6, 57:7, 57:9, 57:10, 58:20, 59:8, 59:17, 60:15, 60:22, 60:23, 61:2, 61:5, 61:6, 61:14, 62:7, 62:8, 72:5, 72:24, 73:14, 74:2, 74:10, 75:21, 77:6, 77:16, 78:18, 79:25, 81:5, 82:8, 83:22, 87:21, 88:11, 89:15, 90:25, 91:8, 92:7, 95:6, 95:8, 98:25, 100:14, 101:1, 101:13, 101:15, 102:17, 103:13, 105:3, 106:14, 107:5, 107:8, 107:10, 107:13, 110:17, 111:3, 111:5, 111:15, 111:20, 113:13, 113:15, 114:23, 118:9
**correcting** [1] - 75:24
**correctly** [1] - 81:3
**COUNSEL** [1] - 2:1
**counsel** [3] - 86:21, 113:4, 117:5
**counseled** [2] - 101:16, 102:24
**country** [1] - 68:25
**COUNTY** [1] - 118:3
**course** [8] - 6:3, 15:20, 33:1, 63:7, 99:21, 105:2, 105:7, 107:24
**Court** [4] - 44:21, 45:20, 118:6, 118:20
**COURT** [107] - 1:1, 1:23, 4:4, 4:9, 4:12, 4:20, 8:9, 8:18, 10:6, 12:19, 12:24, 13:1, 15:11, 15:14, 16:3, 16:9, 18:8, 18:14, 19:9, 20:2, 20:17, 21:13, 21:17, 22:13, 23:1, 24:14, 24:19, 25:4, 25:10, 25:12, 25:23, 26:5, 26:7, 26:11, 26:14, 26:24, 27:2, 27:7, 27:17, 27:20, 28:13, 30:17, 30:22, 31:25, 32:16, 34:12, 37:10, 38:5,

38:17, 41:16, 42:13, 43:1, 45:6, 45:22, 48:19, 52:13, 52:25, 53:8, 53:14, 55:1, 58:1, 59:21, 60:17, 62:16, 62:22, 63:18, 63:20, 63:22, 63:25, 69:7, 71:2, 71:23, 86:20, 92:10, 94:5, 94:8, 94:11, 96:7, 97:24, 99:5, 99:19, 102:11, 102:13, 102:19, 103:24, 104:1, 104:4, 108:1, 108:16, 109:1, 110:1, 110:3, 110:8, 110:20, 111:23, 112:7, 112:9, 113:10, 114:14, 116:8, 116:10, 116:24, 117:7, 117:10, 117:12, 117:16, 118:6
**court** [1] - 57:9, 64:2, 73:9
**Courthouse** [1] - 2:6
**COURTROOM** [6] - 4:17, 25:8, 62:20, 64:6, 64:10, 94:13
**created** [1] - 87:4
**crimes** [4] - 95:2, 95:3, 95:22
**Criminal** [1] - 96:11
**criminal** [3] - 95:19, 96:2, 99:16
**cross** [4] - 12:21, 37:10, 59:20, 93:5
**CROSS** [2] - 37:11, 72:1
**Cross** [2] - 3:4, 3:7
**cross-examination** [2] - 37:10, 93:5
**Cross-Examination** [2] - 3:4, 3:7
**CROSS-EXAMINATION** [2] - 37:11, 72:1
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 118:20
**culture** [3] - 69:2, 69:9

**D**

**DANIEL** [1] - 2:14
**data** [3] - 92:2, 92:20, 92:22
**Date** [1] - 118:15
**date** [10] - 54:15, 54:20, 54:21, 74:12, 82:9, 82:10, 82:14, 87:15, 88:3, 111:6
**dated** [1] - 114:20
**dates** [1] - 38:9
**DAY** [1] - 1:14
**days** [15] - 18:2, 23:14, 28:17, 65:12, 65:16, 65:17, 66:25, 67:3, 67:4, 82:4, 82:17, 82:21, 82:23, 82:24, 87:20
**deal** [5] - 5:24, 7:4, 10:25, 45:22, 76:12

**dealings** [1] - 58:6
**dealt** [2] - 30:7, 30:18
**DEBBIE** [3] - 1:23, 118:5, 118:19
**Debbie** [2] - 62:18, 118:20
**December** [1] - 85:11, 85:18, 85:19, 106:10, 106:14, 106:16, 106:24, 108:9, 108:10, 108:12, 108:13
**decide** [1] - 49:2
**decided** [2] - 28:5, 49:7
**decision** [2] - 36:21, 45:21
**DECKER** [1] - 2:4
**deductions** [1] - 7:10
**deemed** [1] - 99:8
**DEFENDANT** [1] - 2:9
**defendant** [2] - 13:24, 21:13, 31:12
**Defendant** [2] - 1:9, 20:6
**defendant's** [1] - 65:1
**defense** [2] - 63:12, 117:4
**Delhi** [1] - 79:16
**deliberate** [1] - 117:20
**demeanor** [2] - 32:2, 32:4
**department** [1] - 94:25
**deposit** [1] - 7:12
**DEPUTY** [6] - 4:17, 25:8, 62:20, 64:6, 64:10, 94:13
**desk** [1] - 76:23
**detail** [1] - 91:20
**details** [1] - 58:24
**determination** [4] - 6:6, 35:25, 60:24, 101:22
**determine** [16] - 19:21, 31:11, 59:19, 59:25, 60:1, 97:12, 98:15, 99:13, 100:1, 100:3, 101:20, 103:3, 105:12, 107:22, 113:17, 113:25
**determines** [1] - 113:21
**device** [1] - 115:19
**dhinospaan@yahoo.com** [1] - 1:25
**dictate** [1] - 95:11
**dictated** [1] - 96:4
**different** [5] - 9:6, 32:7, 53:22, 58:14, 68:15
**difficult** [1] - 104:13
**DIRECT** [3] - 4:21, 64:12, 94:16
**Direct** [3] - 3:3, 3:6, 3:9
**direct** [7] - 14:1, 14:4, 33:11, 36:2, 37:16, 110:9, 116:13
**directing** [1] - 91:18
**direction** [1] - 93:2
**directly** [3] - 5:24, 6:19, 17:16

**disclosures** [1] - 57:24
**discussed** [3] - 92:17, 112:10, 112:16
**distinct** [1] - 95:7
**DISTRICT** [3] - 1:1, 1:2, 1:3
**District** [2] - 118:6, 118:7
**DIVISION** [1] - 1:2
**Document** [1] - 17:21
**document** [21] - 6:2, 6:5, 14:17, 15:5, 15:22, 16:15, 16:17, 16:22, 18:15, 18:16, 20:19, 20:23, 23:4, 26:1, 26:21, 37:16, 38:10, 40:15, 40:22, 113:8
**documentation** [2] - 7:10, 105:16
**documented** [2] - 59:14, 109:17
**documenting** [1] - 15:6
**documents** [10] - 6:2, 7:6, 7:16, 17:24, 22:20, 50:4, 55:5, 55:6, 62:9, 107:2
**done** [12] - 5:17, 5:19, 37:9, 40:21, 47:14, 51:13, 68:12, 84:1, 87:19, 107:6, 107:11, 108:9
**down** [10] - 37:18, 42:7, 48:20, 62:17, 70:11, 70:19, 76:22, 94:5, 104:20, 114:8
**Dr** [90] - 12:2, 12:4, 13:8, 13:14, 13:18, 13:24, 16:19, 22:19, 22:22, 23:18, 23:25, 24:22, 26:16, 27:22, 28:7, 28:17, 29:6, 29:24, 30:2, 31:18, 32:4, 34:20, 40:6, 41:10, 41:13, 43:14, 46:6, 49:24, 50:5, 51:2, 51:5, 51:7, 52:21, 53:2, 53:4, 53:11, 56:1, 58:7, 58:18, 59:25, 60:2, 60:22, 61:1, 61:8, 61:9, 61:21, 61:23, 62:1, 66:15, 66:16, 68:16, 71:9, 71:20, 74:19, 75:15, 76:16, 76:25, 77:16, 78:23, 79:24, 80:2, 80:5, 80:6, 80:8, 82:2, 87:4, 88:25, 91:20, 92:13, 92:24, 104:8, 104:9, 104:14, 104:16, 104:18, 104:23, 105:1, 105:11, 105:14, 105:15, 106:2, 107:22, 108:21, 109:7, 110:14, 114:20, 115:3, 116:21
**draw** [1] - 21:25
**drive** [1] - 73:9
**Drive** [1] - 2:15
**driving** [5] - 66:21, 79:6, 80:11, 80:13, 80:15
**during** [39] - 6:3, 8:4, 8:25, 9:13, 11:20, 12:2, 12:16, 13:3, 27:24, 28:6, 29:5,

29:25, 31:20, 32:6, 32:10, 32:24, 33:1, 36:24, 37:3, 37:6, 41:20, 42:10, 42:22, 43:3, 43:13, 43:18, 43:19, 49:18, 52:21, 53:5, 53:9, 53:10, 56:2, 59:7, 60:21, 67:8, 97:1, 105:2, 113:2
**duties** [2] - 64:20, 64:21

# E

**e-mail** [2] - 112:15, 113:3
**early** [1] - 30:20
**easier** [1] - 68:14
**efficient** [1] - 25:7
**efforts** [1] - 101:8
**eight** [10] - 50:23, 51:1, 51:4, 51:13, 51:16, 51:25, 52:4, 52:15, 59:7, 59:10
**EILEEN** [1] - 2:4
**either** [3] - 6:19, 15:7, 82:21
**elicited** [1] - 42:22
**employed** [1] - 72:15
**employee** [7] - 29:19, 98:2, 98:13, 99:12, 100:23, 102:6, 103:5
**employees** [7] - 95:21, 95:23, 100:17, 101:9, 101:10, 115:16
**end** [10] - 5:15, 7:14, 49:19, 49:20, 57:3, 70:7, 74:16, 105:25, 106:4, 108:10
**ended** [3] - 19:1, 51:4, 70:9
**engaged** [1] - 79:2
**English** [1] - 79:18
**enter** [3] - 17:4, 87:24, 100:6
**entered** [1] - 87:23
**entering** [2] - 17:6, 21:24
**entire** [3] - 14:17, 14:21, 18:16
**entities** [1] - 11:2
**entitled** [1] - 118:11
**entrap** [2] - 98:3, 100:20
**entrapment** [2] - 99:8, 99:9
**entries** [4] - 39:18, 63:3, 63:5, 63:9
**entry** [18] - 16:24, 16:25, 18:16, 18:19, 22:1, 22:15, 22:16, 33:18, 33:21, 34:24, 36:3, 39:11, 39:24, 86:16, 89:4, 89:11, 90:4, 106:14
**ESQ** [3] - 2:10, 2:14, 2:14
**essentially** [2] - 54:9, 82:22
**establish** [3] - 17:3, 37:18, 47:20
**establishing** [1] - 17:5
**eventually** [1] - 19:14
**evidence** [11] - 15:10, 16:4, 45:20, 62:24, 86:23, 102:4,

109:25, 110:4, 110:21, 116:11, 117:20
**EVIDENCE** [1] - 3:15
**exact** [5] - 54:20, 74:12, 80:3, 82:9, 82:14
**exactly** [3] - 43:19, 82:11, 84:22
**EXAMINATION** [9] - 4:21, 37:11, 58:4, 60:18, 64:12, 72:1, 92:11, 93:17, 94:16
**examination** [5] - 37:10, 37:17, 46:6, 51:14, 93:5
**Examination** [9] - 3:3, 3:4, 3:4, 3:5, 3:6, 3:7, 3:7, 3:8, 3:9
**examining** [3] - 86:17, 87:1, 87:13
**Examining** [5] - 3:16, 14:18, 14:25, 15:17, 88:15
**example** [6] - 9:5, 26:15, 49:25, 50:4, 57:8, 61:8
**except** [1] - 45:11
**excuse** [3] - 18:1, 62:17, 96:2
**excused** [1] - 94:6
**Exhibit** [52] - 14:2, 14:10, 14:16, 15:10, 16:1, 16:5, 16:23, 16:24, 18:16, 20:13, 21:24, 24:20, 25:18, 28:24, 33:12, 33:14, 34:23, 34:24, 37:15, 37:21, 38:2, 38:10, 38:19, 39:8, 43:23, 46:3, 62:23, 63:3, 63:5, 63:12, 86:23, 88:5, 106:12, 106:13, 108:23, 109:3, 109:19, 109:24, 110:3, 110:5, 110:10, 110:11, 110:12, 114:16, 115:25, 116:7, 116:10, 116:12, 116:14, 116:23
**EXHIBIT** [1] - 3:15
**exhibit** [14] - 14:21, 16:3, 16:10, 20:16, 24:17, 25:24, 28:21, 39:7, 39:9, 45:19, 86:24, 88:5, 106:11, 113:6
**EXHIBITS** [1] - 3:13
**existed** [1] - 36:1
**expand** [6] - 34:4, 34:7, 35:16, 35:24, 36:9, 36:22
**expanded** [1] - 33:9
**expanding** [1] - 33:25
**expenses** [11] - 6:7, 7:9, 7:10, 34:3, 34:18, 36:4, 36:6, 36:11, 36:13, 36:16, 36:20
**experience** [2] - 9:19, 52:9
**explain** [6] - 10:15, 23:25, 29:9, 29:12, 73:23, 104:5
**explained** [1] - 71:3
**explanation** [1] - 42:22
**exposed** [1] - 101:7

**external** [3] - 95:3, 95:21

# F

**facing** [1] - 101:10
**fact** [6] - 33:5, 63:9, 71:3, 85:12, 99:15, 103:25
**failed** [1] - 66:7
**fair** [1] - 27:3
**fairness** [1] - 25:25
**familiar** [1] - 63:1
**family** [1] - 104:22
**far** [5] - 18:5, 36:20, 43:10, 99:9, 99:13
**fax** [2] - 90:21
**FEDERAL** [2] - 1:23, 118:5
**federal** [1] - 95:4
**Federal** [1] - 118:20
**felt** [1] - 62:2
**few** [3] - 48:1, 48:3, 48:6
**few-months'** [1] - 48:3
**field** [1] - 73:17
**file** [10] - 7:3, 15:18, 35:2, 40:25, 46:6, 46:8, 46:13, 50:19, 63:3, 71:14
**filed** [2] - 5:11, 17:13
**files** [3] - 15:4, 50:16, 83:25
**finality** [2] - 107:3, 108:17
**finally** [3] - 47:22, 49:7, 106:23
**financial** [2] - 105:17, 105:21, 106:3
**findings** [2] - 5:10, 6:8
**fine** [4] - 51:11, 66:23, 66:24, 117:12
**finish** [7] - 8:10, 11:14, 29:12, 38:16, 47:21, 73:8, 107:4
**finished** [4] - 38:17, 71:7, 71:8, 106:7
**FIRM** [1] - 2:10
**first** [41] - 4:6, 4:23, 7:22, 8:8, 9:6, 14:9, 14:10, 16:24, 18:2, 18:3, 18:20, 19:6, 29:15, 31:6, 31:15, 31:18, 39:19, 43:18, 47:7, 47:14, 48:15, 48:22, 52:21, 60:21, 70:1, 72:7, 72:25, 75:22, 78:22, 80:10, 80:11, 80:14, 80:15, 80:17, 81:20, 82:3, 85:9, 91:24, 93:2, 106:19
**five** [1] - 28:17
**flip** [1] - 44:2
**floor** [1] - 49:20
**flow** [16] - 9:9, 9:14, 9:17, 9:22, 9:25, 10:12, 10:15, 11:2, 11:3, 11:8, 11:11, 18:10, 46:23, 73:2, 74:14, 74:15
**flow-thru** [15] - 9:9, 9:14,

9:17, 9:22, 9:25, 10:12, 10:15, 11:2, 11:8, 11:11, 18:10, 46:23, 73:2, 74:14, 74:15
**flow-thrus** [1] - 11:3
**focus** [3] - 16:6, 16:10, 16:24
**follow** [9] - 16:7, 95:14, 95:18, 95:25, 96:1, 97:11, 99:12, 110:24, 112:10
**follow-up** [1] - 112:10
**following** [1] - 11:16
**follows** [1] - 49:12
**FOR** [2] - 2:3, 2:9
**foregoing** [1] - 118:9
**forgot** [1] - 91:10
**form** [2] - 86:24, 87:3
**format** [1] - 118:11
**forth** [3] - 43:11, 80:23, 90:22
**forthcoming** [1] - 106:1
**forward** [4] - 4:13, 64:1, 100:22, 107:20
**foundation** [9] - 10:5, 15:14, 20:16, 38:4, 52:24, 53:7, 54:25, 62:25, 69:6
**four** [3] - 47:11, 82:4, 91:24
**Fourth** [1] - 2:6
**FOURTH** [1] - 1:24
**framed** [1] - 53:8
**fraud** [2] - 96:8, 96:12
**free** [1] - 104:21
**fresh** [1] - 92:7
**Friday** [2] - 113:12, 114:6
**front** [1] - 14:2
**fruition** [1] - 97:8
**full** [3] - 4:17, 64:6, 94:13
**future** [1] - 109:11

# G

**G-o-m-e-z** [1] - 94:15
**gather** [2] - 17:24, 102:4
**general** [7] - 27:14, 28:20, 29:17, 31:10, 59:2, 59:3, 59:12
**General** [1] - 94:20
**generally** [8] - 27:24, 46:21, 46:22, 50:15, 98:21, 103:9, 108:12, 112:17
**gentleman** [1] - 85:14
**gentlemen** [5] - 4:4, 25:5, 62:18, 110:20, 117:16
**given** [5] - 9:17, 10:25, 11:12, 47:2, 65:7
**glasses** [1] - 22:2, 22:5
**Glenn** [2] - 94:10, 94:15
**GLENN** [2] - 3:9, 94:12
**Gloria** [5] - 71:11, 71:12, 71:14, 78:4, 78:17

**goal** [3] - 115:13, 115:15, 115:16
**goals** [1] - 7:15
**God** [1] - 69:9
**Gomez** [8] - 85:15, 85:16, 85:17, 85:18, 94:10, 94:15, 94:18, 116:14
**GOMEZ** [2] - 3:9, 94:12
**Government** [4] - 4:6, 4:10, 63:14, 63:24
**Government's** [1] - 109:3
**grew** [1] - 79:16
**gross** [1] - 34:16
**ground** [1] - 23:1
**grounds** [1] - 59:21
**GROUP** [1] - 2:13
**group** [5] - 14:15, 71:15, 90:20, 92:19, 115:11
**guess** [8] - 17:10, 19:7, 22:17, 28:4, 29:8, 31:5, 32:13, 56:13
**guessing** [1] - 94:2
**guy** [1] - 12:20

## H

**H-e-n-r-y** [1] - 4:19
**habit** [1] - 26:9
**half** [1] - 87:25
**half-hour** [1] - 87:25
**Ham** [102] - 9:21, 9:24, 10:10, 12:1, 12:13, 12:17, 13:3, 18:6, 18:9, 19:19, 21:21, 22:7, 22:22, 24:8, 24:23, 28:7, 31:12, 31:13, 31:16, 31:21, 32:23, 33:25, 34:9, 35:15, 36:21, 36:25, 37:4, 44:7, 44:18, 45:16, 49:17, 50:8, 51:13, 52:20, 53:11, 53:19, 56:1, 56:2, 57:20, 57:24, 59:7, 59:9, 59:18, 59:24, 60:21, 60:25, 61:9, 62:4, 62:7, 63:4, 70:20, 70:23, 71:5, 71:6, 71:10, 76:13, 76:21, 76:23, 77:3, 77:5, 77:11, 77:16, 77:18, 77:24, 78:5, 78:13, 81:16, 88:2, 88:7, 90:11, 90:20, 90:25, 91:2, 91:4, 96:21, 103:19, 103:22, 104:7, 104:13, 104:15, 104:18, 104:24, 104:25, 105:10, 105:13, 106:9, 106:17, 106:20, 106:24, 107:21, 108:4, 108:21, 109:7, 109:20, 110:15, 111:25, 112:16, 114:20, 116:4, 116:20
**Ham's** [8] - 22:10, 32:1, 44:22, 51:8, 52:3, 60:1, 78:2,

92:13
**hand** [3] - 25:12, 83:4, 110:7
**handed** [1] - 109:2
**handing** [1] - 114:15
**handling** [2] - 11:23, 77:16
**hands** [1] - 83:3
**hang** [1] - 61:21
**hard** [2] - 27:11, 27:16
**harmed** [1] - 115:18
**Harshad** [1] - 40:6
**HARSHAD** [1] - 1:8
**heading** [2] - 66:21, 107:22
**heads** [1] - 66:23
**hear** [7] - 19:15, 49:25, 60:8, 69:14, 76:16, 110:23, 112:4
**heard** [4] - 105:4, 111:6, 113:24, 117:20
**hearsay** [5] - 15:12, 19:8, 52:24, 71:1, 103:23
**Hearsay** [3] - 22:12, 22:25, 53:13
**held** [1] - 118:10
**help** [5] - 7:25, 8:21, 8:23, 9:12, 110:24
**helps** [1] - 57:2
**HENRY** [2] - 3:3, 4:16
**Henry** [9] - 4:11, 4:19, 4:23, 16:25, 22:3, 37:13, 42:19, 62:24, 63:9
**hereby** [1] - 118:7
**hi** [2] - 37:13, 37:14
**Hindi** [5] - 68:24, 69:17, 79:20, 79:21, 93:12
**Hino** [1] - 118:20
**HINO** [3] - 1:23, 118:5, 118:19
**Hino-Spaan** [1] - 118:20
**HINO-SPAAN** [3] - 1:23, 118:5, 118:19
**hire** [2] - 6:21, 104:22
**hired** [1] - 74:17
**history** [5] - 24:1, 39:1, 41:6, 57:13, 61:18
**hold** [1] - 20:22
**home** [3] - 65:21, 66:23, 80:13
**honest** [1] - 46:22
**Honor** [39] - 4:8, 12:22, 12:25, 15:13, 16:1, 16:7, 19:8, 20:15, 24:13, 25:1, 25:11, 26:9, 28:11, 30:21, 37:9, 38:16, 41:14, 42:25, 45:5, 45:19, 48:18, 57:25, 62:15, 63:16, 63:19, 70:25, 86:14, 103:25, 104:6, 108:25, 109:24, 110:18, 112:20, 113:7, 114:13, 116:6, 116:22, 117:4, 117:15

**HONORABLE** [1] - 1:3
**hour** [3] - 87:25, 117:5, 117:21
**hours** [1] - 49:15
**hovering** [1] - 49:15
**hung** [8] - 21:9, 29:13, 52:21, 53:1, 53:4, 61:8, 61:9, 76:25

## I

**idea** [5] - 55:15, 55:19, 57:22, 105:20, 107:2
**identified** [1] - 80:9
**identify** [1] - 56:1
**IDR** [1] - 17:21
**ignore** [1] - 69:11
**ignored** [1] - 69:13
**immediately** [9] - 70:2, 71:11, 71:18, 76:12, 76:22, 77:3, 87:8, 87:14, 87:25
**impact** [1] - 104:4
**improper** [6] - 10:4, 20:15, 25:16, 30:15, 42:25, 75:20
**IN** [2] - 3:15, 59:12
**in-person** [7] - 40:5, 40:7, 41:9, 41:12, 41:21, 43:19, 51:5
**inaccurate** [1] - 45:8
**inappropriate** [3] - 70:15, 70:16, 75:12
**incident** [1] - 71:11
**include** [3] - 44:18, 73:21, 91:11
**income** [13] - 6:7, 7:11, 7:13, 34:3, 34:17, 35:7, 35:10, 35:23, 36:3, 36:16, 36:20, 56:10
**incompetent** [1] - 8:3
**independent** [5] - 58:6, 58:8, 58:17, 61:12, 117:19
**India** [7] - 68:22, 69:8, 79:15, 93:6, 93:8, 93:9, 93:23
**Indian** [8] - 69:2, 79:14, 79:15, 80:23, 83:18, 83:22, 83:23, 84:1
**Indians** [1] - 75:19
**indicate** [2] - 25:13, 112:15
**indicated** [2] - 104:16, 114:3
**indicating** [1] - 21:13
**indicating)** [1] - 42:18
**indication** [1] - 35:23
**indicator** [8] - 36:6, 36:8, 56:23, 104:23, 107:19, 114:1, 114:6
**indicators** [1] - 36:16
**individuals** [2] - 5:5, 101:6
**infer** [1] - 93:20

**inferred** [1] - 93:23
**Information** [1] - 17:21
**information** [26] - 6:4, 17:4, 17:7, 17:8, 17:12, 22:24, 56:8, 56:9, 56:16, 57:12, 57:14, 63:11, 65:25, 66:1, 66:2, 66:3, 77:14, 89:13, 90:11, 90:14, 90:17, 91:7, 91:20, 98:12, 101:12, 107:18
**initial** [30] - 13:11, 13:12, 17:17, 19:7, 28:5, 31:6, 31:15, 32:7, 33:7, 34:4, 35:22, 40:10, 41:17, 42:1, 42:2, 51:20, 53:5, 55:7, 60:10, 60:13, 61:4, 62:9, 62:10, 65:11, 66:4, 82:13, 82:16, 87:16, 106:20, 106:23
**initiated** [1] - 111:14
**initiating** [1] - 99:1
**input** [1] - 17:10
**Inspector** [1] - 94:20
**inspector** [4] - 29:7, 29:17, 31:10, 96:1
**instead** [1] - 76:4
**instructed** [1] - 102:25
**instruction** [2] - 109:10, 110:21
**integrity** [3] - 95:1, 95:17, 101:3
**intended** [1] - 47:2
**intending** [2] - 100:21, 102:6
**intent** [18] - 97:12, 97:20, 98:1, 98:3, 98:5, 98:23, 99:10, 99:11, 100:6, 100:21, 101:22, 113:18, 113:22, 113:25, 114:11
**intention** [1] - 100:20
**interaction** [2] - 11:20, 38:25
**internal** [2] - 95:2, 96:1
**Internal** [21] - 4:25, 15:21, 15:24, 19:2, 64:17, 95:1, 95:5, 95:11, 95:14, 95:15, 95:16, 95:20, 96:4, 96:11, 96:21, 98:1, 101:4, 110:15, 114:19, 116:20
**intervene** [1] - 19:11
**interview** [33] - 13:11, 13:12, 28:5, 40:6, 40:7, 40:10, 40:12, 40:18, 40:23, 40:24, 41:9, 41:13, 42:2, 42:3, 42:8, 42:15, 43:14, 43:19, 51:5, 51:20, 55:7, 55:9, 55:10, 55:12, 55:15, 55:16, 55:19, 61:4, 62:9, 62:10, 80:14, 83:6
**investigate** [1] - 96:8
**investigated** [1] - 97:1
**investigation** [16] - 56:25,

57:2, 57:6, 61:7, 96:16,
96:19, 96:20, 97:14, 97:17,
97:21, 98:11, 98:21, 103:9,
103:12, 113:19, 117:19
**Investigation** [1] - 96:11
**investigations** [3] - 95:18,
95:24, 98:7
**involved** [5] - 5:24, 6:20,
21:5, 29:21, 108:5
**involvement** [5] - 45:15,
51:19, 51:23, 51:25
**irrelevant** [2] - 31:24, 104:3
**Irrelevant** [1] - 8:17
**IRS** [15] - 15:18, 53:25,
54:10, 55:17, 56:8, 63:1,
67:10, 72:15, 94:24, 95:23,
98:13, 101:10, 102:6, 103:5,
108:11
**IRS'** [1] - 56:20
**IRS's** [1] - 55:19
**issue** [5] - 6:5, 17:18,
35:25, 51:2, 105:12
**issues** [2] - 17:9, 56:1
**itself** [2] - 56:24, 110:22

## J

**January** [9] - 109:8, 110:16,
113:12, 113:24, 114:20,
114:22, 114:24, 115:1, 116:1
**JENNIFER** [1] - 2:5
**job** [29] - 7:20, 7:22, 8:5,
8:16, 8:19, 11:10, 11:24,
13:6, 18:21, 18:23, 19:12,
19:23, 32:25, 40:25, 46:1,
46:3, 46:8, 46:13, 48:5,
48:15, 49:11, 50:13, 51:22,
64:19, 70:1, 99:9, 99:10
**John** [2] - 71:10, 78:8
**JOSEPH** [1] - 2:14
**JUDGE** [1] - 1:3
**Judicial** [1] - 118:12
**July** [2] - 88:2, 88:6
**JULY** [2] - 1:15, 4:1
**June** [12] - 67:1, 75:2, 75:4,
75:5, 75:9, 75:17, 82:8,
82:14, 82:16, 87:10, 88:11,
92:5
**jury** [36] - 5:3, 7:21, 8:14,
10:16, 10:21, 14:25, 16:4,
17:2, 18:19, 19:5, 20:9, 21:2,
21:19, 22:14, 25:9, 25:24,
27:19, 27:24, 28:20, 29:5,
29:17, 34:2, 34:14, 36:11,
44:21, 62:21, 63:21, 64:16,
65:3, 66:20, 67:8, 94:18,
103:22, 110:4, 110:7, 110:11
**JURY** [1] - 1:14
**justified** [2] - 28:9, 28:15

## K

**keep** [5] - 22:23, 46:8,
46:13, 62:24, 117:19
**kept** [3] - 15:20, 24:3, 63:6
**kind** [8] - 27:11, 27:15,
34:18, 69:3, 69:20, 75:8,
81:4, 100:16
**kinds** [1] - 30:19
**known** [1] - 94:21
**knows** [1] - 68:21

## L

**lack** [1] - 63:10
**Lacks** [3] - 38:4, 53:7,
54:25
**lacks** [1] - 52:24
**ladies** [5] - 4:4, 25:5, 62:18,
110:20, 117:16
**lag** [1] - 106:25
**Lake** [2] - 2:11
**language** [1] - 79:11
**last** [10] - 4:18, 39:15, 64:7,
64:10, 68:21, 76:14, 94:14,
108:11, 108:13, 114:1
**lasted** [2] - 76:19, 76:20
**lasts** [1] - 76:15
**LAW** [2] - 2:10, 2:13
**law** [3] - 9:9, 9:10, 9:16
**lawyers** [1] - 25:6
**lay** [2] - 15:14, 62:25
**LAYTON** [48] - 2:14, 8:17,
12:18, 12:20, 12:25, 15:12,
16:7, 18:7, 18:13, 19:8, 20:1,
20:15, 21:11, 21:15, 22:12,
22:25, 24:13, 24:17, 25:1,
25:11, 26:9, 28:11, 30:15,
30:21, 31:24, 32:15, 34:11,
37:12, 38:6, 38:19, 39:9,
39:12, 41:19, 42:17, 43:2,
45:7, 45:19, 45:25, 48:20,
52:15, 53:1, 53:9, 53:16,
55:2, 58:2, 59:20, 60:19,
63:17
  **Layton** [2] - 3:4, 3:5
**lead** [1] - 23:2
**Leading** [7] - 12:18, 18:7,
18:13, 34:11, 99:4, 102:10,
107:25
**leading** [6] - 12:25, 25:15,
26:14, 102:18, 111:22
**learn** [1] - 10:23
**learning** [1] - 11:1
**least** [3] - 28:3, 53:10, 55:7
**lecture** [1] - 25:2
**left** [4] - 33:5, 44:10, 44:14,
61:4
**Lemon** [1] - 2:15
**letter** [17] - 7:15, 13:18,

16:21, 17:17, 17:18, 18:25,
21:20, 23:14, 65:11, 66:5,
82:12, 82:13, 82:16, 82:22,
85:6, 87:15, 87:16
**letting** [1] - 27:8
**lied** [2] - 45:2, 45:4
**life** [2] - 114:4, 114:5
**Linda** [1] - 2:16
**line** [2] - 34:18, 34:20
**listen** [1] - 110:24
**listened** [1] - 61:15
**listener** [2] - 103:25, 104:5
**listening** [4] - 60:25, 61:13,
109:22, 110:25
**living** [2] - 4:24, 64:16
**local** [1] - 86:1
**located** [1] - 23:24
**location** [1] - 116:3
**look** [24] - 14:9, 16:14,
18:15, 21:24, 22:3, 23:22,
26:1, 26:22, 33:18, 34:23,
35:4, 36:16, 36:17, 39:3,
43:10, 43:24, 82:10, 83:25,
106:11, 106:12, 108:23
**looked** [4] - 21:15, 35:7,
42:4, 43:2
**looking** [17] - 16:11, 20:23,
24:18, 24:19, 36:6, 36:17,
37:16, 38:3, 38:8, 38:10,
38:14, 38:19, 39:5, 39:12,
40:1, 65:25
**looks** [1] - 17:22, 91:22
**Los** [1] - 66:22
**LOS** [1] - 118:3
**lower** [2] - 57:9, 104:20
**lunch** [3] - 117:17, 117:21,
117:22

## M

**ma'am** [7] - 4:13, 8:10,
25:17, 32:17, 62:17, 64:1,
94:5
**mail** [2] - 112:15, 113:3
**maintain** [4] - 46:1, 46:5,
46:7
**majority** [3] - 57:5, 97:7,
98:17
**manage** [1] - 14:15
**management** [4] - 10:11,
71:17, 75:22, 76:2
**manager** [26] - 6:10, 64:24,
65:7, 67:23, 71:10, 75:24,
76:4, 76:5, 76:13, 77:25,
78:1, 78:2, 78:5, 78:8, 81:5,
81:7, 81:8, 81:9, 81:10,
91:14, 92:18, 92:19, 92:25,
93:2
**managers** [1] - 70:3
**manner** [2] - 11:19

**manual** [1] - 96:1
**March** [26] - 13:13, 13:19,
16:22, 16:25, 18:17, 19:1,
20:6, 21:20, 21:25, 22:7,
22:10, 22:14, 23:4, 23:13,
27:22, 29:6, 31:16, 31:21,
32:4, 39:11, 39:14, 39:15,
39:23, 39:24
**marked** [2] - 86:23, 114:16
**matching** [1] - 17:8
**matter** [5] - 11:1, 83:2,
91:11, 92:17, 118:11
**mean** [15] - 8:3, 21:6, 27:3,
27:12, 31:7, 35:3, 35:9, 41:3,
41:4, 46:12, 49:22, 56:17,
57:23, 60:3, 114:5
**means** [3] - 18:3, 26:2,
26:20
**medical** [1] - 104:21
**meet** [4] - 54:14, 59:12,
85:17, 85:22
**meeting** [21] - 32:6, 32:10,
32:24, 33:3, 36:24, 41:17,
41:21, 54:23, 58:12, 61:5,
86:3, 113:12, 113:14,
114:10, 114:19, 114:21,
115:2, 115:23, 116:20, 117:2
**meetings** [2] - 102:21,
115:6
**meets** [1] - 113:21
**Melanie** [3] - 88:15, 91:23
**Melanie's** [1] - 37:23
**member** [1] - 104:22
**memory** [3] - 42:16, 43:9,
92:7
**mention** [2] - 26:15, 27:10
**mentioned** [7] - 21:3, 21:8,
29:7, 29:14, 61:15, 61:19,
100:18
**met** [9] - 31:18, 32:4, 40:7,
40:8, 40:11, 59:11, 85:18,
105:9, 105:10
**method** [1] - 7:13
**MICHAEL** [1] - 2:10
**middle** [3] - 85:14, 88:5,
117:9
**might** [5] - 5:24, 6:4, 6:6,
7:12, 7:13
**Mike** [26] - 19:6, 19:13,
21:4, 21:9, 22:16, 22:24,
24:24, 29:8, 29:10, 34:22,
70:20, 70:23, 71:6, 71:10,
76:13, 76:23, 90:11, 90:24,
91:2, 92:18, 96:21, 103:19,
110:15, 114:20, 116:20
**mind** [8] - 28:11, 69:7, 71:3,
98:24, 101:20, 104:4, 114:2,
117:19
**mindset** [1] - 104:24
**mine** [8] - 33:21, 37:20,

38:12, 39:10, 88:13, 88:17
**minute** [9] - 25:4, 33:13, 33:16, 35:4, 35:5, 37:18, 41:25, 76:23, 111:21
**minutes** [1] - 117:6
**Miriam** [1] - 117:24
**miscommunication** [2] - 29:11, 61:19
**misconduct** [2] - 29:19, 29:21
**misquoting** [2] - 21:10, 53:19
**mission** [1] - 101:3
**misspelled** [1] - 57:20
**misspelling** [1] - 57:18
**misspoke** [1] - 114:24
**misstates** [2] - 41:14, 42:11
**mistake** [1] - 57:17
**mixed** [1] - 12:23
**moment** [3] - 25:5, 86:13, 86:19
**Monday** [3] - 85:23, 85:25, 86:3
**money** [2] - 56:17, 68:14
**monitor** [8] - 107:21, 107:23, 112:18, 112:24, 113:14, 113:21, 115:10, 115:14
**monitored** [9] - 102:21, 108:20, 110:14, 113:20, 113:21, 114:19, 115:25, 116:19, 117:2
**monitoring** [4] - 111:4, 114:10, 115:11, 115:23
**month** [3] - 5:2, 106:21, 106:25
**months** [3] - 48:1, 48:6, 85:12
**months'** [1] - 48:3
**moratorium** [1] - 108:11
**morning** [12] - 4:4, 4:13, 4:23, 62:19, 64:1, 64:14, 64:15, 72:3, 72:4, 89:5, 89:22, 94:18
**most** [6] - 44:7, 97:8, 97:9, 100:13, 101:5, 106:8
**move** [5] - 11:18, 49:9, 102:12, 108:14, 113:7
**moved** [3] - 45:20, 86:2, 109:25
**MR** [77] - 8:7, 8:17, 10:4, 10:8, 12:18, 12:20, 12:22, 12:25, 15:12, 16:7, 18:7, 18:13, 19:8, 20:1, 20:15, 21:11, 21:15, 22:12, 22:25, 24:13, 24:17, 25:1, 25:11, 26:9, 28:11, 30:15, 30:21, 31:24, 32:15, 34:11, 37:12, 38:6, 38:19, 39:9, 39:12, 41:19, 42:17, 43:2, 45:7,

45:19, 45:25, 48:20, 52:15, 53:1, 53:9, 53:16, 55:2, 58:2, 59:20, 60:19, 63:17, 63:19, 69:5, 70:25, 72:2, 86:13, 86:16, 86:22, 93:18, 96:6, 97:23, 99:4, 99:18, 102:10, 102:12, 102:18, 103:23, 104:2, 107:25, 108:14, 110:2, 111:22, 112:3, 112:5, 112:8, 112:20, 116:9
**MS** [94] - 4:8, 4:10, 4:22, 8:11, 8:19, 10:9, 13:3, 15:16, 16:1, 16:6, 16:10, 18:9, 18:15, 19:17, 20:6, 20:18, 21:18, 22:14, 23:3, 24:22, 26:13, 27:3, 27:8, 27:21, 28:12, 28:14, 30:18, 30:24, 32:1, 32:22, 34:14, 37:9, 38:4, 38:16, 39:8, 41:14, 42:11, 42:25, 45:5, 48:18, 52:12, 52:22, 52:24, 53:7, 53:13, 54:25, 58:3, 58:5, 59:24, 60:16, 63:16, 63:24, 64:13, 69:15, 71:5, 71:22, 92:12, 93:16, 94:10, 94:17, 96:8, 98:3, 99:7, 99:20, 102:14, 102:20, 103:25, 104:6, 104:25, 108:2, 108:20, 109:2, 109:5, 109:24, 110:6, 110:9, 110:18, 111:2, 111:14, 111:18, 111:24, 112:14, 112:22, 113:7, 113:11, 114:15, 116:6, 116:13, 117:1, 117:4, 117:8, 117:11, 117:13, 117:15
**multiple** [4] - 33:9, 113:19, 113:20, 113:21
**must** [1] - 88:13
**mutually** [1] - 54:21
**Mytryee** [2] - 63:24, 64:8
**MYTRYEE** [2] - 3:6, 64:5

**N**

**name** [16] - 4:17, 4:18, 37:23, 57:18, 57:21, 64:6, 64:7, 64:10, 67:21, 68:8, 68:21, 79:13, 80:3, 84:2, 94:13, 94:14
**narrow** [1] - 48:20
**natural** [1] - 105:7, 107:24, 108:6
**near** [2] - 45:17, 63:5
**necessarily** [1] - 48:9
**necessary** [1] - 62:25
**need** [20] - 20:2, 20:10, 20:18, 20:19, 25:6, 25:16, 25:21, 25:24, 25:25, 26:7, 26:19, 26:25, 28:22, 68:9,

68:11, 69:16, 86:13, 112:12, 112:14
**needed** [3] - 21:5, 21:8, 68:9
**needs** [1] - 27:5
**nervous** [2] - 20:24, 84:9
**never** [11] - 20:25, 21:4, 28:11, 49:5, 70:13, 84:24, 84:25, 93:11, 93:13, 103:7
**new** [5] - 44:16, 51:11, 54:5, 100:24, 111:9
**New** [1] - 79:16
**newer** [3] - 46:23, 47:17
**next** [13] - 47:5, 54:17, 63:22, 65:17, 67:15, 70:18, 81:12, 81:13, 90:5, 94:8, 103:4, 111:21, 114:21
**nice** [1] - 117:22
**nobody** [2] - 84:19, 84:20
**none** [1] - 44:6
**Nonresponsive** [1] - 8:7
**noon** [3] - 117:11, 117:12, 117:15
**normal** [3] - 5:21, 31:1, 98:15
**normally** [1] - 107:24
**notation** [1] - 57:13
**note** [4] - 5:10, 14:20, 91:18, 91:19
**noted** [1] - 89:2
**notes** [38] - 15:23, 16:19, 36:3, 37:19, 38:22, 38:23, 38:24, 39:3, 39:16, 40:3, 40:13, 40:15, 40:23, 41:9, 41:13, 41:17, 41:23, 42:4, 42:6, 42:7, 43:2, 43:10, 43:20, 43:23, 44:4, 44:11, 44:14, 44:19, 44:22, 45:2, 45:4, 45:7, 45:11, 45:16, 61:19, 88:19, 89:18, 113:1
**nothing** [6] - 49:1, 52:1, 63:17, 92:9, 94:4
**notice** [2] - 80:2, 111:6
**Notice** [2] - 17:19, 81:22
**November** [2] - 103:16, 107:19
**number** [14] - 17:13, 65:18, 65:20, 65:21, 65:22, 66:10, 66:11, 66:13, 67:6, 72:12, 79:24, 80:4, 80:5, 80:20
**numbers** [1] - 16:14
**numerous** [1] - 100:17

**O**

**o'clock** [1] - 117:21
**oath** [2] - 4:14, 64:3
**object** [1] - 10:7
**objecting** [2] - 12:19, 25:15
**objection** [46] - 8:7, 8:17,

10:4, 12:18, 12:24, 15:11, 15:12, 18:7, 18:13, 19:8, 20:1, 20:3, 20:15, 21:11, 22:12, 22:25, 24:13, 25:1, 26:8, 28:11, 30:15, 30:21, 31:24, 32:15, 34:11, 38:4, 41:14, 42:11, 42:25, 52:12, 52:22, 52:24, 53:7, 53:13, 54:25, 59:20, 69:5, 99:4, 99:18, 102:10, 107:25, 110:1, 112:3, 112:5, 116:8, 116:9
**objections** [1] - 63:12
**objective** [1] - 97:15
**obviously** [3] - 101:4, 103:2, 114:8
**occur** [5] - 23:19, 99:21, 103:14, 113:12, 115:2
**occurred** [9] - 18:12, 21:21, 29:5, 82:2, 106:22, 110:16, 111:24, 112:2, 113:2
**occurring** [2] - 102:23, 115:23
**OF** [7] - 1:2, 1:5, 1:13, 2:1, 118:1, 118:3, 118:4
**offer** [5] - 93:19, 93:20, 98:8, 99:2, 103:7
**offered** [2] - 76:9, 104:2
**offering** [3] - 69:3, 69:10, 103:24
**office** [17] - 24:6, 40:11, 49:18, 54:1, 54:10, 67:22, 67:23, 71:10, 71:12, 71:18, 73:16, 73:17, 74:7, 81:11, 115:3, 115:6, 115:14
**Officer** [1] - 88:15
**Officer's** [4] - 3:16, 14:18, 14:25, 15:17
**officer's** [3] - 86:17, 87:1, 87:13
**officers** [1] - 95:4
**offices** [2] - 23:19, 24:5
**official** [1] - 113:23
**OFFICIAL** [3] - 1:23, 118:1, 118:5
**Official** [1] - 118:20
**often** [2] - 84:11, 84:12
**OJT** [1] - 39:6
**on-the-job** [11] - 7:20, 7:22, 8:16, 8:19, 11:10, 18:21, 18:23, 32:25, 48:5, 49:11, 51:22
**on-training** [1] - 63:4
**once** [13] - 7:3, 24:16, 25:19, 33:20, 72:10, 85:18, 85:19, 85:24, 85:25, 89:4, 89:22, 98:11, 114:10
**one** [36] - 7:13, 7:15, 10:6, 10:13, 11:12, 12:8, 24:11, 24:24, 33:8, 34:4, 34:6, 34:7,

37:20, 39:1, 39:9, 39:11,
40:1, 40:17, 42:1, 44:17,
45:25, 47:9, 47:25, 49:19,
53:10, 65:17, 71:7, 72:7,
73:15, 74:4, 74:5, 80:4, 87:4,
90:5, 102:14, 109:9
  **ones** [3] - 39:5, 45:11,
45:14
  **oOo** [1] - 117:25
  **open** [6] - 13:13, 17:25,
35:15, 87:14, 88:11, 117:19
  **opened** [2] - 18:12, 87:9
  **opine** [1] - 52:17
  **opinion** [5] - 10:4, 20:1,
25:16, 36:9, 53:6
  **opportunity** [1] - 51:8
  **opposed** [1] - 66:1
  **option** [2] - 55:9, 55:10
  **options** [1] - 54:19
  **OR** [1] - 3:15
  **order** [3] - 86:12, 108:18
  **orientation** [2] - 73:16,
75:10
  **originally** [1] - 12:8
  **otherwise** [1] - 94:21
  **outcome** [2] - 67:24, 67:25
  **outside** [1] - 59:20
  **overall** [4] - 27:12, 27:14,
52:8, 52:17
  **overbroad** [2] - 30:22,
59:22
  **Overruled** [1] - 52:25
  **overruled** [32] - 8:9, 8:18,
10:6, 13:1, 19:9, 20:2, 20:17,
21:17, 23:1, 24:15, 32:16,
34:12, 38:5, 41:16, 42:13,
43:1, 48:19, 52:13, 53:14,
55:1, 59:21, 69:7, 71:2, 96:7,
97:24, 99:5, 99:19, 102:19,
104:1, 104:4, 108:16, 111:23
  **oversee** [1] - 94:25
  **oversees** [1] - 95:15
  **oversight** [1] - 95:16
  **overstated** [1] - 36:13
  **overture** [20] - 81:4, 92:13,
92:24, 97:10, 97:13, 98:13,
98:16, 98:19, 100:22,
101:14, 101:17, 101:19,
101:20, 103:1, 103:2,
104:17, 104:19, 107:17,
109:9, 114:7
  **overtures** [4] - 96:3, 99:21,
105:1, 105:5
  **owe** [1] - 56:17
  **owed** [1] - 56:21
  **owes** [2] - 100:3, 100:9
  **own** [5] - 36:21, 39:5,
40:25, 62:7, 95:9

# P

  **P&L** [1] - 35:1
  **page** [9] - 14:9, 14:10,
33:13, 39:15, 39:19, 39:23,
114:1, 118:11
  **PAGE** [1] - 3:2
  **Page** [18] - 14:16, 14:17,
14:21, 16:10, 16:15, 16:23,
20:13, 21:24, 22:6, 29:1,
33:11, 33:14, 34:24, 39:21,
39:25, 86:23, 106:12, 106:13
  **Pages** [1] - 14:5
  **pages** [12] - 14:7, 39:6,
39:22, 40:12, 42:18, 43:3,
43:22, 43:24, 44:4, 44:7,
45:11
  **part** [8] - 8:16, 9:15, 15:17,
18:23, 44:19, 47:14, 50:13,
57:3, 95:5, 106:8, 107:9
  **Part** [2] - 48:7
  **particular** [6] - 31:7, 38:11,
51:9, 56:17, 95:18, 105:17
  **partnership** [7] - 46:17,
46:23, 47:9, 48:14, 48:16,
48:22, 49:5
  **partnerships** [3] - 5:5, 9:10,
10:17
  **parts** [1] - 48:8
  **Parts** [1] - 48:8
  **Pasadena** [1] - 2:12
  **pause** [1] - 86:15
  **pending** [1] - 112:20
  **people** [3] - 61:13, 68:15,
70:4, 83:18, 83:23, 84:1,
84:15, 84:17, 93:5, 93:8,
93:9, 98:3, 101:5
  **percent** [2] - 56:9, 97:7
  **percentage** [1] - 97:5
  **percentages** [3] - 34:16,
34:18
  **perception** [1] - 52:3
  **performance** [1] - 56:1
  **period** [3] - 46:24, 49:18,
73:20
  **person** [12] - 40:5, 40:7,
41:9, 41:12, 41:21, 43:14,
43:19, 51:5, 52:7, 68:13,
68:15, 79:9
  **person's** [2] - 57:18, 70:23
  **personal** [6] - 45:15, 65:4,
65:23, 65:25, 66:2, 72:24
  **personally** [6] - 44:5,
55:22, 55:23, 60:20, 61:3
  **phase** [3] - 8:5, 47:5, 47:25
  **phases** [2] - 9:6, 55:22
  **phone** [35] - 28:20, 29:6,
29:18, 32:7, 42:10, 43:4,
43:18, 49:24, 52:21, 58:15,
58:18, 60:21, 61:9, 61:23,

65:21, 67:7, 67:9, 70:11,
70:19, 76:22, 80:15, 91:8,
96:20, 98:18, 102:15,
103:15, 105:11, 108:3,
108:8, 108:9, 111:4, 112:17,
113:2, 113:24, 114:22
  **physically** [1] - 109:19
  **pick** [5] - 6:11, 54:12,
54:13, 65:7, 117:21
  **picked** [2] - 65:6, 67:7
  **picture** [3] - 10:16, 105:18,
105:21
  **pin** [1] - 114:8
  **place** [8] - 23:23, 24:2,
28:2, 28:5, 54:9, 57:23,
115:19, 116:21
  **Plaintiff** [1] - 1:6
  **PLAINTIFF** [4] - 2:3, 3:3,
3:6, 3:9
  **PLAINTIFF'S** [3] - 4:16,
64:5, 94:12
  **plan** [1] - 105:8
  **play** [5] - 110:4, 110:6,
110:19, 111:16, 116:22
  **played** [6] - 36:8, 111:1,
111:13, 111:17, 116:25,
117:14
  **pleasant** [2] - 78:23, 78:24
  **point** [13] - 28:3, 46:12,
46:16, 67:18, 68:3, 81:18,
83:3, 85:3, 98:22, 102:5,
103:9, 104:10, 108:6
  **points** [3] - 50:13, 99:15
  **policies** [5] - 95:9, 95:14,
95:19, 95:24, 96:4
  **position** [1] - 95:2
  **possible** [6] - 44:16, 44:18,
45:2, 45:4, 57:19, 101:20
  **Post** [1] - 14:20
  **Post-it** [1] - 14:20
  **power** [1] - 7:3
  **practice** [2] - 63:8, 98:7
  **practices** [1] - 98:15
  **preamble** [2] - 111:2, 117:1
  **preaudit** [1] - 18:4
  **prefer** [2] - 18:1, 25:23
  **preferred** [1] - 54:20
  **preliminarily** [1] - 107:18
  **premature** [1] - 112:5
  **preparation** [2] - 63:2,
63:11
  **prepare** [1] - 6:7
  **prepared** [2] - 17:17, 86:17
  **prescheduled** [1] - 17:22
  **presence** [4] - 25:9, 27:19,
62:21, 63:21
  **present** [1] - 81:11
  **presentation** [1] - 100:19
  **presentations** [1] - 100:17
  **presented** [3] - 52:4, 52:16,

54:19
  **pretty** [2] - 30:19, 31:1
  **primarily** [1] - 95:17
  **primary** [1] - 96:16
  **Privacy** [1] - 17:20
  **probe** [1] - 7:11
  **problem** [7] - 34:3, 34:5,
35:22, 59:19, 60:4, 60:6,
73:12
  **problematic** [2] - 115:4,
115:12
  **procedure** [5] - 65:17,
67:13, 67:14, 68:12, 81:21
  **procedures** [2] - 11:17,
49:12
  **proceed** [1] - 4:20
  **proceeding** [1] - 53:17
  **proceedings** [2] - 117:23,
118:10
  **process** [5] - 8:4, 8:23,
9:13, 13:21, 113:19
  **produce** [1] - 22:20
  **professional** [1] - 25:14
  **profit** [2] - 34:16
  **program** [3] - 8:20, 17:3,
17:5
  **progression** [1] - 108:6
  **proper** [1] - 23:21
  **properly** [2] - 11:24, 13:6
  **protect** [2] - 94:25, 101:3
  **protocol** [1] - 71:18
  **provide** [1] - 7:9
  **providing** [1] - 105:16
  **public** [1] - 113:22
  **Publication** [2] - 17:18,
81:22
  **publish** [1] - 16:4
  **pull** [1] - 16:23
  **pulled** [2] - 17:7, 17:8
  **purposes** [2] - 15:23,
102:14
  **pursuant** [2] - 114:21,
118:8
  **purview** [2] - 96:14, 98:14
  **push** [3] - 85:7, 85:8, 92:23
  **put** [19] - 16:21, 18:3,
25:20, 26:22, 26:24, 41:6,
50:19, 62:22, 70:11, 70:19,
76:22, 89:4, 89:13, 91:25,
92:1, 92:16, 92:20, 92:22,
100:7
  **putting** [2] - 18:3, 31:9

# Q

  **qualified** [2] - 52:16, 62:24
  **qualifies** [1] - 52:7
  **qualify** [2] - 9:19, 9:25
  **questions** [13] - 25:15,
25:16, 26:14, 27:13, 42:20,

56:5, 57:25, 59:16, 60:16, 62:15, 71:22, 86:10, 93:16
**quick** [3] - 27:9, 110:21
**quicker** [1] - 46:24

## R

**R-a-g-h-a-v-a-n** [1] - 64:11
**RA** [1] - 88:7
**Raghaven** [4] - 63:24, 64:8, 104:16, 104:17
**RAGHAVEN** [2] - 3:6, 64:5
**raise** [1] - 25:12
**ran** [2] - 34:9, 35:1
**randomly** [1] - 6:15
**rather** [4] - 90:24, 104:10, 105:22, 117:8
**reach** [1] - 108:12
**reached** [2] - 104:8, 104:9
**reactions** [1] - 30:25
**read** [4] - 24:16, 25:24, 26:21, 33:23
**reading** [5] - 21:11, 21:16, 22:2, 22:5, 24:13
**ready** [4] - 4:6, 20:20, 63:22, 94:8
**real** [2] - 28:21, 56:25
**really** [14] - 9:10, 45:10, 46:22, 47:1, 56:13, 56:24, 57:2, 60:20, 61:4, 61:12, 63:12, 91:21, 94:2, 112:12
**REALTIME** [1] - 118:5
**reask** [2] - 20:22, 84:16
**reason** [2] - 40:19, 47:16
**reasons** [3] - 97:9, 97:10, 97:11
**reassigned** [1] - 88:7
**recant** [1] - 103:8
**receive** [3] - 98:12, 101:14, 101:17
**received** [12] - 16:3, 16:5, 75:1, 96:20, 101:19, 105:20, 107:18, 110:3, 110:5, 112:18, 116:10, 116:12
**recognize** [8] - 14:7, 14:12, 14:17, 14:23, 16:15, 86:24, 109:3, 114:16
**recollection** [28] - 20:16, 20:19, 20:22, 24:14, 25:18, 25:19, 26:1, 26:19, 27:6, 27:18, 28:22, 29:3, 40:5, 41:20, 41:24, 42:9, 43:3, 43:15, 50:24, 58:6, 58:7, 58:8, 58:17, 58:19, 62:11, 112:2, 112:10, 113:9
**reconsider** [1] - 45:21
**recontact** [1] - 98:14
**recontacting** [1] - 105:8
**record** [20] - 4:18, 25:13, 27:3, 28:24, 35:12, 37:22,

45:20, 62:22, 64:7, 86:17, 86:21, 87:1, 87:10, 87:12, 87:13, 87:23, 94:14, 101:23, 109:2, 114:15
**recordation** [1] - 45:16
**recorded** [6] - 109:15, 110:13, 110:14, 114:19, 116:19
**recording** [14] - 102:7, 102:15, 109:6, 109:22, 110:19, 110:22, 110:25, 111:1, 111:13, 111:17, 115:19, 115:25, 116:25, 117:14
**Recording** [2] - 3:18, 3:19
**records** [18] - 5:19, 15:15, 21:4, 21:5, 21:6, 22:23, 23:23, 23:24, 24:3, 28:4, 46:1, 61:10, 62:25, 83:8, 104:11, 105:17, 105:19, 106:1
**RECROSS** [2] - 60:18, 93:17
**recross** [2] - 16:8, 42:23
**Recross** [2] - 3:5, 3:8
**RECROSS-EXAMINATION** [2] - 60:18, 93:17
**Recross-Examination** [2] - 3:5, 3:8
**Redirect** [2] - 3:4, 3:7
**redirect** [1] - 42:23
**REDIRECT** [2] - 58:4, 92:11
**Redirect-Examination** [1] - 3:4
**REDIRECT-EXAMINATION** [1] - 58:4
**refer** [5] - 20:10, 20:18, 20:19, 28:21, 70:3
**reference** [1] - 36:4
**referred** [1] - 37:23
**referring** [4] - 15:8, 25:18, 41:13, 41:16
**reflect** [3] - 23:10, 45:16, 109:2
**reflected** [2] - 5:12, 23:4
**reflections** [1] - 44:22
**refresh** [10] - 20:16, 20:19, 25:18, 26:1, 26:19, 27:5, 28:22, 42:9, 43:3, 43:15, 113:8
**refreshed** [6] - 20:22, 25:19, 29:3, 40:5, 41:20, 41:23
**refreshing** [3] - 24:14, 42:16, 58:19
**regarding** [5] - 33:25, 38:24, 42:2, 60:1, 105:23
**regardless** [1] - 58:18
**regards** [1] - 95:15

**regular** [4] - 10:22, 15:20, 47:10, 63:7
**regulations** [2] - 95:9, 118:12
**REJECTED** [1] - 3:15
**related** [1] - 68:4
**relation** [10] - 49:17, 95:19, 96:2, 96:3, 99:10, 100:18, 101:7, 104:10, 105:13, 107:17
**relationship** [1] - 59:19
**relevancy** [1] - 25:15
**relevant** [1] - 63:6
**religious** [1] - 79:9
**rely** [1] - 110:23
**remarks** [1] - 15:4
**remember** [38] - 25:17, 27:11, 27:15, 33:24, 43:17, 43:19, 58:10, 58:21, 58:24, 59:1, 59:2, 59:3, 62:12, 62:13, 66:18, 67:21, 68:8, 72:12, 74:11, 74:12, 74:15, 74:22, 76:15, 76:19, 80:4, 82:11, 82:12, 83:19, 83:25, 84:1, 84:2, 87:18, 88:3, 88:18, 90:16, 103:20, 106:16, 117:17
**Rena** [2] - 4:10, 4:19
**RENA** [2] - 3:3, 4:16
**repeat** [9] - 22:9, 41:18, 44:15, 52:14, 55:22, 97:10, 98:16, 98:19, 103:7
**rephrase** [2] - 22:13, 59:23
**report** [9] - 6:7, 24:19, 63:2, 63:4, 63:6, 63:7, 88:16, 89:10, 92:14
**Report** [12] - 3:17, 5:7, 5:9, 5:13, 5:14, 14:18, 15:1, 15:17, 90:22, 105:24, 105:25, 107:7
**reported** [7] - 111:1, 111:13, 111:17, 116:25, 117:14, 117:23, 118:10
**REPORTER** [4] - 1:23, 112:4, 118:1, 118:6
**Reporter** [1] - 118:20
**reporter** [2] - 64:2, 73:9
**REPORTER'S** [1] - 1:13
**Reports** [1] - 107:12
**representative** [10] - 5:24, 5:25, 6:19, 6:21, 6:23, 7:2, 7:4, 15:3, 15:7, 29:20
**Request** [1] - 17:21
**request** [5] - 6:2, 6:4, 6:5, 84:21, 84:23
**requesting** [1] - 6:2
**required** [3] - 41:6, 87:6, 87:7
**requires** [2] - 43:10, 89:10
**reread** [1] - 114:2

**research** [5] - 17:11, 65:19, 65:20, 66:10
**researched** [1] - 17:10
**resolve** [3] - 84:13, 84:17, 84:18
**respect** [2] - 42:9, 55:21, 63:10
**respects** [1] - 95:16
**respond** [5] - 25:25, 54:13, 65:12, 65:13, 66:7
**responded** [1] - 66:16
**response** [2] - 65:14, 65:15
**responsibility** [1] - 42:6
**responsible** [2] - 40:17, 40:23
**rest** [3] - 62:18, 114:4, 114:5
**result** [22] - 35:1
**return** [22] - 5:11, 7:17, 10:22, 17:4, 17:6, 34:20, 35:2, 36:14, 36:19, 56:9, 65:2, 65:9, 65:23, 66:2, 67:11, 67:17, 67:18, 67:21, 80:7, 80:16, 80:19, 89:25
**returns** [7] - 10:24, 11:11, 64:21, 64:22, 64:23, 64:24, 65:4
**Revenue** [103] - 4:10, 4:25, 5:6, 5:9, 5:12, 5:14, 9:21, 9:24, 10:9, 12:1, 12:16, 13:3, 15:21, 15:24, 18:6, 18:9, 19:2, 19:19, 21:21, 22:7, 22:10, 22:22, 24:8, 24:23, 28:7, 31:11, 31:13, 31:15, 34:9, 35:1, 35:15, 36:21, 36:25, 37:4, 44:7, 44:18, 44:22, 45:16, 47:3, 52:20, 57:24, 59:7, 59:9, 59:18, 59:24, 60:1, 60:21, 60:25, 61:9, 62:4, 62:6, 64:17, 70:22, 71:5, 88:7, 90:22, 94:18, 95:1, 95:5, 95:11, 95:14, 95:15, 95:16, 95:20, 96:4, 96:11, 96:21, 98:2, 101:4, 101:5, 103:22, 104:7, 104:13, 104:14, 104:16, 104:24, 104:25, 105:23, 105:25, 106:9, 106:17, 106:20, 106:24, 107:7, 107:12, 107:21, 108:21, 109:7, 109:19, 110:15, 111:25, 112:16, 114:19, 116:3, 116:20
**revenue** [5] - 4:25, 5:3, 5:17, 6:9, 8:2, 9:2, 9:18, 10:2, 13:4, 15:8, 37:1, 37:4, 37:7, 41:4, 48:15, 48:21, 49:4, 53:22, 62:3, 64:17, 64:20, 67:20, 67:22, 68:3,

68:7, 70:19, 72:5, 72:6,
72:10, 72:17, 98:8, 98:13,
99:1, 100:11, 100:16,
101:11, 101:16, 101:24,
102:7, 102:15, 102:23,
102:25, 109:10, 109:18,
111:19, 112:18, 112:22,
112:25, 115:9, 115:15
  **review** [3] - 6:3, 33:20, 51:8
  **reviewing** [4] - 5:19, 28:24,
50:4, 58:7
  **reviews** [4] - 50:11, 50:14,
50:15, 59:13
  **revisit** [1] - 113:8
  **RGS** [1] - 17:6
  **rights** [3] - 81:19, 81:21,
81:23
  **rise** [2] - 25:8, 62:20
  **role** [3] - 11:15, 11:16,
99:24
  **ROOM** [1] - 1:24
  **rude** [1] - 78:25
  **ruling** [1] - 62:23
  **run** [1] - 25:2
  **runnings** [1] - 15:24
  **rush** [1] - 73:6

### S

  **safe** [3] - 115:15, 115:16,
115:17
  **safety** [1] - 115:9
  **SANTA** [3] - 1:17, 1:24, 4:1
  **Santa** [1] - 2:7
  **satisfied** [1] - 60:13
  **save** [1] - 68:13
  **saw** [2] - 37:23, 60:2
  **schedule** [3] - 83:12, 83:13,
92:23
  **Schedule** [6] - 9:7, 73:22,
73:23, 73:25
  **scheduled** [4] - 18:5, 47:5,
48:25, 114:21
  **scope** [1] - 59:20
  **search** [2] - 57:18, 57:21
  **searching** [1] - 57:12
  **seasoned** [1] - 9:11
  **seated** [2] - 4:5, 20:3
  **second** [15] - 22:1, 39:15,
80:10, 80:17, 80:18, 80:23,
80:25, 82:1, 82:23, 83:4,
83:5, 83:10, 83:11, 85:2,
91:19
  **Section** [1] - 118:8
  **secure** [1] - 105:17
  **see** [28] - 16:25, 18:16,
20:14, 24:12, 30:19, 31:1,
34:17, 36:4, 37:15, 40:18,
47:10, 47:16, 50:2, 50:5,
50:20, 87:9, 88:4, 88:7,

88:10, 88:12, 90:2, 90:5,
90:9, 91:4, 112:13, 112:14,
116:16
  **seeing** [1] - 79:6
  **selected** [2] - 6:14, 6:15
  **seminars** [3] - 100:16,
100:24, 101:11
  **send** [3] - 65:11, 87:14,
87:16
  **sending** [1] - 7:15
  **senior** [4] - 7:24, 9:11, 9:18,
100:24
  **sense** [2] - 31:5, 31:7
  **sensitive** [2] - 92:17, 101:9
  **sent** [3] - 66:4, 82:12, 82:16
  **sentence** [1] - 8:8
  **separate** [7] - 38:13, 39:1,
39:2, 39:3, 39:5, 94:24, 95:7
  **September** [6] - 64:19,
72:6, 73:13, 73:15, 74:4,
118:15
  **serious** [1] - 97:13
  **service** [2] - 63:1, 95:18
  **Service** [20] - 4:25, 15:21,
15:24, 19:2, 64:17, 95:1,
95:5, 95:11, 95:14, 95:15,
95:17, 95:21, 96:4, 96:11,
96:21, 98:2, 101:4, 101:5,
110:15, 116:20
  **set** [9] - 5:23, 6:1, 49:19,
54:23, 83:5, 83:8, 84:24,
104:13, 108:20
  **setting** [1] - 85:2
  **several** [2] - 46:24, 49:7
  **several-year** [1] - 46:24
  **SEVERO** [35] - 2:10, 2:10,
8:7, 10:4, 10:8, 12:22, 63:19,
69:5, 70:25, 72:2, 86:13,
86:16, 86:19, 86:22, 92:9,
93:18, 94:4, 96:6, 97:23,
99:4, 99:18, 102:10, 102:12,
102:18, 103:23, 104:2,
107:25, 108:14, 110:2,
111:22, 112:3, 112:5, 112:8,
112:20, 116:9
  **Severo** [3] - 3:7, 3:8, 71:23
  **SHAH** [1] - 1:8
  **Shah** [80] - 12:2, 13:8,
13:18, 13:24, 16:19, 20:6,
22:19, 22:22, 23:18, 23:25,
24:22, 26:16, 27:22, 28:7,
28:17, 29:6, 29:24, 30:2,
31:18, 32:4, 40:6, 41:10,
41:13, 43:14, 46:6, 49:24,
50:5, 51:2, 51:5, 51:7, 52:21,
53:2, 53:4, 53:11, 58:7,
58:18, 59:25, 60:22, 61:1,
61:8, 61:9, 61:21, 61:23,
62:1, 66:15, 66:16, 68:16,
71:9, 71:20, 75:15, 76:16,

76:25, 77:16, 78:23, 79:24,
80:5, 80:6, 80:8, 82:2, 87:4,
88:25, 91:20, 92:24, 104:8,
104:9, 104:14, 104:16,
104:18, 104:23, 105:1,
105:11, 105:15, 106:2,
107:22, 108:21, 109:7,
110:14, 114:20, 116:21
  **Shah's** [8] - 3:17, 12:4,
13:14, 34:20, 60:2, 74:19,
105:14, 115:3
  **Shahs** [1] - 80:2
  **shareholder** [1] - 68:13
  **shareholders** [1] - 68:6
  **sheet** [3] - 17:9, 38:11, 39:1
  **shock** [12] - 70:13, 70:14,
76:8, 76:12, 76:14, 76:15,
76:16, 76:18, 85:4, 85:5,
91:10, 91:17
  **shocked** [1] - 83:14
  **short** [3] - 74:25, 112:19,
112:25
  **shortly** [2] - 13:23, 111:24
  **show** [5] - 16:23, 41:9,
63:10, 86:22, 111:4
  **side** [4] - 19:16, 22:7, 22:8,
22:11
  **sides** [1] - 60:8
  **signals** [1] - 12:23
  **significant** [5] - 89:13,
89:18, 91:7, 91:15, 91:16
  **similar** [1] - 93:10
  **single** [1] - 100:19
  **sister** [2] - 68:24, 92:1
  **sit** [2] - 49:19, 111:21
  **sitting** [1] - 85:14
  **situation** [3] - 93:3, 102:3,
103:1
  **six** [2] - 27:4, 85:12
  **small** [6] - 67:10, 67:12,
67:16, 79:2, 79:4, 80:23
  **smaller** [1] - 14:4
  **smooth** [2] - 11:19, 61:25
  **smoother** [1] - 25:7
  **smoothly** [3] - 33:3, 58:12,
60:12
  **solely** [1] - 96:14
  **someone** [1] - 9:18
  **sometime** [4] - 74:11,
74:15, 82:14, 82:16
  **sometimes** [5] - 5:23,
17:15, 17:16, 101:23, 115:4
  **somewhere** [1] - 82:25
  **soon** [1] - 76:22
  **sooner** [2] - 47:6
  **sorry** [11] - 12:22, 21:18,
22:9, 24:11, 24:21, 26:9,
28:12, 33:13, 33:17, 41:2,
55:5, 56:2, 61:8, 84:17,
112:4, 112:21

  **sort** [1] - 79:9
  **sounds** [1] - 29:11
  **source** [1] - 63:10
  **South** [1] - 2:11
  **SOUTHERN** [1] - 1:2
  **Spaan** [1] - 118:20
  **SPAAN** [3] - 1:23, 118:5,
118:19
  **speaking** [2] - 79:17, 98:21
  **special** [4] - 12:13, 94:20,
96:24, 99:15
  **Special** [2] - 94:10, 116:14
  **specific** [4] - 10:25, 38:9,
46:7, 105:1
  **specifically** [3] - 47:16,
48:10, 91:19
  **specificity** [1] - 30:23
  **specifics** [1] - 113:1
  **speculation** [2] - 45:5,
108:14
  **Speculation** [1] - 32:15
  **spell** [4] - 4:18, 64:7, 64:10,
94:14
  **Stage** [1] - 48:6
  **stages** [1] - 47:8
  **stall** [1] - 101:21
  **stand** [5] - 4:15, 20:2, 26:8,
64:2, 64:4
  **start** [9] - 18:1, 47:21,
47:22, 50:25, 51:1, 73:8,
96:19, 97:14, 117:8
  **started** [23] - 8:22, 9:7,
28:3, 28:4, 32:18, 32:21,
33:8, 39:23, 40:20, 55:7,
55:16, 64:19, 68:23, 70:1,
71:6, 72:6, 72:12, 72:16,
72:17, 73:13, 73:15, 91:2,
96:20
  **starting** [4] - 7:15, 98:11,
104:10
  **starts** [2] - 7:22, 39:10
  **state** [19] - 4:17, 64:6, 69:7,
70:13, 70:14, 71:3, 76:8,
76:11, 76:14, 76:15, 76:16,
76:17, 85:4, 85:5, 91:10,
91:17, 94:13, 101:20, 104:4
  **STATE** [1] - 118:4
  **statements** [1] - 106:3
  **STATES** [2] - 1:1, 1:5
  **States** [6] - 2:4, 2:5, 2:6,
118:6, 118:8, 118:13
  **statistics** [1] - 34:15
  **stenographically** [1] -
118:10
  **step** [5] - 47:7, 62:17, 94:5,
103:4, 107:20
  **still** [11] - 22:5, 49:22,
69:12, 70:11, 71:8, 75:5,
76:11, 76:16, 83:15, 85:5
  **stop** [2] - 117:9, 117:11

12

**stopped** [1] - 51:22
**story** [4] - 19:16, 22:7, 22:8, 60:9
**strategy** [3] - 35:18, 35:19, 35:21
**Street** [1] - 2:6
**STREET** [1] - 1:24
**stricken** [1] - 102:13
**strictly** [1] - 7:4
**strike** [7] - 44:17, 45:1, 45:3, 51:20, 69:5, 102:12, 108:14
**strong** [1] - 104:23
**stuck** [1] - 114:2
**subject** [3] - 11:1, 43:9, 103:8
**submit** [1] - 6:2
**subsequent** [4] - 34:5, 34:7, 35:24, 36:1
**substantially** [1] - 36:20
**substantiate** [1] - 7:16
**Suite** [3] - 2:7, 2:11, 2:15
**summary** [1] - 40:24
**summonses** [1] - 105:16
**supposed** [4] - 82:9, 82:10, 113:12, 115:2
**sustained** [8] - 18:8, 18:14, 30:17, 31:25, 45:6, 53:8, 102:11, 108:1
**swami** [3] - 79:4, 79:6, 79:7
**SWAMI** [1] - 79:7
**SWORN** [3] - 4:16, 64:5, 94:12
**system** [1] - 17:6

**T**

**table** [1] - 113:4
**tail** [1] - 105:25
**talks** [1] - 75:11
**Tamil** [2] - 79:11
**TAMIL** [1] - 79:12
**tape** [1] - 117:5
**tax** [31] - 5:11, 7:17, 9:8, 9:10, 9:16, 10:22, 10:24, 11:11, 17:6, 33:9, 33:25, 35:16, 36:9, 36:13, 36:22, 56:21, 57:8, 57:9, 64:21, 64:22, 64:23, 64:24, 65:2, 65:4, 65:9, 66:2, 67:11, 73:6, 96:8, 96:12, 100:1
**Tax** [1] - 94:21
**TAX** [1] - 2:13
**taxes** [2] - 72:24, 100:4
**taxpayer** [77] - 5:22, 5:23, 6:17, 6:18, 6:19, 6:20, 7:6, 7:16, 15:3, 15:7, 17:12, 17:15, 17:23, 19:1, 19:7, 19:15, 19:25, 21:3, 21:21, 22:17, 22:19, 23:6, 23:7,

23:18, 29:20, 30:13, 32:23, 36:25, 40:11, 40:16, 41:7, 42:14, 56:17, 59:18, 60:7, 60:11, 61:15, 68:14, 69:17, 69:21, 75:11, 81:23, 89:4, 89:15, 89:21, 89:24, 90:21, 92:21, 97:11, 97:12, 98:1, 98:12, 98:14, 98:16, 98:18, 98:23, 99:11, 99:13, 100:3, 100:9, 101:24, 102:5, 103:4, 107:15, 107:17, 107:22, 109:11, 109:14, 109:18, 111:19, 111:25, 112:23, 113:1, 113:18, 113:22, 114:11
**Taxpayer** [1] - 90:7
**taxpayer's** [5] - 17:19, 30:25, 57:12, 57:21, 81:23
**taxpayers** [9] - 30:7, 30:18, 66:8, 84:3, 97:9, 100:20, 100:21, 101:7, 108:13
**telephone** [6] - 17:13, 27:22, 65:18, 65:20, 66:9, 109:7
**ten** [5] - 48:16, 48:21, 49:4, 65:12, 65:16
**tenor** [1] - 59:3
**term** [1] - 35:11
**terms** [9] - 10:16, 30:13, 30:18, 30:25, 36:11, 36:18, 60:1, 100:9, 115:13
**test** [1] - 25:23
**testified** [6] - 20:25, 41:19, 43:13, 49:11, 59:6, 75:2
**testify** [3] - 40:15, 41:3, 57:11
**testifying** [4] - 38:15, 38:20, 39:4, 85:21
**testimony** [3] - 41:15, 42:11, 86:6
**THE** [150] - 2:3, 2:9, 2:10, 3:3, 3:6, 3:9, 4:4, 4:9, 4:12, 4:17, 4:19, 4:20, 8:9, 8:18, 10:6, 12:19, 12:24, 13:1, 15:11, 15:14, 16:3, 16:9, 18:8, 18:14, 19:9, 19:10, 20:2, 20:5, 20:17, 21:13, 21:17, 22:13, 23:1, 24:14, 24:19, 24:21, 25:2, 25:4, 25:8, 25:10, 25:12, 25:22, 25:23, 26:4, 26:5, 26:6, 26:7, 26:11, 26:14, 26:22, 26:24, 27:1, 27:2, 27:7, 27:10, 27:17, 27:18, 27:20, 28:13, 30:17, 30:22, 31:25, 32:16, 32:18, 34:12, 34:13, 37:10, 38:5, 38:17, 39:10, 41:16, 41:18, 42:12, 42:13, 42:14, 43:1, 45:6, 45:22, 48:19, 52:13, 52:14, 52:23, 52:25,

53:8, 53:14, 53:15, 55:1, 58:1, 59:21, 60:17, 62:16, 62:20, 62:22, 63:18, 63:20, 63:22, 63:25, 64:6, 64:8, 64:10, 64:11, 69:7, 69:8, 71:2, 71:23, 86:20, 92:10, 94:5, 94:7, 94:8, 94:11, 94:13, 94:15, 96:7, 97:24, 97:25, 99:5, 99:6, 99:19, 102:11, 102:13, 102:19, 103:24, 104:1, 104:4, 104:7, 108:1, 108:16, 108:17, 109:1, 109:4, 110:1, 110:3, 110:8, 110:20, 111:23, 112:4, 112:7, 112:9, 112:12, 112:21, 113:10, 114:14, 116:8, 116:10, 116:24, 117:7, 117:10, 117:12, 117:16
**thereafter** [1] - 13:23
**therefore** [1] - 100:3
**they've** [2] - 18:21, 47:4
**thinking** [1] - 97:18
**thorough** [1] - 57:2
**threaten** [1] - 95:23
**three** [21] - 23:14, 36:15, 36:16, 37:22, 38:12, 39:6, 39:22, 40:7, 40:12, 42:18, 43:2, 47:11, 47:13, 53:4, 66:25, 67:3, 67:4, 76:14, 82:4, 82:21, 107:12
**throughout** [1] - 113:18
**thrus** [1] - 11:3
**TIGTA** [44] - 29:22, 29:23, 29:24, 30:2, 30:4, 30:5, 70:4, 75:12, 75:20, 75:22, 75:23, 76:2, 76:3, 76:9, 76:11, 77:20, 77:22, 78:20, 81:4, 85:9, 85:10, 92:16, 94:22, 94:23, 94:24, 95:5, 95:9, 95:11, 95:14, 95:15, 95:19, 96:8, 96:14, 97:12, 99:1, 99:24, 100:1, 100:3, 100:7, 100:15, 102:21, 103:2, 111:18
**timeline** [1] - 82:7
**timely** [1] - 11:19
**Title** [1] - 118:8
**today** [1] - 85:21
**today's** [1] - 76:17
**together** [2] - 38:25, 40:8
**tolerate** [1] - 61:23
**took** [6] - 44:5, 49:7, 57:23, 63:3, 71:14, 80:4
**tool** [6] - 17:11, 34:17, 34:19, 56:22, 65:19, 65:20
**top** [2] - 37:23, 112:12
**topic** [1] - 26:15
**total** [1] - 51:25
**totally** [1] - 51:10

**towards** [3] - 66:22, 105:25, 106:4
**train** [3] - 8:23, 49:2, 49:8
**trainee** [6] - 8:21, 10:19, 10:21, 10:23, 11:12, 11:20
**trainees** [4] - 9:13, 10:18, 10:25, 18:22
**training** [85] - 7:20, 7:22, 7:23, 7:24, 8:5, 8:6, 8:16, 8:20, 9:6, 9:8, 9:9, 9:14, 9:17, 9:19, 9:22, 9:24, 9:25, 10:12, 10:13, 10:15, 11:6, 11:8, 11:10, 11:11, 12:1, 12:4, 18:10, 18:20, 18:21, 18:22, 18:23, 32:25, 46:17, 46:23, 47:4, 47:5, 47:8, 47:15, 47:19, 47:20, 47:21, 47:22, 47:23, 47:25, 48:5, 48:14, 48:16, 48:22, 48:25, 49:5, 49:11, 50:11, 55:21, 55:22, 63:4, 72:22, 72:24, 72:25, 73:1, 73:2, 73:7, 73:14, 73:17, 73:18, 73:21, 74:6, 74:7, 74:8, 74:9, 74:13, 74:14, 74:15, 74:23, 74:24, 74:25, 75:6, 75:9, 75:13, 81:3, 89:10, 100:16
**transcript** [7] - 110:7, 110:13, 110:22, 110:24, 116:19, 118:9, 118:11
**TRANSCRIPT** [1] - 1:13
**transcripts** [1] - 17:7
**transfer** [2] - 71:15, 92:15
**transferred** [4] - 87:25, 88:2, 88:3, 91:4
**transpired** [1] - 31:6
**travel** [1] - 82:4
**Treasury** [1] - 94:20
**treasury** [3] - 29:7, 94:25, 96:1
**TRIAL** [1] - 1:14
**tried** [1] - 80:5
**trip** [1] - 66:21
**trouble** [2] - 66:24, 69:23
**true** [9] - 46:12, 84:9, 84:11, 89:19, 100:21, 102:4, 113:22, 114:11, 118:9
**truly** [2] - 60:20, 115:9
**trustworthiness** [1] - 63:10
**truth** [5] - 71:2, 98:5, 99:10, 103:24, 104:2
**try** [4] - 19:12, 26:6, 73:11, 103:5
**trying** [9] - 21:7, 27:15, 29:9, 29:12, 48:12, 49:6, 97:22, 97:25, 103:3
**turning** [2] - 43:22, 43:23
**two** [19] - 19:12, 27:14, 32:20, 39:18, 43:18, 65:17, 66:25, 67:3, 67:4, 68:4,

13

68:15, 74:17, 76:14, 76:23, 80:2, 82:21, 105:10, 108:11, 108:13
**two-minute** [1] - 76:23
**type** [5] - 9:12, 10:24, 29:21, 70:13, 93:3
**typical** [9] - 5:21, 8:4, 13:21, 30:19, 31:1, 31:4, 31:5, 100:13, 103:12
**typically** [9] - 6:15, 7:8, 23:22, 31:10, 34:4, 34:7, 34:15, 40:21, 96:22

## U

**U.S** [1] - 1:3
**ultimate** [1] - 56:21
**ultimately** [1] - 28:4
**uncomfortable** [2] - 84:4, 84:7
**under** [1] - 67:18
**undergo** [1] - 46:16
**underreported** [2] - 35:10, 35:12
**underreporting** [1] - 36:17
**understandable** [2] - 20:25, 23:11
**understated** [1] - 35:23
**understood** [1] - 105:19
**unfair** [1] - 25:14
**unique** [1] - 95:2
**United** [6] - 2:4, 2:5, 2:6, 118:6, 118:8, 118:13
**UNITED** [2] - 1:1, 1:5
**unsolicited** [2] - 112:17, 112:23
**unusual** [2] - 57:14, 57:16
**up** [36] - 5:23, 7:14, 16:7, 16:23, 17:25, 18:1, 19:1, 21:9, 21:19, 29:13, 31:20, 35:15, 37:23, 47:9, 52:21, 53:1, 53:4, 61:8, 61:9, 61:21, 67:7, 76:25, 79:16, 83:5, 83:8, 88:12, 88:13, 88:20, 88:21, 88:23, 100:15, 104:14, 108:20, 109:9, 112:10, 117:21
**upset** [2] - 60:7, 60:8

## V

**variance** [3] - 35:2, 35:3, 35:9
**various** [1] - 97:9
**vary** [3] - 47:18, 48:12, 48:13
**verification** [1] - 61:13
**verify** [5] - 6:6, 6:7, 7:10, 7:12, 30:2
**verifying** [1] - 36:19

**versus** [1] - 17:17
**viewing** [1] - 52:16
**violations** [2] - 95:20
**Virginia** [1] - 86:2
**Volume** [2] - 1:8, 117:24
**vs** [1] - 1:7

## W

**WAIER** [94] - 2:5, 4:8, 4:10, 4:22, 8:11, 8:19, 10:9, 13:3, 15:16, 16:1, 16:6, 16:10, 18:9, 18:15, 19:17, 20:6, 20:18, 21:18, 22:14, 23:3, 24:22, 26:13, 27:3, 27:8, 27:21, 28:12, 28:14, 30:18, 30:24, 32:1, 32:22, 34:14, 37:9, 38:4, 38:16, 39:8, 41:14, 42:11, 42:25, 45:5, 48:18, 52:12, 52:22, 52:24, 53:7, 53:13, 54:25, 58:3, 58:5, 59:24, 63:16, 63:24, 64:13, 69:15, 71:5, 71:22, 92:12, 93:16, 94:10, 94:17, 96:8, 98:3, 99:7, 99:20, 102:14, 102:20, 103:25, 104:6, 104:25, 108:2, 108:20, 109:2, 109:5, 109:24, 110:6, 110:9, 110:18, 111:2, 111:14, 111:18, 111:24, 112:14, 112:22, 113:7, 113:11, 114:15, 116:6, 116:13, 117:1, 117:4, 117:8, 117:11, 117:13, 117:15
**Waier** [14] - 3:3, 3:4, 3:6, 3:7, 3:9, 4:6, 27:20, 30:23, 59:23, 63:22, 83:20, 86:8, 92:10, 94:8
**wait** [10] - 25:4, 33:13, 33:16, 35:4, 37:18, 41:25, 65:15, 81:12, 81:13, 108:2
**waited** [4] - 82:5, 82:17, 82:19, 87:18
**waiting** [4] - 106:2, 107:2, 107:4, 108:17
**walk** [1] - 76:23
**walking** [1] - 49:22
**WAS** [3] - 4:16, 64:5, 94:12
**WEDNESDAY** [2] - 1:15, 4:1
**week** [4] - 73:15, 74:4, 74:5, 105:10
**weeks** [10] - 50:23, 51:1, 51:4, 51:25, 52:4, 52:15, 59:7, 59:10, 108:12, 108:13
**weight** [1] - 63:12
**WEST** [1] - 1:24
**West** [1] - 2:6
**whole** [2] - 31:6, 58:12

**willing** [1] - 99:14
**WILSON** [2] - 2:13, 2:14
**withdraw** [1] - 112:8
**WITHDRAWN** [1] - 3:14
**Witherspoon** [4] - 78:4, 78:18, 78:20, 81:14
**witness** [12] - 4:7, 25:6, 25:14, 25:15, 27:4, 30:16, 62:25, 63:23, 64:4, 94:9, 108:15
**WITNESS** [36] - 4:16, 4:19, 19:10, 20:5, 24:21, 25:2, 25:22, 26:4, 26:6, 26:22, 27:1, 27:10, 27:18, 32:18, 34:13, 39:10, 41:18, 42:12, 42:14, 52:14, 52:23, 53:15, 64:5, 64:8, 64:11, 69:8, 94:7, 94:12, 94:15, 97:25, 99:6, 104:7, 108:17, 109:4, 112:12, 112:21
**WITNESSES** [1] - 3:2
**word** [2] - 27:11, 27:15
**world** [1] - 68:23
**write** [9] - 42:7, 88:13, 89:10, 91:13, 91:18, 91:25, 92:3, 92:13, 113:1
**writing** [1] - 91:22
**written** [1] - 110:22
**wrote** [7] - 23:17, 24:24, 45:11, 89:18, 91:22, 91:24

## Y

**year** [12] - 12:8, 13:16, 33:8, 34:4, 34:5, 34:6, 34:7, 34:8, 35:22, 35:24, 46:24, 111:9
**years** [25] - 5:2, 8:12, 27:4, 30:7, 30:12, 33:9, 33:25, 35:16, 36:1, 36:9, 36:22, 48:17, 48:21, 49:5, 49:7, 51:13, 51:16, 58:11, 58:21, 63:1, 74:17, 94:22, 96:25, 97:1, 107:12
**Yorba** [1] - 2:16
**yourself** [2] - 5:17, 100:7
**Yu** [3] - 88:15, 91:23

**UNITED STATES DISTRICT COURT**